UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


W444444444444444444444444447
                          5
MARY E. BASS,             5
                          5
        Plaintiff,        5
                          5
        v.                5
                          5 Case No.
SHEILA C. BAIR,           5 1:06CV01345
Chairman, FDIC            5
                          5
        Defendant.        5
                          5
W444444444444444444444444448

Wednesday, May 30, 2007


DEPOSITION OF:

        MARY E. BASS

called for examination by counsel for the
FDIC pursuant to notice of deposition in
Conference Room E7003 of the FDIC, 3501
Fairfax Drive, Arlington, VA 22226, at 1:30
p.m., when were present on behalf of the
respective parties:

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

Appearances:

On Behalf of the Plaintiff:

      DAVID H. SHAPIRO, ESQ.
Of:  Swick & Shapiro, P.C.
      1225 Eye Street, N.W.
      Suite 1290
      Washington, D.C. 20005
      (202)842-0300
      (202)842-1418 fax
      DHShapiro@SwickAndShapiro.com


On Behalf of the FDIC:

      BARBARA SARSHIK, ESQ.
      WILLIAM S. JONES, ESQ.
Of:  Federal Deposit Insurance Corporation
      Labor, Employment & Administration
      Section
      3501 Fairfax Drive, Room E-6012
      Arlington, VA 22226
      (703)562-2309
      (703)562-2482 fax
      Bsarshik@fdic.gov

**NEAL R. GROSS**  Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS  Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    www.nealrgross.com

I-N-D-E-X

WITNESS                          EXAMINATION

Mary E. Bass                              7

EXHIBITS    DESCRIPTION           IDENTIFIED

1        Exhibit 3A to the
         Report of Investigation       48

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433         WASHINGTON, D.C.  20005-3701         www.nealrgross.com

4

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2                                         1:28 P.M.

 3              THE REPORTER:  Please raise your

 4    right hand.

 5    Whereupon,

 6                    MARY E. BASS

 7    was called as a witness and, having been first

 8    duly sworn, was examined and testified as

 9    follows:

10              MS. SARSHIK:  Ms. Bass, my name is

11    Barbara Sarshik and I'll be taking your

12    deposition.  Have you ever been deposed

13    before?

14              THE WITNESS:  Yes.

15              MS. SARSHIK:  Okay.  I'll ask you

16    questions.  My questions and your answers will

17    be recorded by the Court Reporter.  Do you

18    understand that you need to speak up clearly

19    so that the Court Reporter can hear you

20    clearly?

21              THE WITNESS:  Yes.

22              MS. SARSHIK:  If you need a break
```

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.                              Exhibit 3
(202) 234-4433        WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1    at any time, you can tell me or your attorney

2    and we'll see what we can do about a break,

3    okay?

4                    THE WITNESS:  Yes.

5                    MS. SARSHIK:  I'm sure that your

6    attorney  has  told  you  this  but  let  me

7    reinforce;  if  you  want  to  talk  to  your

8    attorney, that's fine.  I just ask that you

9    finish your answer where in the middle of an

10   answer and then you can talk to your lawyer,

11   okay?

12                   THE WITNESS:  Yes.

13                   MS. SARSHIK:  Sometimes after you

14   give an answer you may realize that there's

15   something you want to clarify or something

16   else you've remembered and if that happens to

17   you,  just  tell  me  that  you  want  to  add

18   something and we'll do it while it's still

19   fresh in your mind.  Is that okay?

20                   THE WITNESS:  Yes.

21                   MS. SARSHIK:  And sometimes while

22   you're answering, you may think of documents

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.                     Exhibit 3
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    that may help you to elaborate upon your

2    answer.  If you do, tell us and we'll see if

3    we can get the documents so that you can have

4    them in front of you while you answer.  Is

5    that okay?

6                  THE WITNESS:  Yes.

7                  MS. SARSHIK:    Okay.    Are you

8    taking any medication of any kind today that

9    might effect your ability to understand and

10   answer my questions today?

11                 THE WITNESS:  I'm on Lorazepam.

12                 MR. SAGGESE:    And would your

13   taking Lorazepam effect your ability to

14   understand my questions?

15                 THE WITNESS:  No.

16                 MS. SARSHIK:  Would it effect your

17   ability to answer my questions?

18                 THE WITNESS:  No.

19                 MS. SARSHIK:  Okay, is there any

20   reason you can think of today why you would

21   not be able to answer my questions fully and

22   truthfully today?

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1        THE WITNESS:  No.

2        MS.  SARSHIK:   Okay,  thank  you.

3   I'd like to talk for a few minutes about your

4   background.

5   //

6        DIRECT EXAMINATION

7        BY MS. SARSHIK:

8        Q    Would you tell me first about your

9   education?

10       A    Could you clarify that?

11       Q    Sure.  Did you attend a college or

12   university?

13       A    Yes.

14       Q    What school?

15       A    University of Mississippi.

16       Q    And what degree or degrees did you

17   obtain?

18       A    I  hold  a  Bachelors  in  Political

19   Science   and   a   Masters   in   Public

20   Administration.

21       Q    Okay,  what  years  did  you  attend

22   University of Mississippi?

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1        A      Could you clarify that?

2        Q      When did you begin attending

3    University of Mississippi?

4        A      Fall of `79 through May 1984.

5        Q      And you attended continuously?

6        A      Yes.

7        Q      And by the time you were done in

8    1984, you had your Bachelor's and your

9    Master's.

10       A      Yes.

11       Q      Okay.  Did you receive any honors

12   or awards at University of Mississippi in

13   getting your Bachelor's degree?

14       A      It was a long time ago.

15       Q      Do you remember?

16       A      No.

17       Q      Okay.  Did you receive any honors

18   or awards at University of Mississippi in the

19   process of getting your Master's degree?

20       A      Yes, I did.

21       Q      And what honors or awards?

22       A      I was a member of Pi Alpha Alpha,

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

9

1    the national honorary society for public

2    administration.  I had a 3.5 GPA.

3         Q    And that was at the Master's

4    level.

5         A    Yes.

6         Q    Okay, what was your GPA at your

7    Bachelor's degree level?

8         A    I don't understand the question.

9         Q    Okay, by the time you obtained

10   your Bachelor's degree, what was your grade

11   point average for that period of time you were

12   at the University of Mississippi?

13        A    All four years?

14        Q    Yes.

15        A    I had an overall including from

16   summer school sessions of 3.03.

17        Q    Okay, thank you.  And did you

18   attend any other graduate or professional

19   school other than getting your Master's Degree

20   at University of Mississippi?

21        A    No.

22        Q    Okay.  What is your current title

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                      Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    at the FDIC?

2         A    I'm a Senior Community Affairs

3    Specialist.

4         Q    To whom do you report?

5         A    I report directly to Mr. Lee

6    Bowman.

7         Q    And to whom does Mr. Lee Bowman

8    report?

9         A    He reports to Mr. Robert Mooney.

10        Q    And to whom does Mr. Mooney

11   report?

12        A    Ms. Sandra Thompson.

13        Q    Thank you.  And before you held

14   that position, what was your position?

15        A    I was Chief of the Divisional

16   Contracting Unit within the Acquisition

17   Services Branch in the Division of

18   Administration.

19        Q    And that was the position you held

20   in February of 2005?

21        A    Yes.

22        Q    Before you held that position,

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS              Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    what position did you hold?

2         A    Before that position, I was the

3    Chief of the Program Compliance Unit within

4    the Acquisition Services Branch.

5         Q    For -- I'm sorry, would you say

6    that again?

7         A    I was the -- before the Chief of

8    the Divisional Contracting Unit, I was the

9    Chief of the Program Compliance Unit in the

10   Acquisition  Services  Branch  within  the

11   Division of Administration.

12        Q    And approximately what dates were

13   you in that position?

14        A    From    February    2003    through

15   September the 30th, 2003.

16        Q    Okay, and before that position,

17        A    Before  that  position,  I  was  a

18   Contractor Ethics Specialist.

19        Q    For the FDIC?

20        A    Yes.

21        Q    And  approximately  when  did  you

22   begin  in that job and when did you stop?

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                        Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701      www.nealrgross.com

1      A    In the summer of 1997 through

2    February 2003.

3      Q    Okay.  And before that position,

4    what did you hold?

5      A    I was a Senior Procurement

6    Analyst.

7      Q    For approximately what period of

8    time?

9      A    From 1994 through 1997.

10      Q    And that was with the FDIC?

11      A    That was with the FDIC and the

12    RTC.

13      Q    Okay.  And before that position,

14    what was your job?

15      A    Before that position, I was a

16    Contract Specialist.

17      Q    For approximately what period of

18    time?

19      A    I don't understand your question.

20    Are you asking for the FDIC or the RTC?

21      Q    Either one, FDIC or RTC.

22      A    I was a Contract Specialist at the

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS          Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433      WASHINGTON, D.C.  20005-3701      www.nealrgross.com

1    RTC.

2        Q    For approximately what period of

3    time?

4        A    From December `91 through March of

5    1993.

6        Q    And before then, where did you

7    work?

8        A    I worked at the National Gallery

9    of Art.

10       Q    And what kind of position?

11       A    Contract specialist position.

12       Q    For approximately what period of

13   time?

14       A    From March 1990 through December

15   `91.

16       Q    And before then, where you

17   employed?

18       A    Yes.

19       Q    By whom?

20       A    The US Department of the Navy.

21       Q    As?

22       A    Contract specialist.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1          Q     Okay.  For what period of time?

2          A     From July of 1989 through March of

3     1990.

4          Q     And before then?

5          A     Are you asking me --

6          Q     Before being a Contract Specialist

7     for the Navy, were you employed?

8          A     Yes.

9          Q     Okay, by whom?

10          A     The US Department of Education.

11          Q     And what was your position?

12          A     Contract specialist.

13          Q     For what period of time?

14          A     From August of 1987 through July

15     of 1989.

16          Q     And before then were you employed?

17          A     Yes.

18          Q     Okay, by whom?

19          A     The US Department of Defense.

20          Q     As what kind of position?

21          A     I was a Contract Quality Assurance

22     Specialist.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS        Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1          Q    Okay, for what period of time?

2          A    From April 1985 through August of

3      `87, 1987.

4          Q    And were you employed before then?

5          A    No.

6          Q    Okay.  When did you first -- in

7      what position were you when you first began to

8      supervise employees?

9          A    I was in the Chief of the Program

10     Compliance  Unit  within  the  Acquisition

11     Services Branch.

12         Q    Okay, so that was the job that you

13     started in about February 2003?

14         A    Yes.

15         Q    Reporting to Mr. Harris?

16         A    No.

17         Q    Who did you report to?

18         A    Mr. David K. McDermott.

19         Q    Okay.  And it was the job after

20     that when you reported to Mr. Harris.

21         A    Yes, and I started reporting to

22     him in October of 2003, October the 1st, 2003.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS          Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1      Q    Okay, okay, and you first began

2    supervising employees on or around -- in or

3    around February 2003.

4      A    Yes.

5      Q    How many employees?

6      A    There were approximately five

7    employees.

8      Q    Approximately what grade levels

9    were those five employees?

10     A    Is this the question dealing with

11   Mr. McDermott as my supervisor?

12     Q    In the job that you were in, in

13   the Chief of Program Compliance approximately

14   what were the grade levels of those five --

15     A    It was a 13, two 12s and I can't

16   recall the other two.

17     Q    Okay, and during that period of

18   time, what was your grade level?

19     A    CG 14.

20     Q    Okay.  In any position that you

21   were in before the RTC or FDIC did you file a

22   complaint or grievance about the way you were

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS          Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1      treated?

2              A      No.

3              Q      Okay.   And in any position that

4      you were in before the FDIC or RTC, did you

5      ever file any kind of claim saying that you

6      had been discriminated against?

7              A      No.

8              Q      Okay,   and   you   never   filed   a

9      complaint or claim before the FDIC or RTC

10     saying that you had been treated illegally.

11             A      No.

12             Q      Okay.   You say in your lawsuit

13     that Ms. Bridges Steely subjected you to a

14     hostile work environment when she called you

15     Missy during a meeting on February 3rd, 2005.

16     We'll discuss that incident soon.   For now, I

17     want to put that aside and talk about other

18     things that may or may not have occurred.

19     Were there any other things that Ms. Steely

20     said to you that you believe are part of your

21     hostile work environment claim?

22             A      Yes.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.     Exhibit 3
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    Q    Okay.  And what are those things

2    that she said to you?

3    A    In August of 2003, I was attending

4    a management meeting to discuss the upcoming

5    reorganization within ASB that would take

6    effect on October the 1st, 2003.  And Ms.

7    Steely made a very negative remark towards me

8    and stated that, "I don't need your

9    negativity," and I don't know why she did

10   that.  I didn't confront here in front of the

11   other managers.  I asked her after the meeting

12   to come to my office and I proceeded to say to

13   her, I said, I told her, I said, "Is this

14   because of my prior EEO case?"

15           And also she said, "No."  And then

16   I said, "Did Dave McDermott mention to you

17   about my prior EEO case," and she said, no, it

18   was just that she just was very nasty to me in

19   front of my colleagues.

20   Q    Okay.  Was there anything else

21   that Ms. Steely said to you that you believe

22   is part of your hostile work environment

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS            Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    claim?

2         A    Yes.    In about October of 2003,

3    she called me in her office and she says to

4    me, she says, "Mary, I'm hearing rumors that

5    you're saying bad things about me," and I

6    said, "No, I'm not.    I can't believe you

7    called me in your office for this," and I

8    immediately left out of there, after about

9    five minutes.

10        Then after that on or about --

11        Q    I'm sorry, before we go into

12   anything else, did she specify what kind of

13   bad things she heard you were saying?

14        A    No, she just said that she had

15   heard that I had said some bad things about

16   her and I told her, "I can't believe you

17   called me in your office for this type of

18   meeting," and I left after about five minutes.

19        Q    Okay.   Is there anything else that

20   you believe she said -- that Ms. Steely said

21   to you that you believe is part of your

22   hostile work environment claim?

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS            Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433         WASHINGTON, D.C.  20005-3701         www.nealrgross.com

1        A     Approximately   November/December

2    2003, she called me in her office and she

3    proceeded to tell me that the other managers

4    did  not  feel  comfortable  with  me  in  the

5    upcoming Corporate Success Award Nomination

6    Meeting that was going to take place the

7    upcoming week and I asked her,  I said, "Ann,

8    did Dave McDermott tell you about my prior EEO

9    case."  And she said, "No," she says, "I knew

10   about -- I was told about your case before I

11   even accepted this position."

12       Q     In that conversation when she said

13   that other managers did not feel comfortable

14   with you in CSA discussions, Corporate Success

15   Award discussions, did she say anything about

16   why they didn't feel comfortable with you or

17   the way in which they didn't feel comfortable

18   with you?

19       A     No, she would not tell me the

20   person who said it or the individuals who said

21   it and it made me feel very uncomfortable.

22       Q     Did she express any concern about

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1    whether you might dicuss with other employees

2    things that were said in confidence in a

3    meeting with managers?

4         A    To the best of my recollection,

5    she mentioned something like that but once

6    again, I said to her, "Ann, why are you

7    calling this meeting.  Did David McDermott

8    tell you something about me because he was

9    found guilty of discriminating against me in

10   my prior EEO complaint," and she would not

11   tell me what individuals felt uncomfortable

12   with me being in that upcoming meeting.

13        Q    Okay, and that conversation was in

14   November or December of `03?

15        A    November/December 2003 time frame.

16        Q    Okay, was there anything else that

17   Ms. Steely said that you believe is part of

18   your hostile work environment claim?

19        A    Yes.

20        Q    Okay, what is that?

21        A    In about August of 2004, she

22   called me in her office, once again, and I

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1    felt very uncomfortable.  One of my very good

2    friends has been deployed to Tampa and I'm

3    afraid she'll be going to Iraq and she said

4    that she had heard that I had said that the

5    reason why Lynn Carr-Hawkes was deployed,

6    militarily deployed, was because of her prior

7    position at the Defense Department.  And I

8    just told her, I said, "Ann, I don't believe

9    you keep calling me in here for this kind of

10   stuff."

11        Q    So Ms. Steely said that she had

12   heard that you had said what about Ms. Carr-

13   Hawkes?

14        A    That I had said that she was the

15   reason why Lynn Carr-Hawkes had been deployed.

16        Q    That Ms. Steely was the reason?

17        A    Yes.

18        Q    Okay, anything else that Ms.

19   Steely said that you believe is part of your

20   hostile work environment claim?

21        A    No.

22        Q    Okay.

**NEAL R. GROSS**  Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

Exhibit 3

1            MR. SHAPIRO:  Aside from the thing

2    that you --

3            MS. SARSHIK:   Right, aside from

4    February 3rd, 2005.

5            THE WITNESS:  Right.

6            MS. SARSHIK:  Thank you.

7            BY MS. SARSHIK:

8        Q    Okay, let's go back to the first

9    incident that you described which was August

10   2003, a comment that I believe you said Ms.

11   Steely made during a management meeting.  And

12   I believe, I'm not quoting you verbatim, but

13   you said that she said something to the effect

14   of, "We don't need your negativity."

15       A    Yes.

16       Q    Okay.  Who else knows about this

17   particular event?

18       A    In that meeting, that particular

19   day, it was Rodney Cartwright, Tom Harris,

20   Lynn Carr-Hawkes and David McDermott.

21       Q    The people who were present in the

22   room at the time?

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS          Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1      A     Yes, those were the managers, and

2   Beverly Shuck.

3      Q     Okay.  Is there anyone else who

4   knows about this who was not in the room at

5   the time?

6      A     No.

7      Q     So you didn't discuss it with

8   anyone else.

9      A     Except Ms. Steely after the

10  meeting.

11     Q     Yes, right.  Okay.  Do you believe

12  that that particular incident interfered with

13  your work performance?

14     A     At that particular time, after I

15  talked to her, I decided to just let it go and

16  to proceed on to try and help make ASB a good

17  place to work.

18     Q     Okay, and do you believe that that

19  remark was motivated by any kind of racial

20  discrimination, the negativity remark by Ms.

21  Steely?

22     A     I don't understand the question.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    Q    Okay, the remark that she made to

2    you at the meeting that you believe is part of

3    your hostile work environment claim, some kind

4    of remark to the effect of, "We don't need

5    your negativity."

6    A    I'll say this here, it was a -- it

7    made me feel very uncomfortable to have that

8    coming from a brand new Associate Director who

9    had just made it to my office area.

10    Q    Do you have any reason to believe

11    that she made it for racially discriminatory

12    reasons?

13    A    As    I    said,    I    felt    very

14    uncomfortable with her saying it and she had

15    just made it onboard.

16    Q    I'm going to ask the question

17    again and ask you to answer it.  Do you have

18    any reason to believe that she made that

19    remark for racially discriminatory reasons?

20    A    No.

21    Q    Do you have any reason to believe

22    that she made that remark out of a desire to

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.                    Exhibit 3
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    retaliate  against  you  for  your  previous

2    lawsuit?

3         A    I don't know.

4         Q    Okay.   Now, I believe that the

5    next thing that you have testified about was

6    in October 2003 when Ms. Steely, according to

7    your testimony, told you that she heard you'd

8    been saying bad things about her.  Do you have

9    any reason to believe when she said that, that

10   she was motivated by racial discrimination?

11        A    I know that I was being placed in

12   a hostile work environment.

13        Q    I'm  going  to  ask  the  question

14   again.  Do you have any reason to believe that

15   she said that based on racial discrimination?

16        A    I don't know.

17        Q    And here today, do you have any

18   reason to believe that she said -- made that

19   remark out of the desire to retaliate against

20   you for bringing your previous lawsuit?

21        A    I don't know.

22        Q    The next incident that I believe

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                                 Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433            WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    you have testified about was in November or

2    December of `03 when, according to your

3    testimony, Ms. Steely told you that other

4    managers did not feel comfortable having you

5    in meetings concerning the Corporate Success

6    Award.  Do you have any reason to believe that

7    she made that remark to you out of racial

8    discrimination?

9        A    Yes.

10       Q    Okay.  And what is your reason for

11   that?

12       A    Because when I asked her about the

13   managers or whoever had told her about being

14   uncomfortable with me in that meeting, the

15   first thing I said about my -- I said, is it

16   dealing with my case, and if so, Dave

17   McDermott was one of the managers who was

18   found guilty of discriminating against me in

19   Federal Court, and that's when she proceeded

20   to say, "I was told about your case before I

21   came here."

22       Q    Okay.  I'm asking now specifically

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    not about your previous case.  I'm asking, do

2    you believe she was acting out of a racially

3    discriminatory motive?

4          A     Yes.

5          Q     Okay, and you believe that based

6    on her saying that she'd heard about your

7    case?

8          A     Because  of  what  had  happened

9    prior, the incident in August of 2003, October

10   2003 and once again in November/December 2003,

11   yes, I believed it was based on my race and

12   retaliation for my prior EEO case.

13         Q     Okay.    In   that   November   or

14   December meeting, when she said that other

15   managers didn't feel comfortable with you in

16   discussing the Corporate Success Awards, she

17   didn't use any racial slurs, did she?

18         A     No.

19         Q     And she didn't make any racially

20   derogatory   remarks   to   you   in   that

21   conversation?

22         A     In  that  particular  meeting,  she

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.                              Exhibit 3
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    said something to me about some woman saying

2    something about the word "Sweety" and she had

3    filed a case.  The lady at her old agency had

4    filed a case.

5         Q    Okay.  Did she make any racially

6    derogatory remarks though?  I'm not talking

7    about anything about Sweety that might have a

8    bearing on gender.

9         A    No.

10         Q    Okay.  And in that particular

11    meeting, in November or December, did she make

12    any racially derogatory remarks to you about

13    anyone else?

14         A    No.

15         Q    Okay.  This November or December

16    incident, who else knows about it?

17         A    Except what's in my affidavit with

18    the EEO counselor and my husband.

19         Q    Okay.  Did that particular

20    incident, and I'm just talking about that

21    November/December `03 remark, did that

22    interfere with your work performance?

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.                          Exhibit 3
(202) 234-4433          WASHINGTON, D.C.  20005-3701     www.nealrgross.com

1          A     Yes, it did.

2          Q     Okay, how?

3          A     Because it was coming from the

4    brand new Associate Director of ASB, and I had

5    to watch myself because I just felt that the

6    big boss was out to get me.

7          Q     And I apologize, I don't remember

8    exactly your answer to a question I asked a

9    few minutes ago.  When she said that other

10   managers did not feel comfortable with you,

11   did she say anything about other managers

12   being concerned that you speak with employees

13   about confidential things?

14         A     Yes.

15         Q     Okay, that particular remark in

16   November or December, that remark did not

17   somehow cause you to be demoted in any way or

18   lose salary or lose your office or anything

19   like that, did it?

20         A     I don't understand the -- which --

21         Q     As a result of that remark in

22   November or December `03, you didn't take a

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    cut in pay or lose any job privileges, did

2    you?

3        A    Could you clarify that?  Are you

4    talking about when she mentioned about the

5    other managers feeling uncomfortable with me?

6        Q    Yes.

7        A    I did not receive a CSA award.

8        Q    Okay.  For the year 2003.

9        A    For the year 2000 -- because it

10   ran from 2003 through 2004, I did not receive

11   a CSA award.

12       Q    Okay.  That meeting with Ms.

13   Steely in November or December 2003, how long

14   did it last for?

15       A    To the best of my recollection, it

16   was probably 10, 15 minutes at the most.

17       Q    Okay, and the remark that troubled

18   you, that is part of your hostile work

19   environment claim, about how long did that

20   last?

21       A    That lasted probably for the

22   majority of the conversation because I kept

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                              Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701      www.nealrgross.com

1    emphasizing if the person or persons who felt

2    uncomfortable with me, and I was mainly

3    concerned with David K. McDermott, because he

4    was found guilty of discriminating against me

5    in Federal Court.

6    Q    Okay.  Now, I believe you said

7    that the next thing that Ms. Steely said that

8    is part of your hostile work environment claim

9    occurred in August 2004, during a conversation

10   about Lynn Carr-Hawkes.

11   A    Yes.

12   Q    Okay.  Who else knows about this

13   conversation?

14   A    It's in my affidavit and my

15   husband knows about it.

16   Q    Okay, how long did the

17   conversation last?

18   A    I stayed in her office all of five

19   minutes because I could not believe that she

20   was calling me in there for that because Lynn

21   is my friend and with this war situation, that

22   was very hurting, and I cried because I

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS            Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433         WASHINGTON, D.C.  20005-3701         www.nealrgross.com

1    couldn't believe she was saying that.

2         Q    Okay, what exactly did Ms. Brides

3    Steely say to you?

4         A    To the best of my recollection,

5    she said that she had heard that I had said

6    that she was responsible for having Ms. Carr-

7    Hawkes militarily deployed because of her

8    prior position at the Defense Department.

9         Q    Okay, had you said that to

10   anybody?

11        A    No.

12        Q    Okay, and how did you respond to

13   her?

14        A    I told her I couldn't believe that

15   she had me in her office for that and that I

16   said this office needed prayer and I walked

17   out of her office.

18        Q    Okay, you said you cried about

19   this?

20        A    Yes, I did.

21        Q    When did you cry about it?

22        A    When I went back to my office.

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

 1          Q     Okay, so not in Ms. Bridges
 2    Steely's office?

 3          A     No.

 4          Q     Okay, and that particular
 5    incident, do you believe when she said that to
 6    you that that was racially motivated?

 7          A     Yes.

 8          Q     Why?

 9          A     Because I felt that I was the only
10    Black Unit Chief under Mr. Harris and she was
11    just intentionally picking on me.

12          Q     Did you have any other reason to
13    believe that it was racially motivated?

14          A     No.

15          Q     Okay.  When she made that remark
16    in August 2004, did you believe she was
17    retaliating against you for your prior
18    lawsuit?

19          A     Yes.

20          Q     And what's the basis of that
21    belief?

22          A     Because it was continuing from

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    2003 and like I said, working for her I felt

2    very uncomfortable and to call me in there on

3    something as personal to me as my friend being

4    deployed, I couldn't believe she was doing it

5    and I left out of there at about five minutes.

6    And at that time, I had a Contract Specialist

7    that was dying and who passed away a few

8    months after that.

9         Q    At that time that she called you

10   in for the discussion about Ms. Carr-Hawkes,

11   had you heard anyone else talk about whether

12   Ms. Steely might have somehow arranged to have

13   her deployed?

14        A    No.

15        Q    So this was the first time you'd

16   heard any mention of that.

17        A    Yes.

18        Q    Okay, so this was not a subject of

19   gossip in the office.

20        A    I'm not sure because I had never

21   heard it before until I --

22        Q    Okay,  to  the  best  of  your

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1   knowledge  it --

2           A    To the best of my knowledge --

3           Q    -- it was not a subject of gossip.

4           A    To the best of my knowledge, I

5   heard it for the first time from Ms. Ann

6   Bridges Steely.

7           Q    Okay, before that time, had you

8   said anything negative about Ms. Bridges

9   Steely to people in the office?

10          A    Could you clarify that?

11          Q    Sure.    Had you criticized Ms.

12  Bridges Steely to other people in your work

13  office?

14          A    Everyone    knew    about    Ann's

15  reputation and how bad she had caused that

16  office to suffer.  The morale was horrible in

17  that office.

18          Q    Okay, I'm going to ask the

19  question again.  Had you -- had you criticized

20  Ms. Bridges Steely to anyone else in your

21  office?

22          A    Yes.

**NEAL R. GROSS**  Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1        Q      To who?

2        A      Chuck Benson.

3        Q      Okay, who else?

4        A      That's about it.

5        Q      So you didn't discuss Ms. Bridge

6    Steely with anyone in your office other than

7    Chuck Benson.

8        A      Yes.

9        Q      And   you   never   discussed   Ms.

10   Bridges   Steely   with   Joan   Gustafson   for

11   example, or anyone else who reported to you?

12       A      I don't understand the question.

13       Q      Okay, you had people reporting to

14   you at that time, didn't you?

15       A      Yes.

16       Q      Did you ever criticize Ms. Bridges

17   Steely to any people who reported to you?

18       A      Yes.

19       Q      Okay, to which of those people did

20   you criticize Ms. Bridges Steely?

21       A      Once   again,   it   was   Chuck   Benson

22   and t the best of my recollection, I did talk

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                     Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

1  to Serena Woolrich and Dallas Scott.

2      Q    Okay.  Did Chuck Benson report to

3  you?

4      A    Yes.

5      Q    Okay,  and  did  Serena  Woolrich

6  report to you?

7      A    Yes.

8      Q    Okay, and did Dallas Scott report

9  to you?

10     A    Yes.

11     Q    And generally, would you summarize

12  the  types  of  criticisms  you  made  of  Ms.

13  Bridges Steely to them?

14     A    I don't --

15     Q    What did you say about Ms. Bridges

16  Steely  when  you  discussed  her  with  Chuck

17  Benson, Serena Woolrich or Dallas Scott?

18     A    That I felt that she was after me

19  because of my prior EEO complaint and I could

20  tell that the way I was being treated by her

21  very  -- it was making my -- my condition in

22  the office a very hostile work environment.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS               Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433      WASHINGTON, D.C.  20005-3701      www.nealrgross.com

1      Q    Did you ever tell any of them that

2   you thought she was out to get you because of

3   your race?

4      A    Yes.

5      Q    Did you ever discuss with any of

6   them the specific incidents that occurred that

7   led you to believe she was out to get you

8   because of your race or your prior lawsuit?

9      A    The November of -- the October of

10  2003 and because of Ms. Lynn Carr-Hawkes being

11  deployed.

12     Q    So you discussed the -- you

13  discussed with your subordinates the incident

14  in October 2003.

15     A    Very, very briefly because my

16  reputation was on the line and the senior --

17  with the Associate Director calling me in her

18  office and all I have is my reputation.

19     Q    Did you discuss with your

20  subordinates the conversation you had with Ms.

21  Bridges Steely in August 2004 about Lynn Carr-

22  Hawkes?

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                              Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433            WASHINGTON, D.C.  20005-3701         www.nealrgross.com

1        A    I didn't go into a lot of detail.

2    I just couldn't believe that she said that

3    because that upset me because one person came

4    in and they saw that I had been very upset and

5    everything and I just told them I just didn't

6    want to go into any detail.

7        Q    Did you discuss either of those

8    conversations with other Unit Chiefs?

9        A    No.

10       Q    Okay.  Did you discuss with your

11   subordinates the conversation you had with Ms.

12   Bridges Steely in November or December of `03?

13       A    No, I didn't.

14       Q    Did  you  discuss  any  other

15   criticisms of Ms. Steely with your staff?

16       A    No.

17       Q    So  other  than  what  you've

18   testified, you didn't say negative things

19   about Ms. Steely to your staff.

20       A    No.

21       Q    Were there any other things other

22   than what you've testified to today and other

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    than the February 3rd, 2005 incident that Ms.

2    Steely said to you that you believe are part

3    of your hostile work environment claim?

4         A    Could you clarify that in terms of

5    just what's --

6         Q    Okay, I'll clarify.  You've talked

7    about a few particular incidents, August 2003,

8    October  2003,  November  or  December  2003,

9    August 2004.

10        A    Yes.

11        Q    And we will discuss the February

12   3rd,  2005  incident.   Are  there  any  other

13   things that Ms. Steely said to you that are

14   part of the hostile work environment claim?

15        A    No.

16        Q    And just to make it clear on the

17   record,  and  again,  not  talking  about  the

18   February 3rd, 2005 conversation, in any of

19   these conversations that you've discussed, did

20   Ms. Steely use any racial slurs in talking to

21   you?

22        A    No.

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1        Q    Okay, did she make any remarks

2    that in their words are racially derogatory?

3        A    Could you clarify that?

4        Q    Did she say anything that doesn't

5    tell in your mind as a racial slur but it's

6    racially negative?

7        A    When in that November/ December

8    2003 meeting, when I was confronted and then

9    told by her that my fellow managers didn't

10   feel comfortable with me being in the room for

11   the CSA meeting, and I particularly asked

12   about David K. McDermott because he was found

13   guilty of discriminating against me in Federal

14   Court, the first thing that came to my mind is

15   that yes, I'm being discriminated against.  It

16   was the feeling.  You had to be there.  It was

17   just the feeling and  she said, "No, I knew

18   about your case, I was told about your case

19   before I came to the FDIC."

20       Q    Okay, did she say anything in that

21   conversation that specifically said something

22   along the lines of, "I'm singling you out

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    because you're African American?"

2        A    Once again, I was -- at the time I

3    was one of the African American Unit Chiefs

4    under Tom Harris and when she said to me that

5    she   felt   uncomfortable,   that   the   other

6    managers were feeling uncomfortable with me

7    during that meeting and when I mentioned David

8    D. McDermott being one of the individuals that

9    was found guilty of discriminating against me

10   in Federal Court, she said that, "No, he

11   didn't say anything to me about I heard about

12   your case before I came to the FDIC."

13       Q    Okay.   Did Ms. Steely tell you

14   then who told her about your previous case?

15       A    No, she wouldn't tell me and I

16   kept asking.

17       Q    Are there any things -- getting

18   away for a moment from anything Ms. Steely

19   said, are there any things that Ms. Steely did

20   that you believe are part of your hostile work

21   environment claim?

22       A    She    made    me    feel    very

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    uncomfortable when I was in meetings with her

2    and it started in August of 2003.

3        Q    And how did she make you feel very

4    uncomfortable?

5        A    It was very uncomfortable because

6    of the way she responded to me because she had

7    claimed that she wanted input from the

8    managers about the upcoming reorganization in

9    ASB.  And when she said to me, "I don't need

10   your negativity," and I didn't say anything

11   negative.  I was just trying to let her know

12   that I wanted to be a part of the discussion

13   in placing the right functions together within

14   our organization and I wanted the best for

15   ASB.

16       Q    Okay, other than the things she

17   said, are there -- that made you feel

18   extremely uncomfortable, are there any actions

19   she took or anything else she did that is part

20   of your hostile work environment claim?

21       A    Other than what happened in August

22   of 2003, October 2003 and November 2003, in

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS          Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    the August of --

2         Q    Be specific.  Other than what was

3    said, any specific incidents that you've

4    discussed and laying aside for now February

5    3rd, 2005.

6         A    Not that I can recall.

7         Q    Okay.  Thank you.  Ms. Bass, would

8    you like to take a break to compose yourself

9    or do you want to keep going?

10        A    I'm fine, we can keep going.

11        Q    Okay.  What was the first time

12   that your previous lawsuit was ever discussed

13   between you and Ms. Bridges Steely?

14        A    November/December 2003.

15        Q    That conversation --

16        A    When I asked -- when I mentioned

17   Mr. McDermott, yes.

18        Q    So that previous to that, you had

19   never provided -- you had never discussed the

20   lawsuit with Ms. Bridges Steely.

21        A    No.

22        Q    And you had never provided her

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS        Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    with  a  copy  of  any  information  about  the

2    lawsuit.

3         A    I gave her some information, but

4    according  to  her  affidavit,  she  said  she

5    didn't read it.

6         Q    I'm  not  asking  what  she  read.

7    I'm asking what you gave her.  Did you give

8    her  information  about  your  lawsuit  before

9    that?

10         A    Yes.

11         Q    What did you give her?

12         A    A copy of the -- to the best of my

13    recollection  there  was  a  copy  of  the

14    Washington Post article and then I had placed

15    a note on top of it.

16         Q    I'm  going  to  show  you  now  a

17    portion  of  the  Report  of  Investigation  for

18    this case and I'm going to show you Exhibit A

19    to the affidavit of Ms. Bridges Steely and I'd

20    like to ask you to review that and ask you to

21    tell me when you've finished reviewing it.

22         A    Okay.

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                        Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1          Q    Okay, so you've had an opportunity

2     -- and if you want to read the other pages.

3               (Pause)

4               Okay, could you describe -- off

5     the record for a moment.

6                              (Whereupon,  the  above-

7                              entitled matter went off

8                              the record at 2:18 p.m.

9                              and   resumed   at   2:19

10                             p.m.)

11              MS. SARSHIK:  Back on the record.

12              BY MS. SARSHIK:

13         Q    Ms. Bass, would you describe the

14    pieces of paper that I have just shown you?

15              MR. SHAPIRO:  Piece of paper.

16              BY MS. SARSHIK:

17         Q    Okay, the top piece of paper that

18    I have shown you.  This Exhibit that you've

19    reviewed does consist of several pieces, but

20    let's talk about the first piece of paper.

21              MR. SHAPIRO:  Why don't you just

22    attach it as an exhibit.

**NEAL R. GROSS**  Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1              MS. SARSHIK:  I will.

2              MR. SHAPIRO:  Okay.

3              MS. SARSHIK:  Let's talk about

4       this now.

5              BY MS. SARSHIK:

6         Q     What is that first piece of paper?

7         A     The first piece of paper is a

8       personal note that I had given to Ms. Steely

9       because what had happened was that she had

10      told us that we could come to her on a one-on-

11      one basis, that she had an open-door policy,

12      that we could do it anonymously or whatever,

13      but because we were trying to get ASB

14      organized to the point because the morale was

15      so low, and she gave the impression during

16      that particular time period that she really

17      wanted to make ASB a better place to work and

18      from my understanding she was like, "Mary,

19      we're going to have a candid conversation, I

20      need your input," and I wanted to be as open

21      as possible with her and so forth about me,

22      because I was given the impression by her that

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                          Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433              WASHINGTON, D.C.  20005-3701         www.nealrgross.com

1    this would be a meeting just between the two

2    of us but it never took place.

3         Q    And you gave her this note on or

4    about October 10th, 2003?

5         A    2003.

6         Q    Okay, and your note says, "Once

7    you have had a chance to read these," and the

8    previous sentence says -- refers to these

9    documents.  Those are documents that you were

10   giving her about your previous case?

11        A    Yes.

12        Q    Okay, the memorandum opinion in

13   the previous case.

14        A    Yes.

15        Q    And the newspaper article.

16        A    Yes, yes.

17        Q    Before that time, had you and Ms.

18   Bridges Steely had any communications about

19   your previous lawsuit?

20        A    No.

21        Q    Okay, so the first communication

22   you had with her about your previous lawsuit

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1    was when you provided her information about

2    it.

3        A    We never discussed it.

4        Q    Okay, before you provided her with

5    this information, you had no communication

6    about the lawsuit with her, right?

7        A    No.

8        Q    And as far as you -- is it fair to

9    say that before you gave her this information

10   on October 10th, 2003, before that date, you

11   didn't know whether she knew about your case

12   or not?

13       A    She -- the first time I found out

14   -- no, I didn't know.

15       Q    Okay, thank you.

16           MS. SARSHIK:    I'd like to have

17   Exhibit 3A of the Report of Investigation

18   marked as our exhibit in this deposition.

19           THE REPORTER:    I'm marking this as

20   Exhibit 3A?

21           MS. SARSHIK:    No, I guess you'd

22   mark it as our A or 1, however you want to do

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    it.

2              MR. SHAPIRO:  Exhibit 1.

3              MS. SARSHIK:  Exhibit 1.

4              MR. SHAPIRO:  Let her make copies.

5    Can we go on without those copies, while she

6    makes copies?

7              MS.  SARSHIK:   Yes,  yes,  I

8    certainly can.  Thank you.

9                   (Agency Exhibit 1 marked

10                    for identification.)

11             MS.  SARSHIK:   She'll  bring  it

12   back.

13             MR. JONES:  And what is it?

14             MS. SARSHIK:  It is Exhibit 3A to

15   the report of investigation.

16             MR. JONES:  And it was one page?

17             MS. SARSHIK:  No, several pages.

18             BY MS. SARSHIK:

19        Q    Okay, Ms. Bass, I'd like to turn

20   to February 3rd, 2005 and a meeting that took

21   place on that day, which you've described in

22   your complaint in this case.  Who arranged the

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1     meeting?

2          A     Tom Harris under direction of Ms.

3     Ann Bridges Steely.

4          Q     How did he arrange it?

5          A     It came based on a briefing that

6     had taken place on February the 1st out of

7     DSC.

8          Q     And what happened at that meeting

9     on February 1st?

10         A     What happened at that meeting,

11    that was a monthly contracting meeting that

12    was held because I was the Chief of the

13    Divisional Contracting Unit and DSC was one of

14    my program offices and prior to that meeting,

15    I saw Ms. Donna Gambrell in the lobby area and

16    I greeted her with, "Hi, Sweety, how are you

17    doing?" and she says, "I'm doing fine, Mary."

18    And she was headed to her office to drop off

19    some stuff.  And then she came back and we all

20    proceeded to go into the conference room to

21    hold the meeting to discuss the issues on the

22    DSC contracts.

**NEAL R. GROSS**     Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS     Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433     WASHINGTON, D.C. 20005-3701     www.nealrgross.com

1          Q     Okay, we'll discuss later that

2    February 1st meeting.    Talking about the

3    February 3rd meeting --

4          A     The one that took place at 9:00

5    o'clock that Tom Harris had --

6          Q     That Tom Harris --

7          A     -- okay, had arranged because Ms.

8    Steely directed the meeting, that meeting took

9    place in Ms. Ann Bridges Steely's office and

10   it was to discuss issues out of DIR and DSC.

11         Q     Okay, what kind of issues out of

12   DIR?

13         A     Issues dealing with some projects

14   that had came down late December `04, early

15   2005 and that was DIR and to discuss a

16   procurement that I had decided to place on my

17   credit card for DSC.

18         Q     Okay, focusing on DIR right now,

19   had there been any complaints from DIR?

20         A     DIR, there were some issues that -

21   - of some projects that came out of DIR, but

22   overall, there had been some complaints

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

1    because of the fact that they had sent some

2    stuff over.   It was late in the Christmas

3    holiday season and what had happened, I was

4    down to just one staff member because

5    everybody else had gone for the holiday.  And

6    we were trying to respond to everybody as

7    quickly as possible during that time period.

8         Q    Who was your most senior contact

9    at DIR?

10        A    Andrea Woolford.

11        Q    Okay, and had Ms. Woolford made

12   any complaints?

13        A    During that time period, I don't

14   recall because it was a holiday and I know she

15   was on -- she had been out on vacation.

16        Q    What about previous to that?  Had

17   you heard directly from Ms. Woolford or heard

18   indirectly of any complaints that she had

19   about work done by your staff or you?

20        A    Yes.

21        Q    Okay, those were complaints that

22   you heard from Ms. Woolford?

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS           Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1        A    I had heard some complaints coming

2    from Ann Bridges Steely but because I had

3    direction over so many different FDIC program

4    offices, I was doing my best to get everything

5    turned around as quickly as possible.

6        Q    Had Ms. Woolford ever complained

7    to you?

8        A    Yes.

9        Q    Okay, the February 3rd, `05

10    meeting, the purpose of it, I take it, was to

11    discuss issues involving DIR?

12        A    DIR and DSC.

13        Q    Okay, and would you describe the

14    issues involving DSC?

15        A    The issue involving DSC was the

16    issue of a procurement that they couldn't

17    make up their mind what they wanted to do with

18    it and because of the dollar threshold, I

19    suggested that the easiest way to get it done

20    would be to use my FDIC procurement credit

21    card.

22        Q    And what did she say?  You said

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    that the easiest way to get it done was to use

2    your procurement card?

3         A    What did who say?

4         Q    Oh, what did Ms. Bridges Steely

5    say in response to that?

6         A    Ms. Steely from the outset of the

7    meeting was very sarcastic with me and she

8    just, "Well, it's taking so long," and I said,

9    "They can't make up their mind."

10        Q    That was DSC or --

11        A    DSC couldn't make up their mind.

12        Q    Okay, so she was sarcastic.

13        A    She was very sarcastic.

14        Q    Other than saying, "It's taking so

15   long" -- let's go off the record for one

16   moment, please.

17                        (Whereupon, the above-

18                        entitled matter went off

19                        the record at 2:29 p.m.

20                        and resumed at 2:30

21                        p.m.)

22                   BY MS. SARSHIK:

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                  Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1          Q    Other than telling you that it had

2     taken so long, what did she say that you

3     considered sarcastic?

4          A    To the best of my recollection,

5     she opened up the meeting very condescending,

6     very sarcastic, just like I just didn't have

7     a chance because with that information to do

8     contracts, projects coming over in late

9     December, early January, everybody is

10     basically out on holiday and we, as

11     contracting people, get a total of 30 days to

12     do anything that's under 100,000 and sometimes

13     some of the program offices feel that they

14     could send something over and they thought it

15     could be done like that, but that's not the

16     way contracts operate and I tried to tell her

17     that the projects, the two projects that were

18     being discussed that it was going to take

19     longer, but she was just basically was just

20     very rude and condescending and nasty to me.

21          Q    Okay, is there anything else she

22     said -- and we'll get to the "Missy" remark

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS              Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

1    that's involved in this lawsuit.  Was there

2    anything else that she said in this meeting

3    that you considered rude and nasty?

4         A    The whole tone of the meeting was

5    rude and nasty.  It was like I was not being

6    given a chance to explain myself.

7         Q    Okay, were there specific words

8    she said that set that tone?

9         A    Once again, it was just the very

10   meeting was very rude and condescending and

11   nasty.

12        Q    I take it then, that there were no

13   other specific words, but that it was

14   something else other than what she said.

15        A    I don't understand.

16        Q    Okay, I've asked you were there

17   any specific things she said that you

18   considered to be rude or nasty.  And I haven't

19   heard you say anything specifically that she

20   said other than that it had taken so long.

21        A    She kept trying to accuse me of

22   not doing my work and I told her that was not

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    www.nealrgross.com

1    true.   That with the large volume of work

2    coming out of these different program offices,

3    and I had so many different program offices,

4    DOS, Legal, OD, the Chairman's office, DRR,

5    DSC, it just went on and on and on and on and

6    on and on, and I just was not given a chance

7    to really explain myself because she was very

8    rude and nasty.

9        Q    Okay,    and    those    particular

10   remarks, did you believe at the time that she

11   was motivated by racial discrimination?

12       A    At the time, discussing -- and

13   this is before she said the Missy.  At the

14   time I was so humiliated because of the fact

15   that she was being so condescending that, no,

16   I  didn't  think  that  anything  was  being

17   racially motivated at that particular time.

18       Q    Okay.  And at that particular time

19   did you have any reason to think that those

20   remarks  were  motivated  by  a  desire  to

21   retaliate  against  you  for  your  previous

22   lawsuit?

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1          A      At that time, no.

2          Q      Okay.  And who was the -- who was

3     your primary DSC contact?

4          A      I had numerous people but on that

5     particular project it was Ms. Donna Gambrell's

6     Special Assistant, Lori McMasters.

7          Q      Okay.  What else was said at that

8     meeting?

9          A      Prior to before she referred to me

10    as Missy?

11         Q      Sure.

12         A      Once we made it past the DSC and

13    placing their project on my -- the FDIC

14    procurement credit card, she turned to Tom

15    Harris and stated, she says, "Tom, I need to

16    speak with you," and that's when she proceeded

17    to say, "Now, Missy, you go do that work."

18    And I turned around and I said, "Okay, Missy,"

19    and then I walked out.

20         Q      And did you respond -- during that

21    particular meeting, did you respond in any way

22    other than to say, "Okay, Missy," and walking

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS              Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433         WASHINGTON, D.C.  20005-3701       www.nealrgross.com

1    out?

2          A    Yes, I was appalled, because I

3    knew that she -- what she had called me, a

4    term -- that was a racist slur.  I just knew

5    she had used the word "Missy" to call me a

6    nigger and I felt like she was also -- because

7    of the fact that I come from Mississippi

8    that's like calling an older black gentleman

9    "Boy."

10         Q    Okay, had she called you Missy any

11   time before this?

12         A    No.

13         Q    Did she call you Missy any time

14   after that?

15         A    No.

16         Q    And what happened -- at about --

17   that first meeting that you've described in

18   her office on February 3rd, 2005, that ended

19   with the Missy remark, about how long did that

20   meeting last?

21         A    To the best of my recollection, it

22   had to be about -- at least 30 minutes, at

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1  least 30 minutes.

2       Q     Okay.  And what happened next?

3       A     After  I  left  the  office,  her

4  office, I went to my office and about five, 10

5  minutes later, Ann Bridges Steely came to my

6  office and I closed the door and she proceeded

7  to say in a very nasty tone, "How did you feel

8  when I called you Missy?"  And I knew then and

9  there that my belief that she had used that as

10  racial slur against me was confirmed because

11  she said, "How did you feel when I called you

12  Missy?"

13       Q     And what did you respond when she

14  said that?

15       A     I told her I couldn't believe that

16  she was harassing me like that and then she

17  proceeded to say something about Ms. Donna

18  Gambrell and how I had referred to her as

19  Sweety at a meeting on February the 1st.  And

20  I told her that Ms. Gambrell was my friend and

21  had referred to me as Sweety on numerous

22  occasions and that I just did not believe that

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS          Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    she was coming to my office and harassing me

2    like that.

3         Q    And did Ms. Steely tell you that

4    she called you Missy in connection with your

5    having called one or more people Sweety?

6         A    No.

7         Q    She didn't say it had anything to

8    do with Sweety?

9         A    Like I said, when she came to my

10   office, and I closed my door and she proceeded

11   to say, "How did you feel when I called you

12   Missy," there was no discussion from her about

13   my calling somebody else that other than what

14   she had heard in a private conversation before

15   the meeting on February the 1st, with me and

16   Mr. Gambrell.

17        Q    Did you -- when you spoke with Ms.

18   Steely in your office on that occasion, did

19   you  tell her, among anything else, that you

20   thought it was cute when she called you Missy?

21        A    No.

22        Q    What else did you say to Ms.

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    Steely in your office on that day?

2         A    I proceeded to mention my prior

3    EEO

4    -- my prior lawsuit and she said something to

5    me about somebody at her old agency filing

6    something dealing with Sweety and I asked, I

7    said, "Do you want to file an EEO complaint

8    against me?" About that time my feelings went

9    up, out the roof because I couldn't believe

10   that an Associate Director here at the FDIC

11   had basically used Missy to call me a nigger.

12   I'm 47 years old. I have a child and my child

13   respects me and I was raised to respect me.

14   And I could not believe that in front of Tom

15   Harris, she would call me something like that

16   and then come down to my office five or 10

17   minutes later and ask me, "How did you feel?"

18        Q    One moment. Did you tell Ms.

19   Steely in that conversation in your office

20   that from now on your relationship with her

21   would be strictly professional?

22        A    Yes, I told her it would be

**NEAL R. GROSS**  Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    strictly business.

2         Q    Strictly business, okay.    How

3    would you describe your relationship with her

4    before that point?

5         A    I did not trust Ann Bridges Steely

6    and it was strictly professional.

7         Q    Okay, so it had been strictly

8    business before that time.

9         A    Before that, it was strictly

10   professional business.

11        Q    Okay.  It wasn't that you and she

12   socialized.

13        A    No, we did not.

14        Q    You didn't have lunch together.

15        A    No.

16        Q    And you didn't engage in social

17   chit-chat.

18        A    No.

19        Q    So in what way did your

20   relationship with her change after February

21   3rd, 2005?

22        A    After that it was strictly

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS        Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

66

1    business; I was just totally doing my job.

2        Q    Had it been strictly business

3    before that?

4        A    Yes.

5        Q    Okay.  Was this the first time

6    anyone had ever called you Missy?

7        A    Yes.

8        Q    Okay, so never in your life have

9    you been called Missy.

10        A    I've never been called Missy.

11        Q    Had you ever heard anyone else

12    called Missy?

13        A    No.

14        Q    Okay, was there a situation where

15    you didn't hear it directly, but did you ever

16    know of anyone else who was called Missy?

17        A    No.

18            MS. SARSHIK:  Can we take a break

19    for one moment, please?

20                        (Whereupon, the above-

21                        entitled matter went off

22                        the record at 2:42 p.m.

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1                    and    resumed    at    2:47

2                    p.m.)

3            MS. SARSHIK:   Back on the record.

4            BY MS. SARSHIK:

5       Q     Ms. Bass, why did you believe that

6   Missy was a racial slur equivalent of being

7   called the N word?

8       A     I am from Mississippi.  I was born

9   and raised down South.  And coming up, I knew

10  what words that were used against us and Missy

11  is the equivalent of -- I felt as being called

12  a nigger as well as an African American man

13  being called Boy.

14      Q     Okay, do I remember correctly that

15  you testified a few minutes ago that you had

16  never been called Missy other than that one

17  time?

18      A     Other than that one time.

19      Q     And do I remember correctly that

20  you testified a few minutes ago that you had

21  never heard anyone else called Missy?

22      A     Yes.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                          Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433         WASHINGTON, D.C.  20005-3701         www.nealrgross.com

1    Q    Okay, so why did you feel that

2    Missy was the equivalent of the N word?

3    A    Because with the institution, the

4    nightmare and horror of slavery in this

5    country, when you come up with Massa and Missy

6    in the same sentence, I knew what I was being

7    called.

8    Q    Okay, was the word Massa used in

9    the conversation between you and Ms. Steely?

10   A    No, no.

11   Q    Okay, so when this word that you

12   had never heard used in a racial context was

13   used on February 3rd, 2005, you knew that it

14   was a racial slur.

15   A    I never told you that I had heard

16   -- never heard it used as a racist -- I knew

17   it was a racist slur, but I had never called

18   -- I had never called anybody Missy before in

19   my life and I knew that it was a racially

20   driven word.

21   Q    How did you know that?

22   A    Because of the fact that I'm from

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1    Mississippi.   I  grew  up  down  South  in  the

2    segregation era.

3        Q    Okay.  But you have said that you

4    never heard the word used before.

5        A    I didn't say that.

6        Q    Okay,  then  would  you  please

7    explain more how you knew that the word Missy

8    is a racial slur?

9        A    Because  coming  from  Mississippi,

10   using the word Missy is like calling a grown

11   African  American  male  a  Boy,  but  when  she

12   called  me  Missy  that  day,  I  knew  she  was

13   calling me a nigger using the word Missy.

14       Q    Okay,  but  she  didn't  use  the  N

15   word.  And I'm sorry, I can't bring myself to

16   say the word.

17       A    That's the way -- that's the way I

18   felt when she said it and it was confirmed

19   when I went next door and I spoke -- after she

20   left my office, I went and spoke to Charles

21   Benson and I said to Chuck, I said, Chuck --

22   and he asked me, he said, "Mary, what's wrong

**NEAL R. GROSS**  Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS          Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1   with you?"  And that's what he proceeded to

2   say.  And he's a White male and he said, yes,

3   she had used Missy to call me a nigger.

4          Q    When you had that conversation

5   with Mr. Benson, was that before or after Ms.

6   Steely came to your office?

7          A    That was after she left my office.

8          Q    Mr. Benson didn't hear her call

9   you Missy.

10         A    He saw the look on my face and he

11  asked me what was wrong and I explained to him

12  what had just happened in my office.

13         Q    Okay, is Mr. Benson still employed

14  by the FDIC?

15         A    No, he took the buy-out and left

16  in May of 2005.

17         Q    Where is he employed now?

18         A    I don't know.

19         Q    Do you know where he lives?

20         A    No.

21         Q    Have you discussed with him the

22  possibility of his testifying for you in this

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS             Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    case?

2         A    No.

3         Q    Do you have any idea how to find

4    Mr. Benson?

5         A    No.

6         Q    Okay, so growing up in

7    Mississippi, you understood that certain words

8    were meant, were spoken in a racially

9    discriminatory way.

10        A    Yes.

11        Q    Had anyone ever told you that

12   Missy was one of those words?

13        A    What words?

14        Q    I'm going to ask you again, had

15   anyone over told you that Missy was one of

16   those words?

17        A    Yes.

18        Q    Who?

19        A    My sister.

20        Q    And when did she tell you that?

21        A    Years and years -- and then when I

22   told her what Ann Steely had called me that

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    day, she reconfirmed, yes, she had called me

2    the N word using Missy.

3        Q    Okay, approximately how old were

4    you when your sister told you that Missy was

5    racially discriminatory?

6        A    I don't understand.

7        Q    Were you 10 years old, were you 15

8    years old when your sister told you that Missy

9    was a racially discriminatory word?

10       A    As I said, I grew up in

11   Mississippi.   It could have been any time

12   period.

13       Q    Okay, but your sister did tell you

14   that.

15       A    Yes.

16       Q    Do you have any recollection as to

17   how old you were when she told you that?

18       A    I don't recall but I do remember

19   when going to different segregated facilities

20   like the doctor's office and so forth and I

21   knew that my race was always an issue and I

22   don't recall exactly what age but I had been

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS              Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    told.

2         Q    Okay, and I'm not talking about

3    when you learned that your race was an issue.

4    I'm talking specifically about the word

5    "Missy." When did you learn that Missy was a

6    racial term?

7         A    When I was young.

8         Q    Okay, and you don't have any

9    recollection whether you were five years old

10   or 10 years old?

11        A    I don't recall but I've always

12   known that was a racially insensitive word.

13        Q    Did anyone other than your sister

14   tell you that?

15        A    As I mentioned, Mr. Benson

16   mentioned it to me and also my husband.

17        Q    Okay, but before Ms. Steely used

18   the word "Missy" to you, did anyone other than

19   your sister ever tell you that Missy was a

20   racial word?

21        A    I read a lot of history and by my

22   reading, I've seen Missy in those slave

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

Exhibit 3

1    narratives and so forth along with the word

2    Massah, Missy, whatever.  I knew it was a

3    racially insensitive word.

4         Q    So you have read things in which a

5    slave was called Missy.

6         A    I have seen where slaves almost

7    died when they even heard the word Missy,

8    because they knew that their life depended on

9    it but I don't understand how we got into this

10   point.

11        Q    What did you read in which a slave

12   was called Missy?

13        A    I have read slave narratives.  I

14   can't tell you exactly which slave narrative.

15   There are numerous slave narratives that are

16   on the Internet and so forth, but I can't tell

17   you exactly which one.

18        Q    In which a slave was called Missy.

19        A    Yes, slaves were called Missy and

20   it was a very insensitive word.

21        Q    Have you ever seen or read things

22   in which a white person was called Missy?

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS          Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1          A      Yes.

2          Q      Okay, what things have you seen or

3     read in which a white person was called Missy?

4          A      In    the    slave    narratives,

5     especially when the Misses were called for

6     different slaves to by lynched and tortured

7     and so forth.

8          Q      In which a white person was called

9     Missy?  That's what I'm asking then.

10         A      Yes, and also when black slaves

11    were called Missy.

12         Q      Okay, so you've read things in

13    which both whites -- both white people and

14    black slaves were called Missy.

15         A      Yes, in the history of slavery in

16    America and that was the nightmare that was

17    brought back to me when she used that racial

18    term on me.

19         Q      Okay, and in the things that you

20    have read in which a white person was called

21    Missy, was that word a racial slur?

22         A      To the slaves.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1          Q    Why was the white person being

2    called Missy?

3          A    Because they were the ones who

4    were oppressing the African Americans.

5          Q    Okay, maybe I haven't been clear.

6          A    No, you haven't but --

7          Q    Okay, let me try again then.  You

8    have read -- have you read things in which a

9    white person was referred to as Missy?

10         A    Yes.

11              MR. SHAPIRO:  No, a white person

12   was referred to as Missy, not a white person

13   saying Missy, that's what she's asking.

14              MS. SARSHIK:  Okay, let me try

15   again.

16              BY MS. SARSHIK:

17         Q    Have you read things in which a

18   white person was called Missy?

19         A    Yes.

20         Q    Okay, and by whom was that white

21   person being called Missy?

22         A    The slaves were calling her Missy.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1      Q    Okay, so you have read things in

2    which the word "Missy" was used by a slave to

3    refer to a white owner.

4      A    I have read information where the

5    oppressed slaves had to bow down and call a

6    person Missy and that was -- in my affidavit,

7    I made reference when she called me Missy, all

8    I could think about was the nightmare of

9    slavery that my people have gone through in

10    America and all I could think about was here

11    I go again, I'm having to go back to Federal

12    Court and fight for my rights again because

13    another person is humiliating me, causing

14    great stress and anxiety and I could not see

15    my future going any place here at FDIC,

16    because she had put my family back through the

17    same thing over and over again.

18      But like I said, when she came to

19    my office and she asked me how did I feel, I

20    knew that she had used Missy as a racially

21    derogatory slur and I felt at the time she

22    used Missy that she was calling me the N word.

**NEAL R. GROSS**  Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS  Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1            MS. SARSHIK:  Okay, I just need

2    one moment to review something.    Okay, Ms.

3    Bass I'm going to show you a portion of the

4    answers that you submitted in this case to our

5    interrogatories.  Specifically, I'm going to

6    show you a document captioned, "Plaintiff's

7    Response   to   Defendant's   First   Set   of

8    Interrogatories and Request for Production of

9    Documents to Plaintiff," and then it is also

10   captioned,   "Plaintiff   Answers   to

11   Interrogatories."

12            BY MS. SARSHIK:

13       Q    I'd like to show you first an

14   unnumbered page following page 22 that is

15   captioned "Verification," and ask you if that

16   is your signature?

17       A    Yes.

18       Q    Okay, and so you affirmed in that

19   signature that, under penalty of perjury, that

20   your answers are true and correct.  Is that

21   correct?

22       A    Yes.

**NEAL R. GROSS**  Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1          Q    Now, I'd like you to focus for a

2     moment on your response to Interrogatory

3     Number 10 on page 15 and would you please read

4     into the record the first two lines of that

5     answer?

6          A    This answer here, response to --

7     "As Plaintiff's damages are not physical or

8     financial in nature" --

9          Q    Okay, the first two lines.

10         A    Okay, that's it?

11         Q    Yes, thank you.  So at the time

12    that you signed those answers to your

13    interrogatories, was that statement correct

14    that your damages were not physical or

15    financial in nature?

16         A    Yes.

17         Q    Okay, and that's still correct?

18         A    My family is suffering because of

19    -- there's no precise computation as far as

20    that is concerned.

21         Q    Okay, but putting aside emotional

22    stress that you or your family may be

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                  Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1  suffering, is it still correct that your

2  damages in this case are not physical or

3  financial?

4      A    Because of the anxiety that my

5  family has been placed --

6             MR. SHAPIRO:  Family or you?

7             THE WITNESS:  Me, because of the

8  anxiety that I have been placed through, and

9  because of the loss of enjoyment of life and

10  so forth, that -- and the financial is --

11      Q    Okay, but you --

12      A    But my reputation and anxiety and

13  so forth that I've gone through and so forth,

14  that I know my emotions are coming through at

15  this particular point.

16      Q    When you signed -- you just said

17  that when you signed these answers to

18  interrogatories in February of this year,

19  2007, you had not suffered physical or

20  financial damage and you had said that that

21  was correct.

22      A    At the time I signed this, that is

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS          Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1   correct right there, but I have gone through

2   so much humiliation and stress, I'm on anxiety

3   medication because my doctor placed me on

4   medication because of my anxiety and so forth.

5   It's been effecting my blood pressure and

6   everything.

7        Q    Okay, since February 2007 --

8        A    When I made this statement, I have

9   gone -- I have been through so much stress in

10   that particular office, ASB, from 2003 onward

11   that trying to get my blood pressure under

12   control and being placed on anxiety medication

13   up to this present time.

14       Q    Okay, you seem to be testifying

15   now that this wasn't correct in February 2007

16   when you said it.  You've said in your sworn

17   answers to interrogatories in February 2007

18   that you had not suffered physical damage.

19       A    What I said was correct at that

20   time.

21       Q    Okay, and you said in February

22   2007 that you had not suffered financial

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433         WASHINGTON, D.C. 20005-3701        www.nealrgross.com

1    damage.

2        A    But the stress and the humiliation

3    and so forth has been overwhelming to me and

4    my family.

5        Q    Okay, I'm talking just now about

6    physical damage and financial damage.    And

7    it's correct that as of February 2007, you

8    hadn't suffered any.    That's your sworn

9    testimony.

10       A    When I said this, this is exactly

11   right, the most precise computation on the

12   damages and so forth, but I have gone through

13   a great deal of stress and professional

14   humiliation.

15       Q    Okay.  Let's talk about the stress

16   for a moment, and have you sought medical

17   treatment for the stress you experienced as a

18   result of being called Missy by Ms. Bridges

19   Steely?

20       A    Yes.

21       Q    From whom?

22       A    Dr. Bradley Ware.

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1          Q    When did you -- how soon after

2     February 3rd, 2005, did you seek medical

3     treatment from Dr. Ware?

4          A    I have been going to Dr Ware

5     because I've had -- probably a couple of

6     months afterwards, I came down with a real bad

7     pain and so forth, and I went in and was out

8     for a couple of weeks, so it was probably six

9     to seven months afterwards.

10         Q    Okay, so from February 3rd till

11    that time that was probably six or seven

12    months afterwards, did you see Dr. Ware?

13         A    Yes, I had to go in periodically

14    because of my blood pressure, because I'm on

15    medication and what he does is that, I go --

16    I would have to go in to get my prescriptions

17    refilled and get my blood pressure checked

18    because it was elevated.

19         Q    Okay, do you have any records

20    showing when you went to see Dr. Ware?

21         A    Yes.

22         Q    What records?

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS   Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1          A       The ones that he submitted.

2          Q       Okay.  Other than records that Dr.

3     Ware maintained, did you keep any records?

4     For example, did you keep your personal

5     calendar or perhaps on the office's Outlook

6     system any records showing when you had an

7     appointment with Dr. Ware?

8          A       No.

9          Q       So following February 3rd, 2005,

10    when is the first time you saw someone at Dr.

11    Ware's office?

12         A       As I stated, I had to go in to get

13    my blood pressure medicine refilled, get my

14    blood pressure checked, and because my blood

15    pressure was elevated, I did discuss with him

16    about my lawsuit and my being called Missy.

17         Q       Okay, so before February 3rd, 2005,

18    you were being treated for high blood

19    pressure?

20         A       Yes.

21         Q       When were you first treated for

22    high blood pressure?

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                  Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1        A    I've had high blood pressure for

2   over 20 some years, when I was at the

3   University of Mississippi back in the `80s.

4        Q    When did you start seeing Dr.

5   Ware?

6        A    Dr. Ware became my doctor once my

7   other doctor retired.  I've been with Dr. Ware

8   now for at least since 2001.

9        Q    Okay, and who was your previous

10  doctor?

11       A    Dr. Tamiriz.

12       Q    Would you spell that, please?

13       A    T-A-M-I-R-I-Z, I think.

14       Q    And where was his office located?

15       A    In Alexandria.

16       Q    What was his first name?

17       A    Theodore.

18       Q    Do you know where he is living

19  now?

20       A    No.

21       Q    Do you have any reason to think

22  he's still in this metropolitan area?

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1          A    No.

2          Q    Do you have any reason to know if

3     he's still alive?

4          A    No.

5          Q    Did -- was Dr. Ware given your

6     records from Dr. Tamiriz when you started

7     seeing Dr. Ware?

8          A    I don't recall, but I believe so.

9          Q    When you started seeing Dr. Ware,

10    did you start seeing him -- when you started

11    seeing him, was one of the reasons you were

12    seeing him for your high blood pressure?

13         A    Yes.

14         Q    Okay.  So you continued to see him

15    for your high blood pressure.

16         A    Yes.

17         Q    Okay.  So following -- before

18    February 3rd, 2005, did you see Dr. Ware for

19    any things other than high blood pressure?

20         A    If I got sick with the flu or

21    something like that.

22         Q    Did you see him before February

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                     Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433         WASHINGTON, D.C.  20005-3701         www.nealrgross.com

1    3rd, 2005 for anything that you considered

2    related to work stress?

3        A    No.

4        Q    After February 3rd, 2005, did you

5    see Dr. Ware for anything that you considered

6    work stress?

7        A    Yes.

8        Q    Okay, separate and apart from

9    blood pressure?

10       A    I don't understand the question.

11       Q    Okay, did you see Dr. Ware after

12   February 3rd, 2005 for anything that you

13   considered related to work stress other than

14   for your high blood pressure?

15       A    Yes, I came down with -- something

16   wrong with my back in October of 2005, around

17   that time period.  And I remember mentioning

18   to him, he says, "Ms. Bass, you are definitely

19   stressed out here."  And I remember I was out

20   for almost two weeks for that.

21       Q    Okay, so that was about eight

22   months after the February 3rd, 2005

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    conversation?

2         A    Yes.

3         Q    Okay, and before October 2005, and

4    after February 3rd, 2005, did you see Dr. Ware

5    for anything that you considered related to

6    workplace  stress  other  than  high  blood

7    pressure?

8         A    Yes.

9         Q    Okay, what did you see him for?

10        A    I  came  down  --  it  was  an  upper

11   respiratory problem.  I can't exactly remember

12   and I knew that that was affecting my blood --

13   I can't remember what it was, it was the flu,

14   strep throat.

15        Q    And when was that?

16        A    That had to be -- that had to be --

17   to the best of my recollection, that had to be

18   maybe the spring of 2005.  It had to be around

19   maybe  April  or  May,  to  the  best  of  my

20   recollection.

21        Q    Okay.  So from February 3rd to that

22   visit to Dr. Ware in April or May of 2005, did

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    you see Dr. Ware?

2         A    For anything?

3         Q    Yes.

4         A    As I stated earlier, even though

5    you keep saying not to mention the blood

6    pressure, but I had to keep going to him

7    because I couldn't get my prescriptions for my

8    blood pressure filled without seeing him and

9    every time I would go in, it was elevated.

10        Q    Okay. So between February 3rd, 2005

11   and April or May 2005, did you see Dr. Ware

12   about any complaints other than your high

13   blood pressure?

14        A    Not that I can recall.

15        Q    And I believe you said a few

16   minutes ago that you spoke with Dr. Ware about

17   your lawsuit.

18        A    Yes.

19        Q    Tell me about that conversation.

20        A    I mentioned to him about Ann

21   Bridges Steely calling me Missy and how she

22   came to my office and asked me how I felt and

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                     Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    everything and he said that he had a lot of

2    patients that had a lot of stress.

3         Q    When did you tell Dr. Ware about

4    this?

5         A    It had to be -- I know it was

6    during 2005 but I can't remember the exact

7    month.

8         Q    So it could have been this spring

9    visit in April or May or it could have been

10   October.

11        A    Yes.

12        Q    Had you told him at all before that

13   about your previous lawsuit?

14        A    Yes.

15        Q    And what had you told him about

16   that?

17        A    I just discussed what was in the

18   Washington Post.

19        Q    How did he respond?

20        A    He basically said that, you know,

21   "Mary, life is just so short, you know, you've

22   got to take care of yourself."

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                              Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1       Q    How many times had you talked to

2   him about your previous lawsuit?

3       A    Not that often.

4       Q    More than two?

5       A    Yes, I think so.  I think it was

6   more than two.

7       Q    More than five?

8       A    I know it was more than two.

9       Q    Do you know if it was more than

10   five?

11       A    I don't know.  I know it was more

12   than two.

13       Q    Okay, but you don't know if it was

14   more than five.

15       A    Because sometimes when I would go

16   over to his office, he would not be there and

17   the nurse practitioner was there, but I never

18   discussed the lawsuit with her.

19       Q    Okay, did you discuss that previous

20   lawsuit with anyone in Dr. Ware's office other

21   than Dr. Ware?

22       A    No.

**NEAL R. GROSS**  Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS      Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1        Q    Did you talk about the Missy

2    incident with anyone in the office other than

3    Dr. Ware?

4        A    No.

5        Q    How many times did you talk to Dr.

6    Ware about the Missy incident?

7        A    I know it was more than two times

8    because he kept wondering why my blood

9    pressure kept being elevated and so forth and

10   that's when he put me on the Lorazepam to try

11   to get everything under control.

12       Q    Okay, and I'll apologize in advance

13   for my pronunciation of that medication.

14   Lorazepam, can you spell that, please?

15       A    L-O-R-A-Z-E-P-A-M.

16       Q    And when did Dr. Ware prescribe

17   that medication for you?

18       A    It was the earlier part of this

19   year.

20       Q    So the earlier part of 2007.

21       A    Yes.

22       Q    And why did he prescribe that for

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    www.nealrgross.com

1    you?

2        A    Because my blood pressure was

3    elevated and he was trying to get it under

4    control.

5        Q    Okay, so that is a blood pressure

6    medication?

7        A    No, it's an anxiety medication.

8        Q    Did you tell Dr. Ware in early 2007

9    -- leading up to his prescribing that for you,

10   did you tell him that you were anxious about

11   anything?

12       A    Yes.

13       Q    Did you tell him that you were

14   anxious about work?

15       A    Yes.

16       Q    In early 2007.

17       A    Yes.

18       Q    Specifically, relating to work,

19   what did you tell him you were anxious about?

20       A    About the pending lawsuit, the

21   amount of stress that I was under, because my

22   father had died at an early age of a massive

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1    heart attack and I know that with the blood

2    pressure and so forth, it's hereditary, that

3    I just didn't want to die like that.

4         Q    Did you tell the doctor that you

5    were at all anxious about changing jobs within

6    the FDIC?

7         A    No.

8         Q    Okay, and you never told the doctor

9    that you were anxious about any possible

10   downsizing.

11        A    No.

12        Q    So it was just about the lawsuit.

13        A    About the lawsuit.

14        Q    Okay, did you tell the doctor you

15   were anxious about anything not related to

16   work?

17        A    We had discussions.  I'm 47 years

18   old and I have hot flashes and so forth as a

19   female in menopause.

20        Q    Okay.

21        A    We discussed that, too.

22        Q    Okay, but before the doctor

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.                Exhibit 3
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    prescribed Lorazepam for you, did you tell him

2    that you were anxious about anything else in

3    your life other than physical symptoms you had

4    relating to menopause or anxieties connected

5    to the lawsuit?

6         A    No, we just discussed the lawsuit

7    and the menopause.

8         Q    So nothing else in your personal

9    life.

10        A    Not that I can recall.

11        Q    Okay.  What was the dosage of

12   Lorazepam that Dr. Ware prescribed for you?

13        A    I don't understand the question.

14        Q    Was there a certain number of

15   tablets or a certain number of milligrams?

16        A    All I know I have to take it three

17   times a day.

18        Q    Okay.  And has your blood pressure

19   been lowered since you began taking it?

20        A    The last time I was in there, no.

21        Q    Have your anxiety -- have your

22   anxiety levels been lowered by taking it?

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1          A     No.

2          Q     Are you still taking it?

3          A     I'm still taking it.

4          Q     Okay, and you haven't stopped at

5     any time since it was prescribed for you.

6          A     No.

7          Q     Are you taking any other medication

8     that you believe is related to work stress?

9          A     He did prescribe a second blood

10    pressure pill for me.

11         Q     Has that second blood pressure pill

12    brought down your blood pressure?

13         A     No.

14         Q     Have you seen any other medical

15    practitioner about workplace stress?

16         A     No.

17         Q     So you haven't seen any other type

18    of psychologist or psychiatrist or counselor.

19         A     No.

20         Q     Did Dr. Ware ever suggest that you

21    see anyone else for workplace stress?

22         A     No.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1          Q     Before you talked with Dr. Ware

2     about any anxieties you felt were stress you

3     felt about work, had you ever told any doctor

4     that you felt stressed out by work?

5          A     No.

6          Q     So this was the first time you felt

7     stress serious enough to see a doctor.

8          A     Could you repeat that?

9          Q     Okay.  You said that in -- you saw

10    the doctor in October of 2005 and I believe

11    you said at that point you had problems with

12    your back or shoulder.  Was it both of them or

13    --

14         A     It was a combination of both.

15         Q     Okay.  And that's the problem that

16    you were seeing Dr. Ware about, right?

17         A     In addition to my blood pressure

18    problems.

19         Q     Okay.  Was there ever a time when

20    you went to Dr. Ware because of stress, not

21    because of physical symptoms?

22         A     Not that I can recall.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS          Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1          Q    Okay.    Now,  you  started  to  say

2     before  that  your  family  life  is  suffering  as

3     a  result  of  the  hostile  work  environment  in

4     ASB.   Would  you  describe  that,  please?

5          A    I'm  the  mother  of  a  12-year  old  and

6     I  go  home  and  I  would  just  be  so  stressed  out

7     from  having  to  deal  with  ASB  that  my  daughter,

8     you  know,  she  wanted  time  with  her  mom  and  I

9     just  didn't  have  the  energy  to  give  it.   Or

10    even  on  the  weekends,  just  my  enjoyment  for

11    life  was  not  there  even  with  my  husband  and  so

12    forth.    So  it  was  just  one  thing  after

13    another.

14         Q    And  when  did  that  begin?

15         A    It  all  started  in  2003  and  I  dealt

16    with  it  the  best  way  I  could  because,  you

17    know,  I  just  didn't  want  to  just  keep  having

18    to  file  lawsuits.    And  then  as  things

19    escalated  and  we  made  it  to  February  2005,  I

20    just  couldn't  take  it  any  more.   It  just  --  I

21    knew  I  was  going  to  have  to  go  back  through

22    the  nightmare  of  having  to  file  another

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS          Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    lawsuit, put my family back through that

2    aggravation and also deal with my health in

3    terms of keeping myself to the point of not

4    stroking out or having a heart attack, because

5    like I said, I've had hypertension since the

6    `80s.   My father died of a massive heart

7    attack at a very young age and like I said,

8    just not being there for my daughter and my

9    husband.

10         Q    When in 2003 would you say that

11   stress started?

12         A    It escalated in November/December

13   time frame.  I just knew that at that

14   particular point that my senior manager, Ms.

15   Ann Bridges Steely just had it out for me.

16   And I knew that with my job that was my

17   livelihood and so forth and that was my

18   career.

19         Q    Was there anything else going on in

20   your life in that November/December `03 time

21   frame that was causing you stress?

22         A    No.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433         WASHINGTON, D.C.  20005-3701         www.nealrgross.com

1      Q     When did you finally settle your

2    previous lawsuit with the FDIC?

3      A     To the best of my recollection

4    February 2003.

5      Q     Okay, and during that time, did you

6    feel -- did your family life suffer because of

7    any stress you brought home?

8      A     We were happy because we just knew

9    -- I was at the end of my -- at the end of my

10   nightmare of seven years of dealing with the

11   FDIC in Federal Court.  So I just knew it was

12   over then and it was over until I met Ms. Ann

13   Bridges Steely.

14     Q     Okay, and you met her when?

15     A     In -- she came onboard in May of

16   2003.

17     Q     And you said your stress escalated

18   in the fall of 2003, November or December.

19   When did it start?

20     A     When I had that meeting with her

21   about those CSA awards and she told me that my

22   fellow managers did not feel comfortable with

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    me, I just -- it just affected me so that I

2    just knew that, you know, it was the beginning

3    of something.

4         Q    Okay, and this stress that you've

5    described, has it stopped?

6         A    In a new job at the FDIC, the

7    people that I really respect in DSC but

8    because I'm in something of an occupation now

9    that's totally different from what I had done

10   for almost 20 some years as a contracting

11   professional, that I'm trying my best, you

12   know, to step up to the plate and get things

13   down, only because of my newness to the

14   Community Affairs Section.

15        Q    Okay, I'm not sure I understood

16   your answer.  Has the stress that you've

17   described stopped?

18        A    As far as -- maybe I'm not

19   understanding.

20        Q    Workplace stress?

21        A    The newness of being in DSC as a

22   Community Affairs Specialist is not as

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1    stressful as ASB but because of the fact that,

2    you know, I'm still having to deal with

3    anxiety and so forth.

4        Q    Okay, so the anxiety that you feel

5    is related to the newness of your job.

6        A    It's a very new job but it all

7    started when I was in ASB.

8            MS. SARSHIK:  Okay, I'd like to

9    take a break for a moment.

10            THE WITNESS:  Okay.

11                (Whereupon, the above-

12                entitled matter went off

13                the record at 3:29 p.m.

14                and resumed at 3:38 p.m.)

15            MS. SARSHIK:  Okay, back on the

16    record.

17            BY MS. SARSHIK:

18        Q    Ms. Bass, before February 3rd, 2005,

19    was Donna Gambrell your friend?

20        A    Yes.

21        Q    Would you describe the friendship?

22            MR. SHAPIRO:  Objection.  Vague.

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

1          BY MS. SARSHIK:

2      Q    Okay, how long had you and Ms.

3  Gambrell been friends?

4      A    I had known Ms. Gambrell from

5  working on projects with her for several years

6  and I had a mutual friend who was in -- I

7  don't know the name of the association but

8  they were in the association together.  I

9  can't recall the name of it.

10     Q    Okay, what kind of association was

11  it?

12     A    Now, this was my friend that was in

13  the association with Ms. Gambrell --

14     Q    Okay.

15     A    -- because she said Ms. Gambrell

16  had mentioned me, that I was a person who

17  really knew what they were doing and so forth.

18     Q    Okay, and what kind of association

19  was that?

20     A    It was -- if I'm not mistaken, it

21  was something that took place after work.

22     Q    Okay, was it some kind of political

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1    organization or civic organization?

2        A    I don't know.

3        Q    Okay, and --

4            MR. SHAPIRO:  Sorry, can we go off

5    the record a second?

6            MS. SARSHIK:  Off the record.

7                    (Whereupon,  the  above-

8                    entitled matter went off

9                    the record at 3:40 p.m.

10                   and resumed at 3:44 p.m.)

11           MS. SARSHIK:  On the record.

12           BY MS. SARSHIK:

13       Q    Okay, so you don't know why type of

14   association  that  was  that  both  your  mutual

15   friend and Ms. Gambrell were in.

16       A    No, I don't recall.

17       Q    Okay.   When  did  your  friendship

18   with Ms. Gambrell begin?

19       A    Ms. Gambrell and I go back probably

20   to 2003 or before because I had worked on some

21   project out of her area.

22       Q    Before 2003, is that what you mean?

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS              Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1        A     Yes, I can't recall exactly what it

2   was but she was always very pleasant to me and

3   met me and greeted me as Sweety in a couple of

4   meetings.  I just can't recall which meetings

5   those were.

6        Q     Okay.  Did you ever have lunch with

7   Ms. Gambrell?

8        A     No.

9        Q     Okay,  did  you  ever  socialize

10  outside of work?

11       A     No.

12       Q     Did  you  ever  engage  in  personal

13  conversations  with  her  about  families,  for

14  example?

15       A     No, I didn't.

16       Q     Okay, did you ever engage in any

17  other small talk with her?

18       A     Yes.

19       Q     About what?

20       A     About some of the projects we were

21  working on.  She is a very pleasant lady.

22       Q     Okay, did you ever engage in small

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS   Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    talk with her that was not directly about

2    work?

3         A    The -- one incident, that morning

4    on February the 1st, when she saw me in the

5    lobby and I asked here, I said, "Sweetie, how

6    are you doing", and she said, "Just fine."

7         Q    Okay.  But other than that how are

8    you doing, fine, kind of talk, did you ever

9    engage in social conversation with Ms.

10   Gambrell?

11        A    Like I said, there were some

12   projects that we worked on, some contractual

13   issues that, you know, was a small talk.  The

14   fact that she had referred to me as Sweetie in

15   a meeting dealing with a Chairman's project

16   and so forth.

17        Q    Okay, when was that meeting when

18   she called you Sweetie?

19        A    To the best of my recollection, I

20   knew it was around about 2003.

21        Q    Who else was at that meeting?

22        A    I know there were some other

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS        Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    individuals there but I don't recall exactly

2    who was there.

3        Q    Anyone else from your work group?

4        A    The contract specialist that was

5    assigned to the project and like I said, I

6    can't recall which specialist that was.

7        Q    Okay.  Did Ms. Bridges Steely ever

8    have occasion to call Ms. -- strike that.

9            Did Ms. Bridges Steely ever hear

10    Ms. Gambrell call you sweetie?

11        A    No.

12            MR. SHAPIRO:  Objection.  You're

13    going to have to ask her on that.  I mean, how

14    would she know if Ms. Bridges Steely ever

15    heard?

16            BY MS. SARSHIK:

17        Q    Yes, was Ms. Bridges Steely ever

18    present when Ms. Gambrell called you Sweetie?

19        A    No.

20        Q    Okay, now you said that there was

21    a time on or about February 1st when Ms. Steely

22    heard you call Ms. Gambrell Sweetie.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS          Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1          A      On February 1st, yes.

2          Q      Yes.    And  where  did  that  take

3     place?

4          A      It  was  in  the  lobby  area  in  DSC

5     prior to us going into the meeting to discuss

6     the contractual issues in my unit.

7          Q      So,  it  was  right  outside  the

8     conference room.

9          A      Yes.

10         Q      Okay, so the lobby does not refer

11     to the lobby of the building itself.

12         A      Right  out  --  in  the  receptionist

13     area right outside.

14         Q      Okay, the reception area outside

15     the DSC conference room.

16         A      Yes.

17         Q      In the main building of the FDIC.

18         A      Yes.

19         Q      And how soon was this before the

20     meeting was scheduled to begin?

21         A      Probably  three  or  four  minutes

22     before because Ms. Gambrell, when I referred

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    to her as Sweetie, I specifically remember she

2    had a tray in her hand and knocked some stuff

3    over and I accidentally knocked her

4    strawberries over.   "So Mary, don't worry

5    about it," and she went and took her tray to

6    her office and when she came back we proceeded

7    in the conference room.

8         Q    Did you ever discuss your first

9    lawsuit with Ms. Gambrell?

10        A    No.

11        Q    Did you ever discuss the Missy

12   conversation with Ms. Gambrell?

13        A    No.

14        Q    Have you discussed this lawsuit

15   with Ms. Gambrell?

16        A    No.

17        Q    Have you ever sought career advice

18   from Ms. Gambrell?

19        A    No.

20        Q    Okay.   After that February 1st

21   occasion when you called Ms. Gambrell Sweetie,

22   did Ms. Bridges Steely say anything to you

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1    about that before February 3rd?

2         A    Before February 3rd?

3         Q    Yes.

4         A    Immediately after the meeting was

5    over, she didn't refer to Ms. Gambrell but she

6    abruptly said to me, "Mary, didn't I tell you

7    to stop referring to people as Sweetie," right

8    after the meeting on the 1st.

9         Q    And what did you say?

10        A    I was so insulted that I looked at

11   Tom Harris.  I put my coat on and I told him,

12   I said, "I'll meet you back at the office, I'm

13   going to stop at the restroom," because I

14   didn't want to start a scene out there in the

15   lobby.

16        Q    Had Ms. Bridges Steely ever talked

17   to  you  beforehand  about  calling  people

18   Sweetie?

19        A    She mentioned Sweetie to me in the

20   November/December meeting but she proceeded to

21   start talking about my managers, my fellow

22   managers, they are uncomfortable with me in

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS   Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433   WASHINGTON, D.C.  20005-3701   www.nealrgross.com

1    the CSA.

2         Q    Did you ever call Ms. Bridges

3    Steely Sweetie?

4         A    No.

5         Q    Okay, had you ever called anyone

6    else in your unit Sweetie?

7         A    Yes.

8         Q    Who?

9         A    Serena Woolrich.

10        Q    Okay, anyone else?

11        A    In my unit?

12        Q    Yes, in your section.

13        A    In my -- yes, Ms. Sharon Drakeford,

14   but she's now deceased.

15        Q    Anyone else?

16        A    No.

17        Q    Did you ever call Mr. Harris

18   Sweetie?

19        A    Yes.

20        Q    Would you describe that?

21        A    I accidentally called him Sweetie

22   but I apologized as soon as I said so.

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1      Q    Did you ever call Ms. Woolford

2   Sweetie?

3      A    Not that I can recall.

4      Q    Did you ever call her any other

5   term of endearment?

6      A    Not that I can recall.

7      Q    Did anyone other than Ms. Steely

8   ever talk to you about using the word

9   "Sweetie" in talking to people?

10     A    No.

11     Q    Okay, so in your entire career, she

12  is the only person who ever indicated to you

13  that she didn't like having you call other

14  people Sweetie.

15     A    In all of my years of working, I've

16  never had anybody to tell me that they were

17  offended.   In fact, I can recall that one

18  person said to me that she felt very, very --

19  felt good about me saying it.  I had talked --

20  started her saying it, calling people Sweetie.

21     Q    Did you call males Sweetie?

22     A    No.

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1      Q     So    Sweetie    was    something    you

2   limited to females.

3      A     Not necessarily.  Let me back up.

4   Yes, I have called some males Sweetie.

5      Q     No  one  ever  told  you  that  they

6   minded.

7      A     No one has ever told me and I was

8   raised  that  if  anybody  was  offended  by

9   anything  that  I  ever  did  to  apologize

10  immediately.

11     Q     Did Ms. Bridges Steely ever give

12  you positive feedback or compliments?

13     A     During the summer of 2004, yes.

14     Q     What    positive    feedback    or

15  compliments did she give you?

16     A     Because my unit had been so very

17  short-staffed  because  of  staff  being  out

18  because the family issues, death in the family

19  and Ms. Sharon Drakeford unfortunately passed

20  away in September of 2004, I was commended for

21  holding my unit together and getting the work

22  out timely.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

1      Q      And did she commend you by speaking

2  to you or was there some other form?

3      A      To the best of my recollection, I

4  got an award for holding my unit together

5  because I was down to just one person.

6      Q      Okay, and that award was in the

7  summer of `04?

8      A      I remember when I got the award

9  that it was based on the fact that my unit had

10  been so short-staffed and that I was

11  instrumental in making sure that the work got

12  out and the clients were taken care of.   I

13  don't recall if it was exactly given to me in

14  the summer of `04, but I do remember receiving

15  an award.

16      Q      Do you remember receiving a

17  complimentary e-mail from Ms. Bridges Steely

18  in February of `04 complimenting you on your

19  work?

20      A      I don't recall.

21      Q      You don't recall -- do you recall

22  getting positive feedback or compliments from

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1    Ms. Bridges Steely any time other than this

2    award that you received in approximately the

3    summer of `04?

4         A    I don't recall ever getting a

5    positive feedback for other than that because

6    like I said, my unit was very short-staffed.

7    I was down to one person.

8         Q    Okay, so she never said anything

9    nice to you other than in connection with that

10   one award.

11        A    I don't understand.

12        Q    Did she ever say anything other

13   than in connection with that one award to

14   suggest that you had done anything good?

15        A    Not that I can recall.

16        Q    Okay, you testified earlier that

17   people in your office knew that there was bad

18   morale because of Ann Bridges Steely.   How

19   long had you been in the section before Ms.

20   Bridges Steely joined it?

21        A    Which section?

22        Q    The ABS -- I'm sorry, the ASB.

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C. 20005-3701        www.nealrgross.com

1          A    ASB, the Divisional Unit Chief, I

2    had been in ASB -- see, it had gone through

3    some name changes.  I had been in ASB since I

4    would say returning from RTC in January of

5    `96.

6          Q    Okay, so you have been in ASB in

7    the branch, before Ann Bridges Steely came to

8    it?

9          A    Yes.

10          Q    Okay, how would you describe morale

11    in the branch before she came?

12          A    Morale was very low because we just

13    didn't have a trust of management.

14          Q    Okay.  And did Ms. Bridges Steely

15    do anything to try to raise morale?

16          A    Yes.

17          Q    What did she do?

18          A    She brought in some consultants in

19    the fall of 2003?

20          Q    And what happened with those

21    consultants?

22          A    They did a survey and what

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                           Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    happened, it was a survey on morale and it

2    came back the morale was very low and then

3    later on, after it was discovered that Ann

4    Steely was not what she claimed to be, it even

5    got even worse because the majority of the

6    staff had been placed on the surplus list.

7         Q    What do you mean when you say that

8    Ann Bridges Steely was not what she claimed to

9    be?

10        A    It had been rumored that she was

11   going around bashing the staff and saying that

12   we didn't know what we were doing.

13        Q    What had she claimed to be?

14        A    She had claimed to be somebody that

15   was coming in to help us but it turned out not

16   to be that way.

17        Q    Did you hear that she had bashed

18   anyone?

19        A    Yes, I heard that.

20        Q    Who?

21        A    That she had bashed the entire

22   staff and said that we didn't know what we

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1    were doing.

2        Q    How did morale change after Ann

3    Bridges Steely came to the section?

4        A    The morale that was already in what

5    I characterize as the cesspool even got worse.

6        Q    Okay, so lower than the cesspool.

7        A    Yes.

8        Q    Why did Ann -- why did Ms. Bridges

9    Steely leave the FDIC?

10       A    I have no idea but I did hear

11   through the rumor mill that she was asked to

12   leave.

13       Q    And who told you that?

14       A    Just like I said, through the rumor

15   mill, no specific person.

16       Q    And what did the rumor mill say

17   about who asked her to leave?

18       A    I just know that she was asked to

19   leave.

20       Q    You know that she was asked to

21   leave?

22       A    No, no, I just know that in the

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1    rumor mill it said that she was asked to

2    leave.

3        Q    What did the rumor mill say about

4    why she was asked to leave?

5        A    That she didn't know what she was

6    doing, that she was asked to leave.

7        Q    Did you hear any specifics that

8    showed she didn't -- in the rumor mill that

9    showed she didn't know what she was doing?

10       A    All I know that in the rumor mill

11   that she was asked to leave because she didn't

12   know what she was doing and they didn't go

13   into any detail.

14       Q    Has any manager with knowledge told

15   you that she was asked to leave?

16       A    No.

17       Q    Have you -- before the previous

18   lawsuit against the FDIC, had you previously

19   filed any discrimination claims with a

20   government agency?

21       A    No.

22       Q    And before that previous lawsuit,

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS    Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    www.nealrgross.com

1    had you ever -- have you ever brought any

2    previous   lawsuits   against   anyone   for

3    discrimination?

4        A    No.

5        Q    Have you told people that you plan

6    to go to law school?

7        A    I don't understand the question.

8        Q    Within the last few years, have you

9    told anyone that you want to go to law school?

10        A    Yes.

11        Q    Do you currently plan to go to law

12   school?

13        A    No.

14        Q    So   you   haven't   submitted

15   applications within the last few years to law

16   schools?

17        A    Yes, I did, one.

18        Q    Which law school?

19        A    George Mason.

20        Q    And was that for this upcoming

21   academic year or for the academic year that

22   has just finished?

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1        A      For the year that just finished.

2        Q      Okay, and what happened with that

3    application?

4        A      I put it on hold because my

5    daughter needed my attention.

6        Q      All right, so you never heard back

7    from George Mason about whether you had been

8    accepted or not accepted.

9        A      I was not accepted.

10       Q      Did you review any documents in

11   preparation for today's deposition?

12       A      Yes.

13       Q      What did you review?

14       A      My declaration, the addendum to my

15   affidavit, the Plaintiff's Response to

16   Defendant's First Set of Interrogatories and

17   the Complaint that's filed in the US District

18   Court.

19       Q      Did you review anything else?

20       A      No, just that.

21              MS. SARSHIK:  I'd like to take a

22   break for just one moment.  I think I'm just

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

1    about done, but I want to make sure.

2                          (Whereupon,    the    above-

3    entitled  matter  went  off  the  record  at  4:01

4    p.m. and resumed at 4:02 p.m.)

5              MS.  SARSHIK:   Back  on  the  record.

6    I have nothing further.

7              MR.  SHAPIRO:   We  don't  have  any

8    questions.  We'll read and sign.

9                          (Whereupon,   the   above-entitled

10   matter  was  concluded  at  4:02  p.m.  SIGNATURE

11   WAS NOT WAIVED.)

12

13

14

15

16

17

18

19

20

21

22

**NEAL R. GROSS**    Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com

**CERTIFICATE**

This is to certify that the foregoing transcript in the matter of:

Deposition of Mary Bass

Date:                Wednesday, May 30, 2007

Place:               Arlington, VA

represents the full and complete proceedings of the aforementioned matter, as reported and reduced to typewriting.

_____

Neal Gross

**NEAL R. GROSS**   Bass v. Bair, No. 1:06-cv-01345-GK
COURT REPORTERS AND TRANSCRIBERS                Exhibit 3
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        www.nealrgross.com