Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - - - - x

                          :

MARY E. BASS,            :

                          :

      Plaintiff,      :

                          :

      v.              :   Case Number:

                          :

SHEILA C. BAIR,      :   1:06CV01345

Chairman, Federal Deposit    :

Insurance Corporation,    :

                          :

      Defendant.      :

                          :

- - - - - - - - - - - - - - - - - x


                   Arlington, Virginia


                   Tuesday, July 24, 2007


Deposition of

          GLEN VICTOR BJORKLUND

a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before Leanne

M. Krivonak, Notary Public in and for the Commonwealth

of Virginia, Registration Number 180129, in the

offices of Federal Deposit Insurance Corporation, 3501

Fairfax Drive, Arlington, Virginia, commencing at 10:58

a.m.

      Diversified Reporting Services, Inc.

          (202) 467-9200

APPEARANCES:


On Behalf of the Plaintiff:


        DAVID H. SHAPIRO, ESQ.

        SWAIK & SHAPIRO

        1225 Eye Street, N.W.

        Suite 1290

        Washington, D.C.  20005


        On Behalf of the Federal Deposit

        Insurance Company:

            BARBARA SARSHIK, ESQ.

            WILLIAM S. JONES, ESQ.

            3501 Fairfax Drive

            Arlington, Virginia  22226

Page 3

C O N T E N T S

EXAMINATION BY:                                PAGE

        Counsel for Plaintiff                   4

                        E X H I B I T S

            (None marked.)

Page 4

1                   P R O C E E D I N G S

2    Whereupon,

3                   GLEN VICTOR BJORKLUND

4    was called as a witness and, having been first duly

5    sworn, was examined and testified as follows:

6              EXAMINATION BY COUNSEL FOR THE PLAINTIFF

7              BY MR. SHAPIRO:

8        Q    Could you state your full name please, sir.

9        A    Glen Victor Bjorklund.

10       Q    Mr. Bjorklund, I would normally ask for your

11   residential address, but if we could have an agreement

12   from counsel for the FDIC that they will produce you

13   and that service to them of a subpoena for you will

14   guarantee your arrival.  In other words, it would be

15   considered service upon you.  If that's agreeable to

16   both you and to counsel for the FDIC, I don't need to

17   have any personal information.

18             MS. SARSHIK:  Yes.

19       A    I don't have any problem with that.

20       Q    Fine.  Then we'll have an agreement on that in

21   that regard.  Mr. Bjorklund, are you currently employed

22   by the FDIC?

Page 5

1    A    Yes.

2         Q    And what capacity?

3    A    Deputy Director, Division of Administration,

4    FDIC.

5         Q    And how long have you been with the FDIC?

6    A    Since July of 1990.  So that would be a little

7    over 17 years.

8         Q    And how long have you been the Deputy Director

9    for the Division of Administration?

10   A    Since about mid-July of 2001.

11        Q    What did you do prior for the FDIC?

12   A    For approximately 12 years prior to my current

13   position, I was manager for administration for the

14   FDIC's legal division.

15        Q    So is that the job you originally got when you

16   first came here?

17   A    When I first came to the FDIC; that's correct.

18        Q    And then you moved to the Division of

19   Administration more generally.  In other words, the

20   Division of Administration for the FDIC, as a whole?

21   A    Correct.

22        Q    As the Deputy Director?

Page 6

1    A    Correct.

2    **Q    Okay.  And prior to the FDIC?**

3    A    Prior to the FDIC, I worked at the U.S.

4 Department of Agriculture Federal Crop Insurance

5 Corporation.  And I was there -- title was Assistant

6 Manager for Administration.  That was for about three

7 years.  And for about five or six years prior to that,

8 I was the Personnel Officer, same organization.

9    **Q    And before you were at USDA?**

10    A    Before USDA, I was at the U.S. Civil Service

11 Commission, which then became the U.S. Office of

12 Personnel Management, in a number of positions.  I

13 spent about -- almost 10 years there.

14    **Q    What was your area of specialty there?**

15    A    Wide variety of personnel management.

16    **Q    What was your grades while at OPM or Civil**

17 **Service?**

18    A    I believe the highest grade I achieved while

19 at USOPM was Grade 14.  GS14.

20    **Q    What did you start as?**

21    A    Started as Grade 5.

22    **Q    And when you were the Assistant Manager for**

1    **Administration of the Federal Crop Insurance**

2    **Corporation, USDA, what was your grade there?**

3        A    I was a GM15.

4        **Q    And as Personnel Officer?**

5        A    GM14.

6        **Q    And your current grade at the FDIC?**

7        A    I am an Executive Manager.  There is no grade.

8        **Q    While you were with the legal division, for**

9    **those 12 years?**

10       A    I was an Executive Level 1.  E-01.

11       **Q    What is your current salary?**

12           MS. SARSHIK:  I'm going to object at that

13   point.  That's totally irrelevant and personal.

14           MR. SHAPIRO:  It's not.  It's a government

15   job.  It's public knowledge.  I could get it by public

16   means.  It's not a personal matter.

17           MS. SARSHIK:  I understand.  But it's totally

18   irrelevant.

19           MR. SHAPIRO:  Absolutely not true.  Absolutely

20   not true.  A person's salary, what he gets from this

21   employer is important to show whether he has bias, his

22   interest in keeping in the good graces of his employer.

Page 8

1    In any number of ways, a person's salary is always a

2    relevant thing, and in this case it's a public -- it's

3    a public, matter of public knowledge, so I'd like to

4    know.

5            MS. SARSHIK:  You may answer the question.

6            THE WITNESS:  My total salary is about $213

7    and some change after that.

8            BY MR. SHAPIRO:

9        **Q    Are you eligible for bonuses --**

10       A    Yes.

11       **Q    And how much bonuses are possible?**

12       A    Yes, I'm eligible for bonuses based on

13   performance and the bonus range varies each year based

14   on the determination by the chairman for that year.

15       **Q    And what would be the highest range -- what**

16   **would be the -- give me a typical range.**

17       A    Last year's range was between three percent to

18   a high of eight percent of your base pay.

19       **Q    And your base pay is $213, now?**

20       A    No, that's my total pay.  We have locality

21   pay.

22       **Q    Okay.  And who determines whether you get a**

Page 9

1    bonus and how much of a bonus?  Is it a board?  Is it

2    the chairman who determines that?

3        A    Ultimately, the chairman approves all bonuses.

4        Q    And is there some sort of executive committee

5    that determines -- makes recommendations -- would that

6    be a committee made up of the most senior executives at

7    the corporation?

8        A    Yes.

9        Q    And what is your base pay now?

10       A    Well it's approximately 87 -- 86.3 percent of

11   my total pay.  So, what is that.  Like $180 some

12   thousand.

13       Q    Okay.  Now as the Deputy Director of the

14   Division of Administration, who is your immediate

15   supervisor?

16       A    Arleas Upton Keay.

17       Q    And she would be the Director of the Division

18   of Administration?

19       A    Correct.

20       Q    And her boss would be who?

21       A    John Barinzi.

22       Q    The Chief Operating Officer?

Page 10

1    A    Correct.

2    **Q    Are you a supervisor?**

3    A    Yes.

4    **Q    And whom do you supervise?**

5    A    I supervise the immediate staff in the office

6    of the director.  That's about four people.  And I

7    supervise the assistant and associate directors in the

8    division, and the regional managers, who are field

9    representatives.

10    **Q    You supervise -- you actually supervise the**

11    **operations of the division administration.**

12    A    Yes.

13    **Q    Tell me about the organization.  How many**

14    **units are there -- subordinate units to the director?**

15    A    There are four branches.

16    **Q    So you call them branches.**

17    A    Correct.

18    **Q    Okay.  What are they?**

19    A    Human Resources.

20    **Q    Okay.**

21    A    Acquisition Services.

22    **Q    Okay.**

1      A    Corporate Services.  Management Services is

2  the fourth.

3      **Q    And each one of them are headed by an**

4  **assistant director?**

5      A    Management Services is an assistant director.

6  The other three are associate directors.

7      **Q    Which is higher?**

8      A    Associate director.

9      **Q    How many regional directors are there?**

10     A    Let's see.  There are four regional managers.

11     **Q    And you supervise them.**

12     A    Correct.

13     **Q    So you supervise the operations of the**

14  **regions, too.**

15     A    Correct.

16     **Q    But there are four people on the directors**

17  **staff, who you also supervise -- the Office of the**

18  **Director.**

19     A    Actually, that's three now.

20     **Q    Three people.  And then there is a director**

21  **above you.**

22     A    Correct.

Page 12

1      Q     Any plans to retire, sir?

2            MS. SARSHIK:  I'm going to object.  That's

3      totally relevant, and extremely personal.

4            MR. SHAPIRO:  First of all, personal is not an

5      objection.  And secondly, it's not irrelevant at all.

6      I want to know where he's going to be.  If he's going

7      to be in this area, I want to know.  If he's going to

8      leave the area, I want to know.  And if he's not going

9      to be here, it also has an impact on his credibility.

10           MS. SARSHIK:  Mr. Shapiro, we will agree now

11     to let you know if Mr. Bjorklund leaves, we will give

12     you notice.

13           MR. SHAPIRO:  It's not the same.  I am also

14     entitled to know if he plans to leave.  It's a common

15     question to be asked in public sector positions and

16     private sector positions alike.  There is nothing

17     objectionable about it.

18           Sir?

19           MS. SARSHIK:  You may answer.

20           THE WITNESS:  Eventually.

21           BY MR. SHAPIRO:

22     Q     So there's no current plans.

Page 13

1    A    Correct.

2    **Q    Mr. Bjorklund, who heads the HR branch?  Who's**

3    **the associate director?**

4    A    Chris Aiello.

5    **Q    And how long -- it's mister?**

6    A    Mister.

7    **Q    Mr. Chris Aiello -- could you spell that for**

8    **me?**

9    A    A-I-E-L-L-O.

10   **Q    And how long has Mr. Aiello been a director?**

11   A    About 18 months.

12   **Q    And who was his predecessor?**

13   A    Julie Goodall was acting for about six months.

14   **Q    And the last permanent?**

15   A    Miguel Torrido.

16   **Q    And how long had Mr. Torrido been there?**

17   A    About three years.

18   **Q    What about Acquisition Services?  Who is the**

19   **current associate?**

20   A    Currently, Mike Robino.

21   **Q    Is he acting?**

22   A    He's acting.

1    Q    **And how long has he been acting?**

2    A    Oh, let's see.  Since January.  So that's --

3    Q    **Seven months?**

4    A    Six, seven months, almost.

5    Q    **And who was the person before that?**

6    A    Ann Bridges Steely.

7    Q    **And how long had she been?**

8    A    About three years.

9    Q    **So that would have been 2000 --**

10   A    Four.

11   Q    **Four through 2006, thereabouts?**

12   A    About January or so of 2004 'til January of

13   2007.

14   Q    **Okay.  Corporate Services?**

15   A    That's Mike Robino.  That's his permanent

16   position.

17   Q    **And how long has he been there?**

18   A    Probably about 12 years.

19   Q    **And Management Services.  The assistant**

20   **director of Management Services.**

21   A    That's Paul Sherman.

22   Q    **I know them all.  That's very weird.  So Paul**

Page 15

1    **Sherman -- how long has he been in Management Services?**

2        A    I would say about -- I selected Paul so it

3    would have to have been since August of -- I would say

4    about six or seven years.

5        **Q    Now within Acquisition Services, within that**

6    **branch, are there sections?**

7        A    Yes.

8        **Q    How many sections are in that branch?**

9        A    Three.

10       **Q    And what are they?**

11       A    There is a policy section and there's an IT

12   acquisitions section.  And I believe the third one is

13   corporate acquisitions section.

14       **Q    And I take it each one has a chief -- a**

15   **section chief.**

16       A    Correct.

17       **Q    And who's the section chief of Corporate**

18   **Acquisitions?**

19       A    Tom Harris.

20       **Q    And IT Acquisitions?**

21       A    Dave McDermott just left for detail.  But he's

22   still permanent section chief.

Page 16

1    Q    And Policy?

2    A    Tricia Bursey.

3    Q    Now the associate director is what grade?

4    A    EM.

5    Q    EM.  And the section heads?

6    A    CM2.

7    Q    And is CM2 higher than CM1?

8    A    Yes.

9    Q    That's the old CG-15s?  Equate to CM2?  The

10   old CG-15s, roughly?

11   A    It's not exact.

12   Q    No, but roughly?

13   A    Roughly equivalent to 15 E-1.

14   Q    Okay.  Who hired Ann Bridges Steely?

15   A    Arleas Keay.

16   Q    So she had been hired in January, I think you

17   said, of 2004.

18   A    I'm not sure -- I don't recall the actual

19   date, but that's -- she was here about three years.

20   Q    Okay.  Did you participate in the selection of

21   Ms. Steely?

22   A    Yes.

Page 17

1    Q    **Was it a competitive selection?**

2    A    Yes.

3    Q    **Where did she come from?**

4    A    I believe it was DTRA.  Defense Threat

5    Reduction Agency.

6    Q    **Small agency?**

7    A    I believe so.

8    Q    **She was what there?**

9    A    She was an SES Acquisitions professional.

10   Q    **So she was a contract specialist?**

11   A    She was a senior executive service.  She was a

12   senior manager.

13   Q    **But her field -- her career field had been**

14   **acquisitions management or contract specialist --**

15   A    Correct.

16   Q    **I believe it's 1102.**

17   A    That's the occupational services.

18   Q    **And when she was here, she was an EM employee.**

19   A    Correct.

20   Q    **Had she had any complaints of discrimination**

21   **against her before that you were aware of when she was**

22   **hired?  Whereas, before she was hired here, had there**

Page 18

1    been any indication that she had complaints of

2    discrimination filed against her?

3        A    I'm not aware of any.

4        Q    Did you interview her?

5        A    Yes.

6        Q    All right.  And did you interview other

7    candidates as well?

8        A    Yes.

9        Q    Okay.  Now you were her immediate supervisor

10   for three years, correct?

11       A    Correct.

12       Q    How did she do?

13       A    Very well.

14       Q    What kind of ratings did she get?

15       A    We have a pass fail system.

16       Q    Even for executives?

17       A    Well, it's three steps now.

18       Q    Would it have been three steps while she was

19   there?

20       A    It would have been three steps for one out of

21   the three years.

22       Q    The last one.

Page 19

1    A    The last one.

2    **Q    And what did she get that last year?**

3    A    Fully successful.  Meets expectations, I think

4    is the term.

5    **Q    And that's the mid range?**

6    A    That's the high range.

7    **Q    That's the highest.  What were the other**

8    **two -- what are the other two steps?**

9    A    Marginal would be the middle.  And does not

10   meet would be the bottom.

11   **Q    Did you have an executive during that period**

12   **that didn't meet -- that was marginal?  An executive**

13   **level employee.  EM.**

14   A    No.  Not in DOA.

15   **Q    That's what I mean.  In your -- among your**

16   **executives that you were supervising.**

17   A    No one.

18   **Q    So no one got marginal or less.**

19   A    Correct.

20   **Q    So everybody got meets expectations.**

21   A    Correct.

22   **Q    And you?  Meets expectations?**

Page 20

1        A    Correct.

2        Q    Now, you said there were two other

3    years -- there was a two step, pass/fail.  Meets, does

4    not meet.

5        A    Correct.

6        Q    And she got meets.

7        A    Correct.

8        Q    Anybody get not meets?

9        A    No.

10       Q    Now, during the time that Bridges Steely was

11   here -- by the way, who was her predecessor in

12   Acquisitions?

13       A    I believe her name was Debbie Riley.

14       Q    Debbie Riley.  Okay.  And her predecessor?

15       A    That predates me.  I don't recall.

16       Q    While Ms. Bridges Steely was here, were there

17   any EEO complaints -- equal employment opportunity

18   complaints -- made against her or brought against her?

19           MS. SARSHIK:  You mean in addition to this?

20           MR. SHAPIRO:  Where she was the responsible

21   management official or a responsible management

22   official?  Yes, in addition to this.

Page 21

1          THE WITNESS:  No.

2          BY MS. SARSHIK:

3      Q    **This is the only one.**

4      A    Correct.

5      Q    **Was Ms. Bridges Steely asked to leave?**

6      A    No.

7      Q    **Was it in any way suggested that she should**

8   **leave?**

9      A    No.

10     Q    **So, her leaving was entirely voluntary?**

11     A    Correct.

12     Q    **Why did she leave, as you understand it?**

13     A    To pursue other opportunities.

14     Q    **How many years of government service did she**

15  **have?**

16     A    I believe it was 25.

17     Q    **Did she retire?**

18     A    Yes.

19     Q    **Do you remember what retirement system she was**

20  **on?  CSRS?  FERS?**

21     A    Don't recall.

22     Q    **And how old was she?**

Page 22

1     A     I believe she was 50 or close to 50.

2     **Q     She was a white woman?  Caucasian?**

3     A     Correct.

4     **Q     At any point in the time she was your**

5     **subordinate, did you have cause to counsel her or warn**

6     **her in any way because of behavior, actions, decisions,**

7     **anything at all?**

8     A     Yes.

9     **Q     How many times?**

10    A     Couple.

11    **Q     What was the first time?  Chronologically.**

12    A     You mean date?

13    **Q     Yes.  I'm not asking you what the date was.**

14    **I'm asking you -- tell me about the first time.  When I**

15    **say first time, I mean the chronological first time.**

16    **If she came in 2003 -- 2004 in January and she left in**

17    **January 2007, I'm talking about the earliest in time of**

18    **these times.  The first time.**

19    A     During the first year.

20    **Q     What was that about?**

21    A     Her management style.

22    **Q     What about it?**

Page 23

1    A    Bit about her -- the way she presented

2    decisions.

3    **Q    I don't understand.  The way she told staff**

4    **about decisions or the way she told her bosses about**

5    **decisions?  Or equals.**

6    A    Clients, equals, superiors.

7    **Q    So, not the way she dealt with staff.**

8    A    No.

9    **Q    Okay.  So it wasn't her management of her**

10   **staff, it was something about her style while speaking**

11   **to her clients, her equals in DOA, clients outside of**

12   **DOA, and you and Ms. Upton Keay.**

13   A    Yes.

14   **Q    And how was that?**

15   A    She could be, at times -- what's the term.  A

16   little abrupt.  Too sure of her position.

17   **Q    Okay.  What was the next time?  The next time**

18   **you had occasion to --**

19   A    Probably the following year.

20   **Q    And what was that about?**

21   A    Same general issue.

22   **Q    With the same people?  Clients, equals and**

Page 24

1    superiors?

2        A    Yes.

3        Q    Any other times?

4        A    No.

5        Q    Ever have occasion to counsel her or talk to

6    her, warn her in any way, about the way she dealt with

7    subordinates?

8        A    No.

9        Q    Did you ever hear any complaints from her

10    subordinates about the way she dealt with them?

11       A    No.

12       Q    Did you have a conversation with her where she

13    came to you with a problem regarding Mary Bass?

14       A    Yes.

15       Q    Okay.  How many times?

16       A    Probably two or three.

17       Q    What were the problems, as you can recall?

18       A    They were performance problems --

19       Q    Do you remember the first --

20       A    -- with Mary.

21       Q    All of them?

22            MS. SARSHIK:  I'm going to object, because

Page 25

1    that's unclear.  All of the conversations or all of the

2    performance problems?

3              MR. SHAPIRO:  Two to three times --

4              THE WITNESS:  All of them had to do with her

5    performance, yes.

6              BY MR. SHAPIRO:

7        **Q    Okay, yes.  When was the first one?**

8              MS. SARSHIK:  If you remember.

9              MR. SHAPIRO:  Everything is if he remembers.

10             THE WITNESS:  Probably some time between year

11   one and year two.

12             BY MR. SHAPIRO:

13       **Q    So she started in January 2004, 2004 would be**

14   **year one and 2005 would be year two.  So you're saying**

15   **some time in 2004 or '05 would be the first time?**

16       A    In the 05 -- in the 2005 or 2006 range.  It

17   was after a year to a year and a half of Ann being on

18   board, is my recollection.

19       **Q    So 2005 to 2006.**

20       A    That's my recollection.

21       **Q    And what was the problem?**

22       A    Poor customer service.  Failure to follow up

Page 26

1    on work in progress for clients.  Failure to return

2    client phone calls in a timely manner.  There were

3    complaints from some of the clients about poor service.

4         **Q    Was this before or after Mary Bass made her**

5    **EEO complaint about Bridges Steely?**

6         A    I think it was before.

7         **Q    You think it was before.  Is there a document**

8    **that she came to you with -- Ms. Bridges Steely?  Did**

9    **you document it or did she document it?  Did she send**

10    **you an email about this?**

11        A    My recollection is her contacts with me were

12    face to face.

13        **Q    So they were not on the phone or in writing.**

14    **They were in person.**

15        A    They were in person.

16        **Q    Did you make a written record?**

17        A    No.

18        **Q    In any of the cases?  In any of the two to**

19    **three cases?**

20        A    No.

21        **Q    So when we're talking about all -- each of the**

22    **two to three complaints that you recall Ms. Bridges**

Page 27

1    Steely bringing to you about Mary Bass, the contacts

2    were face to face oral.

3        A    Yes.

4        Q    And between you and Ms. Bridges Steely, right?

5        A    Yes.

6        Q    And you -- she did not follow up with writing

7    as far as you know, and you did not document it in

8    writing, correct?

9        A    I made no note of it, myself.

10        Q    Do you recall her following up your

11    conversation with writing, to you?

12        A    To me?

13        Q    Yes.  That you knew about.  Some writing that

14    you knew about.

15        A    I don't recall her following up in writing to

16    me.

17        Q    So just that I understand what we've just

18    said, what we've just talked about.  On two to three

19    occasions, beginning in 2005 or 2006, Ms. Bridges

20    Steely came to you with customer serv -- with problems

21    that she was having with Mary Bass.

22        A    She mentioned she was having performance

Page 28

1    problems.

2        Q    In each of these cases they were performance

3    problems.

4        A    Correct.

5        Q    She always did this in person --

6        A    That's my recollection.

7        Q    We're going by your recollection, sir.  So I

8    have it correct, right?

9        A    Yes.

10        Q    And you did not make a writing of the incident

11    when she came to you and you don't know that she did,

12    either.

13        A    She did not send me anything in writing,

14    correct.

15        Q    And you don't know whether she wrote anything

16    down.

17        A    I don't know if she wrote anything.

18        Q    Good.  Okay.  So in each of these two to three

19    cases -- were the other cases, or the other case where

20    she came to you -- whether it was two or three -- was

21    the same problem?

22        A    Yes.

Page 29

1    Q    That she talked about?  Performance, customer

2    service, timeliness in getting back to customers and

3    customer complaints.  That sort of thing.

4    A    Correct.

5    Q    You said there were two or three times that

6    she came to you, correct?

7    A    Correct.

8    Q    And so the second time, how close, and maybe

9    it was the only other time, how close was it to the

10   first time?  I'm trying to get a sense.  If the first

11   one was in 2000 -- mid 2005 or perhaps even in 2006,

12   when was the second one?  How close in time?

13   A    Within several months.

14   Q    Several being three?

15   A    I don't recall the actual date.

16   Q    No, what I'm asking is, when you say several,

17   everybody has a different meaning to several.

18   A    Two to three.

19   Q    Two to three.

20        MS. SARSHIK:  Can we take a break for a

21   moment?

22        MR. SHAPIRO:  We certainly can.

Page 30

1          (Brief recess.)

2          BY MR. SHAPIRO:

3          MR. SHAPIRO:  We can go back on.

4          THE WITNESS:  Are we back on the record?

5          MR. SHAPIRO:  We can be.

6          THE WITNESS:  I'd like to be on the record.  I

7    may have mislead you and therefore the record.

8          BY MR. SHAPIRO:

9      **Q     Don't want that.**

10     A     Don't want that.  I was asked a question about

11   the chronological time on Ann Steely coming to me,

12   indicating problems with Mary Bass.

13     **Q     Yes.  You said it was two or three times and I**

14   **asked you to tell me the first one and you said it**

15   **was --**

16     A     But there was a follow up question as to

17   whether she came to me before or after.

18     **Q     The EEO complaint.**

19     A     The first time -- well, I want to make sure

20   because I may not have been very clear about that.  I'm

21   certain the first time was clearly before the complaint

22   was filed.  And if she came to me three times, at least

Page 31

1   two of those times were before any filing of an EEO

2   complaint.

3       Q    Let me ask you about that.  You're sure the

4   first two times were -- if it was three times?

5       A    There were problems raised well before the

6   filing of any EEO claim.

7       Q    When you say the filing of an EEO claim, you

8   mean the filing of a formal complaint.

9       A    Getting knowledge of any EEO complaint.

10      Q    Any knowledge you had.

11      A    Any knowledge I had of an EEO complaint.

12      Q    Okay, and before -- and perhaps the problem

13  was my question.  So when you say before any EEO

14  complaint was filed, you mean before you had any

15  knowledge of any EEO complaint.

16      A    Yes.

17      Q    Okay.  And you believe that the first time she

18  came to you, that is Bridges Steely came to you and

19  enlightened you that she was having a performance

20  problem with Mary Bass, or that Mary Bass was having

21  performance problems in her opinion -- in Ms. Bridges

22  Steely's opinion, was sometime in the second or over to

Page 32

1    **the third year of her time.   You gave me the**

2    **chronology -- you said, if she started in January of**

3    **2004, it was sometime in 2005 and maybe over to 2006.**

4         A    Well, the first time would have been within

5    the first year that Ann was with me.

6         **Q    That's not what you said before.**

7         A    I know --

8         **Q    What you said before that it was certainly**

9    **2005 and perhaps -- 18 months to two years after she**

10   **was there.   That's what you said before.**

11        A    Okay. let me try and make it clear.   Remember,

12   I don't keep a julian calendar embedded in my brain for

13   all this and I have documented almost 300 people

14   indirectly reporting to me.

15             Within Ann's first year, my

16   recollection -- within her first year of being our

17   associate director of acquisition services.   She

18   brought to my attention that there were performance

19   problem concerns with Mary Bass.   That is my

20   recollection.   She talked with me one or two -- could

21   have been as many as three other times.   Periodically,

22   she would come back and let me know that the problems

Page 33

1    were continuing or that there had been some

2    amelioration.  She was clearly trying to work through

3    Tom Harris, who was Mary's supervisor, with Mary on her

4    performance problems.  But the first indication of

5    performance problems was well before any filing of any

6    complaint as I recall.

7        **Q    But you're saying now it was within the first**

8    **year not after 18 months.**

9        A    My recollection is within the first year.

10       **Q    But you did say 18 months, just a few minutes**

11   **ago before the break.  And I'm wondering how it -- what**

12   **was the first one came in 2005 maybe in 2006 more to**

13   **2004.**

14       A    My only problem with establishing relative

15   dates, months and years, is trying to recall something

16   that is now three and a half years back.

17       **Q    No, I understand that, but I'm just -- I'm**

18   **concerned that you said 18 months, perhaps even longer.**

19   **Certainly 2005, perhaps even 2006, has now become**

20   **something within 2004.**

21           MS. SARSHIK:  I'm going to object.  He also

22   clearly said --

Page 34

1          MR. SHAPIRO:  It's a talking objection.

2          MS. SARSHIK:  You're harassing the witness.

3          MR. SHAPIRO:  I'm not harassing anybody.

4    That's an outrage that you would even suggest that and

5    I urge you to stop the talking objections right now.

6          BY MR. SHAPIRO:

7      **Q    Now, sir, I'm just trying to get to the bottom**

8    **of this, you understand.  You've said things that are**

9    **different within the course of the last 25 minutes**

10   **you've said things that are completely different and**

11   **I'm trying to get to the bottom of how that occurred.**

12         **Did you have any conversations with counsel**

13   **about this timing issue during our break?**

14         MS. SARSHIK:  I'm going to object --

15         MR. SHAPIRO:  You're not allowed to.  I'm

16   entitled to know -- once he starts answering questions

17   and once he thinks I'm entitled to know if there was a

18   suggestion made or something like that, it's not a

19   question of privilege anymore.  There is case law that

20   suggests -- that states directly that I'm entitled now

21   to know if there was some sort of bringing to him of

22   different information or concerns after he made a

Page 35

1    statement on the record that it was one thing and then

2    came back after a break and says it's something else.

3    I'm entitled to know where that comes from.

4         MS. SARSHIK:  You are not entitled to inquire

5    into confidential communications between him and his

6    attorney.

7         MR. SHAPIRO:  I'm sorry.  I am entitled to

8    know if there's a change in testimony and in a break in

9    a deposition and I am entitled to know that and I mean,

10   that's what it looks like to me.  I mean anybody would

11   think something happened because he was pretty definite

12   about when it happened and now he's changed it and the

13   only intervening event is a break where he had a chance

14   to speak to counsel, a break that was asked for by

15   counsel.

16        MS. SARSHIK:  He was also pretty definite it

17   happened before he knew about the EEO.

18        MR. SHAPIRO:  I'm not questioning him about

19   that.  I'm questioning about this other thing.  So, if

20   you please, I think I'm entitled to know this, and if

21   you want to object and prevent him from answering, I

22   can't stop you from doing that but I will tell you that

Page 36

1    it's inappropriate.  I am entitled to know these

2    things.

3              MS. SARSHIK:  At this point, I would like to

4    take a break for one moment, not to talk to my client.

5    Mr. Bjorklund would stay here.  I would like to talk to

6    Mr. Jones outside for one moment.

7              MR. SHAPIRO:  Sure.  No problem.

8              We'll go off the record.

9              (Brief recess.)

10             MS. SARSHIK:  We're back on the record.

11             MR. SHAPIRO:  So --

12             MS. SARSHIK:  Is there a question pending?

13             MR. SHAPIRO:  Yes, there was a question that

14    you interrupted.

15             MS. SARSHIK:  Would you read back the

16    question.

17             THE WITNESS:  Would you repeat the question.

18             BY MR. SHAPIRO:

19        **Q    Yes.  I want to know if you had a -- I'll ask**

20    **it again.  I want to know if you had a conversation**

21    **with counsel that engendered this change in the**

22    **testimony.**

Page 37

1    A    No.

2    **Q    You had no conversation with them engendered**

3    **that.**

4    A    I had no conversation that addressed 12 to 18

5    to 24 months.

6    **Q    Did it have to do with the timing of when the**

7    **first complaint happened?**

8    MS. SARSHIK:  Okay.  At this point, I'm going

9    to object and instruct my client not to answer the

10   question.

11   You clearly said before, you recognized that

12   he had said that any conversation that he had about

13   Mary's performance problems occurred before the EEO

14   complaint was known by him.  Clients -- deponents are

15   entitled to clarify the record.  That's what's going

16   on, and I'm going to instruct him not to answer about

17   any communications that took place between us on the

18   ground that it's privileged.

19   MR. SHAPIRO:  Okay.  I understand.  I don't

20   think that you're correct and I think that I'm entitled

21   to probe a manipulation here.  But you instructed him

22   not to answer so I can't go any further at this

Page 38

1    juncture.

2         BY MR. SHAPIRO:

3         Q    Now, how many times do you actually recall Ms.

4    Bridges Steely coming to you with claims of performance

5    problems on the part of Ms. Bass?  And when I say times

6    you actually recall, remember I'm asking for a

7    recollection, now.  Not a well it could have been, or

8    it might have been.

9              I'm talking about recollection.  Do you recall

10   more than one?

11        A    Yes.

12        Q    Do you recall more than two?  Recall.  Not

13   think there might have been.  Could have been.  But

14   actually recall?

15        A    Yes.

16        Q    Do you recall more than two?

17        A    Yes.

18        Q    So when you said before that it was two or

19   three, it wasn't two or three, it was at least three.

20        A    Yes.

21        Q    You actually recall three.

22        A    Yes.

Page 39

1    Q    And each time these were private

2    conversations, that is to say, just between you and Ms.

3    Bridges Steely.  No one else present.

4         A    That's correct.

5    Q    And where did these conversations take place?

6         A    My office.

7    Q    Each time.

8         A    Yes.

9    Q    Okay.  Was this the topic of the conversation

10   or was this just something that was mentioned during

11   the conversation?  In other words, were you having a

12   meeting with her on some other things or on a group of

13   things or a general meeting with your subordinate and

14   this came up or was this the purpose of the

15   meeting -- Mary Bass' performance problems?

16        A    My recollection is that at least once it was

17   the subject and in other times it was a series of

18   topics.

19   Q    And this was one of them.  Or it came up

20   during the series of topics.

21        A    Correct.

22   Q    The first time.  Was that the time it was the

Page 40

1    subject or was it --

2         A    I don't recall.

3         Q    See, what I'm trying to do is here, just so

4    you understand -- you recall three conversations.  And

5    I want you to reconstruct in your mind those

6    conversations.  I want your recollection, not what must

7    have happened, what could have happened, what probably

8    happened.  I mean what I actually recall happened.

9    That's what I'm after.  All right?  So if we go back to

10   this first meeting, the very first time Ms. Bridges

11   Steely said or told you or informed you that she

12   believed Mary Bass was having performance problems vis

13   a vis her customers, timeliness of getting back to

14   them, satisfying them -- so if we can go back to that

15   first time, all right, I want you to tell me everything

16   you recall about the conversation.  It was in your

17   office, correct?

18        A    Correct.

19        Q    Only you and Ms. Bridges Steely was

20   there -- were there.

21        A    Correct.

22        Q    Was it, was that the time that it was the

Page 41

1    **subject of the -- purpose of the conversation or one**

2    **thing that came up?**

3        A    I recall that that was the subject.

4        **Q    Did she come to see you?  She asked to see you**

5    **about this?**

6        A    Yes.

7        **Q    Tell me everything that you can recall about**

8    **that conversation?**

9        A    She indicated that Mary was not performing up

10   to expectations, that Tom Harris and Ann had been

11   speaking to Mary about it.  She indicated the general

12   areas of concern, which was complaints from clients,

13   which required Tom or someone else to then follow up

14   because Mary was not meeting the clients needs.

15            So I asked, well, clients complained, what are

16   their complaints.  General lack of follow up.  Phone

17   calls not returned.  E-mails not responded to in a

18   timely manner, to where they would have to try to

19   escalate the contact to find out what was going on on a

20   particular contracting matter.

21            My advice to her was work with her, make sure

22   she clearly understands what's expected.  Make sure you

Page 42

1     keep records of your conversations, what you've advised

2     her.  Give her help and keep working with her.

3          Q     Anything else you can recall from the

4     conversation?

5          A     No.

6          Q     Now, at this time, Ann Bridges Steely was an

7     executive level employee?  EM?

8          A     Correct.

9          Q     And you were an EM?

10         A     Correct.

11         Q     And Tom?

12         A     CM2.

13         Q     CM2, which is a bridge between 15 -- roughly

14    the equivalent of GS-15 and ES1?

15         A     E1.  What used to be E1.

16         Q     And Ms. Bridges Steely had been an SES in the

17    Executive Branch before coming to FDIC.

18         A     Correct.

19         Q     How long was that first conversation?  Five

20    minutes?

21         A     Five, ten minutes.

22         Q     Okay.  Now, you said the -- I want to go to

Page 43

1    the second conversation that you actually recall.  You

2    said it was several months later.

3        A    At least.

4        Q    Meaning two to three, maybe four?  Maybe five

5    months later?

6        A    I don't recall.

7        Q    Give me the best --

8            MS. SARSHIK:  He says he doesn't recall.

9            MR. SHAPIRO:  I understand.  And I can

10   continue to probe if someone says they do not recall.

11           Do not interrupt again.  If you have an

12   objection to make, make it, and don't make it a talking

13   objection.

14           BY MR. SHAPIRO:

15       Q    So, saying you can't recall precisely -- I'm

16   not asking for precision; I'm asking for like the

17   range, I mean --

18       A    A couple months, at least.

19       Q    At least two months.

20       A    At least two months.

21       Q    And on the other end?

22       A    Could have been as many as four.

Page 44

1      Q    Two to four months, then.

2      A    Yes.

3      Q    Best you can recall.

4      A    Best I can recall.

5      Q    So the second one, this conversation was just

6    a topic that came up over a more general discussion?

7      A    That's what I recall.

8      Q    And so, did you ask or did she bring it up?

9    Did you say, oh, by the way, how's Mary Bass doing,

10   since she had come to you earlier, or did she in

11   reviewing a variety of things say, and with respect to

12   Mary Bass, I want you to know --

13     A    Ann brought it up.

14     Q    Ann brought it up.  Okay.  And how is Mary

15   Bass doing in that second conversation?  I want you to

16   recall again -- not what might have been, what probably

17   was said, what could have been said, but what you

18   recall.

19     A    My recollection is the problems were

20   continuing.

21     Q    Okay.  Anything else that you recall?  Of that

22   part of the conversation.  I don't care about the other

Page 45

1    topics that came up.  That part of the conversation

2    that involved Mary Bass.  Can you recall anything other

3    than Bridges Steely telling you that the problems were

4    continuing.

5         A    I asked and she responded.  I said, how often

6    are you meeting with her about this, and she said

7    regularly.

8         Q    Okay.  Can you recall anything else about this

9    conversation?

10        A    I don't recall anything else.

11        Q    So you've now told us what your recollection

12   is.

13        A    That's correct.

14        Q    About the second conversation.  Now you said

15   you recalled three conversations.  All right.  So the

16   third one.  That also happened in your office, right?

17        A    Correct.

18        Q    And I want you to think back to that

19   conversation, because, again, I'm not interested in

20   what might have happened, what could have happened,

21   what probably happened, what most certainly would have

22   happened -- I'm asking you what you recall actually

Page 46

1    happening.  From your recall.  All right.

2              So this third conversation.  This was also one

3    that this Mary Bass -- the Mary Bass performance

4    situation came up in the course of other things being

5    discussed as well?

6        A    Yes.

7        Q    Who brought it up?

8        A    Ann did.

9        Q    And what did Ann say?

10       A    My recollection was that in addition to the

11   original problems of client -- lack of client follow up

12   and problems with service, Ann indicated that Mary was

13   distancing herself from the management team.

14       Q    From the management team.

15       A    Correct.

16       Q    Anything else?

17       A    That she was finding -- it appeared convenient

18   reasons not to be at management meetings, particularly

19   when downsizing was discussed, or surplus employees

20   were discussed.  Not participating, not caring about

21   her management responsibility to be involved

22   in -- along with the team in addressing the surplus

Page 47

1    employee situation in ASB.

2        Q    Who's the management team?  What is that?

3    That would be her -- that's Bridges Steely -- who else?

4        A    Her assistant directors, who were the CM2s.

5        Q    Tom --

6        A    Tom and Dave, and Tricia.  And then it would

7    be the CM1s.  There were probably seven or eight folks,

8    including Mary.

9        Q    And she said -- Bridges Steely said she was

10   not -- in addition to the performance problems which

11   was customer service really more than anything,

12   correct?  I mean I have it right, customer relations --

13       A    It's a good general term for it.

14       Q    There was this thing that she was distancing

15   herself from the management team, by which Steely

16   meant, she was finding convenient reasons not to be

17   present at management team meetings, particularly when

18   surplus was going on -- that captures it, doesn't it?

19       A    That's correct.

20       Q    Do you recall anything else from that meeting?

21   What you said, what she said, she being Bridges Steely.

22       A    No.

Page 48

1    Q    And again, this was just the two of you in

2   your office.

3    A    Correct.

4    Q    Okay.  Now those are the meetings that you

5   recall, correct?

6    A    Related to Mary's performance.  That's

7   correct.

8    Q    How soon after the second meeting did this

9   third meeting occur?

10    A    I don't recall specifically.

11    Q    Okay but --

12    A    Thirty days, 60 days.  I really don't know.

13    Q    One or two months?  On the outside, could it

14   have been three months?  Ninety days?

15    A    I don't believe so.  I think it was more like

16   one to two.

17    Q    One to two months.  Okay.  And all of these

18   meetings occurred before you were aware that there was

19   an EEO complaint.  Is that what you're saying?  Or at

20   least the first two occurred.

21    A    At least the first two.

22    Q    Okay.  At least the first two.  Now how do you

Page 49

1    get plugged in to a -- suppose there's an EEO complaint

2    against a first line supervisor in -- somewhere in the

3    Division of Administration?  When would that reach your

4    level?  That information reach your level?

5        A    It varies.  It might never reach my level,

6    although that's kind of rare.

7        Q    But suppose there's an EEO counseling, in

8    other words, an informal complaint.  Would that reach

9    your level?

10       A    It varies.  There's no requirement that it

11   reach my level.

12       Q    Is there a requirement that an EEO complaint

13   reach your level, correct?

14       A    Correct.

15       Q    And is EEO in Division of Administration?

16       A    No.

17       Q    So that's not under you.

18       A    Correct.

19       Q    Any other discussions you recall regarding

20   Mary Bass, aside from these performance issues that Ms.

21   Bridges Steely -- and again, I'm talking about

22   regarding Bridges Steely.  I mean if this

Page 50

1  happened -- if something happened, you know, before Ms.

2  Bridges Steely came, I don't care about it.  Any

3  discussions of Mary Bass regarding Ms. Bridges Steely,

4  other than the three you can recall?

5      A    Yes.

6      Q    Can you tell us about those?  Are these that

7  you actually have a recollection of, or that you think

8  might have happened?

9      A    No, I have a recollection.

10     Q    What was that?

11     A    Ann came to me and said, again, something

12  along the lines of I believe Mary is going to complain

13  about me.  And I said, what for.  And she said, I

14  referred to her as 'missy,' and she didn't like it.

15     Q    Is that the total conversation?

16     A    Best I can recall.

17     Q    Did you ask her what this "missy" thing was

18  all about?

19     A    Yes, I think I did.

20     Q    As in, what did you do that for, or what the

21  hell does that mean, or that kind of --

22     A    We had a brief conversation.  I don't recall

Page 51

1    the back and forth.

2        **Q    What did she tell you?  Why did she refer to**

3    **her as "missy?"  Did she indicate why she had done it**

4    **or what missy means or anything at all?  Do you recall**

5    **anything about that?**

6        A    I believe she was, as she described it, she

7    was trying -- she meant nothing specifically about the

8    term.

9        **Q    Wait.  I don't want you to tell me what she**

10   **later explained or what you read she explained or**

11   **anything.  I'm only interested in this conversation.**

12   **Your recollection of the conversation.  I don't want it**

13   **to be, well she must have said, or she later said, no.**

14            **I'm asking for recollection now.  Do we**

15   **understand each other?**

16       A    That's what I'm providing.

17       **Q    Okay.  So you said, when she told you this --**

18       A    Why did you call her missy.

19       **Q    Right.**

20       A    And her response was, we were having a

21   discussion about inappropriate references to people, in

22   a business kind of relationship.

Page 52

1        And I said what are you talking about, and it

2    was -- "I talked to her before about calling other

3    members of staff and clients, superiors 'sweetie pie,'

4    and I told her it was inappropriate, that I didn't like

5    it, and then to show her that it was inappropriate or

6    what I felt was an example," and evidently this was a

7    back and forth between the two of them, "I called her

8    missy.  And she didn't like it."  That was basically

9    the conversation.

10        Q    Wait.  But you said she said she was going to

11    file a complaint.

12        A    I said she was going to complain about me.

13        Q    What kind of complaint?

14        A    That's all she said.

15        Q    And she came to you to tell you this, to give

16    you a heads up?

17        A    Correct.

18        Q    Any other conversations?

19        A    I don't recall any.

20        Q    When Ann Bridges Steely first came on board,

21    in the context of bringing her on board, whether it was

22    before you actually selected her or after you selected

Page 53

1    her or when she first showed up for work, did you brief

2    her about the people she was going to be -- that were

3    going to be in her branch?

4        A    Yes.

5        Q    Did you brief her about Mary Bass?

6        A    No.

7        Q    Why not?

8        A    Didn't get to that level of detail.

9        Q    Mary Bass had her position because of an EEO

10   case, correct?

11       A    That's what I understand.

12       Q    You didn't know about that?  You were not

13   involved in making her a 14 and cutting the paperwork

14   for her 14?

15       A    I seem to remember the actual paperwork

16   occurring around the time I joined the DOA.

17       Q    So you never told her about Mary Bass about

18   being elevated to this level because of an EEO

19   settlement or an EEO suit, or anything like that?

20       A    Not at the time she was being hired.

21       Q    Did you do it later?  Did you advise her of

22   this later, after she was on board a while?

Page 54

1    A    I don't recall advising her about it, no.

2    **Q    Did you ever talk to any of the people that**

3    **Ms. Bridges Steely had complained about Mary Bass?**

4    **Complained about her performance.**

5    A    Specifically about Mary?  No.

6    **Q    What about Mary's unit's performance or --**

7    A    I received feedback.

8    **Q    From whom?**

9    A    I believe it was the Division of Supervision

10   and Consumer Protection.

11   **Q    And who would be the person?**

12   A    My recollection is Donna Gambrel.

13   **Q    Complained about Mary Bass or about --**

14   A    The unit.

15   **Q    Which unit?  Mary Bass' unit?**

16   A    Her unit, yes.

17   **Q    Not Ann Bridges Steely's unit, but just Mary**

18   **Bass' unit specifically.**

19   A    There was a specific matter that she was

20   concerned about.

21   **Q    And what was that matter?**

22   A    Contract for some consulting services, I

Page 55

1    believe with an international concern.  Something for

2    their division director.

3         Q    **What was her complaint?**

4         A    That there was no consistent follow up.  She

5    wasn't able to get the status.  And it was a very

6    important matter to the division director.

7         Q    **So you're saying it wasn't about Mary, but it**

8    **was about her unit.**

9         A    Well, Mary was involved, because she

10   supervised the unit.  We had a subsequent meeting --

11        Q    **With Mary?**

12        A    Mary was a participant.  Donna Gambrel was a

13   participant.

14        Q    **And what was the resolution?**

15        A    Well, we discussed what the status was and

16   when we would have an answer for them.  And who Donna

17   could call -- who she could contact and who would be

18   telling her what the status was, going forward.

19        Q    **And who was that, that she could contact?**

20        A    Well, she could contact everybody, starting

21   with Arleas Keay on down, but that she could primarily

22   contact Mary or Tom Harris, if Mary wasn't available.

Page 56

1      Q     Who was the person on the matter?  Mary

2   directly or someone on her staff?

3      A     I think it was somebody on her staff.

4      Q     Do you remember who that was?

5      A     No, I don't.

6      Q     And when was this?  This Donna Gambrel

7   complaint, or issue?  Was Bridges Steely still there?

8      A     Yes.  Oh yes.

9      Q     Was she at the meeting?

10     A     I'm trying to remember.  I'm not sure if she

11  was at the meeting.

12     Q     Was Tom at the meeting?

13     A     Yes.

14     Q     Okay.  So when was this?  Was this in 2006?

15     A     No.  We were still in one of our Pennsylvania

16  Avenue offices, so it would have been probably sometime

17  in '04.  I believe sometime in '04.

18     Q     Before or after when Ann Bridges Steely came

19  to you with performance problems with Mary?

20     A     I believe it was after.

21     Q     Okay.  Any other conversations that you had

22  regarding Mary?

Page 57

1     A    With Ann?

2     **Q    With Ann, yes.**

3     A    No.

4     **Q    With anybody else?  With Tom?**

5     A    Don't believe so.

6     **Q    With Arleas?**

7     A    I don't recall any.

8     **Q    When Bridges Steely came to you and told you**

9     **about the "missy," her calling her "missy," did you**

10    **have any comment to her about her using that phrase**

11    **with Mary?**

12    A    I'm sure I had a comment.  I don't recall

13    specifically what comment.

14    **Q    What is missy?  What is that about?  What is**

15    **it a reference to?**

16    A    I don't know what it's a reference to.

17    **Q    Have you ever heard anybody called Missy**

18    **before?**

19    A    I called my daughter missy.

20    **Q    How old was she?**

21    A    Probably eight or nine years old.

22    **Q    Why did you do that?**

Page 58

1      A    It was a term of endearment.

2      **Q    Yes.  Do you use missy in any other context?**

3      A    No.

4      **Q    With any other person?**

5      A    No.

6      **Q    With an adult?**

7      A    No other person.

8      **Q    Did you make Arleas Upton Keay -- did you**

9      **enlighten her as to this missy incident?  That there**

10     **might be a complaint coming?  Did you give her a heads**

11     **up the way your subordinate gave you a heads up?**

12     A    I don't recall.

13     **Q    Did you call anybody else?  Give them a heads**

14     **up?**

15     A    No.  Don't recall.

16     **Q    Do you recall the EEO counselor coming to you**

17     **about this?  Speaking to you about it?**

18     A    No, I don't.

19     **Q    Do you recall an EEO investigator taking your**

20     **statement?**

21     A    Well, if there's a statement in the record,

22     then somebody came to me.

Page 59

1      Q    I'm asking if you recall it.  That's --

2      A    I don't recall specifically, no.

3      Q    Do you recall there was an EEO complaint about

4  this missy incident?

5      A    Yes, I do.

6      Q    And how did you first learn about that?  From

7  whom, let's ask it that way.

8      A    I believe Ann told me.

9      Q    Ann told you there was a complaint lodged.

10     A    At least an informal complaint.

11     Q    Did she say it was an informal complaint, or

12 did she say --

13     A    Complaint.

14     Q    Complaint.  And did she say what kind of

15 complaint it was?

16     A    EEO complaint.

17     Q    Okay.  And that's not the conversation where

18 she gave you the heads up.

19     A    Correct.

20     Q    It's a later conversation.  How long afterward

21 from the heads up conversation was this there is a

22 complaint?

Page 60

1    A    I don't recall specifically.

2    **Q    Six months?  Within six months?**

3    A    I believe so.

4    **Q    All right.  Within a month?**

5    A    I don't recall specifically.

6    **Q    Best you can do is within six months?**

7    A    Best I can do.

8    **Q    Okay.  What kind of ratings did Mary Bass get**

9    **during the time that Ann Bridges Steely was her**

10   **supervisor?**

11   A    I don't recall, specifically.

12   **Q    Did she get a -- you said during two of the**

13   **years, it was just pass fail.  Even for somebody at**

14   **Mary Bass' level.**

15   A    Yes.

16   **Q    So, did she pass?**

17   A    I don't recall.

18   **Q    You don't know.**

19   A    I don't know.

20   **Q    What about the last year?  Do you recall what**

21   **she got and what grade level?**

22   A    I don't recall.

Page 61

1    Q    If a person gets minimally successful, is

2    there consequences to that?  I mean, do they have to

3    improve?  Is there a PIP -- performance improvement

4    plan for minimally successful people?  In other words,

5    are there automatic consequences to --

6    A    Minimally is not one of the levels.

7    Q    What do you mean it's not one of the levels?

8    A    It's meets -- in the last year, it's meets

9    expectations, marginal or does not --

10   Q    Marginal.  Are there consequences to getting a

11   marginal?  Like you have to have a PIP?

12   A    Yes.

13   Q    Do you know if Mary had a PIP in 2006?  Or

14   after 2006 because of a rating in 2006?

15   A    I don't recall.

16   Q    Okay.  And when there's only a pass fail -- if

17   you fail, in other words, you get not successful --

18   A    Does not meet.

19   Q    Does not meet expectations.  There are

20   consequences to that, correct?

21   A    Yes.

22   Q    You have to have a PIP.  You have to -- they

Page 62

1    **have to proceed against you if you didn't improve,**

2    **correct?**

3        A    They have to give you an opportunity to

4    improve.

5        **Q    And failing that, there would be consequences.**

6        A    Management could take action, yes.

7        **Q    Were there any of those consequences, whether**

8    **it was a PIP, an opportunity to improve, with respect**

9    **to Mary, that you can recall.**

10       A    I know she was counseled about the

11   shortcomings.

12       **Q    Yes, I'm not talking about that.  I'm talking**

13   **about rating -- you don't know what her rating was.**

14       A    I don't recall what her rating was.

15       **Q    But do you recall any consequences?  Like were**

16   **there proceedings against her?  Were there --**

17       A    I don't believe there were any proceedings

18   against her.

19       **Q    Did she get a PIP?  Was she placed on a PIP?**

20   **That's what you use to improve performance, correct?**

21   **That's what it's called here.**

22       A    Yes.  I don't recall that she was placed on

Page 63

1    PIP.

2        Q    PIP is an acronym for performance improvement

3    plan, PIP, correct?

4        A    Correct.

5        Q    Now, in preparation for this deposition, did

6    you look at any documents?

7        A    No.

8        Q    Not any documents at all.

9        A    No.

10       Q    Did you talk to anybody?

11       A    My attorney.

12       Q    Anybody other than your lawyer.

13       A    No.

14       Q    How long did you talk to your lawyer for?

15       A    Half an hour.

16       Q    And when was that?

17       A    Last week.

18       Q    Last week.  Did you talk to Ms. Bridges

19    Steely?

20       A    No.

21       Q    Did you write a reference for her?  Did she

22    get a reference from the FDIC when she left?  When she

Page 64

1    **was looking for a job?**

2        A    I don't recall giving her a letter of

3    reference.

4        **Q    Do you give letters of reference?**

5        A    If people ask and I believe they merit a

6    letter of reference, I give them a letter of reference.

7        **Q    And you don't recall one for Ms. Bridges**

8    **Steely.**

9        A    No.

10        MR. SHAPIRO:  I don't have anything further.

11    Do you have any questions?

12        MS. SARSHIK:  We have no questions.

13        (Whereupon, at 12:25 p.m., signature having

14    not been waived, the deposition of Glen Bjorklund was

15    concluded.)

16

17        I have read the foregoing pages, which are a

18    correct transcript of the answers given by me to the

19    questions therein recorded.

20

21    Deponent_____

22    Date_____

Page 65

1                    CERTIFICATE OF NOTARY PUBLIC

2

3          I, Leanne M. Krivonak, the officer before whom

4     the foregoing deposition was taken, do hereby certify

5     that the witness whose testimony appears in the

6     foregoing deposition was duly sworn by me; that the

7     testimony of said witness was taken by me

8     stenographically and that I thereafter reduced it to

9     typewriting; that said deposition is a true record of

10    the testimony given by said witness; that I am neither

11    counsel for, related to, nor employed by any of the

12    parties to the action in which this deposition was

13    taken; and further, that I am not a relative or

14    employee of any attorney or counsel employed by the

15    parties thereto; nor financially or otherwise

16    interested in the outcome of the action.

17

18          _____

19          LEANNE M. KRIVONAK, CVR, CCR

20          Notary Registration Number  180129

21     MY COMMISSION EXPIRES:  11/30/2009

22