AFFIDAVIT

District of Columbia }

I, Ann Bridges Steely, Executive Manager, series 1102, employed at the Federal Deposit Insurance Corporation (FDIC), hereby solemnly swear under penalty of perjury and make this statement. For the record, my race is White.

I understand that the claim accepted for investigation is whether Mary Bass was discriminated against based on her race (Black) and prior EEO activity, and whether she was the victim of harassment (non-sexual) when during a meeting on February 3, 2005, I, Ann Bridges Steely, her second-level supervisor, referred to her by calling her "Missy." This was done in front of her first-level supervisor.

At present, I am Associate Director, Acquisition Services Branch (ASB), Division of Administration (DOA), FDIC, 1730 Pennsylvania Avenue, NW, Washington, DC 20006. I began working for the federal government in November 1981 and began working for FDIC in May 2003 in my current position. My first-level supervisor is Glen Bjorklund, Deputy Director, DOA, and my second-level supervisor is Arleas Upton Kea, Director, DOA.

I met Ms. Bass when I came to the FDIC in May 2003, and the entire time of our professional relationship she has been a first-level supervisor in the Acquisition Services Branch (ASB). My dealings with her are frequent but not every day, perhaps several

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 9

Page 1 of 10                                            Initials ABS

AFFIDAVIT

times a week. Ms. Bass's race is African-American and I became aware of it by personal observation when I met her.

I am aware of her prior EEO activity, and the first specific knowledge I had of her prior case was from Ms. Bass herself. On October 10, 2003, she provided me a copy of information related to her prior case. I had heard general comments that she had filed a complaint and won, but I had not heard any specific information. I cannot recall who I heard that general information from. I did not know about her prior EEO complaint before I came to FDIC, as she alleges in her statement. In fact, when I interviewed for this position with Mr. Bjorklund and Ms. Kea, I asked about challenges facing a person coming into the job and were there any personnel problems. The answer to me from both of them was "no," and that there were good people in ASB.

When I first arrived here, many people in this group brought up issues concerning lack of trust, poor morale, frustration, and a general discontent at all levels. During the next several months, I brought in consultants to help improve conditions. During a passing conversation in the hall one day, Mary and I were commenting on how far we had to go to improve the situation within ASB. I asked Mary if she would give some thought to what she thought we could do to improve the team environment and then to come meet with me so that we could chat. A day or two later, Ms. Bass gave me a copy of her prior complaint with a note that she wanted me to read it before we sat down to talk about how we could improve the organization. I thought it unusual for her to provide me with this information and I never read it. From Ms. Bass, I know the identity of the responding

AFFIDAVIT

official. During the meeting I had requested with her to go over things we could do to improve conditions in the organization, I told her that I never read her complaint. I told her that I wanted her help in moving the organization past the types of problems it had experienced in the past and help us have a better future. I have provided a copy of the information she provided to me for the record.

The purpose of the February 3, 2005 meeting was to discuss complaints that were raised to my level by clients that Ms. Bass supports. Specifically, Andrea Woolford of DIR had called and expressed significant frustration about her dealings with Ms. Bass regarding one of Ms. Bass' employees, Joan Gustafson. Present were Ms. Bass and her first-level supervisor, Thomas Harris, who reports directly to me. We discussed the nature of the client's complaints and what might be contributing factors, and we talked about the need for Ms. Bass to be more responsive. According to the clients, she was not returning phone messages and answering e-mails. At the end of that meeting, I stated that returning phone calls and answering e-mails were a minimum requirement. Ms. Bass said she understood and would do better. I said, something like "If you don't, we'll have other things to talk about, won't we "Missy?"" and she left. I do not believe that she responded to me before she left. I did not notice any reaction from Ms. Bass' first-level supervisor, Thomas Harris, when I referred to Ms. Bass as "Missy". He did not say anything. When she left my office, I commented to him that I was going to go and talk to her about it. I do not recall whether he responded.

# AFFIDAVIT

- On February 3, after I used the term "Missy," I continued to speak with Mr. Harris for a few minutes. I then went to see Ms. Bass to discuss why I called her "Missy" and to ask how she felt about me using that term. It was an attempt to point out an example of how people might feel when referred to in terms that could be perceived as less than professional. I asked her how she felt. She said she felt it was disrespectful. I replied that my point was to demonstrate to her how others might feel when she used terms like "honey" and "sweetie." She said, "Oh, I also thought it was cute." I said something to the effect of "You need to focus on the fact that it could be perceived as disrespectful and we should never be disrespectful to our co-workers." I reminded her that as managers, we set the tone in the office setting and we must help set a professional style.

- Ms. Bass became very upset and agitated. She said that FDIC had ruined her life for many years. I told her I realized it was probably very difficult for her to go through what she had experienced but that I would like to focus on the present. She said that I had horrible interpersonal skills. I reminded her that we had just left a meeting in which her interpersonal skills with clients were in question. She then said she was constantly having to defend me to others. I said I had heard many comments regarding rumors indicating she did not defend me, but rather did quite the contrary. I wanted to focus our discussion on things I had personally observed, such as calling co-workers "Sweetie" and on direct client feedback on her performance. She was becoming more upset and stated that Serena Woolrich (an ASB employee) had recently had a car accident. Ms. Bass said the car sustained $3000 in damage and that it had happened because Serena was so
- distraught over what I "was doing to ASB." I acknowledged our organizational changes

AFFIDAVIT

were very stressful and tried to remind Ms. Bass of all of the actions we had taken in ASB to help our employees through these difficult times.

Ms. Bass seemed to be getting more upset. I explained that I had come to her office with the sole intention of discussing why I had used the term "Missy" and to close the loop with her on that issue. She continued to get very upset and brought up a variety of other general issues while I wanted to focus on specific issues. I left her office. The total exchange was probably about 15 minutes.

Ever since I have been here, I have noticed that Ms. Bass refers to women as "sweetie." When I first arrived, she had referred to me in that manner. During the first few months that I worked at FDIC, I met with Ms. Bass in my office and I specifically asked her not to call me "sweetie". I told her I felt it was unprofessional and not an appropriate professional demeanor for our office. I felt it was disrespectful of me and my position. She has not referred to me in that way again. However, I had also heard Ms. Bass refer to co-workers and clients in that same way and I said I felt that was unprofessional. She responded that she is just a very friendly person and wants to be nice to everyone. I talked about the need to differentiate behavior in casual, non-work settings versus a professional work environment. I also discussed with her that if a man in our office would refer to a woman as "honey" or "sweetie," that would not be acceptable. That could be considered sexual harassment and as women we would want to treat each other as we would expect men to treat us. I would not accept behavior from a woman that I would not accept from a man. I told her about a woman I had worked with in San

AFFIDAVIT

Antonio, TX who was extremely friendly and personal with co-workers, frequently using terms such as "honey" or "sweetie" to address women co-workers and subordinates. That woman had an EEO complaint filed against her by another woman for sexual harassment – the employee considered her constant use of such terms as sexually harassing. I told Mary that I thought that situation from my past was illustrative of the types of issues that can arise when we act in too familiar a manner with our co-workers. Ms. Bass has been responsive to my personal request and has not referred to me in that manner again. However, she did continue to address others as "Sweetie". In my opinion, Ms. Bass uses such terms of endearment as "Sweetie" or similar terms in professional settings. She greets people at work in those terms, and I consider work a professional setting. I do not observe her in outside social settings, so I cannot comment on how she addresses individuals in a more casual, non-work setting.

Ms. Bass' race was absolutely not a factor in my reference to her as "Missy," nor was her prior EEO activity a factor. It was absolutely not my intent to harass her when I called her "Missy." My intent was to try and help her improve her own leadership skills and professionalism, to help her be more effective and successful. I considered it to be a coaching situation. I have never heard anyone refer to Ms. Bass in a manner similar to how she addresses others. Because I had discussed this issue with Ms. Bass several times, and because she still continued to call people in the work place by these unprofessional names, I tired to bring this up with her again on February 3. My intent on February 3 was to create a situation that would demonstrate how others might feel about her behavior toward them.

AFFIDAVIT

I do not consider "Missy" to be a racial slur, have not heard of it being used as a racial slur and do not understand how it would be perceived as a racist remark. Instead, I consider it simply to be a common term of endearment, similar to "Sweetie".

I am not familiar with nor have I heard any of the other managers in ASB using terms of endearment in addressing co-workers. On one or two occasions, I have actually been referred to as "Missy" by one of my non-manager subordinate employees, who is white. I have only used the word "Missy" with Ms. Bass during the February 3 meeting.

My management has not discussed this formal complaint with me. I have had the diversity training that is provided by FDIC, and I have also had diversity training with the Air Force and DoD where I was a manager for nearly 20 years.

Many statements in Ms. Bass' affidavit and the addendum are not accurate. For example, as mentioned before, her statements that I knew of her earlier EEO activity prior to my assignment to ASB are untrue. Ms. Bass' affidavit and the addendum also make numerous references to my "threatening", "cold" or "harassing" demeanor with her; I believe these are completely inaccurate depictions of the manner in which I interact with Ms. Bass. In paragraph 5.a of the addendum, Ms. Bass states that after a meeting in the August/September 2003 timeframe, she asked to see me in my office and asked me not to embarrass her in front of other individuals. She states she also asked if I had

AFFIDAVIT

treated her coldly because she had won an earlier discrimination case against the FDIC. This exchange never happened – Ms. Bass never asked to meet with me, she has never discussed with me her perception that I embarrassed her in front of other individuals, and she has never asked if my treatment of her was related to her prior EEO activity. In paragraph 5.b. of the addendum, Ms. Bass discusses a meeting in the fall of 2003. She alleges that she "reacted by saying her (sic) that I (Ms. Bass) could not believe she was calling me in her office to discuss rumors, and promptly I left her office." This is not accurate. I did relay to Ms. Bass that ASB employees made reference to negative comments she had made about me. I expressed my concern. I told Mary then, as I have on several occasions, that she is an important part of the ASB leadership team and that I needed her support. I assured her that she could, and should, feel free to talk to me directly about any concerns she had about how I was leading the branch. In general, Ms. Bass' statements portray our interactions as consistently confrontational. This is not the case. I believe that Ms. Bass and I have had a very pleasant working relationship. These are only examples of the inaccuracies.

The other managers and the ASB Special Assistant have frequently participated in meetings with both Mary Bass and me. They should be able to comment on how I interact with them and with Ms. Bass. Those individuals who are currently in the ASB organization are David McDermott, Tom Harris, Harry Baker, Beverly Shuck, Deena Weatherly and Jill Ballina. Michael Benavides and Rodney Cartwright would also have such knowledge; they recently separated from FDIC but still work in DC area. Lynn Carr-Hawkes would also have some knowledge but is currently deployed to active duty

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 9

AFFIDAVIT

in Florida. We have also used an organizational consultant during the past two years who may have relevant information. She is Dr. Filomena Warihay with Take Charge, Inc. I have contact information for all of these individuals, if it is needed.

I have made it a priority to create an environment for all ASB employees that is one of trust and professionalism. I was hurt and shocked by Ms. Bass' comparison of my treatment of her to slave masters. Long before coming to FDIC, I developed a very strong reputation of supporting diversity in the workplace. For example, immediately before coming to FDIC, I received the Defense Threat Reduction Agency Director's award for EO for my efforts in promoting diversity in the workforce.

I have not treated Mary Bass any differently than I have treated any other manager or employee within ASB. My expectations for all ASB employees are based on high standards for performance and professionalism. I have consistently provided feedback and coaching to everyone I believe requires it. I am Mary Bass' second level supervisor. That role gives me the responsibility to provide performance feedback to her as well as other ASB personnel. I have received numerous complaints from clients regarding Ms. Bass and employees in her unit. In discussing that information with Ms. Bass, my goal has always been to help her improve her performance, provide better support to our clients and be successful in her position.

# AFFIDAVIT

I have read the foregoing statement, consisting of 9 pages, each of which I have initialed, and it is true and complete to the best of my knowledge and belief. Any corrections that I have made have my initials next to the correction. This statement was made of my free will without any threat, promise of immunity or inducement. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27 day of June, 2005.

_____
Ann Bridges Steely