Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - - - - x
                                   :
MARY E. BASS,                      :
                                   :
        Plaintiff,                 :   DOCKET NO.
v.                                 :   1:06CV01345
                                   :
SHEILA C. BAIR, Chairman,          :
FEDERAL DEPOSIT INSURANCE CORP.,   :
                                   :
        Defendant.                 :
                                   :
- - - - - - - - - - - - - - - - - x


                    Marlborough, Massachusetts


                    Thursday, July 26, 2007


Deposition of

            ANN BRIDGES STEELY,

held pursuant to Notice, and the applicable provisions

of the Federal Rules of Civil Procedure, before Jeffrey

H. Mocanu, a Court Reporter and Notary Public, within

and for the Commonwealth of Massachusetts, at the

offices of Raytheon, 101 Boston Post Road, commencing

at 12:42 p.m.


            Diversified Reporting Services, Inc.

                    (202) 467-9200

APPEARANCES:


For the Plaintiff:

      DAVID SHAPIRO, ESQ.

      Swick & Shapiro, PC

      1225 Eye Street, N.W.

      Suite 1290

      Washington, DC  20005


For the Defendant:

      WILLIAM S. JONES, ESQ.

      Federal Deposit Insurance Corporation

      3501 Fairfax Drive

      Room E-6006

      Arlington, VA 22206


Also Present:

      MS. SARSHIK, ESQ.

Page 3

I N D E X

WITNESS:                                        PAGE

Ann Bridges Steely                                4




EXHIBITS          DESCRIPTION                    PAGE


1          Copy, Steely's Tickler File           34


2          10-Page Document                      128

Page 4

1                     P R O C E E D I N G S

2              Whereupon,

3                      ANN BRIDGES STEELY

4              having been sworn by a Notary Public to tell

5    the truth, the whole truth and nothing but the truth,

6    testified upon her oath as follows:

7                                EXAMINATION

8              BY MR. SHAPIRO:

9         Q    **Could you state your name, please, for us?**

10        A    Ann Bridges Steely.

11        Q    **Ms. Steely, are you, do you go by Ms. Steely**

12   **or Bridges Steely?  What do --**

13        A    Steely.

14        Q    **Ms. Steely.  Ms. Steely, where are you**

15   **employed now?**

16        A    Raytheon.

17        Q    **And how long have you been at Raytheon?**

18        A    Since June 4th of 2007.

19        Q    **And we are in a facility here at Raytheon**

20   **Corporation, in Massachusetts, correct?**

21        A    Yes.

22             MR. SHAPIRO:  Thank you, very much, by the

1   way, for allowing us to take the deposition here.

2           BY MR. SHAPIRO:

3       **Q    Can you tell us if you live now in**

4   **Massachusetts?**

5       A    I do.

6       **Q    Do you still own property or have relations,**

7   **some sort of connection to the Washington area, or do**

8   **you no longer have a connection there?**

9       A    I do not own property there any longer.  I

10  have connections through friends.

11      **Q    Oh, friends.  You have friends in the**

12  **Washington area?**

13      A    Um-hum.

14      **Q    But you no longer are a resident --**

15      A    No.

16      **Q    -- of, within 100 miles of Washington, DC?**

17      A    No.

18      **Q    Your residence is now in Massachusetts?**

19      A    Yes.

20      **Q    Prior to coming to Raytheon Corporation, can**

21  **you tell us where you were employed?**

22      A    Immediately prior to coming to Raytheon, I was

Page 6

1    retired.  Prior to my retirement, on January 3rd of

2    2007, I was employed at FDIC, and prior to that, I was

3    a DOD employee.

4        **Q    Now, how long were you employed -- you were**

5    **employed, you say that you left FDIC January 3rd, 2007?**

6        A    I did.  I retired.

7        **Q    And can you tell us when you came to FDIC?**

8        A    May of 2003.

9        **Q    And what position did you hold at FDIC?**

10       A    Associate Director for Acquisition Services.

11       **Q    And that would be Associate Director of the**

12   **Division of Administration?**

13       A    Associate Director of Acquisition Services

14   Branch, which is part of the Division of

15   Administration.

16       **Q    So, you headed the Acquisition Services**

17   **Branch?**

18       A    Yes.

19       **Q    And your boss was whom?  Your immediate**

20   **supervisor?**

21       A    Immediate supervisor, Glen Bjorklund.

22       **Q    And the, the Acquisition Services Branch, did**

1    that have subunits in it; like sections?

2    A    It did.

3    Q    And how many sections were there?

4    A    Three.

5    Q    And what were those?  Were they called

6    sections?

7    A    Yes, I think we called them sections.

8    Q    Okay.  So, what were those sections?

9    A    We had one section that dealt with policy and

10   operations of the branch.  We had one section that

11   supported primarily information technology, contracting

12   activities, and, then, we had another section that

13   supported all of the other non-ITE functions at the

14   FDIC.

15   Q    And who were your branch chiefs?

16   A    At what point in time?

17   Q    Well, let's take it from the beginning.  Let's

18   take the Policies & Operations Section.

19        Who was that when you came?

20   A    When I arrived, in May of 2003, that was,

21   there was a different organizational structure at that

22   time.  Policy was one group, and there was another

Page 8

1    group for Operations.

2        Q    Okay.

3        A    The --

4        Q    So, when you first changed the organization,

5    who was the first Policies & Operations --

6        A    Rodney Cartwright.

7        Q    Rodney, and Mr. Cartwright was one of the

8    heads of either Policy or Operations prior, wasn't he?

9        A    No.

10        Q    Where did he come from?

11        A    He was in one of the groups, and I apologize.

12    I do not remember the titles of the organizations that

13    were on the go.  I could go back and look at

14    Organization Charts.  Mr. Cartwright had a group that

15    had all of the direct negotiation, administration of

16    contracts, and it was all of the contracts in the

17    corporation.

18        Q    So, he was, was he promoted to the position of

19    Policies & Operations Section Chief?

20        A    No.  It was just a reorganization.

21        Q    Just a reorg, and he's a black male?

22        A    Yes.

Page 9

1    Q    Mr. Cartwright, and he was there as a

2  supervisor at the same level when you came in, correct?

3    A    At my same level?

4    Q    No, at the level that he was as the Policies &

5  Operations Section, Branch Chief?

6    A    Yes.  Yes.

7    Q    And did he stay in that position until you

8  left?  Was he in that position when you left?

9    A    No.  He left.

10    Q    And where did he go?

11    A    I don't recall.

12    Q    Did he retire from federal service?

13    A    No.  He, he took another job.

14    Q    At the corporation or --

15    A    No.  Outside of the corporation.

16    Q    Why?  Do you know?

17    A    There was an incentivized early separation

18  package that was fairly lucrative for Mr. Cartwright.

19    Q    Even if he took a federal job?

20    A    Yes.

21    Q    Who became his, who was his successor?

22    A    In the --

Page 10

1    Q    **Policies & Operations Section.**

2    A    We hired Tricia Bursey into that Policy &

3    Operations job.

4    Q    **Bursey is B?**

5    A    B-U-R-S-E-Y.

6    Q    **Black or white?  Ms. Bursey?**

7    A    Black.

8    Q    **And did she come from FDIC or from outside?**

9    A    From outside.

10   Q    **And where did she come from?**

11   A    She came from the Department of Justice.

12   Q    **And were you the selecting official on that?**

13   A    I was.

14   Q    **And who was the approving official?**

15        **Who approved the selection?  Mr. Bjorklund?**

16   A    I would assume so.  That would have been the

17   normal procedure.  I can't remember specifically.

18   Q    **How about IT?**

19   A    And --

20   Q    **Oh, and by the way, when was that done?**

21        **When did Mr. Cartwright leave approximately?**

22        **In other words, let's take -- I understand you**

Page 11

1    might not be able to have the month and the year, but

2    let's take it from the date that you left, which would

3    have been January of 2007, --

4        A    Um-hum.

5        Q    -- and how were, how much before you left did

6    Mr. Cartwright leave, and did you replace him with

7    Ms. Bursey?

8        A    It would have been in the spring of, I believe

9    2005, but I would need to check my notes.

10       Q    So, Cartwright left in the spring of 2005, and

11   how long did it take to get Ms. Bursey on board?

12            Did she come in the spring of 2005, or was it

13   more like --

14       A    It took several months.  The recruiting

15   process, posting, interviews.

16       Q    Summer, fall, 2005?

17       A    Something in that time line.  I, I think.  I

18   would like to say that I would like to check my records

19   on --

20       Q    Of course.

21       A    -- the specific dates.

22       Q    We're just going by, we understand that this

Page 12

1    is by your recollection.

2              How about the IT Contracts?

3              Who, when you reorganized to have an IT

4    Contracts Section, who was that?

5    A    David McDermott.

6    Q    And he was there when you left, right?

7    A    Yes.

8    Q    And he's a white man?

9    A    Yes.

10   Q    How about Corporate Contracts?

11             Who was the, when you reorganized into

12   Corporate Contracts, I take it this, this all was a

13   pro -- this whole structure was a product of a reorg?

14   A    Yes.

15   Q    Who was the Corporate Contracts --

16   A    Tom Harris.

17   Q    A white man?

18   A    Yes.

19   Q    And he was there when you left?

20   A    Yes.

21   Q    Now, in each of these organizations, were

22   there subordinate supervisors?  In other words,

Page 13

1    subsections?

2        A    Yes.

3        Q    **How many subsections did you have in Policies**

4    **& Operations?**

5        A    At one point, there were six.

6        Q    **Six subsections?**

7        A    Two under each of the sections that we just

8    discussed.

9        Q    **I see.  So, two under Policies & Operations,**

10   **two under IT Contracts, and two under Corporate**

11   **Contracts?**

12       A    Yes.

13       Q    **Okay.**

14       A    That changed over time.  As positions became

15   vacant, they may not have been filled again.  So, it

16   was different at different points in time.

17       Q    **But it was designed as two sub-supervisors**

18   **under each branch chief?**

19       A    Yes.

20       Q    **Who were the sub-supervisors in Corporate**

21   **Contracting; that is, non-IT Contracting?**

22       A    That did, that, also, changed at different

Page 14

1    points in time.  At the time that I left, it was Mary

2    Bass and Harry Baker.

3         **Q    Harry Baker?**

4         A    Yes.

5         **Q    When you left, those two were the --**

6         A    Or within a few months before I left, those

7    were the people that were there.

8         **Q    Well, I just want to make sure, when you left,**

9    **these were, this, it was Harris, and he had two**

10   **subordinate supervisors, Bass and Baker?**

11        A    Yes.  I'd like to clarify that, in the two to

12   three months before I left, there was a reorganization,

13   and those individuals, there were no subordinate unit

14   chiefs.

15        **Q    Under Mr. Harris?**

16        A    Under Mr. Harris.  That's correct.

17        **Q    So, he was supervising everybody in Corporate**

18   **Contracting?**

19        A    Yes.  Yes.

20        **Q    And where did Bass and Baker go in this reorg?**

21        A    That was part of a corporate reorganization,

22   and Mr. Baker retired, and Ms. Bass applied for and

Page 15

1   received a job in the Division of Supervision &

2   Consumer Protection, Consumer Compliance, DSC.

3        **Q    Mr. Baker was white or black?**

4        A    White.

5        **Q    All right.  Under Mr. McDermott, was he, did**

6   **he continue to have subordinate supervisors?**

7        A    No.

8        **Q    So, before that reorg that took place before,**

9   **just before you left, --**

10       A    Um-hum.

11       **Q    -- who were his subordinate supervisors?**

12       A    Deena Weatherly and Beverly Shuck.

13       **Q    And Ms. Weatherly is a black woman?**

14       A    White.

15       **Q    White female, and Ms. Shuck?**

16       A    White.

17       **Q    And where did they go?**

18       A    Ms. Weatherly accepted an non-supervisory

19   position in the Contracting Group and was there when I

20   left.

21            Beverly Shuck accepted a position in Kansas

22   City, not with Contracting, but I don't recall which --

Page 16

1    Q    But with the corporation?

2    A    With the corporation.

3    Q    So, when you left, just before you left, there

4    were no subordinate supervisors under the branch

5    chiefs?

6    A    That's correct.

7    Q    So, it was you and three subordinate

8    supervisors, branch chiefs?

9    A    That's correct.

10    Q    And how many people were in these branches?

11         Give me a range from when they were set up

12    and, until when you departed?

13    A    The total organization, Acquisition Services

14    Branch shrunk in size from about, I, I don't remember

15    the specific numbers, but about 60 people or so when I

16    first arrived.

17         At the time the final organization was put in

18    place, there were slightly fewer than 30, but I don't

19    remember the specific number.

20    Q    In preparation for this deposition, did you

21    have any discussions with anyone?

22    A    Yes.

Page 17

1     Q    Who?

2     A    Ms. Sarshik and Mr. Jones.

3     Q    Anyone else?

4     A    No.

5     Q    Did you talk to Mr. Harris by phone?

6     A    No.

7     Q    Did you talk to anybody back at the FDIC by

8  phone?

9     A    No.

10    Q    Anybody personally?

11    A    No.

12    Q    Just Sarshik and Jones?

13    A    Yes.

14    Q    Did you review any documents in preparation

15  for this deposition?

16    A    My own files.

17    Q    Your own files.  These are files that you kept

18  with you, took with you from the FDIC?

19    A    I, actually, reviewed a copy of that file that

20  was the, that was provided by Ms. Sarshik and

21  Mr. Jones.

22    Q    A copy of what file?

Page 18

1      A    What I have referred to as my tickler file.

2      **Q    Your file.  So, when you said that I reviewed**

3  **my files, you meant this thing that --**

4      A    The copy.

5      **Q    -- you referred to as your tickler file?**

6      A    Yes.

7      **Q    And you reviewed a copy of it?**

8      A    Yes.

9      **Q    Now, when -- you say that you received that**

10  **copy to review in preparation for this deposition from**

11  **Ms. Sarshik and Mr. Jones?**

12     A    Um-hum.

13     **Q    Is that a yes?**

14     A    Yes.  I'm sorry.

15          MR. SHAPIRO:  It's much easier to say "yes" or

16  "no", --

17          THE WITNESS:  Yes.

18          MR. SHAPIRO:  -- because um-um and uh-uh make

19  her a --

20          THE WITNESS:  I apologize.

21          MR. SHAPIRO:  -- interpreter, and we hired her

22  as a court reporter and not an interpreter.

Page 19

1          BY MR. SHAPIRO:

2      Q     You did not keep a copy of your tickler file

3   with you when you departed from the FDIC's employ?

4      A     I did.

5      Q     You did.

6            So, did you have a copy of it in addition to

7   the copy that you received from Ms. Sarshik and

8   Mr. Jones to review?

9      A     I have the original, and I have the copy that

10  they provided.

11     Q     And the or -- and the copy that they provided

12  is identical to the original?

13     A     To the best of my knowledge.

14     Q     You kept these files while you were an FDIC

15  employee?

16     A     Yes.

17     Q     You organized this file?

18     A     It wasn't really organized.  It was just a

19  folder that I would drop notes in, or, if I printed

20  copies of documents --

21     Q     Let me show you what I was given.  I was given

22  a file that had two sides to it.  Sort of a double file

Page 20

1    organized like you see, with two sections, and

2    different documents in each section without paper

3    clips.

4         A    Um-hum.

5         Q    I was given this document by Ms. Sarshik, who

6    called it your "Tickler File", and she had that in

7    quotes.

8              Is this the organization that you had it in

9    when you were keeping it?

10        A    No.  Mine was not that organized.  Mine was

11   just an accordion file, and things were dropped down in

12   there.

13        Q    So, there weren't two sections?

14        A    I don't believe so.

15        Q    So, the file that you have, the

16   original -- what you call the original -- that you

17   kept, that file has, doesn't have two sections, and is

18   just an acco -- was in an accordion, just documents

19   that were in an accordion file?

20        A    Yes, but there, I believe there are one or two

21   additional manilla files in that file.

22        Q    So, were they organized that way with two

Page 21

1    separate sections?

2            In other words, whether it was organized by,

3    by clips on a, on a, on a folder, a double folder like

4    this, or whether it was two manilla folders within side

5    of an accordion file, were they, were there two

6    separate and distinct sections of files?

7        A    It's an accordion file.  It has documents in

8    there, and there are some folders in there.  There are

9    papers in the folders, and there are papers that are

10   not in the folders, but are within the manilla -- the

11   accordion file.

12       Q    Okay.  All right.  Did you, how did,

13   Ms. Sarshik gave you the files to read for this, in

14   preparation for this deposition, correct?

15       A    Yes.

16       Q    How did she get them?

17       A    I provided them to her.  I provided her a copy

18   of, I allowed her to copy my files before I left FDIC.

19       Q    The tickler file?

20       A    Yes.

21       Q    Before you left FDIC?

22       A    Yes.

Page 22

1      Q    Now, this tickler file, I'm wondering about

2  the name tickler file.

3           Okay.  Did, is this the only tickler file you

4  had, or did you have tickler files, things you called

5  tickler files other than the one regarding Mary Bass?

6      A    I had tickler files on other subjects or

7  regarding other personnel issues, but this, that was

8  the only file regarding Mary Bass.

9      Q    And was it called, since there is tickler

10 files on other things, this was the Mary Bass tickler

11 file?

12     A    The only label on the file just says, "Bass."

13     Q    Bass.  Okay.  So, Bass meaning Mary Bass' last

14 name. Bass, B-A-S-S, right?

15     A    Yes.

16     Q    And your other tickler files would have had

17 other labels on them?

18     A    Yes.

19     Q    I mean, if you had one on Mr. Harris, it would

20 be called, presumably, Harris?

21     A    Yes.

22     Q    Did you have tickler files on other employees?

Page 23

1       A    Yes.

2       **Q    On all your employees?**

3       A    No.

4       **Q    How many employees did you have files on, did**

5   **you maintain files on?**

6       A    I don't recall.

7       **Q    Did you take them all with you when you left?**

8       A    Some of them I destroyed.  I determined that

9   they were no longer relevant.  They might have just

10  been things that I determined were no longer relevant.

11          If I thought that there were issues either

12  personnel issues or contract issues that might, I might

13  need those files, then, I took those with me.

14      **Q    And did you leave copies for the government of**

15  **all the files that you took with you?**

16      A    Of any that were requested.  Yes.

17      **Q    Any that were requested?**

18          **Well, who, what files were requested aside**

19  **from Mary Bass' file?**

20      A    I don't recall.

21      **Q    Did you tell anybody about the existence of**

22  **these files?**

Page 24

1    A    I don't recall.

2    **Q    Did you tell anybody about destroying files**

3  **that you did destroy?**

4    A    I did not go through an inventory of the files

5  and identify specific files that were destroyed.  No.

6    **Q    Where did you keep these files when you were**

7  **an FDIC employee?**

8    A    In my office.

9    **Q    At the FDIC?**

10   A    Yes.

11   **Q    And was there a specific filing cabinet that**

12 **you used to keep them?**

13   A    My desk, and a file cabinet that was in my

14 office.

15   **Q    Government file cabinet?**

16   A    Yes.

17   **Q    I do want to go through these just to make**

18 **sure I understand that everything is in here; that you**

19 **don't remember a document that's not in here.  I want**

20 **to make sure I have everything.**

21       **I'm wondering, was there a particular thing**

22 **that got you to start a file called Bass, or got you to**

Page 25

1    **start the Bass file?**

2        A    Actually, yes.

3        **Q    And what was that?**

4        A    The first thing that I put in the file was a

5    document that Mary had provided to me, and I thought it

6    was unusual, and I kept it, and, --

7        **Q    And --**

8        A    -- so, I started the file at that time.

9        **Q    On Mary Bass?**

10       A    Yes.

11       **Q    I wonder if you could tell us who else you had**

12   **files on, which employees you had files on?**

13       A    I don't recall.

14            MS. SARSHIK:  I'm --

15            BY MR. SHAPIRO:

16       **Q    Ma'am?**

17       A    I don't recall.

18       **Q    You don't recall any of them?**

19            MS. SARSHIK:  I'm going to object at this

20   point.  That is far afield.  It's not calculated to

21   lead to discoverable relevant evidence, and that has

22   nothing to do with this law suit.

Page 26

1          MR. SHAPIRO:  We'll see.  I don't know that,

2     that's true.  We don't know what the answer is.

3          Suppose she kept files on all the black

4     employees that she had?  That would have something to

5     do with this law suit, but before we have an answer, we

6     can't tell; so, we need an answer to the question

7     before we can tell.

8          MS. SARSHIK:  If you'd stay closer --

9          MR. SHAPIRO:  So, I'm going to --

10         MS. SARSHIK:  -- to this law suit, that would

11    be a big help.

12         MR. SHAPIRO:  Maybe to you, but not to my

13    client.  In your opinion what's closer to this law suit

14    is not my opinion.  So, we don't share the same

15    opinion.

16         I don't want to have a talking objection, and

17    I don't want to have a discussion on the record.

18         BY MR. SHAPIRO:

19     **Q    So, ma'am, can you tell us the names of the**

20    **employees who you can recall that you had files that**

21    **were retrievable with their names; in other words,**

22    **Bass, Harris, Smith, Jones?  That sort of thing.**

Page 27

1     A    Joan Gustafson was one example.

2     **Q    Anybody else that you can recall?**

3     A    Rick --

4     **Q    Now, I'm asking for recollection, not**

5     **supposition.**

6     A    Rick Miller.

7     **Q    Anybody else?**

8     A    I cannot specifically recall.  It is my normal

9     management style to have a tickler file on my direct

10    reports, which would have been Mr. Harris,

11    Mr. McDermott, Ms. Bursey, Jill Ballina and Andrea

12    Landry.  I don't recall that I had specific files, but

13    that would have been my normal management --

14    **Q    Who were the last two people that you**

15    **mentioned?**

16    A    Jill Ballina.

17    **Q    Jill?**

18    A    Yes.

19    **Q    Ballina, B?**

20    A    B-A-L-L-I-N-A.

21    **Q    And?**

22    A    Andrea Landry.

Page 28

1          MS. SARSHIK:  Can we take a break for one

2     moment, please?  I'd like to talk with Ms. Steely for

3     one moment.

4          MR. SHAPIRO:  Sure.

5          MS. SARSHIK:  Thank you.

6          (Off the record from 1:05 to 1:07 p.m.)

7          BY MR. SHAPIRO:

8     Q    So, I want to make sure that I understand it.

9          It would be your practice, as a general

10    practice, your testimony is it would be your practice

11    to have a file on each of your direct reports, which

12    would have been Harris, McDermott, Bursey, Ballina, and

13    Landry, but you don't, actually, recall whether you did

14    or you didn't.

15         Is that -- does that summarize it?

16    A    That's correct.

17    Q    Now, you, also, said, when you were talking

18    about these tickler files, that they weren't

19    necessarily files about people.  There might be an

20    incident that you, or a contract that you had a file

21    on, correct?

22    A    Yes.

Page 29

1      Q    Or did I misunderstand that?

2      A    Correct.

3      Q    So, what other files did you have that were

4  retrievable by, in this system, this tickler system

5  that you had that were retrievable other than by a

6  person's name?

7      A    I don't recall.

8      Q    But there were them on contracts?  Say, the,

9  the Smith Consulting contract?  That kind of thing?

10     A    Yes.

11     Q    And why would you start, have a tickler?

12          I mean, the agency, your office would have had

13  files on every contract, right?

14     A    That's correct.

15     Q    Why would you have had a tickler file, for

16  example, on -- just making this up -- the Smith, the

17  Smith Consulting contract?

18          Why would you have had that in your tickler

19  file system?

20     A    If there were an issue, on a particular

21  contract, that I might want to have one or two

22  documents available for ready reference for meetings or

Page 30

1   issues that I think might come up.

2       **Q    And I understand why you might have files on**

3   **your direct reports, because they were direct reports,**

4   **and you'd have to deal with them directly right there**

5   **on their performance and that sort of thing, correct?**

6       A    Yes.

7       **Q    But why would you have a file on Ms. Bass,**

8   **Ms. Gustafson and Mr. Miller?**

9       A    All of these employees were in my

10  organization, and there were situations that I thought

11  I might need reminders of things that had occurred.

12      **Q    Were these troublesome employees?**

13      A    Not necessarily.

14      **Q    Were they employees that gave you difficulty**

15  **or about whom there were complaints or that you had**

16  **complaints?**

17      A    Not all of them.  No.

18      **Q    Were they employees who complained?**

19      A    I'm not sure I understand your question.

20      **Q    Well, for example, why did you have the, you**

21  **recall three of them.**

22          **Were there others, or do you not recall?**

Page 31

1        A    I don't recall.

2        **Q    So, let's take the ones that we know, aside**

3   **from your direct reports, who you're not really sure**

4   **you had them, but that would have been your practice.**

5             **Ms. Bass, Ms. Gustafson and Mr. Miller, why**

6   **did you have a tickler file on Mr. Miller?**

7        A    My recollection is that I had a file on

8   Mr. Miller because he had requested an accommodation

9   for a physical disability that he had, and I had some

10  documents related to that.

11       **Q    Did he get the accommodation?**

12       A    He did not get the specific accommodation that

13  he requested is my recollection, but I would have to

14  look at the documents.

15       **Q    How about Ms. Gustafson?  Why the tickler file**

16  **on her, under Gustafson?**

17       A    Ms. Gustafson had an issue that was identified

18  in an audit of Time & Attendance records, and there was

19  a rather complicated audit of her time records of an

20  extended period of time, and I had copies of those

21  documents.  That's when I started that file.

22       **Q    But was there, was she disciplined for this?**

Page 32

1    A    Not, not for the issue that started the file.

2  No.

3    Q    **For the time and attendance issue she wasn't**

4  **disciplined?**

5    A    No.  Not for the issue for which I started the

6  file.

7    Q    **But she was disciplined on something else?**

8    A    There was a different issue that came up.

9  Right.

10    Q    **What was that?**

11    A    It was an absence pro -- she had an extended

12  absence.

13    Q    **So, it was a time and attendance, it was an**

14  **attendance problem?**

15    A    Yes.

16    Q    **And Mr. Miller, did he complain about not**

17  **getting his accommodation that he requested?**

18    A    I don't recall.

19    Q    **And Ms. Bass, why did you st -- why did you**

20  **have a file on her?**

21    A    I started the file on Ms. Bass when she gave

22  me documents that I thought were, I just thought it was

Page 33

1    an unusual set of documents for her to give me, and I

2    started a file to keep those documents.

3        Q    And you added to the file over time?

4             The other documents didn't relate to the

5    initial documents?

6        A    No.

7        Q    In other words, once you had a file on a

8    person, you just dropped documents in that related to

9    the person, whatever you got?

10       A    That was my system.  Yes.

11       Q    All right.  Let's look at this.  I have

12   copies.  I'm going to provide this to you.  This is the

13   precise order that I received them in.  So, if they're

14   not your order, I'd like to know that, and, and if

15   they're, if there is anything missing or any document

16   that links with a document that doesn't seem to be

17   linked in here, I'd like to know that too, but,

18   basically, I'm going to go through the document just to

19   make sure I have everything, all right?

20       A    Okay.

21            MR. SHAPIRO:  We'll call this Exhibit No. 1,

22   and let the record reflect that it is a photocopy of

Page 34

1    exactly what I, what I received.

2                    (The document referred to was

3                    marked for identification as

4                    Steely Exhibit No. 1.)

5    MS. SARSHIK:  Of the non-Bates?

6    MR. SHAPIRO:  Of the non-Bates.

7    MS. SARSHIK:  Okay.

8    MR. SHAPIRO:  I'm showing you now what has

9    been marked, in the deposition, as Exhibit No. --

10   MR. JONES:  Dave, before you start, would you

11   prefer to use the Bate Stamped edition; so, you can

12   refer to specific, I have a, I have a separate set here

13   of the Bate Stamped --

14   MR. SHAPIRO:  But, then, hers would not be

15   Bate Stamped because the photocopy is not of the Bate

16   Stamp, and --

17   MR. JONES:  That's correct.

18   MR. SHAPIRO:  -- mine would.  So, why don't we

19   just use --

20   THE WITNESS:  Okay.

21   MR. SHAPIRO:  -- what I've got --

22   MS. SARSHIK:  Okay.

Page 35

1          MR. SHAPIRO:  -- because I got the Bates Stamp

2     late --

3          MS. SARSHIK:  Okay.

4          MR. SHAPIRO:  -- because of just a foul up.

5          MR. JONES:  I understand.

6          MR. SHAPIRO:  Casting no aspersions.

7          MS. SARSHIK:  Right.

8          MR. JONES:  I was just suggesting it might be

9     quicker, rather than identifying documents, --

10          MR. SHAPIRO:  But if don't both have it, but

11     if we don't both have it, then, it would be impossible

12     to, to do it that way.  So, why don't we, why don't we

13     just go through this.

14          I'm looking at a document, first of all, if

15     you'll just look through the way it's organized, you'll

16     see that there are, it's one file, but, then, there are

17     two subsections of the file.

18          BY MR. SHAPIRO:

19     Q    Do you see how that's set up?

20     A    Yes.

21     Q    And that there is what I, the way that I was

22     given these, this bi-fold folder, I suppose.

Page 36

1           The first thing I have is, Acquisition

2   Services All Hands.  That's the first document in the

3   first section of the file.

4           The first document in the second section of

5   the file is an August 20 e-mail from Ms. Bass to

6   Mr. Harris cc to you.  The second document in the --

7       A    Oh, I'm sorry.

8       Q    The first document in the second section.

9       A    August 20?

10      Q    Yes.  August 20.

11      A    Yes.

12      Q    Wednesday, August 20, at 3:20.  Sorry, at 2:16

13  p.m, and it says, "Reorganization to Corp Contracting"?

14      A    Yes.

15      Q    Do you see that?

16      A    Yes.

17      Q    Now, neither one of these documents seem to be

18  a document that Mary Bass would have handed you that

19  was unusual.  Am I right?

20      A    That's correct.

21      Q    But this is the organization that the

22  documents were in when I got them.  So, can you tell me

Page 37

1    **which, can you identify for me what documents, in this**

2    **pile of documents, you said started the file, was the**

3    **start of this file?**

4           THE WITNESS:  If I could have a moment to

5    look?

6           MR. SHAPIRO:  Oh, absolutely, and feel free to

7    disengage these clips, if it helps you, as long as we

8    maintain the order.

9           (Witness reviews document.)

10           MS. SARSHIK:  Take as much time as you need.

11           THE WITNESS:  I know what I'm looking for.  I

12    just don't see it yet.

13           (Witness reviews document.)

14           THE WITNESS:  Found it.

15           BY MR. SHAPIRO:

16    Q    **Now, it's a handwritten document, and is it**

17    **dated?**

18    A    It's dated, 10/10/03.

19    Q    **Okay.**

20           MR. JONES:  David, I'm going to just leave

21    this --

22           MS. SARSHIK:  If you want to --

Page 38

1          MR. JONES:  If you decide you want to --

2          MR. SHAPIRO:  Oh, okay.

3          MS. SARSHIK:  If you, also, want to --

4          MR. SHAPIRO:  To identify it?

5          MS. SARSHIK:  Yes.

6          MR. SHAPIRO:  I see.

7          MS. SARSHIK:  If you, also, want to.

8          MR. SHAPIRO:  Okay.  That's helpful.  Great.

9          BY MR. SHAPIRO:

10     **Q    So, this is the, this is the 10/10/03**

11  **handwritten, it looks like it's on, like, a sticky, a**

12  **Post-It, with lines, a lined Post-it, that says,**

13  **"Please call me with any questions about these**

14  **documents"?**

15     A    Yes.

16     **Q    That's the one that starts that way?**

17     A    Yes.

18     **Q    And it's signed, "M Bass"?**

19     A    Yes.

20     **Q    And it's document, you'll agree with me that**

21  **it's Document 00015.  Isn't it?**

22     A    Yes.

Page 39

1      Q    That's the Bate Stamp.

2           Now, that document is maybe 10 to 12 documents

3  down in the first subsection of this tickler file.

4  Not, it's not the first document by any stretch, is

5  that right?

6      A    It's not the first document in sequence.  No.

7      Q    You're saying that, that's the document which

8  started you having the file?

9      A    Yes.

10     Q    But there are documents, for example, if you

11  go back to the first document in this first section of

12  the file, that document is dated May 20th, 2000, isn't

13  it?

14     A    Yes.

15     Q    And that would be Document 00001, right?

16     A    Yes.

17     Q    Whose handwriting is on there on that first

18  page of the first document?

19     A    That's mine.

20     Q    That's your handwriting, and whose handwriting

21  is the note that you pointed out; in other words

22  Document 15?

Page 40

1    A    Mary Bass'.

2    **Q    The first, so, how did the earlier documents**

3    **get into this file, or the file you say was started**

4    **sometime in October of 2003?**

5    A    After Ms. Bass submitted this complaint, and I

6    was providing an earlier statement, I pulled some

7    documents from my computer files, and printed them out

8    to provide to the investigator.

9            As I said, I just dropped them in an accordion

10   folder.  I did not necessarily sequence them or put

11   them in any chronological order.

12   **Q    These first documents in this section, 01**

13   **through 10, --**

14           THE WITNESS:  Can I look at yours?

15           MR. SHAPIRO:  Yes.  Sure.

16           (Witness reviews documents.)

17           THE WITNESS:  This is 10.  Yes.  Thank you.

18           BY MR. SHAPIRO:

19   **Q    These were documents that you gave out?**

20   A    These, this is a copy of a Power Point

21   presentation that I projected at the first meeting that

22   I held with the ASB staff upon my assignment to FDIC.

Page 41

1   It was made available to them electronically.  I did

2   not handout paper copies.

3        **Q    I see.  So, you made a, it was after Ms. Bass**

4   **filed her EEO complaint that you made these, this Power**

5   **Point presentation documents and dropped them into the**

6   **Bass file?**

7        A    That particular document.  Yes.

8        **Q    These first ten pages?**

9        A    Yes.

10       **Q    And why did you put those in the file called**

11  **Mary Bass?**

12       A    I had been asked a question during an earlier

13  statement that I was given about, I made the statement

14  that I had been asked to improve the professionalism of

15  the organization.

16            I was asked if I had communicated those

17  expectations to individuals, and I used this briefing

18  as an example of articulating my expectations to

19  everyone at ASB.

20       **Q    You said that you were asked.  You were asked**

21  **by whom?**

22       A    I don't remember the individual's name, but I

Page 42

1    was, had given a statement early in this process.

2         Q    In the Bass --  In the Bass EEO complaint?

3         A    Yes.

4         Q    I see, but the Bass file, you're saying, the

5    Bass tickler file was already in existence --

6         A    Yes.

7         Q    -- before there was an EEO complaint?

8         A    Yes.

9         Q    And it started when she gave you this note

10   with the attached documents on 10/10/03?

11        A    Yes.

12        Q    You, how did she come to give you that?

13        A    She offered this to me, and as it indicates,

14   she gave it to me, and said, "Call me if you have any

15   questions."

16             As part of my initial work at FDIC, I was

17   working with a Management Team and with employees on

18   issues that they felt we needed to address to make the

19   organization more effective, a stronger organization.

20        Q    Well, you were trying to deal with problems,

21   right?

22             You said that there was a big morale problem

Page 43

1    **when you first got there?**

2         A    Did I say that?

3         **Q    Didn't you say that?**

4         A    I don't recall just saying that.

5         **Q    Well, I didn't say that you just said that.**

6              **Ms. Bass gave you this doc -- this note and**

7    **attached documents, which is her EEO, the decision in**

8    **her EEO case, correct?**

9         A    Yes, I believe it is.

10        **Q    And, in fact, it's, it's a memorandum opinion,**

11   **written by a judge in the District Courts, right?**

12             **A United States Magistrate Judge?**

13        A    I never read the document.

14        **Q    I understand.  You never even looked through**

15   **what they were?**

16        A    Once I looked at, it was given to me in a

17   folder.  When I looked inside the folder and realized

18   what it was, I, I quit reading.  I did not want to, it

19   looked to me to be an old issue, and I really wanted to

20   stay focused on the current situation within ASB.

21        **Q    Well, didn't she give you this in response to**

22   **your request that she help you get to the bottom of the**

Page 44

1    morale problems, and the organizational problems that

2    your organization had when you were taking over, and

3    you wanted to cure those problems; so, you asked Mary

4    to help you and to explain to you what the problems

5    were, and what they were grounded in; so, far as she

6    saw it?

7        A    That's not accurate.

8        Q    That's not accurate.  Did she give you these

9    in response to your request that she help you look at

10    the morale problems?

11       A    No.

12       Q    You hired a contractor, didn't you, early on

13    in your tenure at FDIC because of the organizational

14   and morale problems that your organization was having,

15   correct?

16       A    That's not an accurate reflection of the

17   situation.

18       Q    Okay.  Let's go back to this document, these

19   documents.  Document 15 is the cover sheet, and the

20   rest of the documents that she handed you go to, can

21   you identify the end of that first group of documents

22   that she gave you that you put, that caused you to

Page 45

1    **start the file without reading the documents?**

2              **(Witness reviews documents.)**

3              THE WITNESS:  The --

4              MR. JONES:  Let met just --

5              MR. SHAPIRO:  Hang on.

6              MR. JONES:  Okay.

7              MR. SHAPIRO:  Let's just get to it.

8              MR. JONES:  Fine.

9              MR. SHAPIRO:  The first document that's --

10             THE WITNESS:  That was not part of that folder

11    from Mary is a document dated 11/07, 2005.  Yes,

12    Document 00038.

13             BY MR. SHAPIRO:

14        **Q    So, everything between 15 and 37 is part of**

15    **the documents that Mary handed you that caused this,**

16    **the group of documents that she handed you that caused**

17    **you to start this tickler file labeled, "Bass"?**

18        A    Yes.

19             MR. JONES:  David, before you do your next

20    question, I just wanted to let you know that we have

21    another set of this if you'd like to make this Exhibit

22    1, and have the witness look at this --

Page 46

1        MR. SHAPIRO:  Sure.

2        MR. JONES:  -- so that you'd be looking at the

3   same document --

4        MR. SHAPIRO:  I'm happy to do that.

5        MS. SARSHIK:  Okay.

6        MR. SHAPIRO:  I'm happy to do that --

7        MS. SARSHIK:  Okay.

8        MR. SHAPIRO:  -- as long as it's in the same

9   order as --

10        MS. SARSHIK:  Yes.

11        MR. SHAPIRO:  -- what we received.

12        MS. SARSHIK:  Yes.

13        MR. SHAPIRO:  Why don't we just, but they're

14   not set up in two separate stacks.

15        MS. SARSHIK:  No.  No.  It is not, but they're

16   separate.  We can identify --

17        MR. JONES:  But we can --

18        MS. SARSHIK:  -- the first page number of the

19   second stack.

20        MR. SHAPIRO:  Okay.  Why don't we do that?

21   Just leave 1, and once we find it, we can get to the

22   page number --

Page 47

1          MS. SARSHIK:  Yes.

2          MR. SHAPIRO:  -- and easily do that.

3          MR. JONES:  And can we have one of your

4    unmarked ones?

5          MR. SHAPIRO:  Sure.

6          MR. JONES:  I'll use it.  You can have that

7    copy.

8          BY MR. SHAPIRO:

9      **Q      What are exhibits that are not the Power Point**

10   **from 11 to 14?**

11          **They're earlier than the first document that**

12   **you said that caused you to start this tickler file,**

13   **but they're not the Power Point.**

14      A    E-mails.

15      **Q    E-mails, but these are earlier than the 10/19,**

16   **the 10/10/03 handwritten note with the attachments,**

17   **right?**

18      A    Yes.

19      **Q    And why are they in the file?**

20      A    Similar to the document that started with

21   0001, they're documents that I pulled from my

22   electronic files.  E-mail in this case.

Page 48

1          In response to questions and in preparation

2   for discussions with the investigator when this case

3   first came to be, I pulled records for communications

4   with the staff.

5        Q    **These don't necessarily relate to Mary Bass.**

6        A    They relate to everyone in ASB at --

7        Q    **And why are --**

8        A    -- that time.

9        Q    **-- they in here?**

10       A    Again, to highlight communications that I had

11   with everyone at ASB about what we were doing.  For

12   example, if I could go back to the first document, on

13   Exhibit Page 00008, where it says, "Homework

14   Assignments," during that first meeting, I asked all

15   ASB employees to tell me three things that they thought

16   were good about ASB, and I, also, asked them to tell me

17   three things that we needed to work on together.

18          The first e-mail that is Exhibit 00011 is a

19   reiteration of that, and thanking them for their

20   participation and reminding them that I was soliciting

21   their input.

22          MR. JONES:  Can we agree that we don't need to

Page 49

1   say the 000?

2          MS. SARSHIK:  We could just say, "Page 11," or

3   "Page 15"?

4          MR. SHAPIRO:  Whatever.

5          Now, I'm looking at the first page that you

6   said was not a part of this docu -- the documents that

7   Mary Bass gave you, and that would be 38, and when I

8   say a number, it's the Bate Stamp number.  That's what

9   we're talking about, the Bate Stamp.  These numbers.

10         BY MR. SHAPIRO:

11     **Q    Now, this looks to be a Routing & Clearance**

12   **Sheet with a notation written by hand at the bottom by**

13   **you.  Is that right?**

14     A    That's correct.

15     **Q    Now, it looks like Ms. Campbell got this thing**

16   **and signed off on it or sent it, if she's the**

17   **initiating party, on November 7, '05, and Mary Bass got**

18   **it sometime after that, and she initiated and sent,**

19   **initialled and sent it off on, two days later, on the**

20   **9th, after three other people had sent it and signed it**

21   **on the 8th and the 9th, right?**

22     A    Yes.

Page 50

1    Q    And, then, Tom signs it on the 12 -- the 7th

2    of December, and you sign it on the 12th of December,

3    right?

4    A    Yes.

5    Q    What does the signature mean?  The date you

6    got it or the date you send it off?

7    A    The date that I would have reviewed it, and,

8    then, sent it to --

9    Q    Okay.  So, your note, there is a note that's

10    crossed out that says, can you read that note that's

11    crossed out?

12    A    "Time is of the essence.  Please handle

13    promptly and hand carry to the next addressee."

14    Q    So, the date that the person initials it is

15    the date that they reviewed it and sent it off, right?

16    That's generally the way it's done?

17    A    Yes.

18    Q    So, here, your note says, and if you'll read

19    it to us, the note you wrote on the 12th of December,

20    2005?

21    A    "Tom, Mary, Campbell, ACQ Plans are intended

22    to help layout the strategy for the requirement;

Page 51

1   primarily, the pre-award activity.  It is required to

2   be executed prior to release of the solicitation.

3   Please, insure there are no future occurrences of such

4   a wait ACQ Plan," with my initials.

5       Q    **What may, when you say, "ACQ," it's A-C-Q;**

6   **meaning, Acquisition Plan, right?**

7       A    That's correct.

8       Q    **So, when was this due?**

9            MS. SARSHIK:  I'm going to object, at this

10  point, to these questions.  They have nothing

11  whatsoever to do with the events alleged in this law

12  suit, which go back several months and more than a

13  year.  Totally irrelevant.

14           MR. JONES:  Let me --

15           MR. SHAPIRO:  Your objection is of record.

16           BY MR. SHAPIRO:

17      Q    **When was the Acquisition Plan at issue here**

18  **due?**

19      A    I recall the specific acquisition.  This

20  acquisition had, actually, been in process for many,

21  many months.  So, that, at the time it was initiated,

22  in November, it was already late.

Page 52

1          Q     Which acquisition is it?

2          A     The benchmarking and service costing service.

3    It was a requirement that was being worked with the

4    Division of Finance.

5          Q     So, who was the person who was the action

6    officer on this?

7                Campbell?  Campbell DeMallie?

8          A     Would be the employee with initial

9    responsibility.  Yes.

10         Q     So, this person sent it late?

11         A     Yes.

12         Q     And Ms. Bass sent it, seems to have sent it,

13   turned it around immediately upon getting it.  That's

14   what it looks like, right?

15         A     Yes.

16         Q     And, then, there was a month long, almost a

17   month long delay at Tom Harris' stop, correct?

18         A     Yes.

19         Q     And a couple of days, a couple of, five days

20   with you?

21         A     Yes.

22         Q     So, who are the other people on this, the

Page 53

1    Oversight Manager, and the Legal Division and the

2    Development & Equal Opportunity?

3        A    Other individuals that are required to

4    coordinate on the Acquisition Plan.

5        Q    So, who was responsible for this being late?

6        A    Tom, Mary and Campbell, which was why my note

7    was addressed to all three.

8        Q    I see.  You weren't responsible for it being

9    late?

10       A    I, ultimately, am responsible, was

11   responsible.  Yes.

12       Q    I see.  When did this get added to the, to the

13   tickler file?

14       A    I don't recall.

15       Q    Now, the next document, 39, is dated July 5,

16   2005, and whose writing is this?

17       A    This is my handwriting.

18       Q    And it's on your note pad, correct?

19       A    Yes.

20       Q    And can you read that to us?

21       A    "Tom H. out.  Mary in charge.  Joan G. was not

22   in the office.  I went to Mary's office to make sure

Page 54

1    she knew these (16) NFE modes had to be completed by

2    COB.  Mary said Joan was scheduled leave.  So, I said

3    that someone else would have to do them.  She said,

4    Campbell was her only employee in the office.  Said it

5    was up to her to figure out who, who could the mods by

6    the deadlines COB July 5."

7        **Q    You said that it was up to her.**

8            **Is that what it said?  Said that it was up**

9    **her?  Means that you said?  You told Mary that it was**

10   **up to her?**

11       A    Yes.

12       **Q    Was, was Campbell Mary's subordinate?**

13       A    Yes.

14       **Q    How many subordinates did Mary have?**

15       A    At that time, I don't recall.

16       **Q    How many did she have over all?**

17           **The highest number of employees she had when**

18   **she was --**

19       A    I don't recall.

20       **Q    What was the lowest number of employees she**

21   **had?**

22       A    I don't recall.

Page 55

1      Q    Now, the next document is dated a year

2  ear -- almost a year earlier.  It's 8/30/04, and it

3  says, "Good afternoon, Ms. Betsey"?

4      A    Yes.

5      Q    "Please come to see me.  Ms. Steely wants us

6  to," can you make that out?

7           "Wants us to come and discuss a noncompetitive

8  action that you are working on for Miguel Torado's

9  area, Personnel.  Thanks, Mary Bass."  Right?

10     A    Yes.

11     Q    Who is Betsey?

12     A    Genelle Betsey.

13     Q    Whose subordinate was she?

14     A    At that time, I don't recall.  She may have

15  been Ms. Bass' employee at that time.

16     Q    Or maybe not?

17     A    I don't recall.

18     Q    Why did this end up in here?

19          How did you get a copy of this?

20     A    It was on my, it was on a file that ultimately

21  came to me.

22     Q    The next one, 41, says, by the way, that last

Page 56

1    one was 40.  This is 41.  This is from your desk again.

2         What does this say?

3    A    "Ophelia Jones, 62595 EEO Counselor.  ODEO

4    Mary Bass.  Missing offense."

5    Q    It's not dated, is it?

6    A    No.

7    Q    And the EEO Counselor was Ophelia Jones, who

8    came to see you?

9    A    It was a telephone call.

10   Q    Telephone call.  And 42 is, also, from you.

11   It, also, involves Ophelia Jones with a telephone

12   number, which appears to be the same phone number as on

13   the previous page, but with the full phone number.

14   A    Yes.

15   Q    Can you read this one to us?

16   A    "Ophelia Jones, 202 416-2595.  Separate entry,

17   Tom P.  62427.  Implementing instructions on," I can't

18   even read my own handwriting.  "On expenditure

19   authority.  Separate entry, Paul, Lucy McCabe, Deena

20   Weatherly, PMP."

21   Q    What is this about?

22   A    This --

Page 57

1    Q    Do these have anything, these three

2    different --

3    A    They're not related.

4    Q    They're not related?

5    A    That's the line in between.  I frequently take

6    notes that way when I'm taking phone calls.

7    Q    These next look like telephone messages from a

8    secretary or somebody answering the phone?

9    A    Yes.

10    Q    And how did these end up in the file?

11    A    I put them there.

12    Q    Now, you see the first one is from Greg Cofer.

13         Who is that?

14    A    Greg was a supervisor at the time in ODEO.

15    Q    That's the Equal Opportunity Office?

16    A    Officer of Diversity & Equal Opportunity.

17    Q    And what is, "Problem with employee, Mary."

18    That's your note, right?  Which part of this did you

19    write?

20    A    Mary.

21    Q    You wrote, "Mary"?

22    A    Yes.

Page 58

1     Q    Mr. Cofer was giving you a heads up that you

2   had a problem with an employee?

3     A    No.  Mr. Cofer was calling because he had some

4   contract requirements that were being handled in

5   Ms. Bass' area, and he was having problems getting

6   contract support.

7     Q    I see.  Two days later, you get a call from

8   somebody from the EEO counselor, the counselor works

9   out of ODEO?

10    A    Out of a different office of ODEO.

11    Q    And that's two days later, and it says, "She

12  spoke with Mary."  This is whose writing?

13    A    The smaller part is mine.

14    Q    That is, "She spoke with Mary"?  That is

15  yours?

16    A    Yes.  That's mine.

17    Q    "She spoke with Mary.  Mary is alleging

18  "racial harassment."  October, 2003 CSA"?

19    A    Yes.

20    Q    What is CSA?

21    A    It's a, I don't remember what the acronym

22  stands for.  It's a performance recognition of

Page 59

1    employees.

2         Q    And, then, it says, "Donna Gambrel, Mickey

3    Collins"?

4         A    Yes.

5         Q    And, then, "Iraq rumor"?

6         A    Yes.

7         Q    What is that about?

8         A    These were just my notes to myself.  I

9    frequently take notes --

10        Q    But this was about Mary?

11        A    These must have been items that Ophelia talked

12   during that phone conversation.

13        Q    The next one, 44, is, again, on your

14   stationery, dated February 1, 2005?

15        A    Yes.

16        Q    Can you read that to us?

17        A    "Andrea, 86633."  I, then, went on to

18   highlight Wilford of DIR.  Mary Bass, Joan.  Almost

19   impossible to get in touch, get response.  Assured her

20   new contracts would be in place by January.  Blame new

21   policy on sole source."

22        Q    Does that mean that Ms. Wilford blames new

Page 60

1    **policy?**

2        A    No.  She was saying that Mary and Joan were

3    blaming the new policy regarding sole source.

4            "Jane Lewin, editor for, editor working 45K.

5    Tony Sanders, CFR, program coordinator, 50K.  Started

6    talking mods, et cetera, in November.  One here lost.

7    DIR re-accomplished package."  I can't read this.

8            "Mary met with her once.  No follow up.  Would

9    give them F.  Both."

10       **Q    And this is a note taken -- what?  On a**

11   **telephone conversation?**

12       A    Yes.

13       **Q    And the next one is a e-mail, and it says,**

14   **this is your e-mail to Tom and Mary?**

15       A    Yes.

16       **Q    Dated February 2nd, 2005?**

17       A    Yes.

18       **Q    Does this indicate that there was any**

19   **complaint about Mary?**

20           **(Witness reviews document.)**

21           MR. SHAPIRO:  The body of this e-mail.  It's

22   maybe 12, 13, 14 lines or so.

Page 61

1           THE WITNESS:  I'd like to read it.

2           MR. SHAPIRO:  Sure.  Please.

3           (Witness reviews document.)

4           THE WITNESS:  I'm sorry.  Could you repeat

5   your question?

6           MR. SHAPIRO:  Yes.

7           BY MR. SHAPIRO:

8       **Q    Is there anything in here that indicates that**

9   **the complaint was about Mary?**

10      A    It indicates that Ms. Wilford expressed a

11  concern and frustration with her dealings with ASB.

12      **Q    Yes.  I understand.  You are ASB, right?**

13      A    We were all ASB.

14      **Q    Right, but it doesn't indicate any complaint**

15  **about Mary.  It indicates a complaint about Joan,**

16  **right?**

17      A    It does not even indicate a complaint about

18   Joan.

19      **Q    Right.  I'm going to read it to you, and let's**

20  **just make sure I read it accurately.  If you'll follow**

21  **along.**

22          **It's from you to Tom Harris and Mary Bass.**

Page 62

1    It's dated Wednesday, February 2nd, 2005, at 11:28 a.m.

2    The subject is, "DIR Requirements."

3         The body of it reads as follows, and I quote,

4    "Tom and Mary, I received a call from Andrea Wilford

5    yesterday expressing concern and frustration about her

6    dealings with ASB during the past year.

7         "I spoke with her this morning about two

8    specific requirements that we are working on right now.

9    She says that Joan committed to have these on contract

10   no later than January 1, but the contracts still have

11   not been awarded.

12        "One requirement is for services from

13   Jamberlyn for editing services, total value 45K,"

14   $45,000.00, I guess, "for the CFR working paper, and

15   the other is for Anthony Sanders, who serves as a CFR

16   Program Coordinator, total value $50,000.00.

17        "Dr. Sanders has expressed concern, to her,

18   that he is operating without a contract with current

19   rates, et cetera.  I would like for you to get the

20   facts together on these two specific cases; including a

21   firm commitment on when the contracts will be awarded,

22   and come see me.  Just the two of you.

Page 63

1    "I would prefer to discuss this later this

2    afternoon before we leave for the day, but we can meet

3    tomorrow morning if absolutely necessary.  After we

4    discuss these specific cases, I want to discuss my

5    concerns about consumer support in general."

6    Did I read that correctly?

7    A    Customer.

8    Q    Customer.  Sorry.  It's, "Customer support in

9    general."  Did I read that accurately?

10   A    You did.

11   Q    The handwritten item here, is that your

12   handwriting?

13   A    Yes.

14   Q    What does that mean?

15   A    "JNCP"?

16   Q    Yes.

17   A    Justification for noncompetitive procurement.

18   Q    And what is that, the rest of all?  All?

19   A    "All dollars through PNO?"

20   Q    Now, this complaint that Ms. Wilson, Wilford

21   brought to you, is the first time you heard of the

22   delays and the problems?

Page 64

1    A    On this specific incident, yes.

2    **Q    It says, "Expressing concern and frustration**

3    **about her dealings with ASB during the past year."**

4         **Is this the first time you heard of it -- when**

5    **she came to your the day, the, the day before?  That**

6    **would be the first of February?**

7    A    It was the first that I heard about the

8    concerns on these two particular requirements.

9         It was not the first time that Ms. Wilford had

10   expressed concern with support from that unit during

11   that past year.

12   **Q    The next document is 46, and it seems to be a**

13   **note from you to Mary.  Can you read it for us?**

14   A    "Mary, it's been a really tough year for

15   everyone.  Thank you for always having a smile and

16   pleasant outlook.  I appreciate your efforts to work

17   hard for our clients.  Thank you, Ann."

18   **Q    And this was dated December 8, 2005?**

19   A    Yes.

20   **Q    Correct?**

21   A    Yes.

22   **Q    The next document is, also, seems to be a note**

Page 65

1    written by you.

2         A    Yes.

3         Q    Can you read it to us?  This would be 47.

4         A    "3/23/05,  Met with Donna Gambrel to discuss

5    ASB support to DSC.  Told her I knew she hadn't been

6    happy.  Wanted improvement in our support.  She said

7    that she was very frustrated with responsiveness.  Her

8    staff constantly complained things take a long time,

9    but they can't get calls answered, e-mails returned.

10            "Everyone commented that Mary Bass was very

11   nice, but couldn't get things done.  Asked her to call

12   me or Tom anytime.  Not to wait for things to reach

13   crisis stage."

14        Q    Did you talk to Mary Bass about this

15   conversation with Ms. Gambrel?

16        A    I don't recall.

17        Q    There is no indication that you did here,

18   you'll agree, in your notes?

19        A    That's correct.

20        Q    11 -- the next one is a meeting with Ann,

21   11/13/03, and this would be in 2003.  These others were

22   in 2005, correct?

Page 66

1      A    Yes.

2      Q    **Who, whose typewriter -- whose work is the**

3 **typewritten portion?**

4      A    Mary's.

5      Q    **And the handwritten?**

6      A    Mine.

7      Q    **What does your say?**

8      A    I had asked Mary for her ideas about how our

9 Leadership Team could improve the culture in ASB.

10     Q    **So, you had asked.  That means that you had**

11 **asked in the past?**

12     A    Yes.

13     Q    **Now, we're back to 2005 again, in Document 49,**

14 **and I believe 49, 50 and 51, are these your notes?**

15     A    Yes.

16     Q    **Can you give, can you read them to us, please?**

17     A    "2/3/05, Meeting with Tom Harris, Mary Bass;

18 Re:  Andrea Bazemore, DIR frustration with both Joan

19 and Mary."

20     Q    **Hang on one second.  Andrea Bazemore; who is**

21 **that?**

22     A    She's the same as Wilford.  It's married or

Page 67

1    divorced.  Same person.  Different last name.

2        **Q    But, now, I want to understand what these**

3    **notes are.**

4        **Did you write these notes as you were talking,**

5    **before you started talking or after the fact when you**

6    **were writing the notes about what happened?**

7        A    After the fact.

8        **Q    So, now, read them to us, please?**

9        A    "Asked MB," --

10        **Q    That's Mary Bass?**

11        A    Mary Bass "for status on the two items of

12    concern to Andrea.  Then, discussed general feedback

13    (no follow through, not returning calls, e-mail, et

14    cetera).  Told Mary Bass Andrea would give her an F for

15    support over the past year.  Asked how she manages work

16    in her branch.  Told her failure to return calls,

17    e-mail unacceptable at all levels of the organization.

18    Reminded her of similar feedback from others.  Agreed

19    we would find timing subjects customer support,

20    managing the work of subs.  Told her future complaints

21    could not be tolerated, "Missy."

22        **Q    Okay.**

Page 68

1    A    A separate --

2    **Q    Hang on one second before you go below the**

3    **line.  Managing work of subs?  Subcontractors or**

4    **subordinates?**

5    A    Subordinates.

6    **Q    And, now, you said, "Told her," the last thing**

7    **is, "Told her future complaints could be not tolerated,**

8    **"Missy."**

9    A    Yes.

10   **Q    Is that your, is that what you said, "Future**

11   **complaints cannot," I'm quoting you now.**

12            **"Future complaints cannot be tolerated,**

13   **Missy."  Is that what you said to Ms. Bass?**

14   A    The entire statement is not in quotes.  Just

15   the "Missy."

16   **Q    No, I understand.**

17   A    It's just along those lines.  Yes.

18   **Q    All right.  Go ahead.  Now, read below the**

19   **line.**

20   A    There is a line separating the comments.

21            "Then, went to MB's office a few minutes

22   later.  Asked what she thought when I called her

Page 69

1  "Missy."  She said, she felt I was disrespectful.  I

2  said, that was the point I was trying to make.  Then,

3  MB said, oh, but I, also, thought it was cute.

4        "Reminded her of our need to show respect to

5  others.  As managers, we set the example.  Must

6  maintain professional style in the work setting.

7        "MB became very upset.  Conversation

8  deteriorated.  She said, FDIC ruined her life for many

9  years.  I said, I wanted to focus on the present.  Told

10  me, I had horrible interpersonal skills.  Reminded her

11  we had just discussed her interpersonal skill problems

12  with clients."

13     **Q    Hold on.  Not returning phone calls and not**

14  **getting work done is what you characterize as**

15  **interpersonal skills?**

16        **Is that what you were talking about when you**

17  **talked to her?**

18     A    Yes.

19     **Q    Okay.  Go ahead?**

20     A    "She said, she was constantly defending me.

21  Told her, I heard rumors to the contrary, but I wanted

22  to concentrate our discussion on things I

Page 70

1    observed -- calling people "sweetie", and direct client

2    feedback."

3            (Pause.)

4            I'm sorry.  There is an extra page.

5            MS. SARSHIK:  No, that's all right.

6            THE WITNESS:  "She asserted Serena's recent

7    car accident was because she was so upset about what I

8    was doing to ASB.  Reminded her of sessions we made

9    available to help people through these times.

10           "I, finally, said, I had come to see her only

11   to discuss why I had called her "Missy" and to close

12   the loop on that.  She was getting too upset and

13   bringing in other issues, and I wanted to focus on

14   specifics.  Left her office after about 15 minutes."

15           BY MR. SHAPIRO:

16       Q    **Now, when did you make this note?**

17       A    Immediately after this event happened.

18       Q    **What does "immediate" mean?  The same day?**

19       A    Within the hour.

20       Q    **Within the hour.  So, these were really two**

21   **meeting?**

22           **This is a meeting that you had with Mary Bass**

Page 71

1    on the 3rd, in your office, with Tom Harris?

2        A    Yes.

3        Q    And, then, a follow-up meeting that you had

4    when you went down to Mary's office, right?

5        A    Yes.

6        Q    How, now, did you make these notes, did you

7    make the first part of the note about the Tom Harris,

8    Mary Bass meeting before you went down?

9        A    No.

10       Q    So, it was sometime that, later that day that

11   you made these notes?

12       A    Within the hour.

13       Q    Within the hour of which meeting?

14       A    The meetings were consecutive.  There was less

15   than 10 or 15 minutes between them.  After the second

16   meeting with Mary, in her office, within the hour of

17   the completion of that meeting, I made these notes.

18       Q    Ms. Wilford or --

19       A    Bazemore.

20       Q    -- Ms. Bazemore, the same person, did she

21   complain about Mary Bass using the, using the phrase

22   "Sweetie" with her?

Page 72

1    A    No.

2    Q    The meeting that you had with Tom Harris and

3    Mary Bass had to do with Ms. Bazemore or Ms. Wilford's

4    complaint?

5    A    Yes.

6    Q    The one that you summarized in your e-mail of

7    the day before, right?

8    A    Yes.  Yes.

9    Q    It had nothing to do with the comment of

10   "Sweetie" by Mary Bass, right?

11   A    Right.

12   Q    So, would you agree with me that your calling

13   her "Missy" was gratuitous at the end of that meeting

14   in front of Mr. Harris?

15   A    I would not describe it as gratuitous.  No.

16   Q    Well, it was gratuitous to the subject of the

17   meeting that was going, that had just gone on, right?

18   A    The purpose of the meeting was to discuss

19   Ms. Bass' performance.  We had, had earlier

20   conversation about her leadership performance and

21   professional performance regarding using terms of

22   endearment with coworkers.

Page 73

1       Q    But that was not Ms. Bazemore/Wilford's

2   discussion at all.   That wasn't about what she was

3   raising, right?

4       A    That's correct.

5       Q    Let's look at the next document, shall we, 52?

6            This is to you.   It's a letter or a fax from

7   Johnny J. McCoy, EEO Investigator?

8       A    Yes.

9       Q    And it says, "A copy of the affidavit and

10  addendum of the complaint of Mary Bass"?

11      A    Yes.

12      Q    And whose affidavit was attached?

13      A    Ms. Bass'.

14      Q    I see.   And this would have been June 6th,

15  2005, right?

16      A    That's the date of the letter.   Yes.

17      Q    But you had talked previously to an EEO

18  counselor, right?

19      A    I had been notified that there was a potential

20  complaint by the EEO counselor.

21      Q    Who did you notify of the potential complaint?

22           Anybody?

Page 74

1        **When you were notified there was a potential**

2   **complaint, did you notify anybody?**

3        A    When it was in the informal stage, I notified

4   my supervisor, Ms. Jones, the coun -- the EEO

5   counselor, Pat asked if it was possible for me to

6   reassign Mary.  That was not possible, and I mentioned

7   to Mr. Bjorklund that, that might be requested.

8        **Q    And, then, the next document is a copy of the**

9   **complaint that was fax'd to you, correct?**

10       A    That's --

11            MR. JONES:  Do you mean --

12            MS. SARSHIK:  The complaint?

13            MR. JONES:  -- the Declaration?

14            MR. SHAPIRO:  Yes.  Declaration.  Sorry.  Not

15   EEO complaint.

16            BY MR. SHAPIRO:

17       **Q    The Declaration, and your handwritten notes.**

18            **I take it the, on several of the pages, for**

19   **example, look at Page 3 and Page 4, there is**

20   **marginalia; that is, handwritten notes, circles,**

21   **underlining and sometimes comments in the margin?**

22   **Those are all your handwriting?**

Page 75

1      A    Yes.  Yes.

2      **Q    The signature under the declarant's initials**

3  **is Mary Bass', right?**

4      A    I assume so.  Yes.

5      **Q    But not yours certainly?**

6      A    No.

7      **Q    All of the handwritten notes, if you go**

8  **through this page by page, now, looking on Page 5 of**

9  **this document, there is a paragraph that indicates,**

10  **there is a section that starts, the first paragraph**

11  **that begins on the page starts with, "During this**

12  **second conversation," do you see that?**

13     A    Yes.

14     **Q    And in there, you underline the second line,**

15  **and you, actually, put a bracket around the first five,**

16  **six words of the second line, "revealed that she bears**

17  **a grudge."  Do you see that?**

18     A    Yes.

19     **Q    And, then, you write, in the margin, "I**

20  **mentioned this to Mary."  What did you mention to Mary?**

21     A    What I had mentioned to Mary was that I had

22  overheard her referring to Ms. Gambrel as "Sweetie," as

Page 76

1    we were referring for a meeting, and that I thought

2    that was inappropriate.

3         The brackets around "revealed that she bears a

4    grudge," I didn't quite understand.  I understand the

5    grudge part.

6    **Q    You noticed that you circled "two days later,"**

7    **later on in that paragraph where the sentence says, "In**

8    **fact, all I felt was that she was being very**

9    **disrespectful in using "Missy" and that this after the**

10   **fact justification two days later was nothing more than**

11   **a pretextual mask for what her use of "Missy" really**

12   **was, a gross racial slur against me."**

13        **You write, circled "two days later," and you**

14   **write, "Not true."  Is that your handwriting, the "Not**

15   **true"?**

16   A    It is my handwriting.

17   **Q    So, when something is not true, you circle it**

18   **and say so?**

19   A    There is no consistent marking here.  Some of

20   these were, I was just reading it, and underlining

21   either items that were confusing to me, or that, there

22   is no formal editorial style that I used in making

Page 77

1    these markings.

2        **Q    Later on, on Page 7 of this 10 page, this**

3    **Declaration, --**

4        A    Exhibit Page 59?

5        **Q    Yes, Exhibit Page 59.  There is a section, at**

6    **the bottom of the page, that says, "During that 2003**

7    **meeting, Bridges Steely unsolicited informed me that**

8    **someone at her former agency had filed an EEO complaint**

9    **against a women for referring to them as "Sweetie"."**

10        **Do you see that?**

11        A    I do.

12        **Q    And your handwritten note is, "That is when I**

13    **asked her not to call me."**

14        **What do you mean, "not to call me"?**

15        A    When I first arrived at FDIC, Mary called me,

16    "Sweetie", and I had asked her, I had called her to my

17    office and asked her not to refer to me in that way.

18    That I thought it was --

19        **Q    Too familiar?**

20        A    -- too familiar, and not professional, and

21    demeaning to me as her supervisor.

22        **Q    And did she ever call you "Sweetie" again?**

Page 78

1    A    She never did.

2    Q    Now, you, also, say, "Not true," once again on

3    the next page, which would be Page 60.  It's the eighth

4    page of this.

5         It says, "The only other manager that I

6    frequently use the term of endearment with in ASB is

7    someone that I consider to be a friend, and that

8    person, Lynn Carr-Hawkes, a corporate manager, has been

9    deployed on active duty in the military since the

10   summer of 2004."

11        You write, "Not true."  Do you see that?

12   What's not true?

13   A    I heard Mary refer to many people as

14   "Sweetie".

15   Q    In ASB?

16   A    Yes.

17   Q    And, then, you said, "I have never heard

18   this."  You wrote something, "I have never heard this."

19        Do you see that?  That's on the other side.

20   At the same point in the page, you, you wrote, with a

21   semicircle, "I have never heard this."  Do you see

22   that?  What does that refer to?

Page 79

1        A    I believe it refers to the fact that she

2    considered her to be a friend, and that, that was the

3    only other person that she had called that.

4            Again, I have no formal editorial training

5    here.  These were just reactions and incomplete

6    thoughts.

7        **Q    You, also, wrote, "Not true," on Page**

8    **9 -- that is Page 61 of this file -- where she says**

9    **that you had been informed about her, Mary and her**

10   **discrimination case before you accepted the job as**

11   **director, and you write, "Not true."**

12       A    That is absolutely not true.

13       **Q    And, then, you write, "Absolutely not true,"**

14   **at the very end, when you say, where Mary Bass says, in**

15   **her document, "I told her," meaning you, "I told her he**

16   **had been one of the managers that was found to have**

17   **discriminated against me by the US District Court.**

18            **"It was this inquiry that led Ms. Bridges**

19   **Steely to tell me about the fact that she had been**

20   **informed about my discrimination case prior to**

21   **accepting the ASB job, but she never told me the name**

22   **or names of the ASB managers who she claimed felt**

Page 80

1    **uncomfortable with me."**

2            **You say that, that's absolutely not true.**

3            **What's absolutely not true?**

4            THE WITNESS:  I'd like to read the full

5    paragraph before I respond to that.

6            MR. SHAPIRO:  Be my guest.

7            (Witness reviews document.)

8       A    What's not true about that, I never told her

9    that I had been informed about her discrimination case

10   prior to accepting the job in ASB.  I never told her

11   that because it's not true.  I first found out about

12   Ms. Bass' discrimination case from Ms. Bass, herself.

13           BY MR. SHAPIRO:

14      **Q    David McDermott was one of the officials who**

15   **was accused of discriminating and found to have**

16   **discriminated in Ms. Bass' case earlier.  Isn't that**

17   **right?**

18           MS. SARSHIK:  Objection.

19           THE WITNESS:  I don't know.

20           MS. SARSHIK:  You haven't laid any foundation

21   for --

22           MR. SHAPIRO:  I don't need to lay a foundation

Page 81

1    at a deposition.

2            BY MR. SHAPIRO:

3        Q    Ma'am, David McDermott was one of the

4    officials.    Wasn't he?

5        A    I don't know.  I wasn't there.

6        Q    Did you read the, did you ever read the

7    decision in the case?

8        A    No.

9            MS. SARSHIK:  Asked and answered.  She already

10   testified that she didn't.

11           MR. SHAPIRO:  Excuse me.  No more talking

12   objections, or I'm going to call the judge.  You're not

13   allowed to do that anymore.  Do not do it.

14           BY MR. SHAPIRO:

15       Q    All right.  Ma'am, you never read the

16   com -- the memorandum opinion of Magistrate Judge

17   Robinson in the case?

18       A    I said earlier that I had not, and I have not.

19       Q    But you knew, the fact that she gave you that

20   was what got you to start the file on her?

21       A    Yes.  Yes.  I thought it was a strange

22   document to give me.

Page 82

1    Q    Now, the next document is an addendum to the

2    affidavit, and you will agree, will you not, that the

3    underline, marginalia, marginal notes are all yours?

4    A    Yes.

5    Q    I'm at the end of the first section of this,

6    and the next section of this begins with Page 69, and

7    it goes to August, 2003, which is, again, before

8    Ms. Bass' 10/10, 2003 handwritten note, to which was

9    attached the memorandum about her, the memorandum from

10   the Court about her earlier case.  Correct?

11   A    Yes.

12   Q    And this has to do with earlier conversations

13   with Mr. Harris when Mary was taking, when she was

14   coming into the organization that you had formed,

15   right?

16             THE WITNESS:  Would you like me to read it

17   now; so, that I can --

18             MR. SHAPIRO:  Be my guest.

19             (Witness reviews document.)

20             THE WITNESS:  Could you repeat the question?

21             MR. SHAPIRO:  Yes.

22             BY MR. SHAPIRO:

Page 83

1    Q    This says, this is from Mary to Mr. Harris,

2    talking about the reorganization because she was now

3    placed under Mr. Harris in the new organization.

4         This is where you formulated this

5    organization, which had three sections, three branches,

6    and each branch had two sections, correct?

7    A    Yes.

8    Q    So, we can date that from some time in the

9    summer of 2003?

10    A    August 20th, 2003.

11    Q    Why did this end up in the file?

12    A    I believe that several of these e-mails are,

13    again, ones that I printed out as this case has gone

14    forward.  Things that I printed out, either in

15    discussions with the investigator or --

16    Q    This is --

17    A    -- just reminding myself of activities.

18    Q    Now, it seems that, in looking at the next

19    document, the next series of documents, a series of

20    e-mails, not just to Mary Bass, but from you to the, to

21    the staff generally, it looks like somewhere around the

22    fall of 2003 -- your first all there -- you were

Page 84

1   **looking for people to give you feedback on how the**

2   **place could be improved.  Is that accurate?**

3       A    Actually, it started earlier than this.  As I

4   pointed out, on Exhibit Page 8, in my very first

5   meeting with everyone in ASB, I asked them to tell me

6   things that we needed to work on.

7       **Q    Was it your understanding that Mary Bass was**

8   **giving you that file in October of 200 -- October 10,**

9   **2003, in an effort to show you one of the reasons why**

10  **things were rotten in the organization, that there was**

11  **race discrimination?**

12      A    It was not clear to me why Ms. Bass gave me

13  that file.

14      **Q    Did you ask her?**

15      A    She left the file with a --

16      **Q    I understand.  Did you ask her?**

17      A    She left the file on my desk with a sticky

18  note.  When we met later, I asked her why she had given

19  that.

20      **Q    And what did she say?**

21      A    She said that she wanted to make sure that I

22  knew about her history, and I said that I wanted to

Page 85

1    focus on the future.  That her experiences could help

2    us build a better future for ASB.

3         Q    **That her experiences could help us build, you**

4    **said?**

5         A    That everyone's experiences --

6         Q    **But you said to her that your experiences**

7    **could help us build a better future?**

8         A    I don't recall the exact words that I used.

9         Q    **I understand, but that's what you just said**

10   **just now?  Yes?  Your future could help us build a --**

11        A    Your --

12        Q    **Your experience could help us build a better**

13   **future in ASB?**

14        A    I'm saying that I don't remember the specific

15   words.  The discussion had consistently been with Mary,

16   and everyone in ASB, that I wanted everyone's input

17   based on what they thought we needed to do.

18             MS. SARSHIK:  David, sometime in the next few

19   minutes, I'd love to take a pit stop.  It doesn't have

20   to be right this moment, but when you get to a

21   convenient time --

22             MR. SHAPIRO:  Now is a convenient time.

Page 86

1          MS. SARSHIK:  Great.

2          MR. SHAPIRO:  Take five.

3          (Recess was held from 2:12 to 2:18 p.m.)

4          MR. SHAPIRO:  We can go on.  I'm looking at

5     Page 74, and --

6          THE WITNESS:  Seventy-four?

7          MR. SHAPIRO:  Yeah, Item 74.

8          (Witness reviews document.)

9          MR. SHAPIRO:  You comment to her, in an

10    e-mail, saying, "Mary, I want to tell you that several

11    people have commented to me that they noticed how hard

12    you've been working lately.  Someone used the phrase

13    that you are really stepping up to the challenge of the

14    new job.  I just thought you would like to know that."

15          BY MR. SHAPIRO:

16    Q     **This is in February of 2004.  Is that right?**

17    A     Yes.

18    Q     **Now, I have a question about something that**

19    **was in the past documents.**

20          **You said, an earlier statement that you read,**

21    **that you had heard rumors that she had, you said to her**

22    **that you had heard rumors that she had not defended**

Page 87

1   you.  That quite to the contrary that she was critical

2   of you behind your back.  Who told you that?

3        A    I don't remember the specifics regarding that

4   note that I wrote.

5        Q    But you remember the note that you read here?

6        A    Yes.

7        Q    And it said that she was saying that she had

8   to defend you because of your bad interpersonal skills,

9   and you said that, in fact, you had heard that she had

10  been critical of you and not defending you, but quite

11  the contrary, right?

12       A    Yes.

13       Q    So, can you tell me, I'm going to ask you to

14  think about it.  Who told you that, that Mary had been

15  one that was criticizing you and not defending you?

16       A    My recollection is it wasn't one specific

17  situation.  That there, during the course of my time

18  there, that Mary had been critical of my, the way that

19  I managed and led the organization.

20       Q    Was Mary the only person who was critical?

21       A    Mary was the only person that I heard talking,

22  that there were rumors that she talked about it with

Page 88

1  subordinate employees.

2      **Q    Who told you that if you can recall?  If you**

3  **can't recall --**

4      A    I can't recall it.  As I said, I think there

5  were, there were several situations.  The only one I

6  specifically remember was Rodney Cartwright.

7      **Q    Rodney Cartwright told you what?**

8      A    I don't recall specifically.

9      **Q    Well, you recall specifically a situation**

10 **where he said that Mary said something.  Right?**

11      **Do I have it correct, or --.**

12      A    I can remember discussions with Rodney during

13 which he would mention that, that Mary was critical of

14 things that I was doing, and that she would share those

15 comments with subordinate personnel.

16      **Q    Meaning her subordinates?**

17      A    Her subordinates were, also, my subordinates,

18 but --

19      **Q    No, but --**

20      A    -- subordinates within ASB, not necessarily

21 her own.

22      **Q    But people lower than her?**

Page 89

1      A    Yes.

2      Q    **Going on, in this document, there is a**

3   **document at --   these memos or e-mails --.**

4           **Look at 75, this is a memo to you, dated March**

5   **13, 2004, to the DOA Contacts DC.   What is that?**

6      A    It's a memo from me.

7      Q    **Yes.**

8      A    DOA Contracts DC is all of the ASB employees

9   in the Washington office.

10     Q    **And what is the purpose, if you can read this,**

11  **you don't have to read aloud, but just tell me what the**

12  **purpose of this is?**

13          **(Witness reviews document.)**

14     A    The primary purpose is to schedule some dates

15  for some continued team building, and to just reiterate

16  things that we had done as a group leading up to that.

17     Q    **So, why is it in this file?**

18     A    As I've mentioned, with several of these

19  documents, as I was preparing for discussions with the

20  investigator or with the EEO counselor -- I can't

21  remember which -- I was asked questions like what kind

22  of communications, what had the organization done, what

Page 90

1    had I done as the leader, and some of these were just

2    pulled for that purpose.

3         **Q    On, at 77, there is a copy of an e-mail,**

4    **printed from your station, from a Jill Ballina.**

5         **That's somebody on your personal staff?**

6    A    Yes.  She was my special assistant.

7         **Q    And she says, in this e-mail, which is dated**

8    **February 15th, 2005, "D. Lee wants you to call her.**

9    **Said you had the number.  Cindy Riley," with a phone**

10   **number," working under a tight deadline with her story,**

11   **wants to know if you received her e-mail."**

12        **Then, there is the third thing, and I take it**

13   **that's why this e-mail is in this file?**

14   A    I'll have to read it.

15        **Q    I'm going to read it:  It's "Greg Cofer**

16   **called," and, then, there is a number.  It says,**

17   **"Talked a great length about problems he's having with**

18   **Joan G."  That's Gustafson, isn't it?**

19   A    Yes.

20        **Q    "Problem with dropped option period, invoices**

21   **that did not get paid, contract extensions that did not**

22   **get handled in time.  Must praise for Tom as he seems**

Page 91

1    to always be drawn in at the 11th hour to fix the

2    problems.  Has sent e-mails to her supervisor to no

3    avail.  Has yet to return one from earlier this year,

4    and he went on and on.  Have more particulars, but it

5    doesn't get any better.  Said he hated to make the

6    call, and in the light of what's happening, the

7    downsizing, maybe there is nothing to be done.  I told

8    him I would relay the message to you."  The supervisor

9    spoken of here is Mary?

10        A    Yes.

11        Q    What did, at this point in time, the first

12   quarter of 200 -- of calendar year 2005, how many

13   subordinates did Mary Bass have in her section?

14        A    I don't recall.  I'd have to go back and look

15   at --

16        Q    Could it have been one?  Just Joan, last one

17   left after the downsizing?

18        A    I don't believe that's accurate in 2005.

19        Q    There was a time when there was just Joan,

20   right?

21        A    That's true.  There was a pin tin time when

22   several of the supervisors had only one employee.

Page 92

1      Q    I didn't ask you about several of the

2  supervisors.  I asked you about Mary Bass.

3           She had one subordinate, and it was Joan

4  Gustafson, right?

5      A    Just at the last few months before the final

6  reorganization.

7      Q    And when was the final reorganization?

8      A    In the fall of 2006.  I don't remember the

9  specific date that it was made effective.

10          MR. SHAPIRO:  Okay.  Good.  I'm going to need

11 to take another rest room break.  I'm sorry.

12          MS. SARSHIK:  It's okay.

13          THE WITNESS:  Okay.

14          MR. SHAPIRO:  So, we can just freeze.

15          (Recess was held from 2:29 to 2:37 p.m.)

16          THE WITNESS:  I just was trying to save time.

17          MR. SHAPIRO:  Okay.  Go ahead.

18          (Witness reviews document.)

19          MS. SARSHIK:  Do you want any water?

20          MR. SHAPIRO:  I want to go --

21          MR. JONES:  No, I'm going.

22          MR. SHAPIRO:  I want to go to Document 79.

Page 93

1    This is an e-mail from Mr. Gofer (sic) --

2         MR. JONES:  Cofer.

3         MR. SHAPIRO:  Cofer to Mary Bass and Joan

4    Gustafson.  Copies to you, Harris, Velda Flood.

5         BY MR. SHAPIRO:

6    Q    **Who is that?**

7    A    An employee in the office with Mr. Cofer.

8    They, actually, Mr. Cofer's group of ODO, actually, did

9    small business outreach, and she was part of that team.

10   Q    **Okay.  I see, and in the document, it says,**

11   **and, I'm looking at the third paragraph, it says,**

12   **"Finally, in previously meetings, in the spring of**

13   **2004, with Mary Bass and the other contracting staff,**

14   **Velda and I requested copies of both of these PO**

15   **contracts.**

16   **Since I am unable to locate copies, I can only**

17   **conclude they were never sent over.  We really need**

18   **copies of these active PO contracts as do the vendors."**

19   **Did you talk to Mr. Cofer about these, this**

20   **e-mail?**

21   A    I don't recall if I spoke with him about this

22   specific e-mail.  I talked with him in response to the

Page 94

1    telephone message that you read a moment ago.

2        **Q    The one -- that was Ms. Belinda?**

3        A    That was Ballina.

4        **Q    Ballina?**

5        A    Yes.  I did talk to him after I received that

6    message, and --

7        **Q    Okay.  This, did you ask him to put this**

8    **e-mail in writing?  Did you ask Mr. Cofer to write this**

9    **e-mail?**

10        A    I don't believe I did.  No.

11        **Q    Did you ever track down whether Mary Bass had**

12    **sent copies of the contracts to Mr. Cofer?**

13        A    I don't recall the specifics of this.

14        **Q    I mean, you agree with me that it's a little**

15    **odd that he says that, since he doesn't have copies, he**

16    **can only assume that they were never sent?**

17            **Did that strike you as odd?**

18        A    No.

19        **Q    If I don't have copies, it could, also, mean**

20    **that my office failed to, or I failed to save copies or**

21    **file them properly.**

22        A    It, also, says that, in previous meetings, I

Page 95

1    asked for them, --

2        Q    **Right, and he's only assuming that they**

3    **weren't sent because he doesn't have copies.  He can't**

4    **locate copies, right?  Does that seem a little odd to**

5    **you?**

6        A    No.

7        Q    **No.  Okay.  Look at Page 83, there is a, did**

8    **Mary Bass talk to people about, improperly about the,**

9    **about the CSA's?**

10       A    I don't know.

11       Q    **Is there any claim that, that's so?**

12       A    Are you referring to the document on Page 83?

13       Q    **Yes.  Yes.**

14       A    It's addressed to the entire Management Team.

15       Q    **I understand.  I want to know what it's doing**

16   **in here, in this file.**

17       A    As I've said, on several occasions, many of

18   these documents are in this file as a result of my

19   preparation, or in response to questions that were

20   asked by the investigator when this original complaint

21   was filed, and, so, I printed out many documents that I

22   thought were related to conversations, not only with

Page 96

1   Mary, but with the entire Management Team.

2       Q    So, you're not saying that Mary Bass somehow

3   violated confidentiality regarding discussions,

4   management discussions over CSA?

5       A    That's not what this document says.

6       Q    And that's not what you're saying?

7       A    That's not, this is my document, and that's

8   not what it's saying.

9       Q    What, there are lots of documents

10  complimenting the staff, thanking the staff, the

11  management staff for the CSA thing.  Is there any

12  reason particularly that they're in here?

13      A    When I first arrived at FDIC, the management,

14  people in management there did not work very cohesively

15  together.  One of my primary objectives was to forge a

16  team of the managers, and I tried, at every

17  opportunity, to give positive feedback when they worked

18  well together, reenforce the importance of our working

19  as a unified management group for the optimization of

20  the team.

21      Q    But I'm asking is there any particular reason

22  that they're in here, in this Mary Bass file, other

Page 97

1    **than the thanks was to Mary, as well as to others, and,**

2    **since this was a file about Mary Bass, you put them in**

3    **here?**

4    A    As I said before, in response to specific

5    questions that were asked of me either by the

6    investigator or in other preparation for this case, I

7    printed out many communications that were sent to, not

8    only Mary, but to the entire team, and many of these

9    were just general reminders of communications that I

10   had.

11   **Q    All right.  Look at 89, this is a full-page**

12   **handwritten memo that's written by you?**

13   A    Yes.

14   **Q    And it's dated May 17, 2005?**

15   A    Yes.

16   **Q    Can you read this to us, please?**

17   A    "I met briefly with Mary Bass to discuss Chuck

18   Benson's proposed delayed departure.  Tom Harris sat

19   in.  Meeting lasted only about 10 minutes.  Gave Mary

20   the attached copies of relevant guidance.  She said, it

21   didn't" -- wait.

22        "She said, she didn't have that information.

Page 98

1    I pointed out that it came via Global's FDIC Net, et

2    cetera.  Emphasized that management must assess

3    workload needs to support delayed departure.  Chuck did

4    not have a right to request or withdraw the proposal.

5            "Pointed out the responsibilities of managers

6    frequently require us to make decisions contrary to

7    employee desires.  Used the example of all employees

8    wanting leave on one day.  She couldn't support doing

9    that.

10           "Said, we tried to be sensitive to employee

11   "wants", but final decisions must be based on

12   organization needs.  She thanked me for clarifying the

13   issue.  Said, she did not understand that to be the

14   case.  It was a very pleasant, brief meeting."

15       **Q    So, why did you make a record of this?**

16       A    This situation was what I believe a good

17   example of Ms. Bass not fully understanding her

18   responsibilities as a manager and supervisor.

19           There were, this was a very important

20   situation in terms of individuals being given an

21   opportunity for early separation, early retirement or

22   voluntary separation with incentives, and Mary had not

Page 99

1    fully read the documents that were relevant.  She had

2    not responded to inquiries that I had about this

3    situation, and I felt that the fact that she said, she

4    acknowledged she did not know about some of those

5    documents supported that she was not fully informed

6    about things that she should be informed about.

7         Q    **Well, tell me what the situation was about?**

8              **This fellow Chuck Benson was on her staff?**

9         A    Yes.

10        Q    **And he was opting to take the early out?**

11        A    He was a member of her staff.  She had

12   submitted a request for an extension.  I had been

13   asking for documentation as to why because that was

14   part of the requirement, and she had just continually

15   told us that Mr. Benson wanted to leave early, and it

16   was part of the discussion that it had to be related to

17   organizational --

18        Q    **I thought that it was that he wanted a delay**

19   **in his departure date?**

20        A    Yes.  I'm sorry.

21        Q    **Not to leave early, but to take the early out,**

22   **but to do it at some later date?**

Page 100

1        A    That's right.  Yes.  Yes.

2        **Q    Did he get the extension?**

3        A    The request was withdrawn.

4        **Q    So, he withdrew the request?**

5        A    The request was withdrawn.

6        **Q    He withdrew the request?**

7        A    I don't know if it was Chuck or Mary.  I don't

8    recall if it was Chuck or Mary.

9        **Q    Well, it was Mary, it was Chuck's request?**

10       A    The request had to be submitted by management.

11       **Q    Oh, I see.**

12       A    The employees did not have the right to an

13   extension.  It had to be based on organizational needs.

14   I believe that was the point of this conversation with

15   Mary.  She kept saying that's what Chuck wanted, and we

16   kept asking what the organizational basis for that was.

17       **Q    The, Page 90 is on your stationery.  Unlike**

18       **the last note, this one is on your stationery, but it's**

19       **undated.**

20           **Can you tell us what this is?**

21       A    These were just the notes that I wanted to

22   make sure I covered in the meeting with Mary.

Page 101

1    Q    And I take it that documents 91 through 94 are

2    the buy out information background?

3    A    I'm sorry?  Through page what?

4    Q    Ninety-one to ninety-four are the buy out

5    information?

6         (Witness reviews document.)

7         BY MR. SHAPIRO:

8    Q    Ninety-one through ninety-five.  I'm sorry.

9    A    Yes.

10   Q    And the last e-mail thing is the e-mail chain

11   that is 96 through 98, that has to do with this Benson

12   extension?

13   A    Yes.

14   Q    And 99, 100, to 101 is, also, the Benson

15   extension.  Is that right?  That's another e-mail

16   chain?

17   A    Yes.  That appears to be correct.

18   Q    In fact, everything through 106 is the Benson

19   extension?

20   A    Yes.

21   Q    How much of an extension was Mr. Benson

22   requesting?

Page 102

1      A    I would have to go through and look at his

2   documents to say.  I don't recall.

3      Q    **Days or weeks?**

4      A    I don't recall.

5      Q    **Don't recall whether it was days as opposed to**

6   **months?**

7      A    I don't recall.

8      Q    **The CSA business, this is the, like a Pay for**

9   **Performance Program?**

10     A    It, yes, it's an aspect of a Pay for

11  Performance.

12     Q    **And is there a reason why these are in here?**

13          **That is, these being 107, 108 and 109?**

14          MR. JONES:  You said --

15          MS. SARSHIK:  Is this CSA?

16          MR. JONES:  -- CSA?

17          MS. SARSHIK:  This says, "CAS."

18          MR. SHAPIRO:  CAS.  I'm sorry.

19          THE WITNESS:  Oh, CAS is, is a, was a major

20  Information Technology Program that was being put on

21  contract.  It is not related at all to employee

22  performance.

Page 103

1          BY MR. SHAPIRO:

2      **Q    Okay.  So, what is this, what is the note here**

3   **that says, if you see, it's on Page 107?**

4      A    Yes.

5      **Q    That's your note?**

6      A    Yes.

7      **Q    Can you read it to us?**

8      A    "Met with Mary," --

9      **Q    It's 8/4/05.  August 4?**

10      A    Of '05.

11      **Q    That would be August 4?**

12      A    August 4, '05.

13      **Q    Okay.**

14      A    "Met with Mary to review this proposed

15   schedule for CAS.  Very pleasant productive session.  I

16   emphasized her role as advisor to this team.  The need

17   leadership in business contract issue."  The CT is

18   contract issues.  "Told her to tell me if she wanted my

19   support in attending meetings, et cetera."

20      **Q    And there is a circle.  That's a, the next**

21   **page is the same page but without the note on it.  So,**

22   **you can read the full page, isn't it?**

Page 104

1    A    Right.

2    Q    **And what was that circle, "Move it up"?**

3         **What was that all about?**

4    A    The notes on there were just some specific

5    notes as Mary and I were going through this milestone

6    of, of comments that we made about what needed to be

7    done and  the project milestones.

8         So, we needed to move up that particular item

9    number, 13, that's circled.  My note saying, "Move it

10   up," need to have it done earlier than October 14th.

11   Q    **Now, 110 is an e-mail from the EEO**

12   **investigator indicating that he's drafted up an**

13   **affidavit for you?**

14   A    Yes.

15   Q    **And what is the, Document 111 is the CM**

16   **Performance Input.  It's from Fred Selby to you in**

17   **January, 2006.**

18   A    Yes.

19   Q    **Why is this here?**

20   A    I, I made it a regular habit of soliciting

21   input on my employees, both from them, and from our

22   clients, as to their performance, before giving

Page 105

1    performance feedback.  Fred included this note about

2    Mary, and, so, I dropped it in this file.

3           What's noteworthy about this is that Mr. Selby

4    was on the Executive Steering Committee for CAS, was

5    very engaged in it, and Mary should have had the lead,

6    had the lead contract role; yet, he was not aware of

7    her personal, he never observed her personally, which

8    was an indication of her low level of active

9    participation.

10       **Q    Low level of active participation or just low**

11   **level, just not having contact with Fred Selby?**

12       A    No.  There were many opportunities for Mary to

13   be in briefings and meetings in which Mr. Selby

14   participated.  The fact that he didn't really get to

15   observer her is an indication that she did not

16   participate.

17       **Q    I see, and that's why you put it in here?**

18       A    Yes.

19       **Q    I see.  The next one Page 112, is a memo from**

20   **you, dated January of 2006.  This is ranking**

21   **categories.  What is this?  This is rating employees?**

22       A    This is in preparation for the Pay for

Page 106

1    Performance Evaluations and categories that would have

2    to be implemented within all of FDIC, but this was

3    specifically focused on ASB.

4         **Q    And is this your handwritten note?**

5         A    Yes, it is.

6         **Q    What does it say?**

7         A    "Management met on 1/12.  I explained where

8    greatest variance was, which people, and indicated Mary

9    had ranked her unit and section people highest, all in

10   Group 1, and rated other generally acknowledged high

11   performers as Group 2.

12        "Asked her to discuss her thoughts with the

13   group.  She started with, "To begin, I believe charity

14   begins at home."  During this meeting, she, also, read

15   from Ed Hall's Exit Evaluation from Wayne Evans, DSC.

16   I told her before I felt this was inappropriate."

17        **Q    What is Ed Hall's Exit Evaluation from Wayne**

18   **Evans?**

19        A    Ed Hall had been on a detail to another

20   organization where Wayne Evans was the supervisor, and

21   had appropriately been given exit performance feedback.

22        **Q    From Mr. Evans?**

Page 107

1    A    From Mr. Evans.

2    **Q    And?**

3    A    Ms. Bass had obtained a copy of that.  She was

4    not Mr. Hall's supervisor, nor had she any direct

5    involvement in, with Mr. Evans, and, yet, she had a

6    copy of that document and was reading it in the

7    group, --

8    **Q    What --**

9    A    -- and I had indicated to her that I felt that

10   was inappropriate.

11   **Q    Was he critical of Mr. Hall?**

12   A    I don't recall.  That was not the point of my

13   comment.  It was inappropriate for her to be reading

14   another employee's performance feedback.  Quite

15   frankly, I wasn't even sure where she obtained it.  It

16   was inappropriate for her to --

17   **Q    Did you ask her where she obtained it?**

18   A    That was not the point.

19   **Q    But, no, but did you ask her where she**

20   **obtained it?**

21   A    I don't recall that I asked her where she got

22   it.  It was inappropriate for her to be reading from

1   that document in a group meeting.

2        Q    Page 113 is a, the printed part is an e-mail

3   from Mary Bass to you, regarding the status of call to

4   Booz Allen Hamilton, where Mary Bass says, "As

5   promised, I called Booz Allen Hamilton and left a

6   message, but I haven't heard back from Judith Ann

7   Martin," with a phone number.  "Thanks, MB."

8             Then, the rest is your handwriting?

9        A    Yes.

10       Q    And what does it say?

11       A    "Mary participated in meeting with Gail P,"

12  which is Gail Patelunas, "Ron Pferchy, Nina Jandaleo on

13  11 January," or 12 January, "to discuss travel cost

14  issues on CAS.  Prior to a call to BAH she and I

15  discussed the strategy for the call.  Tell BAH we're

16  strategizing how FDIC will support the effort.  Ask

17  what they plan for Dallas travel.  Instead, she called

18  and asked if they had priced out travel."

19       Q    That's not what the e-mail says?

20       A    No.

21       Q    It says that she left a message?

22       A    No, but I had conversations with Mary, and

Page 109

1    made the note on this.

2        **Q    Oh, I see.  This is, again, this is January,**

3    **2006?**

4        A    Yes.

5        **Q    Right.  This next one is January 11, 2006, and**

6    **it's a note from you to Mary?**

7        A    Which document are you referring to?

8        **Q    To 114.**

9        A    Yes.

10       **Q    Can you tell us what this says?**

11       A    "Mary, Gail P.," Patelunas, "has asked us to

12   participate in a meeting in her office at 3:00.  Nina

13   and Ron Pferchy will be there.  The topic is the travel

14   problem that has popped up on CAS.  Can you, please,

15   attend with me?  Thanks, Ann."

16       **Q    And this just ends up in here because you were**

17   **keeping everything regarding Mary at this point?**

18       A    I don't think I was keeping everything.  This

19   was a particularly large contract with particularly

20   significant strategic implications for FDIC, and, and I

21   felt a need to keep some documents related to it

22   because of the criticality.

Page 110

1    Q    Did you have a contract, did you have a file

2    called, "CAS"?

3    A    I don't recall.

4    Q    Now, the next document is several pages long,

5    and it goes from what looks like 115 to 126, is that

6    right?

7    A    Yes.

8    Q    Can you tell us what this is?

9    A    It's a document cap -- it's a Selection

10   Recommendation Report, which documents the selection of

11   a contractor in a competitive procurement.

12   Q    Who ran the competitive procurement from your

13   office?

14   A    Mary was the contracting officer.

15   Q    Mary was the contracting, and this, the

16   marginalia is yours?

17   A    Yes.

18   Q    Is this a draft of the document?  It looks

19   like a draft.

20   A    Yes.

21   Q    And are these, look at the first page, that is

22   Page 115, there is On-Site $19,260.00.  Do you see

Page 111

1    **that?**

2           MR. JONES:  It's 19 million.

3           MR. SHAPIRO:  Nineteen, sorry.

4           BY MR. SHAPIRO:

5       **Q    It's nineteen million, two hundred and sixty**

6    **thousand, five hundred and nine dollars.  Do you see**

7    **the circle?**

8       A    Yes.

9       **Q    "Is space available?"  What's that about?**

10      A    What this indicates is that they are pricing

11   for all the work to be performed in FDIC facilities.

12   We had, had several discussions that space was limited.

13   So, if we were going to evaluate it to do the work

14   on-site at FDIC, the question was, "Have we confirmed

15   that space is available to actually do that?"

16      **Q    So, you were just asking a question on this**

17   **draft?**

18      A    Right.  These are just comments and questions.

19      **Q    Okay.  And the strike-overs in the note?**

20      A    Are strike overs.

21      **Q    You just think that, that section of the note**

22   **should not be there?**

Page 112

1    A    Yes.

2    Q    **The, all the marginalia are your notes?**

3    A    Yes.

4    Q    **What draft is this?  Is this the first draft?**

5    A    I don't know.

6    Q    **Why are you doing the review of it?  Did Mr.,**

7    **did her boss, Tom, have a hand at this?**

8    A    As I recall, Mr. Harris was not available.  As

9    I said, this was a highly critical and visible and

10   complex project.

11        There had been concerns about making sure that

12   we had all of the documentation clearly in order, and

13   in Tom's absence, I would reviewed the document.

14   Q    **And you kept this why?**

15   A    I kept this because I thought it was an

16   example of Mary's weak technical skills.  This was,

17   this was a very poorly written document.  It was poorly

18   constructed in terms of how to articulate the

19   competitive analysis, and it was, also, getting very

20   close to the deadline.  To have such a poor document

21   that close to the deadline was very disconcerting to

22   me.

Page 113

1    Q    But you don't know which draft it was.  It

2    might have been the first draft.  It might have been

3    several drafts later.

4    A    It would not matter.  At this point, we were

5    at tight time lines, and the document had to be

6    completed.

7    Q    I understand.  Mr. Harris had reviewed earlier

8    drafts.  He just wasn't available to review this one?

9    A    I don't know.

10    Q    Well, he would have been the responsible

11    supervisor, right?

12    A    Mary Bass was responsible for this.  She was

13    the contracting officer.

14    Q    I understand, but you usually would see things

15    that were reviewed by her supervisor, correct?

16    A    Not always.  No.

17    Q    No.  I understand, but usually that's the way?

18        The supervisor reviews it, and it gets kicked

19    up when he's satisfied?

20    A    No, sir.  That's not what I'm saying.  All

21    documents are not reviewed by multiple levels.  Because

22    of the criticality of this program, I inserted myself

Page 114

1    because of the importance to the corporation.

2         Q    Gotcha.  And you saved it because you thought

3    it was poorly worded?

4         A    Not poorly worded.  Not only poorly worded.  I

5    thought it was very weak from a contracting technical

6    standpoint.  It indicated a lack of understanding of

7    many issues, and just, in general, was very weak;

8    particularly, given the importance of this.

9              I would have expected from someone at Mary's

10   level and level of experience a much more refined

11   document at this point.

12        Q    What rating did Mary get?  What was her

13   appraisal in 2004?

14        A    I don't recall.

15        Q    Well, did she get needs improvement?

16        A    I don't recall.

17             MS. SARSHIK:  Do you mean for the year 2004?

18             MR. SHAPIRO:  Yes.  For the year 2004.

19             BY MR. SHAPIRO:

20        Q    How about for the year 2005?

21        A    I don't recall.

22        Q    What about for the year 2006?

Page 115

1          A    I don't recall.

2          Q    Did you give anybody an unacceptable

3    performance rating in your unit?

4               Anyone in ASB, did they get an unacceptable

5    performance rating?

6               MS. SARSHIK:  I'm going to --

7               THE WITNESS:  I don't recall.

8               MS. SARSHIK:  -- object because there has been

9    no foundation that unacceptable is a rating.  It's

10   meets or do not meet, and you've heard that.

11              BY MR. SHAPIRO:

12         Q    Well, did anybody get do not meets, does not

13   meet requirements?

14         A    I don't recall.  I don't believe so.

15         Q    So, Mary would have gotten, then, based on

16   your recollection, meets requirements, correct?

17         A    I be -- I, I would have to look, but I believe

18   Mary probably received a "meets".

19         Q    Meets requirements?

20         A    I'm sorry.  I'm getting very tired.

21         Q    Meets requirements, right?  You believe Mary

22   would have gotten that?

Page 116

1       A    Yes.

2       **Q    And it's the supervisor's obligation to**

3    **properly rate an employee, correct?**

4       A    Yes.

5       **Q    Mr. Harris and yourself in Mary Bass' case,**

6    **correct?**

7       A    Mr. Harris.

8       **Q    Well, Mr. Harris is the immediate supervisor,**

9    **but you are the reviewing official.  You're the person**

10   **that has to approve the rating, correct?**

11      A    Yes.

12           MS. SARSHIK:  Would you like to take a break

13   to rest for a moment?  You've just said that you're

14   tired.

15           THE WITNESS:  Well, I, yes, I'm getting

16   very --

17           BY MR. SHAPIRO:

18      **Q    Would you like to take a break?**

19      A    Yes.  Could we have one minute?

20           MR. SHAPIRO:  Sure.  Absolutely.

21           THE WITNESS:  Thank you.

22           MR. SHAPIRO:  Thank you, very much.

Page 117

1          THE WITNESS:  I'll just walk around for a

2     minute.

3          (Recess was held from 3:07 to 3:12 p.m.)

4          BY MR. SHAPIRO:

5     Q    **Let's look at 130, please?**

6          **Well, actually, let's look at 129.  This is a**

7     **phone call message from Mary Bass, and can you read**

8     **what the message says?**

9     A    It's a message for me from Mary Bass,

10    "Campbell is taking care of Gail's SRR and Karen Hughes

11    read the ODO contract.  Call" something," if you need

12    to.

13    Q    **Call --**

14    A    "If you need to. 703313," blah, blah, blah.

15    "Home at," "Home until 3:00 p.m."

16    Q    **So, Mary is giving you information, or**

17    **somebody is taking this message down?**

18    A    Yes.

19    Q    **Who's handwriting is it?**

20    A    Andrea Landry, the administrative assistant.

21    Q    **Do you know what this is about?**

22    A    I don't recall.

Page 118

1      Q    Now, look at 130.  It's a May 22nd, 2006 note

2   on your stationery.  Can you read it?

3      A    Yes.  "5/22/06.  Tom, Mary, I'm very concerned

4   about this response.  The replies to each

5   recommendation sound as though we have done little or

6   nothing to review of the OIG's position and conduct our

7   own review.  This is unacceptable.  Can't we say that

8   we have accomplished?  So --"

9           MS. SARSHIK:  "Can't we say"?

10          THE WITNESS:  Oh, "What we have accomplished?

11  Some of these issues don't seem that complex."

12          BY MR. SHAPIRO:

13     Q    Well, who wrote this?

14          Who did the draft?  Not this document, the

15  thing that it's attached to.

16     A    The, the attached document --

17     Q    Came to you through Tom?

18     A    It came to me through Tom.  You originally

19  asked, "Who wrote it?"  Mary Bass wrote it.

20     Q    And your questioning, Tom approved it coming

21  up to you?

22     A    Actually, this was a document that Tom and I

Page 119

1    had discussed.  It was many months delinquent.  It was

2    a response to an Office of the Inspector General

3    review.

4           Tom had become very, very frustrated in his

5    inability to get adequate responses from Mary.  He and

6    I discussed it.  He said that it had gotten about, he

7    had seen many edits.

8           This was the most recent, and I asked him just

9    to go ahead and send it to me because we were so

10   delinquent.

11        Q    **What's the final document look like?**

12        A    I --

13             MS. SARSHIK:  If you know?

14             THE WITNESS:  I, I don't know.

15             BY MR. SHAPIRO:

16        Q    **Did Mary Bass, was there a final document that**

17   **went out?**

18        A    I don't recall.

19        Q    **This was the first one you saw?  The first**

20   **draft you saw?**

21        A    I don't recall if it was the first draft I

22   saw.

Page 120

1        Q    And the marginalia on the draft, itself, is

2    yours?

3        A    Yes.

4        Q    Not Tom's?

5        A    No.

6        Q    And 135 is a memo, not on stationery.  It's

7    just on lined paper.  It's a rather lengthy memo by

8    handwritten.  It's three-pages long.

9             Can you read that to us?  It's 4/6/06.  It's

10   April 6, '06.

11       A    "Meeting my office with M. Bass and Tom

12   Harris.  Re:  Attached 3/23 e-mail from Mary to Andrea

13   Wilford.  Stated I wanted to discuss the issues behind

14   Mary's response, as well as response itself.

15            "Told Mary I needed better understanding of

16   her need for "help" as stated in her message.  Also,

17   said that I felt it is not appropriate to vent to

18   client; particularly, without answering client's

19   question.

20            "Mary said, she had spoken to ODEO and filed a

21   complaint against Mr. Harris.  I said, she had a right

22   to do that, but we had to continue to get the work done

Page 121

1    for the clients.  She said, she felt this meeting was

2    hostile, and she would make a memo to that effect.  I

3    said, I was sorry she felt that way.  I was merely

4    trying to understand her issues, and insure adequate

5    support to client.

6           "She mentioned not having a 13.  Tom addressed

7    having reassigned work out of Mary's work area as

8    people left, only holding her accountable for work

9    assigned to her or her staff."

10      Q    How many people did she have at this point?

11      A    I don't, I don't recall.  It --

12      Q    It may have been Ms. Gustafson only?

13      A    I don't recall.

14      Q    Ms. Gustafson was a GS, a CG-8 level employee?

15      A    Either a 7 or an 8, I believe.

16      Q    Continue?

17      A    "She," we're back to Mary Bass.  "She tried to

18   divert discussion.  I brought it back to the DIR

19   e-mail.  I specifically told her that venting

20   frustration to clients was inappropriate, and that she

21   should address those issues within ASB, reminded her

22   she had not raised her concerns to my attention, and,

Page 122

1    if she wasn't happy with ASB response, she should feel

2    free to approach Glen Bjorklund or Arleas Kea.  In the

3    future, I expected her to provide appropriate answers

4    to client's inquiries.

5         "I got no response.  So, I asked if she

6    understood.  No response.  Facial glaring, head back,

7    arms crossed.  I told Mary that her body language and

8    facial expressions felt hostile toward me.  I asked

9    again.  She said, she understood.

10        "There was lots of discussion of minor details

11   of work.  She was only one person was handling a major

12   project, CAS, et cetera.  I told her, we all had

13   multiple projects and priorities.  The higher the grade

14   the more that is true.  I know org changes cause

15   stress.  We all feel it, but I hadn't heard anything

16   that suggested we were expecting more of her than was

17   grade appropriate or more than her peers.

18        "I asked her if there was something about her

19   workload that she felt I wasn't aware of.  No response.

20   I had to ask repeatedly for an answer.  She finally

21   said, no.  Mary said that she would call Andrea Wilford

22   with answers to her questions.  Reiterated opening

Page 123

1   comments, organizational changes happening daily,

2   present challenges and create stress.  We must still

3   work together to support clients."

4          Separate note:  "Mary was very defensive even

5   though I tried very hard not to create confrontation

6   environment.  I really wanted to understand her

7   perspective.  It was hard to keep her focused on the

8   topic of the meeting.  I felt she tried to intimidate

9   me by telling me this was apart of her EEO," and I'm

10  sorry, but it's cutoff at the bottom.

11         "I wanted to discuss client support."

12         (Pause.)

13         BY MR. SHAPIRO:

14  **Q    And this was in front of Tom or just a private**

15  **conversation with you?**

16  A    No, Tom Harris was in this meeting as well.

17  **Q    Okay.  Now, the next page, 138, is on your**

18  **stationery, and not lined paper, and it says, "Work**

19  **together to serve customers, organizational changes**

20  **creating," --**

21  A    As in the earlier situation, I sometimes would

22  make notes of what I -- points that I would want to

Page 124

1    make in the conversation before I got there.

2        Q    So, these are the notes that -- for the

3    conversation, this three-page memo?

4        A    Yes.  Yes.

5        Q    That would be Page 138 in relation to Page 135

6    through 37.  Right?

7        A    Yes.

8        Q    And this is the e-mail exchange that

9    engendered the conversation, isn't it, between

10   Ms. Wilson (sic) and Mary Bass?

11       A    Yes.  The --

12            MS. SARSHIK:  And what particular --

13            BY MR. SHAPIRO:

14       Q    Page 139 and 140?

15       A    Yes.

16       Q    Now, this next one is a meeting with Tom

17   Harris and Joan Gustafson, not Mary, correct?

18       A    That's correct.

19       Q    And what, can you read your note?  It's

20   4/7/06, April 7, '06?

21       A    Exhibit 141.

22       Q    Yes.

Page 125

1        A        "Meeting with Tom Harris, Joan Gustafson, RE:

2    Req, COR HQ 189 Attached E-Mail.  Joan was a little

3    disjointed in giving background for this req.  Couldn't

4    remember if problem was incomplete req package or

5    failure of DIR to budget check.  Said, req was assigned

6    to her in March.  She knew of client's requirement.

7    Had originally talked to DIR, Andrea Wilford, in August

8    of '05.  Clearly laid responsibility at feet of Mary

9    Bass.  "Mary told us not to work..."  "Mary was working

10   a higher priority..."  Told Joan we were not to ask the

11   client to give us a new req since it was an ASB error

12   that closed it in NFE."

13       **Q    So, why wasn't Mary Bass in on this**

14   **conversation?**

15       A    I believe she was not at work that day.

16       **Q    Did you write her about what Ms. Gustafson**

17   **said?**

18       A    I don't recall.

19       **Q    There is nothing in here that indicates that,**

20   **is there?**

21       A    I would have to look.  I don't recall, and I

22   have not read these attached documents recently.

Page 126

1      Q    Well, the attached documents are, actually,

2   earlier documents.

3      A    Right.

4      Q    Earlier than the meeting with Gustafson,

5   correct?

6      A    I'm sorry.  Could you say that again, please?

7      Q    The attached e-mail chain --

8          MS. SARSHIK:  It's 142 and 143?

9          MR. SHAPIRO:  And 144.

10          MS. SARSHIK:  Oh, excuse me, and 144.

11          BY MR. SHAPIRO:

12      Q    That is earlier than the meeting that you had

13   with Gustafson --

14          MS. SARSHIK:  Do you know what time the

15   meeting took place because some of these e-mails are

16   the same date.

17          THE WITNESS:  Right.

18          MR. SHAPIRO:  But they're in the morning, and

19   Mary was out that day the witness said; so, if these

20   e-mails would be earlier than the meeting --

21          MS. SARSHIK:  Well, we don't know what time

22   the meeting took place --

Page 127

1          BY MR. SHAPIRO:

2      **Q    Ma'am, the e-mail exchanges are what you were**

3  **meeting about, correct?**

4      A    Yes.

5      **Q    So, they were earlier than the meeting that**

6  **you write about in 141, correct?**

7      A    I believe so.

8      **Q    Yes, and there is no e-mail or indication that**

9  **you talked to Mary Bass about what Ms. Gustafson said,**

10 **is there?**

11     A    There is not.  My recollection of this

12 situation is that, with the information from Joan, when

13 Mary returned, Mr. Harris was to talk to her about this

14 situation.

15     **Q    And you did not talk to her about this**

16 **situation?**

17     A    I did not.

18     **Q    Have we now gotten to the end of this?  Yes?**

19         **(No verbal response.)**

20     MR. SHAPIRO:  You have to answer.

21     THE WITNESS:  Yes.

22     MR. SHAPIRO:  I just have a few more questions

Page 128

1    about one document that I want to show you.

2              I'm going to have this marked as Exhibit 2.

3                        (The document referred to was

4                        marked for identification as

5                        Steely Exhibit No. 2.)

6              MR. SHAPIRO:  Thank you.  I'm showing you

7    what's been marked as Exhibit 2 for this deposition.

8              MS. SARSHIK:  And can Ms. Steely work with

9    this copy that you've given her?

10             MR. JONES:  That's the one --

11             MS. SARSHIK:  That's for her to use now?

12             MR. JONES:  She'll work with the exhibit copy.

13             MS. SARSHIK:  Okay.  Great.

14             BY MR. SHAPIRO:

15        Q    And I want you to take a few moments, and I

16   want you to read it and make sure you're familiar with

17   it?

18             MR. SHAPIRO:  It's 10 pages long, but it's

19   your work product.

20             MS. SARSHIK:  And take as much time as you

21   need.

22             MR. SHAPIRO:  As much time as you need.

Page 129

1            THE WITNESS:  I will.

2            MR. SHAPIRO:  We can go off the record so you

3    can relax, ma'am.  You just let us know when you're

4    ready, and we'll come back on the record.

5            THE WITNESS:  I will.

6            (Recess from 3:24 to 3:32 p.m.)

7            BY MR. SHAPIRO:

8        **Q    This document is your affidavit?**

9        A    Yes.

10       **Q    You signed it under oath?**

11       A    Yes.

12       **Q    And you recognized that you were sworn to tell**

13   **the truth at the time you gave the affidavit?**

14       A    Yes.

15       **Q    Is there anything in here, upon, and you just**

16   **reviewed it?**

17           **You've read this affidavit this afternoon just**

18   **a few moments ago, correct?**

19       A    Yes.

20       **Q    Is there anything in here that strikes you as**

21   **not accurate, that upon reflection, you would change?**

22       A    No.

Page 130

1      Q    Now, in the affidavit, it says, Page 2, the

2  first paragraph beginning on the page, the third

3  sentence, it says, "I had heard general comments that

4  she had filed a complaint and won, but I had not heard

5  any specific information."

6           This is before she handed you the documents on

7  October 10, 2003, correct?

8      A    Yes.

9      Q    Who had told you that she had, had an EEO

10 complaint and won?

11     A    As I stated in my affidavit, I cannot recall.

12     Q    You came to the FDIC in May of 2003?

13     A    Yes.

14     Q    So, sometime between May of 2003 and October

15 10 of 2003 someone or, one or one, more than one person

16 told you that Mary Bass had, had an EEO complaint and

17 had won?

18          MS. SARSHIK:  I'm going to object.  This

19 mischaracterizes her former testimony because she

20 doesn't say EEO in her Declaration.

21          MR. SHAPIRO:  That's a talking objection.  If

22 you do that again, I am going to go to the judge.  Now,

Page 131

1    you're not suppose to do that.  You're not suppose to

2    tell the witness anything by way of objection, and I'm

3    getting real tired of you doing it.  Now, I'm warning

4    you for the very last time.  Do not make a talking

5    objection again, ma'am.

6            MS. SARSHIK:  Mr. Shapiro, I'm going to object

7    because this is a mischaracterization of her testimony.

8            MR. SHAPIRO:  That's all you have to say.

9            MS. SARSHIK:  Okay.  That's all I'm --

10           MR. SHAPIRO:  You're not --

11           MS. SARSHIK:  -- saying.

12           MR. SHAPIRO:  That's not all you said.

13           THE WITNESS:  Can I, please, ask you to keep

14   your voice down?  There are offices very close to this.

15           MR. SHAPIRO:  I'm telling you, this has been a

16   continuing problem, and it's not appropriate.

17           BY MR. SHAPIRO:

18      Q    Now, what exactly had, did you know before

19   Mary, about the complaint then, her winning before

20   October 10, 2003?

21      A    I didn't know any details.

22      Q    What did you know?

Page 132

1    A    I knew there had been some type of complaint.

2  I did not know the basis of it or any of the details.

3    **Q    You didn't know it was an EEO complaint?  Is**

4  **that your testimony?**

5    A    I don't recall knowing any specifics about the

6  complaint.

7    **Q    Is it your testimony that you did not know**

8  **that it was an Equal Employment Opportunity complaint?**

9    A    It's my testimony that I do not recall any

10  details.

11    **Q    But does that mean that you don't, you didn't**

12  **know it was an EEO complaint?**

13    A    It means what I just said.  I don't recall any

14  details of the complaint, of my knowledge of the

15  complaint.

16    **Q    But you had some knowledge that she had won**

17  **something?**

18    A    Yes.

19    **Q    And you don't recall who told you?**

20    A    I don't.

21    **Q    It would have been somebody above your level?**

22    A    I don't recall.

Page 133

1      Q     Could it have been Dave McDermott?

2      A     No, it could not have been Dave McDermott?

3      Q     Why could it not have been Dave McDermott?

4      A     I specifically know, recall that Dave

5   McDermott never had any conversations with me about

6   this.

7      Q     About what?

8      A     About Mary Bass.

9      Q     Who was Mary's superior before you reorganized

10  and made her Mr. Harris' subordinate?

11     A     Dave McDermott.

12     Q     Did you ask the supervisors for a review of

13  their people when you first came in?

14     A     I asked each of the section chiefs to give me

15  an overview of the programs for which they were

16  responsible, the workload within their group and the

17  human resources.

18     Q     The human resources meaning their people?

19     A     Their people.

20     Q     So, what did Dave McDermott tell you about

21  Mary Bass?

22     A     He told me about the programs that she

Page 134

1    managed.  I did not has for performance assessments.

2         At that time, it was about, did we have enough

3    people, did we have the right skill sets -- that type

4    of thing -- for the programs that they were managing.

5         **Q    Did they tell you, did he tell you that they**

6    **had enough people?**

7         **Did your subordinate supervisors tell you,**

8    **section chiefs tell you that they had enough people?**

9         A    At that point in time, when --

10        **Q    Yes.**

11        A    -- I came in, yes, Mary Bass had very few

12   programs; particularly, at her grade level, and she had

13   adequate personnel to manage those programs.

14        **Q    How many people did she have?**

15        A    I believe the organization structure, when I

16   first got there, she had three personnel.

17        **Q    And what grades were they?**

18        A    That I don't recall.

19        **Q    The second paragraph, on the same page, says,**

20   **when you, "When I first arrived here, many people in**

21   **the group brought up issues concerning lack of trust,**

22   **poor morale, frustration and a general discontent at**

Page 135

1    all levels."  That was AB -- ABS people, right?

2            MR. JONES:  ASB.

3            MS. SARSHIK:  ASB.

4            MR. SHAPIRO:  ASB.  Sorry.

5            THE WITNESS:  ABS is me.  Yes.  ASB, yes.

6            BY MR. SHAPIRO:

7        Q    And, then, it says, "During the next several

8    months, I brought in consultants to help improve

9    conditions."

10            When were the consultants in?

11        A    If you recall, that was in one of the e-mails

12    in my tickler file.  I don't recall them from memory.

13    I'd had to look back at those documents.

14        Q    Then, it says, "During a passing conversation,

15    in the hall, one day, Mary and I were commenting on how

16    far we had to go to improve the situation in ASB.  I

17    asked Mary if she would give some thought to what she

18    thought we could do to improve the team environment,

19    and, then, to come meet with me so that we could chat.

20    A day or two later, Ms. Bass gave me a copy of her

21    prior complaint."  That would be October 10, right?

22        A    Yes.

Page 136

1            MR. JONES:  I think you're saying, --

2            MR. SHAPIRO:  So, --

3            MR. JONES:  -- October 3rd?

4            MR. SHAPIRO:  No.

5            THE WITNESS:  No.

6            MS. SARSHIK:  No.  October 10th.

7            MR. SHAPIRO:  She gave you the copy, she gave

8    you that memo --

9            MR. JONES:  Sorry.

10           BY MR. SHAPIRO:

11      **Q    That little note with the attachment, correct?**

12      A    Yes.

13           MR. JONES:  Sorry.

14           BY MR. SHAPIRO:

15      **Q    So, it was in the context of your asking**

16   **Ms. Bass to talk to you about the problems in ABS,**

17   **right?**

18           MR. JONES:  I'm sorry.

19           THE WITNESS:  I asked --

20           MS. SARSHIK:  ASB.

21           THE WITNESS:  I asked --

22           MR. SHAPIRO:  ASB.

Page 137

1          THE WITNESS:  I asked Ms. Bass, as I asked

2    every ASB employee, and I had many emp -- almost all of

3    the employees came in and were giving me inputs as I

4    had asked.  I saw an opportunity for Mary and I to

5    continue that conversation.

6          BY MR. SHAPIRO:

7      **Q    And it was in response to that hall**

8    **conversation that she gave you a copy of the decision**

9    **in her case, and the newspaper article about it,**

10   **correct?**

11     A    I don't know why she gave that to me.

12     **Q    Well, you characterized, this is all**

13   **your statement, correct?**

14     A    I --  I'm giving you a time sequence in my

15   affidavit.

16     **Q    Well, --**

17     A    I don't know what her motivation was.

18     **Q    I understand, but it's in the same paragraph**

19   **as, that there was a, that when you came to the group,**

20   **there was a lack of trust, poor morale, frustration,**

21   **general discontent.  During several months, you got**

22   **consultants in there.**

Page 138

1          **In a passing conversation in the hall with**

2     **Mary, you both recognized how far you had to go, the**

3     **organization had to go to cope with its problems.  You**

4     **asked her to come to you, and it's on coming to you**

5     **that she gave you the, the October 10 memo, correct?**

6     A    My affidavit is reporting the sequence of

7     events, but, again, I do not know what Ms. Bass'

8     motivation was for giving that to me.

9     **Q    I understand.**

10    A    It could have been in response to my

11    questions.  It could have been to intimidate me.

12    **Q    I see.  At that point in time, you had a --**

13    **barely knew Ms. Bass.  Is that fair?**

14    A    I had known Ms. Bass since May.

15    **Q    So, this would have been five months later?**

16    A    Yes.

17    **Q    You saw her a few times a week?**

18    A    I saw her everyday.

19    **Q    You met with her, you dealt with her two,**

20    **three times a week?**

21    A    Yes.

22    **Q    In an office that had maybe 50, 60 people at**

Page 139

1    the time?

2        A    We probably had about 40 in the office.

3        Q    You told me you had 60 at the beginning,

4    didn't you?

5        A    I have employees, at that time, I had

6    employees around the country.  In that office, about

7    40.

8        Q    About 40 employees, and you had good relations

9    with Ms. Bass as far as you knew?

10       A    Yes.

11       Q    Now, the beginning of the very next paragraph

12   says, "The purpose of the February 3rd, 2005 meeting

13   was to discuss complaints that were raised to my

14   level," meaning your level, "by clients that Ms. Bass

15   supports.  Specifically, Andrea Wilfson, of DIR."

16       A    Wilford.

17       Q    "Wilford, of DIR, had called and expressed

18   significant frustrations about dealings with Ms. Bass

19   regarding one of Ms. Bass' employees, Joan Gustafson."

20            That's the meeting when you said, "Missy."

21            Right?

22       A    Yes.  Later in that same meeting.

Page 140

1    Q    Right.  The meeting had nothing to do with,

2    the purpose of the meeting had nothing to do with your

3    notion that Ms. Bass shouldn't use "Sweetie," in

4    referring to people at work, correct?

5    A    The meeting had to do with Ms. Bass'

6    performance as a manager of her organization.  During

7    the conversation we not only spoke specifically about

8    this example, but how she managed her workload and led

9    her employees in general.

10    Q    And you have a memo that summarizes what this

11    meeting was about, which you did right after the

12    meeting was over, correct?

13    A    Yes.

14    Q    Within the hour I think you said?

15    A    Yes.

16    Q    Now, you have a quote here, and you say, this

17    is the same paragraph.  You say, "At the end of the

18    meeting, I stated that returning phone calls and

19    answering e-mails were a minimum requirement.  Ms. Bass

20    said that she understood and would do better.  I said

21    something like, "If you don't, we'll have other things

22    to talk about.  Won't we, Missy?"  Did I read that

Page 141

1    accurately?

2        A    I believe you did.

3        Q    "And she left."  Now, why did you use the word

4    "Missy"?

5            (Pause.)

6        A    Why did I use the word "Missy"?

7            "Missy" is the type of phrase that my mother

8    or father would have used to me trying to, as a child,

9    in trying to focus my attention or, "Snap to, Missy,"

10   or "Let's get," "Clean up your room, Missy."

11           So, it's something maybe that you would refer

12   to as a child, and --

13       Q    Now, --

14       A    And, if I could continue?

15       Q    Sure.

16       A    You asked me why I used that.

17           I really felt that Mary's continued referral

18   to other women in the office by terms that I believe,

19   "Sweetie" or "Honey", were demeaning, just as to refer

20   to someone with a childlike kind of referral, as

21   "Missy," would be demeaning, and --

22       Q    She didn't use "Missy", did she?

Page 142

1    A    You asked me why I used that.

2    **Q    Yes.**

3    A    And I am explaining that.

4    **Q    Sure.**

5    A    I thought it was a similar type phrase.

6    Similar in that I think it's demeaning in the work

7    place, and I was trying to create a situation in which

8    she would experience what other people might feel with

9    that.

10    **Q    Anybody complain to you about her using**

11    **"Sweetie", or was it just in your mind that this was**

12    **inappropriate?**

13    A    When I first came to FDIC, one of the specific

14    challenges that was given to me, by Arleas Upton-Kea

15    and Glen Bjorklund, was to increase the professionalism

16    of the work force in ASB.

17    They were, they did not think that the group,

18    as a whole, was very professional either in appearance

19    or demeanor or conduct with clients, and that was one

20    aspect of it.

21    **Q    So, answering my question specifically, did**

22    **Glen Bjorklund say, "Stop Mary Bass from saying,**

Page 143

1    "Sweetie"?

2        A    No.

3        Q    Did anyone complain to you about Mary Bass

4    using the word "Sweetie" or was that your impression

5    that it was something that ought not to be?

6        A    It's my impression, as being a manager for 25

7    years, and feedback that I've had in professional

8    seminars on women in the work place.  Many, many forums

9    that I've been to, how can we, as women, improve our

10   professional status in the work place.  It's not just

11   my personal opinion.

12       Q    Yes.  No one complained to you at FDIC?

13            Am I correct?

14            No one complained to you at FDIC about Mary

15   Bass referring to them as "Sweetie", isn't that right?

16       A    No one complained to me specifically, but that

17   does not mean that it was professional for her to refer

18   to people as "Sweetie".

19       Q    I understand your point of view.  I'm asking

20   you if anyone complained, and your answer is no,

21   correct?

22       A    That's correct.

Page 144

1    **Q    In fact, no one complained that they overheard**

2    **Mary saying, calling somebody else "Sweetie", correct?**

3         MS. SARSHIK:  Mr. Shapiro, I'd appreciate it

4    if you would lower your voice.  Your --

5         MR. SHAPIRO:  My voice is --

6         MS. SARSHIK:  -- voice is starting --

7         MR. SHAPIRO:  My voice is not loud.  That's a

8    cheap shot, and you know it.  Cut it out.  Don't

9    interrupt again with cheap shots.

10         THE WITNESS:  Mr. Shapiro, I did ask if you

11    could keep your voice down.

12         MR. SHAPIRO:  That's fine.

13         THE WITNESS:  There are offices very close,

14    and I would appreciate --

15         MR. SHAPIRO:  I would think that the offices

16    could bear that kind of talk, but in any case answer my

17    question, ma'am.

18         BY MR. SHAPIRO:

19    **Q    Did anybody, you'll agree with me that no one**

20    **complained about hearing Mary Bass call somebody else**

21    **"Sweetie", correct?**

22         A    No one complained about Mary Bass calling

Page 145

1    people "Sweetie".

2        Q    Or "Honey", correct?

3        A    That was not a specific complaint.

4        Q    Right.

5        A    No.

6        Q    I see, and you didn't use, did you ever hear

7    Mary Bass call somebody "Missy"?

8        A    Not that I recall.

9        Q    "Missy", as you said, is a word that your

10    father or mother might use to you, as a child, to

11    direct your attention to something, correct?

12        A    Yes.

13        Q    Can I ask you, where did you grow up?

14            Where did you grow up?  What state?

15        A    What does that have to do with --

16        Q    Oh, it has something to do with it.

17            What state did you grow up in?

18        A    Why does it have anything to do with --

19        Q    I don't have to answer questions.  I ask them,

20    at a deposition.

21            What state did you grow up in, ma'am?

22        A    I don't think that's relevant.

Page 146

1          Q     It doesn't matter what you think.

2                What state did you grow up in?

3          A     I grew up in Alabama.

4          Q     And when did you leave Alabama?  Did you leave

5     there as a child or did you leave there --

6          A     Are you intentionally trying to speak with a

7     southern accent?

8          Q     When did you leave Alabama?

9                When did you leave Alabama?

10         A     I --

11         Q     When did you leave Alabama?

12         A     I --

13         Q     Ma'am, when did you leave Alabama?

14         A     In 1981.

15         Q     Did you leave to go -- how old were you in

16    1981?

17         A     Why is that relevant?

18         Q     It's relevant.  When did you leave Alabama?

19         A     I said, in 1981.

20         Q     At what stage in your life?

21         A     I answered.

22         Q     Did you go to college in Alabama, or did you

Page 147

1    **leave Alabama to go to college?**

2        A    Both.  I went to college in South Carolina,

3    and I went to college in the State of Alabama.

4        **Q    When did you graduate from college?**

5        A    In 1977.

6        **Q    And what school did you go to?**

7        A    I went to Converse College, in Spartanburg,

8    South Carolina, and I graduated from the University of

9    Alabama, in Birmingham.

10       **Q    And you said that you left Alabama in 1981?**

11       A    Yes, I said that.

12       **Q    What prompted you to leave Alabama?**

13       A    I received a management development

14   opportunity with the Air Force, and I was assigned to

15   an Air Force Base, in Texas.

16       **Q    So, you went to college starting, you were**

17   **raised in Alabama until you went to college in South**

18   **Carolina?**

19       A    Yes.

20       **Q    And, then, you came back to graduate from**

21   **college at the University of Alabama?**

22       A    Yes.

Page 148

1    Q    And, then, you went from Alabama to Texas, in

2    1981, with the Air Force?

3    A    As an Air Force civilian employee.  Yes.

4    Q    Can you give me your date of birth, ma'am?

5    A    Do I have to give my date of birth?

6    Q    Sure.

7    A    Six, twenty-six, fifty-six.

8    Q    And what part of Alabama were you raised in?

9    A    Birmingham.

10   Q    Now, why did you go, you said, in the same

11   paragraph, "I do not believe that she responded to me

12   before she left."

13        Responded to you in terms of what you said --

14   A    I'm sorry.  Can you tell me where you are?

15   Q    Yes.  Sure.  It's the same paragraph.  It's on

16   Page 3, and, after I read the quote, quoting you,

17   quoting yourself where it says, "Missy," you said, "She

18   left," and, then, "I do not believe."  I'm reading

19   again from the affidavit.  "I do not believe that she

20   responded to me before she left."

21        Meaning responded to your question.  "We'll

22   have something to talk about, "Missy".  Right?  Is that

Page 149

1   **right?**

2       A    That's what it says.

3       **Q    Right.**

4       A    And that's my recollection.

5       **Q    Right.**

6       A    Yes.

7       **Q    And, then, you said, "I did not notice any**

8   **reaction from Ms. Bass' first level supervisor,**

9   **Mr. Harris, when I referred to Ms. Bass as "Missy".  He**

10  **did not say anything.  When she left my office, I**

11  **commented to him that I was going to go and talk to her**

12  **about it.  I do not recall whether he responded."**

13          **Why were you going to talk to Ms. Bass about,**

14  **what was "it" that you were going to talk to her about?**

15      A    After I had made the statement, "If you don't

16  improve this situation, we'll have other things to talk

17  about.  Won't we, "Missy"?", I, then, wanted to go and

18  talk to her about that and see how she felt about it.

19  See if she had felt anything that I thought maybe

20  people felt when she called them "Sweetie".  Just like

21  I felt when she called me "Sweetie" in the beginning

22  when I went to FDIC.

Page 150

1          I wanted to use that as an opportunity for her

2     to experience what other people might be feeling when

3     she referred to them in similarly disrespectful,

4     nonprofessional terms.  Not disrespectful.

5     Nonprofessional terms.

6          **Q    Did she ever, did she ever use, did you ever**

7     **hear her use the term "Sweetie" in an aggressive way?**

8              **"We'll have something to talk about,**

9     **"Sweetie."  As opposed to, "Hi, "Sweetie".  How are**

10    **ya?"**

11         A    No.

12         **Q    You used the term "Missy" intentionally**

13    **aggressively, didn't you?**

14         A    I do not believe I used "Missy" in an

15    aggressive manner.

16         **Q    You meant to demean her with it.  You meant to**

17    **have her have a demeaned reaction.  That was the point.**

18              **Wasn't it?**

19         A    I meant for her to feel what other people

20    might feel when a phrase that referred to someone in

21    less than a professional way was used in the work

22    place.  I did not use that phrase in an aggressive

Page 151

1    manner.

2         Q    "Missy" refers to a young girl, doesn't it?

3              It's a phrase that is often, in fact, you said

4    that your parents would use it to you when you were

5    young.

6         A    When I was a child.  Yes.

7         Q    Yes.  When you were a child; so, it refers to

8    a female child, doesn't it?

9         A    I believe that's what I said.

10        Q    "Sweetie", "Honey", --

11        A    Let me clarify?

12        Q    Yes.

13        A    If I may clarify?

14        Q    Um-hum.

15        A    That's the way I was, I don't think that's the

16   exclusive, I mean --

17        Q    That's the way you would use it?

18        A    Not in all cases, but, when I specifically

19   used this, it was, like, you know, hey, "Missy", are we

20   going to have a problem?

21        Q    Meaning, child?

22        A    Meaning someone less than a professional.

Page 152

1      **Q    Well, professional?**

2           **Someone less than a professional or someone**

3    **less than an adult?**

4           **I mean, you defined it for us as a child.**

5      A    I said that I used that because it was a

6    phrase that might have been used by my parents in

7    talking to me --

8      **Q    As a child?**

9      A    I did say that.  Yes.

10     **Q    Yes.  "Sweetie", "Honey", that's not**

11   **necessarily referring to a child at all, is it?**

12     A    No.  It's a term of endearment, and not

13   professional in the work place.  I do not think "Missy"

14   is appropriate in the work place.  I do not think

15   "Sweetie" is appropriate in the work place.

16          I was attempting to create a similar

17   circumstance so that Ms. Bass could experience what I

18   believe other people experience when she referred to

19   them in an unprofessional --

20     **Q    Except no one complained to you about her**

21   **referring to them as "Sweetie" or anything else,**

22   **correct?**

Page 153

1       A    Sir, it's my responsibility --

2       **Q    We've already -- excuse me.**

3       **I just want to make sure --**

4       A    I've already answer that question.

5       **Q    Have we already established that no one has --**

6       A    I've already answered that question,

7  Mr. Shapiro.

8       **Q    I just want to make sure because you seem to**

9  **be giving a contrary answer now.**

10      A    I don't believe I'm giving a contrary answer.

11      **Q    Okay.**

12      A    I have said once already no one specifically

13  complained.  It was my responsibility, as the associate

14  director of that group, with specific direction from

15  Ms. Kea and Mr. Bjorklund, to improve the

16  professionalism.

17           I have been a manager for over two decades.  I

18  have attended significant leadership and management

19  training, and I think that whether or not anyone

20  complains, I have enough experience and knowledge to

21  make certain determinations on my own.

22           I had an employee who wore house slippers into

Page 154

1    the office.  That's not professional.  No one

2    complained, but I knew that wasn't professional either.

3         **Q    During your conversation, the second one where**

4    **it was  just you and Ms. Bass, that --**

5         A    The second conversation on February 3rd?

6         **Q    Yes.  The one, that's the one where you say**

7    **that she said that she, she, also, thought it was cute**

8    **that you called her "Missy"?**

9         A    Yes.

10        **Q    That's what you said, but there was no one**

11   **else there but you and Ms. Bass, is that right?**

12        A    That is what I say, and that is what she said.

13        **Q    But there was no one there but you and her?**

14        A    That's true.

15        **Q    And that conversation, the second one, took**

16   **place in Ms. Bass' office?**

17        A    Yes.

18        **Q    And you say, in that, that she was getting**

19   **more upset as the conversation went on?**

20        A    She was getting very upset.

21        **Q    What was upsetting her?**

22        A    She started to get the most upset when she

Page 155

1   started to talk about FDIC and her experience with

2   FDIC, and how her previous case and all of the turmoil

3   around that had ruined her life, had created such

4   stress for her family.  It was really in referring to

5   previous incidents that she got the most agitated.

6   **Q    And your whole conversation with her, in her**

7   **office, was how long?**

8   A    Just a few minutes.  Ten, fifteen, I believe

9   is in my notes.

10  **Q    And where you were talking about how she felt**

11  **when you called her "Missy", that's what you came down**

12  **to reiterate with her?**

13  A    I wanted to explore how she felt about that;

14  so, that we could have a similar experience and talk

15  about how she, how she felt and how others might feel

16  in a similar situation.

17          I felt that was part of my responsibility as

18  the leader there, to coach and mentor the leaders in my

19  group.

20  **Q    You have in the next, in the paragraph, in the**

21  **last paragraph, that begins on Page 5, you're still**

22  **talking about the same meeting, correct?**

Page 156

1          A    I'll need to read this page.

2          **Q    Sure.  The paragraph I'm talking about is,**

3     **"Ever since I have been here."**

4          **You're still talking about the "Sweetie" and**

5     **the --**

6          A    I see the paragraph.  I'd like to read it.

7          MR. SHAPIRO:  Yes.  Please.

8          (Witness reviews document.)

9          THE WITNESS:  What was your question,

10    Mr. Shapiro?

11         BY MR. SHAPIRO:

12         **Q    Have you finished the paragraph?**

13         A    I now know which meeting we're talking about I

14    think.

15         **Q    It's the second meeting, right?**

16         **Correct?**

17         A    No.  This meeting occurred very ear -- this

18    was a totally different meeting.  This meeting

19    occurred, I had not been at FDIC very, we're talking

20    about down here, "I, also, had heard," --

21         **Q    Yes.**

22         A    It says here, "During the first few months

Page 157

1    that I worked at FDIC, I met with Ms. Bass in my

2    office, and, specifically, asked her not to refer to me

3    as "Sweetie"."

4          She had called me "Sweetie".  I, personally,

5    take offense at that, and think it's unprofessional.  I

6    asked to speak with her about it.  This paragraph

7    refers to that meeting.

8      **Q    Right.  And, then, it says, "And she has not**

9    **referred to me that way again."**

10     A    That's true.

11     **Q    So, you asked her not to, and she didn't?**

12     A    That's correct.

13     **Q    No one asked, apparently asked her not to?**

14     A    I don't know.

15     **Q    Well, you don't know if anybody did, and no**

16     **one --**

17     A    No one has complained to me, Mr. Shapiro.

18     **Q    Right.  I got it.**

19          **Then, it says, "However, I had, also, heard**

20     **Ms. Bass refer to coworkers and clients in the same**

21     **way, and I said that I felt it was unprofessional."**

22          **Did you say that at the meeting with her when**

Page 158

1  you asked her not to call you "Sweetie", or is that

2  when you were talking about later at the meeting on

3  February 3rd?

4     A    It was at the meeting during, that I had with

5  her during the first few months.

6     Q    I see.

7     A    There is no reference in this paragraph to the

8  later meeting.

9     Q    I understand.  Then, it says, "I, also,

10  discussed that if a man in our office would refer to a

11  woman as "Honey" or "Sweetie", that would not be

12  acceptable," but the reverse is not necessarily true,

13  is it?

14     A    Mr. Shapiro, what I was trying to point out to

15  Ms. Bass, as a coach of the leaders in my group, was

16  that professional behavior cannot be okay for you, but

17  not okay for somebody else in a leadership position,

18  and that, if I had heard, if I had heard one of the men

19  calling one of the women "Sweetie" or "Honey", I would

20  ask them not to do that.

21     Q    Yes.  I understand that, but men and women do

22  not have to behave identically to be equal.

Page 159

1    A    No, they don't have to behave identically.

2    **Q    Do they?**

3    A    I was --

4    **Q    They don't dress identically, and they don't**

5    **have to behave -- different rules do apply, don't they?**

6    **Women, for example, wear skirts to work.  They**

7    **can also wear pants.  Men, generally, don't wear skirts**

8    **to work.**

9    A    The point that I was trying to make with

10   Ms. Bass is that I believe in treating coworkers

11   professionally.  There are no differences in standards.

12   I want men to treat women professionally, and I want

13   women to treat women to treat women professionally.  I

14   want everyone to deal with each other in a professional

15   manner.

16   **Q    And --**

17   A    That was the point in my conversation.

18   **Q    How people behave professionally doesn't**

19   **necessarily mean the same for the sexes, does it?**

20   **For example, dressing professionally is**

21   **different for men and for women, correct?**

22   **Both have to be professional, but it's a**

Page 160

1    different standard of dress, correct?

2        A    Women and men can dress different.  Yes.

3        Q    And both be professional, correct?

4        A    Yes.

5        Q    Because we have different standards between

6    the sexes sometimes.  Correct?

7        A    That's correct.

8        Q    Okay.  Your prior assignments before, you

9    said, before you came to FDIC, you were at DOD for a

10    time?

11        A    Yes.

12        Q    And where were you stationed in DOD?

13        A    Immediately before coming to FDIC, I was

14    Director of Acquisition & Logistics, at Defense Threat

15    Reduction Agency, at Ft. Belvoir, Virginia.

16        Q    And how long were you there?

17        A    A little over three years.

18        Q    Prior to Ft. Belvoir?

19        A    I was at Brooks Air Force Base, in San

20    Antonio, Texas, and, before that, at Kelly Air Force

21    Base, Texas.

22        Q    Texas?  Kelly Air Force Base?

Page 161

1     A    Yes.

2     **Q    In Texas also?**

3     A    Yes.

4     **Q    Where in Texas?**

5     A    San Antonio.

6     **Q    And how long were you at Brooks?**

7     A    From, I'd have to, I think from late '96 to

8     the spring of 2000.

9     **Q    And at Kelly?**

10    A    From November of 1981 until I went to Brooks.

11    So, late of '96.

12    **Q    Now, did you, if you look at the par -- the**

13    **only paragraph that begins on Page 6, the one that**

14    **starts with, "Mary Bass' race was absolutely not a**

15    **factor in my reference to her as "Missy", nor was her**

16    **prior EEO activity a factor." Do you see that**

17    **paragraph?**

18    A    I do.

19    **Q    Why don't you give that paragraph a read; so,**

20    **we can talk about it?**

21    A    Yes.

22         (Witness reviews document.  Phone rings.)

Page 162

1           MR. SHAPIRO:  Sorry.

2           MS. SARSHIK:  Do you still have a lot to do

3   when --

4           THE WITNESS:  I do.

5           Mr. Shapiro, can you give me an estimate of

6   about how much --

7           MR. SHAPIRO:  Twenty more minutes.

8           MR. SHAPIRO:  This paragraph --

9           (Phone rings.)

10          MR. SHAPIRO:  Oh, sorry.

11          THE WITNESS:  Can you turn that off, please?

12          MR. SHAPIRO:  Yes.

13          THE WITNESS:  Thank you.

14          BY MR. SHAPIRO:

15      Q    All right.  That paragraph, it says that you,

16   that, it says, do you see, in that paragraph, the word,

17   "Because"?

18           There is a sentence, it's about, it's a little

19   more than a halfway through the paragraph, "Because I

20   had discussed the issue with Ms. Bass several times and

21   because she still continued to call people in the work

22   place by these unprofessional names, I tried to bring

Page 163

1    this up with her again on February 3rd."

2        A    Yes.

3        Q    Now, how many times had you discussed this

4    with her that you can recall?

5             There is the one time when she called you

6    "Sweetie" very early on?

7        A    Three or four.

8        Q    When was the time before February 3rd?

9        A    I don't recall.

10       Q    When was the time closest to February 3rd?

11       A    I don't recall.

12       Q    Now, you say, in paragraph, on Page 7, you

13   say, there is a paragraph where it says, "I am not

14   familiar with, nor have I heard any of the other

15   managers at ASB using terms of endearment in addressing

16   coworkers.  On one or two occasions, I have, actually,

17   been referred to as "Missy" by one of my non-manager

18   subordinate employees, who is white.  I have only used

19   the word "Missy" with Ms. Bass during the February 3rd

20   meeting."  Did I read that accurately?

21       A    More or less.

22       Q    Who is the person who used "Missy" to you?

Page 164

1    A    Now, I can't recall.  I, I can't recall now.

2    **Q    Well, it was a subordinate of yours in, in --**

3    A    That's what my statement says.  I can't recall

4  who it was.  I'm really sorry.

5    **Q    Was it a male or a female?**

6    A    I can't recall.

7    **Q    Well, I'm not asking you to recall now.**

8         **I'm asking was it a male or a female?**

9    A    If I can't recall who the person is, I can't

10  remember the gender of the person.

11    **Q    I see.  You're a white female.  Correct?**

12    A    Yes, I am.

13    **Q    You claim that you had a good relationship**

14  **with Ms. Bass?**

15    A    I think it was a pleasant relationship.  Yes.

16    **Q    But you said that you were hurt by her saying**

17  **that she, in her complaint that, in her affidavit,**

18  **relating your calling her "Missy" to acting like a**

19  **slave master?**

20    A    I find that very offensive and --

21    **Q    So, you --**

22    A    -- hurtful.

Page 165

1     **Q     So, you were offended by Ms. Bass saying that?**

2     A     I was hurt by that.

3     **Q     Yes, and you treated her accordingly?**

4     A     No.

5     **Q     Why not?**

6     A     Because I try to treat people the way that I

7     would like to be treated, and I tried to maintain a

8     pleasant and professional relationship even though she

9     said things that were very hurtful to me.

10          MR. SHAPIRO:  I don't believe I have anything

11     else.

12          MS. SARSHIK:  Okay.  Can we --

13          MR. JONES:  Can we take five?

14          MS. SARSHIK:  Yeah.  Let's take five minutes.

15          MR. JONES:  Or three?

16          MS. SARSHIK:  We have a couple of questions to

17     ask, but I'd like to have a couple of minutes to

18     caucus.

19          MR. SHAPIRO:  Sure.

20          MS. SARSHIK:  Thank you.

21          (Recess was held from 4:10 to 4:12 p.m.)

22          MS. SARSHIK:  We just have a few questions.

Page 166

1        MR. JONES:  I'm just going to ask a couple of

2    clarifying questions.

3        When you reviewed Ms. Bass' affidavit, did you

4    circle or mark or annotate everything that you didn't

5    agree with?

6        THE WITNESS:  Oh, no.

7        MR. JONES:  Let me ask you to look on Page 57

8    of Exhibit, Deposition Exhibit No. 1?

9        THE WITNESS:  Yes.  I'm --

10        MR. JONES:  Which is Ms. Bass' affidavit?

11        THE WITNESS:  Yes.

12        MR. JONES:  Is there any significance to the

13    fact that you didn't circle on Page 57 where she says

14    that "Missy" was a gross racial slur?  Do you see where

15    that is?

16        THE WITNESS:  I do.  There is no significance.

17    I mean, if I circled everything that I disagreed with,

18    everything would be circled or highlighted.  I, I,

19    there is no significance to that.

20        MR. JONES:  So, do you agree or disagree that

21    "Missy" was a gross racial slur?

22        THE WITNESS:  No, I was, I had never heard

Page 167

1   anyone imply that "Missy" is a racial slur.  I mean, I

2   found that very surprising that she asserted that.

3          MR. JONES:  If you look over on Page 64, could

4   you read your marginal note there?

5          THE WITNESS:  "I have been called "Missy" by

6   white employees."

7          MR. JONES:  Is that what you were discussing

8   before that was in your affidavit?

9          Is that, that you have been called "Missy" by

10  a subordinate?

11         THE WITNESS:  Right.

12         MR. JONES:  In ASB?

13         THE WITNESS: Yes.

14         MR. JONES:  Okay.  That's all we have.

15         MR. SHAPIRO:  Good.  Ma'am, you can read and

16  sign or you can waive it.  I suppose the FDIC had some

17  views on that.  Why don't you advise her so we can get

18  out of here.

19         MR. JONES:  Quit talking in that southern

20  accent.

21         MR. SHAPIRO:  Why don't you advise her so we

22  can get out of here.

Page 168

1           MS. SARSHIK:  We want to read and sign.

2           MR. JONES:  We'll read and sign.

3           MR. SHAPIRO:  Actually, it's the Bronx.

4           Thank you, very much.

5           THE WITNESS:  Okay.

6           MR. SHAPIRO:  She needs to get --

7           THE WITNESS:  I have her card.

8           (Recess was held from 4:14 to 4:16 p.m.)

9           COURT REPORTER:  We're back on the record at

10    4:16 p.m.

11           MR. SHAPIRO:  For the convenience of

12    everybody, here is what we've agreed to do.  We're

13    going to use the Bate Stamped version of Exhibit No. 1,

14    which is the Tickler File, and we'll, for the purposes,

15    because the Bate Stamped version does not have two

16    sections, as the Tickler File was given to me in two

17    sections, we will identify that Page, Bate Stamp Page

18    00068 is the last page of the first section, and 00069

19    is the first page of the second section of the non-Bate

20    Stamped version.

21           The Bate Stamp version will be substituted --

22           MR. JONES:  As Exhibit 1.

Page 169

1          MR. SHAPIRO:  -- as Exhibit 1 --

2          MR. JONES:  Right.

3          MR. SHAPIRO:  -- because it's the, as we said,

4   it's the identical document, but it has the convenience

5   of Bate Stamping on it.

6          MR. JONES:  Yes.

7          MR. SHAPIRO:  All right.

8          MR. JONES:  So, you can unsticker present

9   Exhibit 1 and resticker substitute Exhibit 1.

10          MR. SHAPIRO:  That's fine.  If you'll give

11   that back to me, that will be great.

12          MS. SARSHIK:  Okay, and we are off the record.

13          (Whereupon, at 4:18 p.m., the above-entitled

14   deposition of ANN BRIDGES STEELY was closed.)

15          I have read the foregoing pages, which are a

16   correct transcript of the answers given by me to the

17   questions therein recorded.

18

19     Deponent_____

20

21          Date_____

22

Page 170

C E R T I F I C A T E

1

2    COMMONWEALTH OF MASSACHUSETTS    )

3    COUNTY OF SUFFOLK                )  SS.

4        I, Rosemary Gormley, a Court Reporter and

5    Notary Public, within and for the Commonwealth of

6    Massachusetts, do hereby certify that there came before

7    me on this 27th day of July, 2007, the person

8    hereinbefore named, who was by me duly sworn to tell

9    the truth, the whole truth, and nothing but the truth,

10   concerning and touching the matter in controversy in

11   this cause; that she was thereupon examined upon her

12   oath, and her examination reduced to typewriting, under

13   my direction, and that this deposition transcript is a

14   true and accurate record of the testimony given by the

15   witness.  I further certify that I am not related to

16   any of the parties hereto or their counsel, and that I

17   am in no way interested in the outcome of said cause.

18       Dated at Boston, Massachusetts, this 13th day

19   of August, 2007.

20   _____

21   Rosemary Gormley, NOTARY PUBLIC

22   My Commission Expires:  November 2, 2012