# Acquisition Services
## All Hands

### May 20, 2003

*my first mtg w/ ASB staff*

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1



*RG EXHIBIT #1 9/21/07 Shelby*

00002

# Here's What We're Going to Do

- Break Bread (or Sandwiches) Together
- Get to Know Each Other
- Share Ideas and Information
- Ask Questions







Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

# Tell Me About You

- What's Your Name?

- Where Were You Born?

- How Long Have You Worked for FDIC?

- What Fun Thing Are You Going to do This Summer?

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1



# All About Ann Bridges Steely

# My Expectations and Style

- Customers Comes First in All We Do
  - We Have Many Customers – Up, Down, Around
- My Job is Help You Succeed
  - Give You the Right Tools
  - Help you Grow – Give Rewards & Constructive Feedback
  - Personnel Issues are Ultimately My Responsibility
- Expect Professionalism in All We Do
  - Dealing with Each Other & Those Outside of ASB
  - Presentations, Punctuality, Demeanor, etc – Put Your Best Foot Forward

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00005

# My Expectations and Style

- My Door is Always Open
  - Try to Use Your Chain of Command
- Don't Hold Back on Bad News
- Don't be Afraid to Take Risks
  - Keep Me in the Loop When You Get Creative
- Don't be Afraid to Question Me
- Tell Me if My Sense of Humor Bothers You
- Give Me Feedback on How Things are Going
- Customers Comes First in All We Do!

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00007

# My Acquisition Philosophies

- Acquisition is a Critical Support Function
  - FDIC Cannot Be Successful Without Us
- We are Not Enemies with Contractors or Customers -- We are Partners
- Following the Rules is Only Part of What Is Expected of Acquisition Professionals
- Our Greatest Value is as Business Advisors, Not Contract Specialists
  - Must Think Beyond Good Contracts

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

# Homework Assignments

- Talk to Me!
  - Tell Me the 3 Best Things about ASB
  - Tell Me the 3 Things We Need to Work On
- Study the Global Objectives for ASB

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

# Now What?

- Monthly ASB All Hands Meetings
- Team Assessment Survey
- ASB Team Building Sessions
- ASB Management Focus Sessions
- Work Together to Plan for the Future

00009



Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

## Steely, Ann Bridges

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Tuesday, May 20, 2003 6:17 PM |
| **To:** | DOA Contracts DC |
| **Subject:** | Thanks! |

**Attachments:**    ASB Objectives.doc; Talk to Me.ppt

First, I want to thank everyone for participating in my first ASB All Hands meeting today. Special thanks to Patty and Dave for helping with arrangements for lunch. I thoroughly enjoyed getting to know everyone better and I appreciated your willingness to spend your lunch break with me. We have a great team of people here and I am very excited about the terrific things I know we can do together. We'll work hard, but I think we can do wonderful things for FDIC, DOA and ASB.

Second, I want to remind you about your homework assignment. I would appreciate your feedback on the Global Objectives and thoughts on the 3 best things about ASB and 3 things that need attention. This is purely optional on your part, but it is your opportunity to let me know what you think. I would like to have your input by COB next Tues, May 27. I've attached those two documents just in case you need another copy.

    

ASB          Talk to
ctives.doc (34le.ppt (39 KB

Thank you all for the wonderful welcome you have given me so far. You have certainly made transition here very pleasant. abs

**Ann Bridges Steely**
Associate Director
Acquisition Services Branch
202-942-3010

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**00011**

## Acquisition Services Branch
## Global Objectives

> We will create and maintain an environment that encourages and enables ASB employees to develop their full professional capabilities.

> ASB will provide outstanding procurement and contracting support to all organizations within FDIC.

> ASB personnel will serve as business advisors to and be valuable partners in the successful execution of FDIC missions.

> We will establish procedures and create tools that facilitate the smart utilization of electronic capabilities across the functions for which ASB is responsible.

> We will create an environment that encourages open communication and the free flow of ideas and information.

> ASB personnel will maintain the highest standards of professionalism, integrity and respect in all dealings with others – other ASB personnel, other FDIC employees, and contractors.

> We will maintain a continuous business process improvement outlook for the acquisition management function to ensure a streamlined and cost-effective service delivery.

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Thursday, July 03, 2003 12:11 PM |
| **To:** | DOA Contracts DC |
| **Subject:** | Polishing the ASB Image |

You can probably imagine that in my first several weeks here at FDIC, I have spent a lot of time visiting with our customers. I have been talking to them about what they think is good about working with ASB and what they think we could do better to support them. Amazingly, there is one area several customers were frustrated about that we can fix very easily – no extra people required, it doesn't cost any money, and it's not extra work on our part. The most common item of frustration for our customers is that they just can't get in touch with us. They feel we don't do a good job returning phone calls or answering email. To add to their frustration, they can't easily tell who is in the office or who is on leave or CWS.

To address this very basic customer support issue, I want to remind everyone of a few basic rules of professional etiquette for ASB:

- If there are days you will not be in your office for whatever reason (leave, travel, CWS, off-site meetings, etc), there are two things we all need to do:
    - Use the Out of Office feature of Outlook to let people know you won't be responding to your email on those days. Be sure to indicate a point of contact they may reach if they have an urgent item that needs to be addressed.
    - Leave an appropriate voice mail message letting people know you are out, when you will return, and who they can contact for urgent assistance.
- When you leave the office for the day, turn off the main lights in your office. This may seem silly, but if the lights are on in your office, people assume that you are at work. Also, if you have a radio in your area, turn it off when you leave.
- When you are in the office, phone calls should be returned and email should be answered promptly. No call or email directed to anyone in ASB should go unanswered.

I am almost embarrassed to have to raise these issues, but it has been such a consistent topic of conversation that I know it's not just one unhappy customer complaining out there. This is really an easy thing to fix and will go a long way to improve the professional reputation of the Acquisition Services Branch as a whole and improve customer relationships.

I appreciate your help in following these very basic concepts in professionalism and common courtesy. If you have any of these types of issues that I need to raise with our customers, please feel free to let me know.
Thanks.
abs

**Ann Bridges Steely**
Associate Director
Acquisition Services
202-942-3010

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Thursday, July 03, 2003 12:11 PM |
| **To:** | DOA Contracts DC |
| **Subject:** | Polishing the ASB Image |

You can probably imagine that in my first several weeks here at FDIC, I have spent a lot of time visiting with our customers. I have been talking to them about what they think is good about working with ASB and what they think we could do better to support them. Amazingly, there is one area several customers were frustrated about that we can fix very easily – no extra people required, it doesn't cost any money, and it's not extra work on our part. The most common item of frustration for our customers is that they just can't get in touch with us. They feel we don't do a good job returning phone calls or answering email. To add to their frustration, they can't easily tell who is in the office or who is on leave or CWS.

To address this very basic customer support issue, I want to remind everyone of a few basic rules of professional etiquette for ASB:

- If there are days you will not be in your office for whatever reason (leave, travel, CWS, off-site meetings, etc), there are two things we all need to do:
  - Use the Out of Office feature of Outlook to let people know you won't be responding to your email on those days. Be sure to indicate a point of contact they may reach if they have an urgent item that needs to be addressed.
  - Leave an appropriate voice mail message letting people know you are out, when you will return, and who they can contact for urgent assistance.
- When you leave the office for the day, turn off the main lights in your office. This may seem silly, but if the lights are on in your office, people assume that you are at work. Also, if you have a radio in your area, turn it off when you leave.
- When you are in the office, phone calls should be returned and email should be answered promptly. No call or email directed to anyone in ASB should go unanswered.

I am almost embarrassed to have to raise these issues, but it has been such a consistent topic of conversation that I know it's not just one unhappy customer complaining out there. This is really an easy thing to fix and will go a long way to improve the professional reputation of the Acquisition Services Branch as a whole and improve customer relationships.

I appreciate your help in following these very basic concepts in professionalism and common courtesy. If you have any of these types of issues that I need to raise with our customers, please feel free to let me know.
Thanks.
abs

**Ann Bridges Steely**
Associate Director
Acquisition Services
202-942-3010

10/10/03

Please Call Me
With any questions
~~about~~ these documents.
Once you have had
a chance to read these,
then we can meet
and discuss issues
~~did~~ dealing with
Conflict Management,
leadership, etc, so
we can be the
best "Leaders" for ASB

N. Bass

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARY ELIZABETH BASS,

    Plaintiff,

      v.

DONNA TANOUE, Chairman,
Federal Deposit Insurance Corporation,

    Defendant.

Civil Action No. 00-0115
DAR

## MEMORANDUM OPINION

### INTRODUCTION

Following a four-day trial before a jury in this Title VII action, the jury returned a verdict in plaintiff's favor, finding by a preponderance of the evidence that defendant discriminated against her on account of her race in excluding her from consideration for the grade 14 position of Chief of the Financial Review Unit in defendant's Acquisition Services Branch in September, 1997. The jury awarded plaintiff $1,500,000 in compensatory damages, and the court entered judgment for plaintiff in the amount of $300,000. See 42 U.S.C. § 1981a(b)(3)(D).

This matter is now before the court for consideration of Plaintiff's Motion for an Award of Equitable Relief (Docket No. 55). In it, plaintiff seeks (1) re-promotion to a permanent grade 14 level, retroactive to January, 1997, and placement in the position of Chief of the Financial Review Unit, or, another grade 14 position in her career field in defendant's Washington, D.C. office; (2) an award of

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

Bass v. Tanoue                                                                          2

full back pay, including all pay increases, step increases, quality step increases, awards and bonuses, with interest thereon, as well as any other benefits which she could have received at the permanent grade 14 level, from January, 1997; (3) correction of all official records "to accord with the equitable relief awarded by the Court"; (4) a permanent injunction against discriminatory and retaliatory conduct against plaintiff in the future; and (5) an award of costs, including reasonable attorney's fees of $69,343.00, with interest thereon. Plaintiff's Motion for an Award of Equitable Relief at 2-3; see Memorandum of Points and Authorities in Support of Plaintiff's Motion for an Award of Equitable Relief ("Plaintiff's Memorandum") at 3-11.

Defendant opposes the motion except with respect to plaintiff's request for an award of costs. With respect to all other requests for equitable relief, defendant submits that "the equitable relief Plaintiff requests does not comport with the jury verdict or the evidence in this case." FDIC's Opposition to Plaintiff's Motion for Equitable Relief (Defendant's Opposition") at 1. Defendant maintains that the jury's verdict "does not establish that Ms. Bass would have been selected" for the position of Chief, Financial Review Unit, and that "[t]hat question was neither asked of nor answered by the jury." Defendant submits that "[t]he verdict thus provides no basis for concluding that [plaintiff] would have been entitled to the position [absent] discrimination." FDIC's Opposition at 2. With no citation of authority, defendant maintains that "[t]he denial-of-opportunity-to-compete case actually pled, tried, and decided here is distinct from the kind of denial-of-promotion case that would justify the retroactive promotion remedy Plaintiff seeks." Id. at 6.

Defendant argues that "since the Court should not grant the retroactive promotion request, the

Bass v. Tanoue                                                                    3

back pay request becomes moot." Defendant's Opposition at 11. Defendant also submits that if

plaintiff were awarded a retroactive promotion as equitable relief, then back pay should be calculated

as if plaintiff had received "fully successful" rather than "outstanding" performance appraisals, see

Defendant's Opposition at 11, and be calculated effective November 23, 1997, when the position of

Chief of the Financial Review Unit was filled, rather than January, 1997, when plaintiff's grade was

reduced from a temporary grade 14 to a permanent grade 12. Id. at 12.

     Defendant asserts that "[s]ince promotion is not appropriate, correction of records is also

inappropriate." Defendant's Opposition at 12. With respect to the issuance of a permanent injunction,

defendant, without citation to any authority, submits that "[t]here has been no finding that future

discrimination will, or is likely to occur. Absent such a finding, a blanket injunction against actions

already expressly prohibited by law is inappropriate." Id.

     Plaintiff, in her reply, suggests that "[t]he fundamental problem" with defendant's opposition is

that "it fails to recognize that since the 1991 amendments to the Civil Rights Act of 1964 . . . the

remedies phase in a discrimination case is necessarily bifurcated[,]" and that "determinations regarding

equitable relief are reserved for the court." Plaintiff's Reply in Further Support of Her Motion for an

Award of Equitable Relief ("Plaintiff's Reply") at 4. Plaintiff maintains that there was therefore "no

reason for the plaintiff or this Court to ask the jury whether Ms. Bass should have received the

promotion to the position of the Chief of the Financial Review Unit at the CG-14 level." Id. at 6.

Plaintiff observes that "[i]n any event, the defendant did not submit such a jury interrogatory for this

Court's consideration." Id. at 6, n.2. Plaintiff asserts that the "clear implication of plaintiff's articulation

Bass v. Tanoue                                                                    4

of her claims was that had she not been deprived of a fair opportunity to be considered [for the] Chief

of [the] Financial Review Unit position, she would have received the promotion." Id. at 6-7. Plaintiff

further submits that defendant "envisioned this case prior to the trial as a non-selection case in light of the

fact that it expected to present testimony regarding whether or not plaintiff was qualified for the position

of Chief of the Financial [Review] Unit[,]" and "[u]ltimately . . . *treated* [it] as a non-selection case

considering it told the jury in its opening argument that Ms. Bass was not qualified." Id. at 7. Finally,

plaintiff observes that

> [a]t no time during the trial did the defendant put on
> evidence by the selecting official or any other FDIC
> management official that Ms. Bass was not the most
> qualified individual for the position despite this Court's
> ruling during a bench conference that the door had been
> opened regarding Ms. Bass' qualification.

Id. at 9.


**DISCUSSION**

Section 2000e-5(g)(1) of Title 42 of the United States Code provides, in relevant part:

> If the court finds that the respondent has intentionally
> engaged in or is intentionally engaging in an unlawful
> employment practice charged in the complaint, the court
> may enjoin the respondent from engaging in such
> unlawful employment practice, and order such
> affirmative action as may be appropriate, which may
> include, but is not limited to, reinstatement or hiring of
> employees, with or without back pay . . . or any other
> equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1).                                    Bass v. Bair, No. 1:06-cv-01345-GK
                                                               Exhibit 10-1


**00019**

This Court has observed that "Title VII entitles individuals to be '[made] whole for injuries suffered on account of unlawful employment discrimination.'" Hayes v. Shalala, 933 F. Supp. 21, 24 (D.D.C. 1996) (citing Albermarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975)). Accordingly, "[d]istrict courts must strive to grant 'the most complete relief possible' in cases of Title VII violations." Lander v. Lujan, 888 F.2d 153, 156 (D.C. Cir. 1989) (citing Franks v. Bowman Transp. Co., 424 U.S. 747, 764 (1976)). To that end, "the courts must make the victim 'whole' by 'plac[ing him], as near as may be, in the situation he would have occupied if the wrong had not been committed.'" Lander, 888 F.2d at 156 (citing Albermarle, 422 U.S. at 418-19) (internal citation omitted). In fashioning a remedy which satisfies the objectives of Title VII, the district court is vested with "considerable discretion." Lander, 888 F.2d at 156; see Hayes, 933 F.Supp at 25. Thus,

> a district court which endeavors to fashion a remedy for
> discrimination cannot confine itself to narrow or technical
> measures which, while perhaps bearing a logical
> connection to the plaintiff's complaint, fail to reflect the
> whole of the plaintiff's injury. Rather,
> comprehensiveness, and a keen sensitivity to the equities
> of the case before it, must control the court's
> determination.

Brown v. Marsh, 713 F. Supp. 20, 22 (D.D.C. 1989), aff'd, 918 F.2d 214 (D.C. Cir. 1990); cert. denied, 502 U.S. 810 (1991).

Retroactive Promotion

This Circuit has expressly held that "Title VII envisioned that making a victim whole would

Bass v. Tanoue                                                                    6

include his reinstatement to the position he would have held but for the discrimination."

Lander, 888 F.2d at 156. Additionally, this court has observed that Section 2000e-5(g) of Title VII

"specifically includes reinstatement as an appropriate judicial remedy," and that reinstatement "'is the

preferred remedy in the absence of special circumstances militating against it.'" Hayes, 933 F.Supp. at

25 (citing Squires v. Bonser, 54 F.3d 168, 173 (3d Cir. 1995)). "A district court may order a

retroactive promotion if it finds that the plaintiff 'would have attained the position but for the defendant's

unlawful employment practices.'" James v. Norton, No. CIV.A. 99-2548, 2001 WL 1524422, at *3

(E.D. Pa. Nov. 30, 2001) (citing Richerson v. Jones, 551 F.2d 918, 923 (3d Cir. 1977)).

    Absent from defendant's opposition is any suggestion that "special circumstances [militate]

against" a retroactive promotion. See Hayes, 933 F.Supp. at 25. Instead, defendant opposes plaintiff's

request for a retroactive promotion as equitable relief solely on the ground that such relief "would put

Plaintiff in a better position than she would have been entitled to had there been no discrimination."

Defendant's Opposition at 2. However, the undersigned finds that defendant's contention is predicated

upon a flawed interpretation of the role of the jury in making a determination with respect to liability, and

that of the court in fashioning equitable relief which satisfies the objective of Title VII that a prevailing

plaintiff be afforded make-whole relief. Indeed, this Circuit has long recognized that "in Title VII cases

'the questions of statutory violation and appropriate statutory remedy are conceptually distinct.'"

Johnson v. Brock, 810 F.2d 219, 223 (D.C. Cir. 1987) (citing Smith v. Secretary of the Navy, 659

F.2d 1113, 1120 (D.C. Cir. 1981)).

    The undersigned finds that no authority supports the proposition advanced by defendant that

Exhibit 10-1

00021

Bass v. Tanoue                                                                 7

"[t]he denial-of-opportunity-to-compete case actually pled, tried, and decided here is distinct from the

kind of denial-of-promotion case that would justify the retroactive promotion remedy Plaintiff seeks."

Defendant's Opposition at 6.  Defendant offers no authority in support of the proposition.  Nor does

defendant propose any alternative measure of equitable relief.[1]

     This Circuit has held that a defendant may defeat a request for a retroactive promotion as

equitable relief once discrimination has been found only by "[proving] by clear and convincing evidence

that [plaintiff's] qualifications were such that he would not in any event have been selected." Day v.

Mathews, 530 F.2d 1083, 1085 (D.C. Cir. 1976); see Milton v. Weinberger, 696 F.2d 94, 98 (D.C.

Cir. 1982).  Defendant introduced the issue of plaintiff's qualifications during defendant's counsel's

opening statement, but offered no evidence that plaintiff was not the best qualified person for the

position. See Plaintiff's Reply, Exhibit 1 at 146-52.[2] Defendant's    recognition of the need to put

on evidence regarding plaintiff's qualifications is also evident upon an examination of the witness list

defendant included in the parties' joint pretrial statement, where defendant identified four witnesses from

---

    [1] Defendant's opposition to a retroactive promotion, back pay, correction of records and
injunction against future discrimination and retaliation is tantamount to a suggestion that even though the
jury found in plaintiff's favor on each question it was asked to decide, and awarded her compensatory
damages of $1,500,000, she is entitled to no equitable relief.  Such an anomalous result is plainly
inconsistent with Title VII's objectives.  See Squires, 54 F.3d at 171 ("the denial of a make-whole
remedy must be supported by 'reasons which, if applied generally, would not frustrate the central
statutory purposes of eradicating discrimination throughout the economy and making persons whole for
injuries suffered through past discrimination.'").

    [2] Defendant's failure to offer such evidence is rendered even more inexplicable by the
statement of defendant's counsel, as part of her objection to a question to plaintiff by her counsel about
her qualifications, that "we have to prove that she could not have been selected for the job" since the
case "has turned into a non-selection case[.]" Plaintiff's Reply, Exhibit 1 at 147.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

Bass v. Tanoue                                                           8

whom defendant expected to elicit testimony regarding plaintiff's qualifications. See Joint Pretrial

Statement (Docket No. 32) at 15-17.[3] However, defendant did not do so, and now entirely fails to

point to any evidence offered at trial from which the undersigned could find by clear and convincing

evidence "that [plaintiff's qualifications were such that [she] would not in any event have been selected."

See Day, 530 F.2d at 1085.

     The only evidence on which defendant relies in support of her opposition to plaintiff's request for

a retroactive promotion as equitable relief is the trial testimony of Freddie Cook. Mr. Cook is an

African-American man who was a permanent Grade 15 when the "Expression of Interest" e-mail was

sent, and who like plaintiff, did not receive it. Mr. Cook testified that he "probably would have been the

best candidate" had he received the "Expression of Interest" e-mail and decided to apply. Trial

Transcript, Vol. II at 13-14. The undersigned finds, however, that the fact that Mr. Cook - - who was

also excluded from consideration - - was qualified, and believed that he would have been the best

qualified, is hardly "clear and convincing" evidence that plaintiff was not the best qualified applicant.

Indeed, such evidence shows, at most, that absent discrimination, at least one other qualified African-

American candidate would have applied.

     Plaintiff's testimony regarding her qualifications was thus unrebutted. Plaintiff's testimony

included a discussion of the fields of study for the bachelor's and master's degrees she earned; her work

experience prior to 1991, when she began her tenure at the Resolution Trust Corporation; her

---

[3] Defendant made no effort at trial to demonstrate that the selectee was better qualified than
plaintiff; nor does defendant, in her opposition to plaintiff's motion for equitable relief, suggest that there
is any evidence from which the court could so find.

Bass v. Barr, No. 1:06-cv-01345-GK
Exhibit 10-1

Bass v. Tanoue                                                                           9

promotions from the grade 12 level to the grade 13 level, then to the grade 14 level; her duties and

responsibilities, including her performance of "the duties that became [the] job" of Chief of the Financial

Review Unit; and her qualifications for the position of Chief. See Plaintiff's Reply, Exhibit 1 at 126-58,

168-69, 196-200.

Moreover, the record makes plain that the jury, while not specifically asked to find whether

plaintiff would have been selected for promotion to the position of Chief of the Financial Review Unit

absent discrimination, in fact found that plaintiff was qualified for the position.  First, the jury's verdict is

an unequivocal rejection of defendant's assertion, in her counsel's opening statement, that "even if the

Plaintiff had applied, the personnel rules would have prevented her from getting the job of the unit chief,

and that's because, unfortunately, she wasn't qualified." Trial Transcript, Vol. I at 123.[4]  Second, the

jury was instructed with respect to its evaluation of the evidence regarding plaintiff's qualifications, and

obviously found, in its determination, that the reasons articulated by defendant for not allowing plaintiff to

compete were pretextual:

> If you find that Ms. Bass was qualified to apply for the
> grade 14 vacancy in ASB's Policy and Compliance
> Section, the position of chief of the Financial Review
> Unit, and was nevertheless excluded from those
> considered candidates for the vacancy, and that most of
> those considered were white and were not as well-
> qualified for the position as was Ms. Bass, and you find
> that the defendant has not offered a legitimate reason or
> reasons for this different treatment of Ms. Bass, you may
> find that the plaintiff has proven her claim of intentional
> employment race discrimination.

---

[4] See n.2, n.3, supra.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

Bass v. Tanoue                                                                    10

Trial Transcript, Vol. V at 69-70 (emphasis supplied).

Accordingly, the undersigned find that plaintiff was qualified for the position of Chief of the

Financial Review Unit. "Where courts have found that a plaintiff was qualified for a promotion, they

have awarded that promotion retroactively." James, 2001 WL 1524422, at *3   (surveying recent

decisions in which retroactive promotion ordered as equitable relief).  As defendant has failed to show

by clear and convincing evidence - - either offered at trial or proffered in her opposition to plaintiff's

motion for equitable relief - - that plaintiff would not have been promoted absent discrimination, the

undersigned will order that defendant immediately promote plaintiff to the position of Chief of the

Financial Review Unit at a permanent grade 14, effective November 23, 1997, the date on which the

position was filled.

Back Pay

Plaintiff seeks back pay, from early January, 1997, with a pay differential between what she

earned as a grade 12 and what she would have earned as a grade 14, until she is actually promoted, and

her pay is adjusted.  Plaintiff's Memorandum at 8.  Plaintiff also seeks any step increases, bonuses and

merit pay "as if she had been appointed to the Financial Review Unit Chief's position at the permanent

grade 14 level in earliest January 1997 and served there with distinction since that date."  Id.

Defendant, with no citation of authority, maintains that "since the Court should not grant the

retroactive promotion request, the back pay request becomes moot."  Defendant's Opposition at 11.

Alternatively, defendant asks that if plaintiff is retroactively promoted as equitable relief, then (1) her

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00025

Bass v. Tanoue                                                                                    11

back pay be calculated as if she had earned "fully successful," and not "outstanding" performance

appraisals; and (2) that the calculation of back pay begin effective November 23, 1997- - the date on

which the position of Chief of the Financial Review Unit was filled - - rather than January, 1997.

Defendant does not address plaintiff's request for interest on the award.

    "In calculating a back-pay award, [a] court must, as nearly as possible, recreate the conditions

and relationships that would have been, had there been no unlawful discrimination." Walker v. Dalton,

89 F. Supp. 2d 20, 24 (D.D.C. 2000) (citations and internal quotations omitted). Moreover, "a court

should calculate the amount of money the claimant could have reasonably earned if the discrimination

had not occurred. The figure should include the base pay, raises, and bonuses or benefits the claimant

would have reasonably expected to earn." EEOC v. Delight Wholesale Co., 765 F. Supp. 583, 587-88

(W.D. Mo. 1991), aff'd, 973 F. 2d 664 (8th Cir. 1992). See also Bonura v. Chase Manhattan Bank,

N.A., 629 F. Supp. 353, 355 (S.D.N.Y. 1986) ("In calculating back pay, the Court may take into

account any salary increases that [plaintiff] could reasonably have expected to receive had [she] not

been [discriminated against]."). Furthermore, "since the [defendant's] unlawful conduct has created the

necessity for this backpay judgment, any 'uncertainties in determining what an employee would have

earned but for the discrimination, should be resolved against the discriminating (party)." Mead v. United

States Fidelity and Guaranty Co., 442 F. Supp. 114, 134 (D. Minn. 1977) (citations omitted).

    Defendant's contention that plaintiff should be awarded no back pay is plainly at odds with the

objectives of Title VII; indeed, this Circuit has observed that even in an instance in which a court

determines that a promotion as equitable relief is properly denied, "[n]othing [in such instance] is

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00026

Bass v. Tanoue                                                                      12

intended to suggest that the employee who is denied the promotion should also be denied back pay,

seniority credit, attorney's fees, costs, equitable relief, or the like, where any such relief is otherwise

found to be appropriate." Milton, 696 F.2d at 99 n.14.

      The undersigned finds that an award of back pay is required in order to, "as nearly as possible,

recreate the conditions . . . that would have been, had there been no unlawful discrimination." See

Walker, 89 F.Supp. at 24. The undersigned further finds that plaintiff demonstrated that she had been

performing at consistently high levels until she was given "the lowest performance evaluation rating in my

career history" by Patricia McClintock, her then supervisor and competitor for the position of

Supervisory Contract Policy Analyst. See Trial Transcript, Vol. I at 205. Moreover, defendant neither

offered evidence of any instance in which plaintiff's performance was other than exemplary, nor

otherwise attempted to demonstrate that plaintiff's performance could have been expected to be

anything less than outstanding had she been selected Chief of the Financial Review Unit. For these

reasons, the undersigned finds that the plaintiff's back pay award is more appropriately based on

continued "outstanding" ratings. Cf. Hayes, 933 F.Supp. at 26 (where most recent evaluation of "fully

successful "was not contested at trial, back pay and benefits calculated as if plaintiff had received "fully

successful," rather than "outstanding" rating.). Such result is consistent with the admonition that "any

'uncertainties in determining what an employee would have earned but for the discrimination, should be

resolved against the discriminating [party].'" Mead, 442 F. Supp. at 134 (citations omitted).[5] The

---

    [5] To the extent that this methodology may be deemed to overcompensate the plaintiff, "the
deterrence objectives of Title VII's remedy provision may excuse this result." Brown, 713 F. Supp. at
22 n.5 (citing Albemarle, 422 U.S. at 417-18; Louisiana v. United States, 380 U.S. 145, 154 (1965)
(a court "has not merely the power but the duty to render a decree which will so far as possible

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

Bass v. Tanoue                                                                    13

award shall be calculated from November 23, 1997, the date on which the position of Chief of the

Financial Review Unit was filled, to the date plaintiff is actually promoted and her pay adjusted upward

to the grade 14 level.  The undersigned will also award interest on the back pay.


Correction of Records

        Defendant opposes plaintiff's request for correction of all FDIC records solely on the ground

that "like back pay, correction-of-records relief depends entirely on whether a promotion is granted."

Defendant's Opposition at 12.  However, upon consideration of the findings regarding retroactive

promotion and back pay, as well as the objectives of Title VII, correction of records will be ordered.

See Hayes, 933 F.Supp. at 27.


Injunctive Relief

        The undersigned will also grant the injunctive relief requested by plaintiff.  See Shepherd v.

American Broadcasting Co., 862 F. Supp. 486, 502 (D.D.C. 1994), vacated on other grounds, 62

F.3d 1469 (D.C. Cir. 1995) (injunctive relief ordered where, as here, plaintiff remains an employee of

defendant).  See also Mitchell v. Secretary of Commerce, 715 F. Supp. 409, 410 (D.D.C. 1989), aff'd,

918 F.2d 214 (D.C. Cir. 1990), cert. denied, 502 U.S. 810 (1991) ("The Court is concerned that,

absent such an injunction the [defendant's] mistreatment of [plaintiff] will continue, albeit in subtle ways

that may be beyond immediate judicial supervision.")  While this Circuit has not held that enjoining a

---

eliminate the discriminatory effects of the past *as well as bar like discrimination in the future.*"
(emphasis in original)).

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

Bass v. Tanoue                                                                14

defendant from further acts of discrimination is a "mandatory" remedy, it is a "typical" remedy, and the

district court has broad discretion in the discharge of its "duty to render a decree which will so far as

possible eliminate the discriminatory effects of the past as well as bar discrimination in the future."

Albemarle, 422 U.S. at 417 (internal quotations omitted).

Defendant's contention that "a blanket injunction against actions already expressly prohibited by

law is inappropriate" in the absence of any finding by the jury that future discrimination or retaliation will

occur, or is likely to occur, is thus contrary to the law of this Circuit.  Instead, this Circuit has held that

> the request for injunctive relief will be moot only where
> there is no reasonable expectation that the conduct will
> recur, or where interim events have "completely and
> irrevocably eradicated the effects   of the alleged
> violation[.]"

Bundy v. Jackson, 641 F.2d 934, 946 n.13 (D.C. Cir. 1981).

Like the Bundy court, this court "perceives no such certainty here, most obviously because

[plaintiff's] agency has taken no affirmative steps to prevent recurrence of the [discrimination], and

because [the employees who undertook the discriminatory actions] still work for the agency."  Bundy,

641 F.2d at 946 n.13.  Indeed, defendant does not proffer that it has taken any "affirmative steps" to

ensure that there is no recurrence of any discrimination against plaintiff, and that she will not be subjected

to retaliation.  Nor does defendant dispute that one official whose conduct was the subject of this action

remains one of plaintiff's supervisors, and that the other official will be after plaintiff is promoted in

accordance with the court's order.

Bass v. Tanoue                                                                    15

## CONCLUSION

On the basis of the findings set forth herein, equitable relief is awarded to plaintiff in accordance with the Order entered on this date.

_____

DEBORAH A. ROBINSON
United States Magistrate Judge

_____
DATE

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

Bass v. Tanoue                                                                16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARY ELIZABETH BASS,

    Plaintiff,

     v.                                            Civil Action No. 00-0115
                                                  DAR

DONNA TANOUE, Chairman,
Federal Deposit Insurance Corporation,

    Defendant.

## ORDER

In accordance with the Memorandum Opinion filed on this date, it is, this _____ day of

December, 2001,

    **ORDERED** that Plaintiff's Motion for an Award of Equitable Relief (Docket No.55) is

**GRANTED**, and that

    (1) FDIC shall place plaintiff in the position of Chief, Financial Review Unit, Acquisition Services

Branch, or in a comparable position at the grade 14 level, in plaintiff's career field, in the Washington,

D.C. office of the FDIC;

    (2) FDIC shall provide plaintiff with full back pay (including all pay increases, step increases,

quality step increases, awards and bonuses), with interest thereon, as well as all other benefits which she

could have received since November 23, 1997 had she been selected for the permanent grade 14 Chief,

Financial Review Unit position, and had she served in that position since that time, in a fair environment free

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

Bass v. Tanoue                                                                          17

of discrimination and retaliation, with "outstanding" performance ratings;

(3) FDIC shall correct all of its records, including plaintiff's official personnel folder ("OPF"), to

accord with the equitable relief awarded by the Court;

(4) FDIC shall be permanently enjoined against engaging in discriminatory or retaliatory conduct

against plaintiff in the future; and

(5) FDIC shall pay plaintiff's costs of this action (and of the administrative complaints that

preceded it), including her attorneys' fees in the total amount of $69,343.00 ($68,544.50 of which is for

reasonable attorneys' fees and $798.50 of which is for non-fee expenses incurred by both plaintiff and

her lawyers), with interest thereon, and shall do so by check made payable to the order of "Mary E.

Bass and David H. Shapiro, Her Attorney".

---

DEBORAH A. ROBINSON
United States Magistrate Judge

**OPA**

E-CLIPS

E-Clips Home     Previous

## HEARSAY The Lawyer's Column:

## Battling FDIC Alone Results in Racial Bias Suit Victory

By: James V. Grimaldi
*Washington Post, 4/16/01* — When Mary Elizabeth Bass was passed up for a promotion at Federal Deposit Insurance Corp. (FDIC), she filed a racial bias complaint. When she decided to take the case to federal court, she went looking for a lawyer.

Bass, who is black, asked one lawyer, then another, and then another. After 10 inquiries and 10 rejections, she filed the lawsuit on her own. For one year she battled the FDIC in U.S. District Court alone — drafting the complaint, serving notice to the government, answering and winning motions designed to slow the case, filing an amended complaint, undergoing a deposition and discovery.

All without a lawyer.

Just three months before trial, Bass, 40, of Alexandria, finally persuaded David Shapiro, a seasoned civil rights and employment-discrimination lawyer at Swick & Shapiro, to represent her. But by the time Shapiro joined the case, Bass already had passed key legal milestones that often waylay even the most skilled of lawyers. Shapiro was shocked.

"How did you make it this far?" Shapiro asked. "It was by God's grace," Bass said, recounting the exchange.

And, by the grace of a seven-person jury, Bass won her case. On March 30, after a five-day trial, the jury declared that Bass should be awarded $1.5 million because the FDIC discriminated against her because of her race. Bass hugged her husband and began to cry.

A magistrate judge reduced the amount to $300,000, the cap set under federal law for large employers in race bias cases. (Juries are not informed of the ceiling and are told to set the damages at the amount they deem appropriate.)

FDIC spokesman Phillip Battey said an appeal "is possible" after a final judgment is entered.

The verdict and Bass's lone crusade has become instant legend at the FDIC, an agency wracked by racial-discrimination allegations for several years. Late last year, the FDIC tentatively settled a class action case filed by black employees for $14 million, and a hearing is set in U.S. District Court for April 23.

But a group of black workers is challenging the deal in federal court. They say the award amounts to a few thousand dollars per worker and falls far short of reforms needed to end discriminatory conduct in promotions and hiring. They also are questioning a $2 million fee to be paid to Cohen, Milstein, Hausfeld & Toll and the Washington Lawyer's Committee for Civil Rights Under Law. The class's attorney, Joe Sellers, said the reforms are "significant," the legal fees "fair" and the monetary settlement the largest ever in a race bias case against a federal employer.

Bass's case began in 1997 when she was excluded from a group of employees who were asked to apply for a supervisory position as chief of the financial review unit in the contracts section. With a bachelor's degree and a master's degree in public administration from the University of Mississippi,

Bass's Bain. No. 1:06-cv-01345-GK
Exhibit 10-1

**00033**

## OPA

# E-CLIPS

### Today's News from the Office of Public Affairs



**HELP**

**BACK ISSUES**

- Edition Date -
Current Issue
10/09/2003
10/08/2003
10/07/2003
10/06/2003
10/03/2003

For previous
edition, enter
edition date.
**(mm/dd/yyyy)**

Submit

**SEARCH**

### EDITION DATE: 04/16/2001

**E-CLIPS is for internal use only.**

**Big Banks Expected To Pan FDIC Plan** - *American Banker, 4/16/01*
WASHINGTON - A key constituency has yet to join the deposit insurance
reform fray — big banks. While community banks have long clamored for
increasing the per-account

**FASB Eases Up on Goodwill Rule Change** - *American Banker, 4/16/01*
WASHINGTON - Standards setters who are now debating details of along-
awaited proposal to change merger accounting rules have voted for a less
onerous measure of the value

**First Union Is Set to Acquire Wachovia** - *Wall Street Journal, 4/16/01*
**Rival North Carolina Banks To Unite in Stock Deal Valued at $13 Billion**

**Insurer Group Moving To Erase Bank Edge** - *American Banker, 4/16/01*
WASHINGTON - The American Council of Life Insurers has started circulating a
draft that could be the basis for legislation to create a federal charter for life
insurance

**Slowdown Rattles West Coast's Big Banks** - *Wall Street Journal, 4/16/01*
**Power Woes Contribute to `Modest' Forecast for First-Period Results**

**Problem Loans at Riggs May Offer Economic Clues** - *Washington
Post, 4/16/01*
Riggs National Corp., the largest bank in the District and one of the biggest
independent banking companies in the region, reported some good news and
some bad news last week

**Beware the Telecom Quake** - *Washington Post, 4/15/01*
The colorful flameout of the dot-com companies is obscuring a deeper and
more dangerous problem for the global economy: the financial squeeze
affecting the world's telecommunications

**Powell Continues to Send Out Mixed Signals About FDIC Post** - *American
Banker, 4/16/01*
Recent statements from Texas community banker Don Powell have left industry
observers scratching their heads. They are trying to figure out whether he's
denying that he

**HEARSAY The Lawyer's Column:** - *Washington Post, 4/16/01*
**Battling FDIC Alone Results in Racial Bias Suit Victory**

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**00034**

Bass considered herself as qualified as the white woman selected for the job.

But she was never offered a chance to apply. The job was not posted and the mostly white candidates were notified by e-mail.

The case also contains a number of complex elements that likely scared off many lawyers Bass initially contacted. Part of her claim was that white supervisors carefully tailored the job description and the timing of the opening to exclude qualified blacks from the potential pool of applicants. The allegation is a central element in the class action case that the FDIC is attempting to settle.

"Ten attorneys told me I didn't even have a case," Bass said. "They said, 'There's not much here.' I knew in my heart I had to do what I had to do."

Her first major hurdles were motions to consolidate her case with the class action and with another pending bias lawsuit. By cribbing from other cases and studying the Federal Rules of Civil Procedure on the Web, she filed arguments against the FDIC motion — and won.

"Some nights on weekends I would sit up until 2 and 3 in the morning, researching on the Internet," she said. "You've got to be willing to sacrifice. You really have believe in yourself, put God first and go for it."

Bass then caught another big break when FDIC attorney Susan Cone Kilgore missed her deadline to seek summary judgment on the case. And that was after Bass granted the FDIC a 30-day extension. Three other similar FDIC racial discrimination cases were dismissed on summary judgment in February.

Kilgore did not return phone calls seeking a comment, but FDIC spokesman Battey said, "The deadline for filing these motions was suspended, in our view, while a stay for mediation was in place." The judge disagreed.

"I think because they never saw a physical attorney with me, I don't think they took me seriously," Bass said.

Magistrate judge Deborah A. Robinson appointed Bass a pro bono attorney, but only to try to mediate a settlement before trial. Bass was eager to settle. But the FDIC offered few concessions and no money, Bass said, though she would have settled for a promotion alone. When talks failed, a trial date was set and she knew she needed a full-time lawyer. That's when she found Shapiro.

Shapiro said discrimination cases are hard enough for lawyers who are immersed in the law, let alone a legal novice.

"They are expensive to mount, the facts are complex and very contentious, and the law is constantly changing," Shapiro said. "They are not prepared to handle the legal questions. And the attorneys who are ready to handle the legal questions are not prepared for the grit of trial."

For Bass, all she really wanted was the promotion. She likes working for the FDIC, an institution she respects. Now, she sort of feels sorry for the FDIC.

"This is the FDIC! They have been around since 1933," Bass said. "They insure the banks. They had this whole big diversity program at the FDIC. It is quite embarrassing" for the agency.

But, because the FDIC has given up on her, she says, she's looking for a new career.

Now, she wants to go to law school.

"I want to become a trial attorney," Bass said, "specializing in labor law and employment discrimination."

Bass v. Bair, No. 1:06-cv-01345-GK<br/>Exhibit 10-1

**00035**

High Court Drama

Hearsay was curious to see a film crew outside of the U.S. Supreme Court a couple of weeks ago, rolling down the sidewalk with an elaborate elevated contraption holding a camera. This was not your usual media cluster. It turns out that it was part of a crew filming a new TV drama focused on the Supremes and starring Sally Field as a liberal justice.

Then we learned that ABC's "The Court" is but one new drama focusing on the highest court in the land. Can our notoriously reclusive justices take not one, but two TV melodramas focusing on the machinations of the court?

CBS's "First Monday" stars James Garner as an aging and (just to balance out the left-leaning lead character of "The Court") conservative chief justice; Joe Mantegna plays a newly appointed moderate justice who is a swing vote on a deeply divided court.

Both are aimed at capitalizing on the success of the White House drama "The West Wing," and hope to win spots in fall network lineups announced in May. "The Court" portrays the court through the eyes of a clerk who works for Field's left-leaning justice. When the producer of "The Court" contacted Chief Justice William H. Rehnquist for help in making the show, the chief justice demurred.

Both studios, Touchstone Television (ABC) and Paramount (CBS), have peppered the court with factual questions. Touchstone officials toured the building March 8. "Both seem interested in accuracy in depictions of the court," court spokeswoman Kathy Arberg said. "I hope with any project involving the court that it is treated with the proper respect and dignity."

Hearsay is quite sure that both shows will be very silly and absurd. We can't wait.

Joel Klein, Old News?

Boy, how soon we forget. Just one year ago, on Easter Monday, news broke in this newspaper that Joel Klein, former assistant attorney general for antitrust, was planning to ask a court to break up Microsoft Corp. Now, that order is on appeal and apparently about to be sent back to U.S. District Court, as the Court of Appeals for the District of Columbia is preparing its decision in the case. (We predict a May ruling. But don't hold us to that.)

And Klein, it seems, is old news. Klein — now chairman and chief executive of Bertelsmann Inc., the media giant's corporate services division — was to be the featured speaker at a National Press Club last Tuesday to discuss "competition policy and antitrust enforcement in the global economy" and billed as "the man Microsoft loved to hate." But because of a lack of interest, the luncheon was canceled.

Klein did not return a phone call for comment.

And Furthermore

Former Assistant Attorney General Robert Raben has formed the Raben Group, a legislative consulting and lobbying practice on Capitol Hill. Raben lists the Recording Industry Association of America and Sony Music Entertainment as clients.

Calendar

The Young Lawyers Section of the Bar Association of the District of Columbia will hold its third annual Esquire International fund-raiser for various community programs at 10 p.m. on April 27 at Ristorante Murali, 901 9th St. NW. The event features an Italian buffet, a make-your-own toga table, a disc jockey and dancing, a $5 Caesar's potion, Aphrodite martinis and a cash bar. Tickets $30. Contact Narda M. Newby at 202-879-7777.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

Hearsay dons togas, twists and shouts every other week in Washington Business. E-mail your recipes

**00036**

for Caesar's potions and Aphrodite martinis to hearsay@washpost.com

E-Clips Home | Previous

Last Updated: 4/16/01                    Search FDICnet | Home                    fdicnet@fdic.gov

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**00037**

| | Federal Deposit Insurance Corporation | DATE |
|---|---|---|
| | **ROUTING AND CLEARANCE SHEET** | 11/07/2005 |

| | NAME/OFFICE | ACTION | INITIALS/DATE |
|---|---|---|---|
| 1. | Campbell DeMallie, Senior Contract Specialist, DOA/ASB | Concurrence | CD 11/7/05 |
| 2. | Nancy Deyerle, Oversight Manager, DOF | Concurrence | nd |
| 3. | Peter M. Somerville, Legal Division | Concurrence | PMS 11/9/05 |
| 4. | Robert Elcan, Office of Development and Equal Opportunity | Concurrence | RE 11/8/05 |
| 5. | Mary E. Bass, Contracting Officer, DOA/ASB | Approval | 11/9/05 |
| 6. | Thomas D. Harris, Assistant Director, DOA/ASB | Approval | TH 12/7/05 |
| 7. | Ann B. Steely, Associate Director, DOA/ASB | Approval | ABS 12/12/05 |
| 8. | | | |
| 9. | | | |
| 10. | | | |

**SUBJECT**

Acquisition Plan for Benchmarking and Service Costing of Service Lines and Business Processes

**REMARKS**

Please sign the Acquisition Plan and forward it to the next person on the list.

*Time is of the essence*
*Please handle promptly*
*+ hand carry to the next*
*addressee.*

*Tom/Mary/Campbell — Acq Plans are intended to help*
*lay out the strategy for the requirement, primarily the*
*preaward activity. It is required to be executed prior*
*to release of a solicitation. Please ensure there are no*
*future occurences of such a late Acq Plan.*
*ABS 12/12/05*

| FILE ID: | TYPIST: | Bass v. Bair, No. 1:06-cv-01345-GK<br>Exhibit 10-1 |
|---|---|---|

| FROM: *(Originator's Name/Office)* | PHONE NUMBER | ROOM NUMBER |
|---|---|---|
| Campbell DeMallie/DOA/ASB | 202-942-3244 | PA-1730-4024 |

1211/40 (2-00)

00038



**FDIC** Federal Deposit Insurance Corporation

July 5, 2005

Ann Bridges Steely
Associate Director
Acquisition Services

Tom H. out / Mary in charge.
Joan G was not in the office.
I went to Mary's office to
make sure she knew these (NFE)
mods had to be completed
by COB. Mary said Jean
was on scheduled leave,
so I said someone else would
have to do them. She said
Campbell was her only employee
in the office. Said it
was up to her to figure out
who could the mods by the
deadline — COB July 5.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

8/30/04

Good Afternoon Ms. Betsey,

Please come to see me. Ms. Steely wants us to come and discuss a "NonCompetitive" action that you are working on for "Miguel Torrado's" area personnel.

Thanks,
Mr Bass

**FDIC** Federal Deposit Insurance Corporation

Ann Bridges Steely
Associate Director
Acquisition Services

*Ofelia Jones   62595*
*EO Counselor /OAEO*

*Mary Bass*
*"Missy" Appraiser*

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00041

 Federal Deposit Insurance Corporation

Ann Bridges Steely
Associate Director
Acquisition Services

Ofelia Jones
202 416 2595

Tom P
- 62427
implementing instructions
on milled exp auth

Paul
Lucy McCabe

Deena Weatherby — PMP

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

TO _____ *Ann* _____

DATE _2/15_____ TIME _3:30_

## PHONE CALLS
### "WHILE OUT" RECORD

M. _Greg Cofer_

OF _____

PHONE _6-4482_
AREA CODE    NUMBER    EXTENSION

| TELEPHONED | ✓ | PLEASE CALL | |
|---|---|---|---|
| CALLED TO SEE YOU | | RETURNED CALL | |
| WILL CALL AGAIN | | URGENT | |

MESSAGE _Problem w/ Employee_

_Mary_

TAKEN BY: _JB_

---

TO _____ *Ann* _____

DATE _2/17_____ TIME _11:45_

## PHONE CALLS
### "WHILE OUT" RECORD

M. _Ophelia Jones_

OF _____

PHONE _6-2595_
AREA CODE    NUMBER    EXTENSION

| TELEPHONED | ✓ | PLEASE CALL | |
|---|---|---|---|
| CALLED TO SEE YOU | | RETURNED CALL | |
| WILL CALL AGAIN | | URGENT | |

MESSAGE _She spoke w/ Mary_
_Mary is alleging "racial harassment"_
_Oct 2003 CSA,_
_Donna Gambrel_
_Mickey Collins_
_Iraq rumor_

TAKEN BY: _JB_

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1





**FDIC** Federal Deposit Insurance Corporation

2/1/05

Ann Bridges Steely
Associate Director
Acquisition Services

Andrea  8-6633
~ woolford/MR

Mary Bass
Lean

almost impossible to get
in touch / get response

assured her new Ker would
be in place by Jan

blamed new policy on sole source
1/10/05 . rec |signed 2/1/05|  $45K
– Jane Lewis – editor for working
1/21/05 EAD 2/1/05|
– Tony Sanders – CFR prog coord $50K

started talking, mods, etc. Nov
one here – "lost", DIR reaccomplished
pkg DEC

Mary met w/ her once – no follow-up

would give them F – both

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Wednesday, February 02, 2005 11:28 AM |
| **To:** | Harris, Thomas D.; Bass, Mary E. |
| **Subject:** | DIR Requirements |

**Importance:**    High

Tom and Mary, I received a call from Andrea Woolford yesterday expressing concern and frustration about her dealings with ASB during the past year. I spoke with her this morning about 2 specific requirements that we are working on right now. She says that Joan committed to have these on contract no later than Jan 1, but the contracts still have not been awarded. One requirement is for services from Jane Lewin for editing services (total value -$45k) for the CFR working papers and the other is for Anthony Sanders who serves as the CFR program coordinator (total value - $50k). Dr Sanders has expressed concern to her that he is operating without a contract with current rates, etc. I would like for you to get the facts together on these 2 specific cases, including a firm commitment on when the contracts will be awarded, and come see me – just the 2 of you. I would prefer to discuss this later this afternoon before we leave for the day, but we can meet tomorrow morning if absolutely necessary. After we discuss these specific cases, I want to discuss my concern about customer support, in general.

abs

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(202)942-3010**

*JNCP (all dollars thru PEO?)*

Dec 8, 2005

Mary,

It's been a really tough year for everyone. Thank you for always having a smile and pleasant outlook. I appreciate your efforts to work hard for our clients.

Thank you,

Ann

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00046

3/23/05

Met w/ Donna Gambrell to discuss ASB
support to OSC. Told her I knew she
hadn't been happy - wanted improvement
in our support. She said she was
very frustrated w/ responsiveness -
her staff constantly complained things
take a long time, but they can't get
calls answered, emails returned.
Everyone commented that Mary Bass was
very nice, but couldn't get things done.
Asked her to call me or Don anytime.
not to wait for things to reach crisis
stage.

## 11/13/03 MEETING WITH ANN:

- Conflict Management:

    * Personal Experience (Opinion/Post Article);
    *Communication is Key (Once communications breaks down, everything will spiral out of control.); and
    * Training – EEO Process; and Union Grievances.

- Leadership:

    * Training
        - Structured (Georgetown University's Program – 12 months); and
        - Unstructured – Random Courses.

I had asked Mary for her ideas about how our leadership team could improve the culture in ASB.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1
**00048**

1

*Mary Bass*

2/3/05

Mtg w/ Tom Harris / Mary Bass
RE: Andrea Barenene's (DIR) frustration
w/ both Lear and Mary

- asked MB for status on the 2 items
  of concern to Andrea
- then discussed general feedback
  (no follow thru, not returning calls/email,
  etc) - told MB Andrea would give
  her a "F" for support over the past
  year
- asked how she manages work in her
  branch
- told her failure to ret calls/email
  unacceptable at all levels of org.
  -- reminded her of similar feedback from
     others
- agreed we would find trg on 2 subjs
  -- customer support
  -- managing the work of sub
- told her future complaints could not
  be tolerated "Missy"
_____

then went to MB's office a few minutes
later
- asked what she thought when I called

her "Missy" - said at first it was cute
-- she said she felt I was disrespectful
-- I said that was the point I was
   trying to make
-- then MB said "Ok, but I also thought
   it was cute"
-- reminded her of our need to show
   respect to others — & as mgrs
   we set the example, must maintain
   professional style in the work
   setting

MB became very upset, conversation
deteriorated
-- she said FMC ruined her life for many
   years — I said I wanted to focus
   on present
-- told me I had horrible interpersonal
   skills — reminded her we had just
   discussed her interpersonal skills
   problems w/ clients
-- said she was constantly defending me
   — told her I heard many rumors to
   contrary, but I wanted to concentrate
   our discussion on things I observed
   (calling people "Sweetie") ......

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

client feedback.

-- she asserted Serena's recent car accident was because she was so upset about what I was "doing to ASB -- reminded her of sessions we made available to help people through these times

- I finally said I had come to see her only to discuss why I had called her "wrong", and to close the loop on that, She was getting too upset and bringing in other issues and I wanted to focus on specifics.

- Left her office after about 15 min.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

# FAX

**Johnie J. McCoy**
**EEO Investigator**
**Fax: 410-997-6424**
**Voice: 410-997-1158**

*marked up copy*

**Date**: June 6, 2005

**To**: Ann Bridges-Steely
**Fax Nr**: 202-942-3544
**Voice Nr**: 202-942-3010

**Cc**:

**Subject**: Copy of the affidavit and addendum of Complainant Mary Bass

Ms. Bridges-Steely:

Per FDIC policy to provide a complainant's statement to responding officials in EEO investigations, I have attached a copy of Ms. Bass' affidavit and the addendum to that affidavit so that you have an idea of the charges you will be asked to respond to during you upcoming interview. Please treat this information as Personnel Confidential.

Sincerely,

*Johnie J. McCoy*
Johnie J. McCoy
EEO Investigator
US Investigations Services, Inc.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1 6/6/05

**00052**

<u>**DECLARATION**</u>

I, Mary Elizabeth Bass, Corporate Manager, CM-1102-1, employed at the Federal Deposit Insurance Corporation (FDIC), do hereby declare under penalty of perjury as follows:

For the record, I am an African American (Black) and have engaged in prior EEO activity.

I have alleged discrimination based on my race (Black) and retaliation for my prior EEO activity in that I was the victim of harassment (non-sexual) when, during a meeting on February 3, 2005, Ann Bridges-Steely, a white female and my second-level supervisor, ridiculed to me by calling me "Missy" -- a demeaning racist reference. To add insult to this injury, Bridges-Steely used this racist reference to me in front of my first-level supervisor, Thomas H. Harris, a white male.

At present, I am the Chief of the Divisional Contracting Unit, Acquisition Services Branch (ASB), Division of Administration (DOA), FDIC. My job site is at 1730 Pennsylvania Avenue, NW, Washington, DC 20429. I have been in this position since October 2003 and have been a Corporate Manager since April 1, 2004. My current first-level supervisor, Thomas H. Harris, is the Assistant Director of the Corporate Contracting Section. My second-level supervisor, Ann Bridges-Steely, is the Associate Director, ASB, DOA.

My prior EEO activity was a law suit I brought against FDIC on a claim of race discrimination in promotion practices -- *i.e.*, I had been denied the opportunity to

-1-

Declarant's Initials

compete for a promotion to the CG-14 level (and a supervisory position) because of my
race (Black).  The case was called *Bass v. Tancus*, and it was designated as Civil Action
00-115 (DAR) in the U.S. District Court for the District of Columbia.  The DOA
managers involved in that case were not my current managers.  The case was tried in
2001.  I won a verdict in my favor from the jury and judgment was entered in my favor
by the District Court.  That Court ordered the FDIC was ordered to promote me and place
me in a supervisory position.  It also ordered FDIC to pay me a large amount of money in
damages and to pay all my legal fees and expenses.  FDIC appealed from the judgment of
the District Court (the appeal was called *Powell v. Bass*, and designated Appeal No. 02-
5027 by the U.S. Court of Appeals for the D.C. Circuit).  However, the litigation was
settled before the appeal went forward to decision as a result of court-ordered mediation.
In the end, under the settlement and the District Court judgment, I was promoted to the
CG-14 level and provided a supervisory position, without a probationary period (now my
CM level job), paid a large amount of money by FDIC as compensatory damages, and
had all my legal fees and costs paid by FDIC.  It was a total victory.

**February 3, 2005 Meeting and Subsequent Events —**

On Tuesday, February 1, 2005, Mr. Harris scheduled a meeting for Thursday, February 3,
2005, to begin at 9:00 a.m., in Ms. Bridges- Steely's office.   The purpose of this meeting
was to discuss issues concerning projects out of the Division of Insurance and Research
(DIR) and the Division of Supervision and Consumer Compliance (DSC).  Ms. Bridges-
Steely had requested the meeting.  I was required to attend because DIR and DSC are two

-2-

Declarant's Initials

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

of the FDIC program offices to which my unit provides contracting services.

On Thursday, February 3, 2005, at approximately 9:00 a.m., Mr. Harris, Ms. Bridges-Steely, and I met in Ms. Bridges-Steely's office to discuss the DIR/DSC issues. Ms. Bridges-Steely started the meeting with a discussion with me in a very sarcastic, condescending and cold manner. She stated that my clients (e.g., DIR) had complained that I had not been returning their calls in a timely manner and that I had not timely responded to projects that had been received in my unit in or about late December 2004 / January 2005. She coldly alleged that many of my clients had stated that although I was very nice to work with, my unit could not get the work completed. I responded that this assertion was simply not true. She asked about a project out of DSC that I had determined could be procured using my "FDIC Procurement Credit Card,." inquiring, accusingly, why this project was taking so long to complete? I informed her that the program office (DSC) could not make-up its mind what it wanted. She then turned to Mr. Harris and told him that she needed to speak with him. I asked her if she needed anything else from me and, in response, she dismissed me stating -- in a very nasty and condescending tone -- that I should "go and take care of that work 'Missy'."

My response back to Ms. Bridges-Steely was "Ok, Missy, I'll take care of the work!" and I walked out of her office and proceeded immediately back to my own office. Mr. Harris did not make any comment when Ms. Bridges-Steely referred to me as "Missy". It was my clear impression at the time that Ms. Bridges-Steely was using the word "Missy" as a derogatory racial slur and I was very shocked and hurt when she first said it to me in

-3-

Declarant's Initials

front of Mr. Harris.  That it was meant as a hurtful racist slur was confirmed a few
minutes after I left her office, when Ms. Bridges-Steely came to my office -- some ten
minutes later -- to continue to slight me.  Once she arrived at my office and I closed my
door, Ms. Bridges-Steely proceeded to sarcastically ask how I felt when she referred to
me as "Missy."  She also asked, "Didn't I tell you that someone at my former agency
filed an EEO complaint because someone called them 'Sweetie.'" [As I recall, during a
meeting in the November/December 2003 time frame she had told me about someone
filing an EEO complaint at her former agency concerning the use of the term "Sweetie.".]
I immediately asked her if she wanted to file an EEO complaint against me.  *This occurred on 2/3/05.* She did not
respond.  *I said no.*

At the moment she came to my office to confront me a few minutes after calling me
"Missy" in front of white male supervisor, my emotions went through the roof, and I
could not believe she would be harassing me like this -- *i.e.*, creating such a hostile work
environment for me.  All I could think of was:  here I go again with the FDIC and this
organization's dismal history of discrimination against minorities.  I had flashed backs of
my seven-year battle with FDIC and how I had to go to U.S. District Court to fight for
my rights and to be vindicated.  So, I mentioned my prior discrimination case to Ms.
Bridges-Steely, and she very sarcastically and coldly stated that my discrimination case
was before her coming to FDIC, and that I needed to leave the past behind.  I guess she
failed to realized, or just did not care, that when she called me "Missy" she brought back
not only the memory of my case and why I had filed it; worse, she brought back all of the

-4-

Declarant's Initials

very dehumanizing memories of how African Americans had been dehumanized by the slave masters during the institution of slavery in America and by the crackers during Jim Crow.   Due to individuals like Ann Bridges-Steely, it seems that Black Americans will forever keep re-living their past nightmares.

*I mentioned this to Mary*

During this second conversation with Ms. Bridges-Steely on February 3, 2005, she also revealed that she bears a grudge against me because of the way that I had greeted a friend — Donna Gambrel, an African American, and the Deputy Director of DSC.   It seems that during a private conversation which occurred in the lobby area outside of a conference room just before a meeting on Tuesday, February 1, 2005, with FDIC's DSC (Ms. Bridges-Steely and Mr. Harris attended the meeting with me), Ms. Bridges-Steely had overheard me use the term "Sweetie" in greeting my friend Donna Gambrel.  During that second February 3 conversation, I informed Ms. Bridges-Steely that I was an adult, and she could not tell me how to greet my friends.  In fact, she stated that the way I greeted Ms. Gambrel, by saying "Sweetie", was "very disrespectful," and that was why (she claimed) that she refer to me as "Missy" earlier in her office -- i.e., to show me how it felt to be disrespected (I suppose).  In fact, all I felt was that she was being very disrespectful in using "Missy" and that this after-the-fact justification (two days later) *not true* was nothing more a pretextual mask for what her use of "Missy" really was:  a gross racial slur against me.  In any event, I immediately told Bridges-Steely that Ms. Gambrel was my friend, and on several occasions has referred to me as "Sweetie" and that it was none of her business.

-5-

Declarant's Initials

*it should*
*had been*

I was so upset at the way Ms. Bridges-Steely was harassing me in my own office that I informed her that our relationship would be strictly business from that point forward. It is my belief that Ms. Bridges-Steely's actions towards me on Thursday, February 3, 2005, were pre-meditated. In other words, Ms. Bridges-Steely knew exactly what she was doing. How she could used the racial slur "Missy" to me, and then attempt to use as an excuse my greeting to a personal friend in DSC in a private conversation two days earlier (on February 1, 2005) is simply adding insult to injury. It was a premeditated racist remark and nothing less.

In any case, after Ms. Bridges-Steely exited my office, I was so upset that I telephoned my husband, and explained to him what had happen. He helped me to calm down (as he knows that I suffer from hypertension and should not get excited). He informed me that I did not have to take that kind of treatment from my second-level supervisor (or anyone else), and he agreed with me that I should request an EEO Counselor. After I finished talking with my husband, on the telephone, I took a few deep breaths and emailed Michael Collins, Director, Office of Diversity and Economic Opportunity (ODEO), and requested EEO Counseling with regard to Ms. Bridges-Steely's harassment of me (hostile work environment) because of my race and in retaliation for my prior EEO activity at FDIC.

After sending the email to Mr. Collins, I went to Mr. Harris' office and informed him that I was tired of Ms. Bridges-Steely harassing me, and that I had requested an EEO

-6-

Declarant's Initials

FROM :                              FAX NO. :4109976424        Jun. 06 2005 11:07AM  P8

05/10/2005  13:34    2023421418              SWICK & SHAPIRO              PAGE  09

Counselor.  Mr. Harris never asked me why I had requested an EEO Counselor.  In fact,

he has never asked me about Ms. Bridges-Steely calling me "Missy" in front of him in

her office on February 3, 2005 at all.


**My Use of the Term "Sweetie" —**

As to my use of the term "Sweetie" as a greeting or in reference to friends and

acquaintances, I would noted the following:  I have been employed by the FDIC for

almost 14 years (Hired by the FDIC/(Former) Resolution Trust Corporation (RTC)

December 1991), I have greeted and been greeted by numerous colleagues, personal

friends, executives, etc., here at the Corporation using "Sweetie" and being referred to by

others (executives included) as "Sweetie."  This has occurred in various settings, over

the almost 14 years that I have been employed by the FDIC.  I have never taken offense

at the term being used in others addressing me, nor has anyone else ever told me that they

were offended or felt disrespected when I used the term in addressing them.  In fact, the

only person who has ever made any issue over this at all was Ms. Bridges-Steely — and I

never referred to her as "Sweetie" or addressed her using that word.  She made mention

of my use of the word "Sweetie" twice — once (as noted) on February 3, 2005, and on an

earlier occasion during a meeting that she requested with me concerning Corporate

Success Award Nominations, in the late November / early December 2003, time frame.

During that 2003 meeting, Bridges-Steely, unsolicited, informed me that someone at her

former agency had filed an EEO complaint against a woman for referring to them as

"Sweetie."  I am not aware of any of the current managers under Ms. Bridges-Steely

*that is*
*when I asked*
*her not to*
*call me*

-7-

*Declarant's Initials*

supervision use of terms of endearment, etc., because I only have a business/working

relationship with these managers. For the record, all of these managers are white. The

*not true*

only other manager that I frequently used terms of endearment with in ASB is someone

that I consider to be a friend -- and that person, Lynn Carr-Hawkes, Corporate Manager,

*I have never heard this*

CM-1102-1, has been deployed on active duty in the military since the Summer of 2004.

For the record, Ms. Carr-Hawkes is Black, and I have know her since 1992, when we

were co-workers at the RTC.

*because I asked her not to*

I do not use any terms of endearment with reference to or in addressing Ms. Bridges-

Steely as I have only a professional relationship with her. No one whom I have

addressed as "Sweetie" or any other term of endearment or friendship at the FDIC has

ever complained to me about my doing so or otherwise indicated to me, directly or

indirectly, that my doing so made him/her uncomfortable. If I had ever gotten wind of

*She did*

any such complaint or discomfort, I would have certainly apologized to the person

personally and discontinued my use of the any term of endearment with that person. I

was just brought up that way.


### Background Information --

On several occasions, in the past year and a half (the time frame maybe a little more than

a year and a half, actually), Ms. Bridges-Steely has made statements to me that have

made me very uncomfortable, caused me to be intimidated, and has effectively created

for me a hostile work environment within ASB. I believe that her calling me "Missy" on

-8-    Declarant's Initials

February 3, 2005, in front of Mr. Harris, was just another one of her attacks against me,
which I believe began during the Summer of 2003.  I also believe that her conduct is
motivated by and intent to discriminate against me because of my race and/or retaliate
against me for my prior EEO activity / participating in judicial proceeding covered by the
anti-discrimination statute Title VII of the Civil Rights Act, wherein, as noted, a jury in
the federal court found that the FDIC had discrimination against me based on my race
(Black/African American).


While it is true that Ms. Bridges- Steely was not employed with the FDIC at the time of
the above verdict (having came on board as the Associate Director of ASB in May 2003),
she has indicated an antipathy for me based on my prior EEO litigation.  In or about
November or December 2003, she informed me during meeting in her office concerning
Corporate Success Awards (CSA Nominations) that she had been informed about me and
my discrimination case before she accepted the job as Associate Director in May 2003.
During this meeting, Ms. Bridges-Steely also told me that the other ASB Managers did
not "feel comfortable" with me being in an upcoming meeting (which was scheduled to
be held approximately the following week) to discuss ASB staff CSA nominations.  She
stated that the other managers "felt" that I would tell staff members if they had been
nominated or not for a CSA.

*not true !*

I was appalled that Ms. Bridges-Steely would call me into her office for such a
discussion.  The first thing I asked her was if Mr. David K. McDermott (White),

-9-

Declarant's Initials

Assistant Director, ASB, was one of the managers who she claimed felt uncomfortable with me, because if so, I told her he had been one of the managers that was found to have discriminated against me by the U.S. District Court. It was this inquiry that led Ms. Bridges-Steely to tell me about the fact that she had been informed about my discrimination case prior to her accepting the ASB job -- but she never told me the name or names of the ASB Managers who she claimed felt uncomfortable with me.

*absolutely not true*

It is clear enough to me that Ms. Bridges-Steely is on a campaign to harass me and create a hostile work environment for me. All the evidence to me points to race and/or retaliation for my prior EEO case as the motive behind her inappropriate treatment of me.

I have read the foregoing statement, consisting of 10 pages (the first nine of which I have initialed and the last one I have signed), and I declare it under penalty of perjury to be true and complete to the best of my knowledge and belief. Any corrections that I have made have my initials next to the correction. This statement was made of my free will without any threat, promise of immunity or inducement. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of May 2005.

*Mary E. Bass*

MARY E. BASS

-10-

ADDENDUM TO AFFIDAVIT

District of Columbia  }


I, Mary Elizabeth Bass, Corporate Manager, CM-1102-1, employed at the Federal Deposit
Insurance Corporation (FDIC), hereby solemnly swear under penalty of perjury and make this
addendum to my affidavit in order to address certain additional factual inquiries of the EEO
investigator that were inadvertently omitted from my initial affidavit:


1.        As to why I claim that Ms. Bridges-Steely's reference to me as "Missy" was done in
retaliation for prior EEO activity, it is based on what she said to me as part of her relentless
attacks against me which began during the summer of 2003.  Although Ms. Bridges-Steely was
not employed with the FDIC at the time of the jury verdict finding for me in my race
discrimination suit against the FDIC (i.e., Bass v. Tanoue, Civil Action No. 00-115 DAR)," in
November / December 2003, she informed me in a most threatening manner during an unrelated

*not true* meeting in her office that she had been informed about me and my discrimination case even
before she accepted the job as Associate Director (which was in May 2003).


2.        With regard to the harm I suffered (and continue to suffer) as a result of Ms. Bridges-
Steely's attitude and statements to/against me, I am at pains to not that no human being can be
expected to continue to function productively under the type of hostile, uncomfortable and
intimidating circumstances that I am having been forced to endure in ASB under Ms. Bridges-
Steely.  As the top boss in ASB, my own first-level supervisor (Mr. Harris), reports directly to
her.  While I do not know for sure his real feelings, he acts as though he is afraid of her.  Indeed,

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

Page 1 of 6                                                                      Initials ___

00063

FROM :                     FAX NO. :4109976424            Jun. 06 2005 11:09AM P13

## ADDENDUM TO AFFIDAVIT

as of today, Mr. Harris has yet to discussed with me Ms. Bridges-Steely referring to me as

"Missy" in front of him on February 3, 2005.  Moreover, Ms. Bridges-Steely comes at me with

direct intimidation and harassment regarding issues that Mr. Harris has never even discussed

with me (*e.g.*, see ¶ 5 below).  In short, I have no support from my immediate supervisor, and I

am having to defend myself against a second-level superior who has limited knowledge of my

job performance, but an abundance of antipathy for me personally -- though without any rational

cause.  The consequence is that I am subjected to personal and professional humiliation by Ms.

Bridges-Steely on a regular basis as part of the hostile work environment she has created for me.

Also, due to Ms. Bridges-Steely's actions, my family is being harmed financially, because of the

amount of money that I am having to spend legally to fight for my rights and my job.  Most of

all, my family life is suffering, because of the amount of stress that I bring home daily as a result

of the hostile work environment in ASB.  All of the above constitutes harm and injury in my

book.

*I have seen called Missy by (3) while employee*

As to whether any other employees have been referred to as "Missy" by Ms. Bridges-

Steely, I have no knowledge whatsoever.  As far as I know, her racist comments in this regard is

unique to me -- which is why, coupled with her revelation that she was "put wise" to me and my

prior EEO case prior to accepting her job in ASB, that I believe that retaliation (in addition to

racial discrimination) is at the core of Ms. Bridges-Steely's motivation in creating the hostile

environment for me.

Bass v. Bair, No. 1:06-cv-01345-GK
Initials

FROM :    FAX NO. :4109976424    Jun. 06 2005 11:10AM  P14

## ADDENDUM TO AFFIDAVIT

4.    Other than my attendance at a mandatory EEO training course for FDIC supervisors in approximately February / March 2003 at Seidman Center in Arlington, Virginia -- which to my recollection covered the areas of preventing, reporting, and/or mitigating harassment on the job - - I have had no training on preventing, reporting, or mitigating harassment.

5.    On several occasions during the past year and a half to two years Ms. Bridges-Steely has made statements to me or taken actions which caused me discomfort, were intimidating, or otherwise caused me to suffer a hostile work environment.

a.    Indeed, her calling me "Missy" on February 3, 2005 in front of Mr. Harris was just one of her attacks against me. Her entire campaign seems to has started in the summer of 2003 -- just after she came to ASB (and just after she learned of my prior EEO activity -- which was resolved in my favor to the FDIC's embarrassment prior to her arrival in ASB or her employment with FDIC). As early as August / September 2003, Ms. Bridges-Steely directed a rather nasty-toned negative comment towards me in an ASB Managers' meeting, coldly stating in front of my colleagues that she did not need my "negativity" in reaction to a comment that I made concerning the pending re-organization of ASB that would be effective October1, 2003. Her statement in the meeting made me feel very uncomfortable and greatly intimidated me in front of my colleagues (the other managers), but I did not confronted her in the meeting in the presence of the other ASB managers in attendance (Rodney Cartwright, Lynn Carr-Hawkes, Harry Baker, Thomas Harris, Beverly Shuck, and David K. McDermott, were present in addition to Ms. Bridges-Steely and myself). Rather, I asked if I could speak with her in my office. Once there, I asked her not to embarrass me like that again in front of other individuals. I also asked

*[handwritten: is k other managers]*

*[handwritten: not true]*

Page 3 of 6

Bass v. Bair, No. 1:06-CV-01345-GK
Exhibit 10-P
Initials

## ADDENDUM TO AFFIDAVIT

her if the reason why she had responded to my comment concerning the then-pending ASB

reorganization so coldly in the meeting had anything to do with the fact that I had won

discrimination case against the FDIC and, in this connection, whether any of the ASB Managers

— specifically Mr. David K. McDermott (White), Assistant Director — had mentioned my case

to her. When she indicated that no one had mentioned my prior case to her, I took it at face

value (*i.e.*, I let this incident go) and proceeded to tell her that I wished the upcoming ASB

reorganization success and I would do everything possible to help make it successful. With this,

the meeting ended — without me knowing what had caused her public nastiness to me.

      b.     During late September or early October 2003, Ms. Bridges-Steely asked me to

meet with her in her office. With only the two of us present, she stated that she called me to the

meeting to discuss a rumors — that someone had told her that I made negative comments about

her. She refused to say who had told her such a thing. I reacted by saying her that I could not

believe she was calling me in her office to discuss rumors, and promptly I left her office. This

meeting lasted approximately five minutes. This entire affair made me feel very uncomfortable:

it was certainly intimidating coming from my new second-level supervisor, and it surely helped

create a hostile work environment for me. Nothing like this has ever happened with Mr. Harris,

my immediate supervisor. The message was clear: the "big boss" — who barely knows me — is

out too get me!   *False!*

      c.     A month or two later (in the November / December 2003 time frame), Ms.

Bridges-Steely informed me — again during meeting in her office with just the two of us were

present — that she had been was informed about me and my discrimination case even before she

accepted the job as Associate Director, ASB (in May 2003). This meeting had nothing to do

*not true*

*Not true!*

Page 4 of 6

Case 1:06-cv-01345-GK
Exhibit 10-1
Initials

00066

FROM :                    FAX NO. :4109976424              Jun. 06 2005 11:10AM P15

## ADDENDUM TO AFFIDAVIT

with this subject -- having been concerned with Corporate Success Awards (CSA) nominations.

Ms. Steely also used this occasion to allege that the other ASB managers did not "feel

comfortable" with me being in the upcoming meeting to discuss ASB staff CSA nominations

(which was scheduled to be held approximately a week later). She said that the "other

managers" felt that I would tell staff members if they had been nominated or not for a CSA.

Naturally, I was appalled that she would make such allegations from an anonymous source(s).

The first thing I asked her was if David K. McDermott was one of the managers who claimed to

feel uncomfortable with my presence at the upcoming CSA nominations meeting because, if so,

he was one of the managers whom the jury and judge had found had discriminated against me in

my law suit. This is the part of the conversation that seems to have led Ms. Bridges-Steely to tell

that she had been informed about my past discrimination case prior to coming to the ASB job.

In any case, she never told me the name or names of the ASB managers who allegedly felt

uncomfortable with me attending the ASB nominations meeting. This entire discussion left me

feeling very uncomfortable and intimidated. It seemed calculated to place me in a hostile work

environment, one in which, notwithstanding no discussions at any time on these subjects with

my immediate supervisor, the new "big boss" appeared to be really out to get me.

*[handwritten margin note: I spoke about her failure to participate]*

    d.    One other instance in which Ms. Bridges-Steely harassed me prior to her racial

slur against me on February 3, 2005, comes to mind. Less than a year ago, on or about August *June*

10, 2004, Ms. Bridges-Steely called me into her office (again, it was just the two of us in her

office) to tell me that she had heard a rumor that I had told someone that she had Lynn Carr-

Hawkes deployed with the military based on her own (Bridges-Steely's prior employment

Page 5 of 6

FROM :    FAX NO. :4109976424    Jun. 06 2005 11:11AM P17

## ADDENDUM TO AFFIDAVIT

connection with the Defense Department. This was of course a complete fabrication and I immediately told her so and that I could not believe she had called me into her office for such nonsense. Although this little confrontation lasted only a few minutes, it left me feeling very uncomfortable and intimidated -- given what had gone on previously.

Certainly, my work environment was by this point hostile due to Ms. Bridges-Steely's actions and attitudes. I started telling myself that I could not keep putting up with these type assaults from Ms. Bridges-Steely, and continue to be a productive employee of the FDIC. With this as a backdrop, on February 3, 2005, I decided to stand-up for my rights by contacting EEO when Ms. Bridges-Steely referred to me as "Missy." It was the final straw, but it was not the first incident in her campaign of harassment and intimidation.

I have read the foregoing statement, consisting of __6__ pages, each of which I have initialed, and it is true and complete to the best of my knowledge and belief. Any corrections that I have made have my initials next to the correction. This statement was made of my free will without any threat, promise of immunity or inducement. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 31st day of May 2005.

_Mary E. Bass_

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00068

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Bass, Mary E. |
| **Sent:** | Wednesday, August 20, 2003 2:16 PM |
| **To:** | Harris, Thomas D. |
| **Cc:** | Steely, Ann Bridges |
| **Subject:** | Reorganization to Corp Contracting |

Good Afternoon Tom,

I want to "Thank You" for taking the time out of your busy schedule too meet with me on yesterday (8/19/03). This will be my first time working under your supervision, and I know this teaming will be a success.

In addition, I would like to again "Thank You" for granting my request to work as the "Chief over the Driver Division's Unit", within the Corporate Contracting Section. Even though there may be a potential conflict, if I personally handle contracts out of Mr. Rubino's area, I will gladly, avail my staff in anyway to assist the DOA Contracting Unit with work. **I am going to do everything within my power to help make "ASB's Reorganization" successful.**

As Chairman Powell stated in our "All Hands" meeting on yesterday (8/19/03), we are "Stewards of the FDIC." I am going to end on this note: **"Each person is a steward before God over the resources, including his intellectual and labor skills, under his authority... He bears the cost of his decisions." (Matthew 25:20-23); and we are obligated to use FDIC's resources wisely.**

Thanks. MB

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**00069**

## Steely, Ann Bridges

**From:**    Steely, Ann Bridges
**Sent:**    Monday, November 24, 2003 10:14 AM
**To:**    Bass, Mary E.
**Subject:** FW: More Feedback

Mary – I've heard from everyone except you about this. Could you please let me know what you think? If you have other ideas about how to deal with this, please let me know.
Thanks.

abs

**Ann Bridges Steely**
Associate Director
Acquisition Services
202-942-3010

-----Original Message-----
**From:** Steely, Ann Bridges
**Sent:** Thursday, November 13, 2003 5:36 PM
**To:** Steely, Ann Bridges; Shuck, Beverly J.; Baker, Harry D.; Bass, Mary E.; Carr-Hawkes, E. Lynn; Cartwright, Rodney C.; Harris, Thomas D.; McDermott, Dave
**Subject:** RE: More Feedback

I have only heard from a couple of you on this. If you haven't already done so, please let me know how you feel about using this approach.
Thanks.

abs

**Ann Bridges Steely**
Associate Director
Acquisition Services
202-942-3010

-----Original Message-----
**From:** Steely, Ann Bridges
**Sent:** Thursday, November 06, 2003 11:25 AM
**To:** Shuck, Beverly J.; Baker, Harry D.; Bass, Mary E.; Carr-Hawkes, E. Lynn; Cartwright, Rodney C.; Harris, Thomas D.; McDermott, Dave
**Subject:** FW: More Feedback

After the 360 session on Tues, Fil and discussed the staff reaction to the information. I am concerned, and she agrees, that many of the people would like a little more insight into how each of us did. She proposed the following approach for our consideration. I would be very interested to know how each of would feel about doing this with your people. Please mull this over and let me know what you think by COB next Wed. You do not have to share your response with the whole group – just let me know how you would feel about doing this.
Thanks very much.

abs

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**00070**

**Ann Bridges Steely**
Associate Director
Acquisition Services
202-942-3010

-----Original Message-----
**From:** Filomena Warihay [mailto:fwarihay@takechargeinc.com]
**Sent:** Tuesday, November 04, 2003 4:28 PM
**To:** Steely, Ann Bridges
**Cc:** Rosaria Hawkins
**Subject:** RE: More Feedback

Here is the ideal approach and one that would rebuild staff confidence and challenge the leadership team to act responsibly. The approach outlined below would make a huge difference and contribute to **rebuilding trust**. Each manger meets with h/h direct reports and does/says the following: :

Thank you for taking the time and interest to complete the survey

I know the overall survey results looked better than most people would have anticipated and that may have been
due to some managers being rated higher. However, I want you to see how I was rated.

Here are the five top rated competencies and the ratings you gave me...

Here are the five lowest rated competencies and the ratings you gave me.

I value your feedback and intend to work on improving across the board. However, I've started with three actions that I believe will make the most positive impact. The three things I intend to do differently in interacting with you are...(These things should be specific, observable actions)

There may be things that are more important to you. I want to know what they are as well. So, I'll leave the room and give you 30 minutes to discuss the two or three most important additional things I can do so you can do the best job possible. When I come back, I would like to hear them and I'll respond.

Upon returning, the manager reviews the requests and identifies what h/s can or cannot do.

Close with a commitment to the planned actions (as well as a commitment to continuing to work on all areas) and by thanking the team for their help

The approach outlined above does several things: It sends the message to all that the "books are open." It removes the perceived threat of retribution. It sends the message that the managers trust their direct reports (for some it will be difficult to be in such a vulnerable position). It enables each manager to tailor h/h actions to what is needed most in the unit. The sessions can be facilitated or the managers can conduct them on their own. The KEY TO SUCCESS is being completely non-defensive and actually doing whatever is promised. I would be happy to help prepare the managers and/or facilitate the sessions.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 16-1

**00071**

Let me know what you would like me to do, Ann.    I'm eager and able to help in any way that you think best.  Fil

-----Original Message-----
**From:** Steely, Ann Bridges [mailto:ASteely@FDIC.gov]
**Sent:** Tuesday, November 04, 2003 3:40 PM
**To:** 'fwarihay@takechargeinc.com'
**Subject:** More Feedback

Since you left earlier, I've had several people tell me they thought the survey results were too low. I've been trying to think about how we could slice the data to be a little more revealing to the staff without compromising the confidentiality of the data for the individual supervisors.  One option is the one we discussed - pull my data out.  I'm new, so by pulling my information out we could get a picture of how the staff sees the "old" management team.  Another option is to combine the data for Dave, Tom and Rodney in one group (that would should the view of the assistant director group) and then combine the data for Harry, Mary, Lynn, and Bev (that would should the view of the first line supervisors).  I think this second option could be very revealing to the staff and give them a little more confidence in the survey.  One person told me their workgroup saw the scores as being too low and saw that as a trust issue (we must have manipulated the data to make us look good).

What do you think?

Thanks again for your help and your feedback.

abs

**Ann Bridges Steely**

Associate Director

Acquisition Services

202-942-3010

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00072

6/13/2005

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Bass, Mary E. |
| **Sent:** | Thursday, January 15, 2004 6:18 PM |
| **To:** | Steely, Ann Bridges |
| **Subject:** | FW: Leadership Luncheon |

Good Evening Ms. Steely,

We are both working late!!

I think that the luncheon is a very good idea. I heard a lot
of positive input from the staff concerning the 360 sessions
held on yesterday. The main thing is we have to keep pushing
forward in a positive direction together, taking the "bitter" with
the "sweet", as we move along on our journey together here in
ASB.

I like the idea of ordering a sandwich platter for conference room
4092, for our meeting on 2/4/04. Thanks. MB  (23243)

"HAVE A GREAT EVENING"

-----Original Message-----
**From:** Steely, Ann Bridges
**Sent:** Thursday, January 15, 2004 5:56 PM
**To:** Bass, Mary E.
**Subject:** RE: Leadership Luncheon

Mary – What is your input about lunch?

abs

**Ann Bridges Steely**
Associate Director
Acquisition Services
202-942-3010

> -----Original Appointment-----
> **From:** Bass, Mary E.
> **Sent:** Thursday, January 15, 2004 5:56 PM
> **To:** Steely, Ann Bridges
> **Subject:** Accepted: Leadership Luncheon
> **When:** Wednesday, February 04, 2004 12:00 PM-2:00 PM (GMT-05:00) Eastern Time (US & Canada).
> **Where:** TBD

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Wednesday, February 25, 2004 9:52 PM |
| **To:** | Bass, Mary E. |
| **Subject:** | Feedback |

Mary, I wanted to tell you that several people have commented to me they noticed how hard you have been working lately. Someone used the phrase that you are "really stepping up to the challenge of the new job". I just thouht you would like to know that.
abs

Ann Bridges Steely
Associate Director
Acquisition Services

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00074

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Saturday, March 13, 2004 10:46 AM |
| **To:** | DOA Contracts DC |
| **Subject:** | ASB Off-Site |

Over the past 10 months or so, we have made a lot of progress as a team. We conducted the team assessment last June and had an off-site at VASQ to review the results. That assessment provided us with good insights into the issues we are facing as a group. Later in the summer, we all went through the Myers-Briggs inventory and spent a day learning more about ourselves and our co-workers as unique individuals. In the fall, we used the OPM 360 Survey to obtain feedback about the ASB leadership team and how you think we are doing. Individual 360 sessions with each supervisor were held in January. As a result of the team survey last summer and the 360 feedback last fall, the ASB leadership team participated in a day of Conflict Resolution training in February.

Working through these issues is hard work and I commend the leadership team and the entire ASB staff for dedicating the energy needed to make improvements in the branch. With all of the great work we have done so far, I think we are ready for the next step – our two-day team building off-site. We are currently making arrangements to hold the session on April 14 and 15 at VASQ. Takecharge Consultants (Fil Warihay) will serve as our facilitators for this important endeavor. In general, the objectives for the session are:

> ➢ Agreement about the qualities that contribute to a great ASB
> ➢ Consensus on the three to five most important actions to move toward ASB greatness and accompanying action plans and measures
> ➢ Ability to resolve conflict in positive, productive ways
> ➢ Enhanced communication, cooperation and collaboration among and between ASB team members

Please mark these dates on your calendar. Start thinking about how we can make these days highly productive for the group and think about what you can do to contribute to the success of the activities. These will be days that we can work hard and play hard together and I look forward to us having lots of fun while we continue to build a great future for ASB.

We have been through a great deal of change during the past 10 months, and the changes have presented personal and professional challenges for all of us. I truly appreciate the hard work everyone does and everyone's dedication to doing a good job for FDIC and ASB.

We'll provide more details about the arrangements for the off-site as the plans are firmed up. If you have any suggestions or ideas, please don't hesitate to pass them along.

abs

**Ann Bridges Steely**
Associate Director
Acquisition Services
202-942-3010

**Federal Deposit Insurance Corporation**
3501 N. Fairfax Drive (Room 801-1232), Arlington, VA 22226-3500                    Office of Diversity and Economic Opportunity

## NOTICE OF AUTHORIZATION

Johnie McCoy, an investigator with the firm of US Investigations Services, is hereby authorized to conduct an investigation of all aspects of the following claim in the complaint of employment discrimination filed against the Federal Deposit Insurance Corporation by Mary Bass in complaint FDICEO-050030.

### ACCEPTED CLAIM

Whether Complainant was discriminated against based on her race (Black) and due to reprisal (prior EEO activity) and whether she was the victim of harassment (non-sexual) when:

1. during a meeting on February 3, 2005, Ann Bridges-Steely, Complainant's second-level supervisor, referred to Complainant by calling her "Missy." This was done in front of her first-level supervisor.[1]

In connection with the investigation of the above stated claim(s), Ms. McCoy is hereby authorized to:

(1)    require all employees of the Corporation to cooperate in the investigation;

(2)    require all Corporation employees having any knowledge of the alleged matters to furnish testimony under oath or affirmation without a pledge of confidentiality; and,

(3)    review and/or obtain a copy of employment records and documents relevant to the accepted issues.

_____            _____
for  Amy L. Del Valle                                          Date 4/6/05
Oversight Manager
Complaints Processing Branch

cc:    David H. Shapiro, Esquire (Complainant's representative)
       Mary Bass (Complainant)
       Paul Sherman, Assistant Director, Division of Administration
       Leonard J. Levy, Senior EEO Specialist, Complaints Processing Branch, ODEO
       Stephanie Gordon, EEO Specialist, Complaints Processing Branch, ODEO

_____

[1] The Investigator was also instructed to gather background information on whether prior statements were made which made Complainant uncomfortable, intimidated her and created a hostile work environment for her.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00076

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Ballina, Jill A. |
| **Sent:** | Tuesday, February 15, 2005 4:19 PM |
| **To:** | Steely, Ann Bridges |
| **Subject:** | Messages |

Dee Lee - wants you to call her -said you had the number.
Cindy Riley 205-822-4025 - working under a tight deadline with her story...wanted to know if you received her e-mail.

Greg Cofer called 6-4482 - talked at great length about problems he is having with Joan G. Problem with dropped option period , invoices that did not get paid, contract extensions that did not get handled in time......much praise for Tom as he seems to always be drawn in at the 11th hour to fix the problems. Has sent e-mails to here supervisor to no avail - has yet to return one from earlier this year and he went on and on. Have more particulars, but it doesn't' get any better. Said he hated to make the call, and in the light of what's happeing (the downsizing) maybe there's nothing to be done. I told him I would relay the message to you.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**Steely, Ann Bridges**

**From:**       Steely, Ann Bridges
**Sent:**        Wednesday, February 02, 2005 11:28 AM
**To:**          Harris, Thomas D.; Bass, Mary E.
**Subject:**    DIR Requirements

**Importance:**   High

Tom and Mary, I received a call from Andrea Woolford yesterday expressing concern and frustration about her dealings with ASB during the past year. I spoke with her this morning about 2 specific requirements that we are working on right now. She says that Joan committed to have these on contract no later than Jan 1, but the contracts still have not been awarded. One requirement is for services from Jane Lewin for editing services (total value -$45k) for the CFR working papers and the other is for Anthony Sanders who serves as the CFR program coordinator (total value - $50k). Dr Sanders has expressed concern to her that he is operating without a contract with current rates, etc. I would like for you to get the facts together on these 2 specific cases, including a firm commitment on when the contracts will be awarded, and come see me – just the 2 of you. I would prefer to discuss this later this afternoon before we leave for the day, but we can meet tomorrow morning if absolutely necessary. After we discuss these specific cases, I want to discuss my concern about customer support, in general.

abs

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(202)942-3010**

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Cofer, Greg |
| **Sent:** | Tuesday, February 22, 2005 2:55 PM |
| **To:** | Gustafson, Joan L.; Bass, Mary E. |
| **Cc:** | Harris, Thomas D.; Fludd, Velda; Hudgins, Joyce L.; Steely, Ann Bridges; Elcan, Robert P.; Jones, Margaret A. |
| **Subject:** | Alderson Reporting and Professional Interpreters Exchange Invoices |

I have received calls from two vendors, Alderson Reporting and Professional Interpreters Exchange, regarding unpaid invoices. Alderson, our CART service provider, tells me they are owed for invoices dating back to August 2004, for work that dates back to July 2004. A list of those unpaid invoices is detailed below. PIE is inquiring about their most recent invoices, which would be for December and January. These also are detailed below.

My PIE contact tells me that they have made several requests for a copy of the actual PO/contract, but do not believe their office has received one. Contract number 02-00534_C_LX was originally awarded January 30, 2003. The most recent modification was January 1, 2005. They did receive a copy of the Modification dated January 1, 2005, via e-mail, but it does not detail the invoicing procedures, which I suspect may have changed from the original issue date.

Finally, in previous meetings in the Spring of 2004 with Mary Bass and the other contracting staff, Velda and I requested copies of both these PO/contracts. Since I am unable to locate copies, I can only conclude that they were never sent over. We really need copies of these active PO/contracts, as do the vendors.

In my discussions with both firms it appears there is ongoing confusion regarding where to send the invoices and how they are to be presented. Here is what I think I need:

(1)      Copies of each Purchase Order or contract, including modifications for our files, which should include accurate information on invoicing procedures and a POC for outstanding issues.
(2)      Copies of the PO/contracts need to be sent to the vendors with clear directions as to the proper invoicing procedures
          For PIE Attn: Patti [patti@pieinc.com]
          For Alderson: Attn: Rob Deziel [rob@aldersonreporting.com]
(3)      Verify if there are invoices received by the agency that have not been paid

Your attention to this ongoing difficulty would be sincerely appreciated. If there is something ODEO is not doing, please let me know and I will take care of it. If there is an issue that the vendor is creating, please let me know and ODEO and DOA will attempt to resolve it. I am attaching a series of e-mails regarding the Alderson Reporting Contract which might assist in resolving the matter.

As you can tell, our frustration over the process of administering these two contracts continues. This is the third year that we have dealt with the same or similar issues. Each time we go through these trying experiences, we expect the issues to be resolved and for things to proceed without disruption. However, this does not seem to be the case.

Any assistance you can provide to assure these issues are satisfactorily resolved would be appreciated.

Greg Cofer

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00079



RE: Alderson
Reporting Contrac...

Professional Interpreter Exchange Invoices (02-00534-C-LX):

| 12/31/2004 | $3,395.00 |
| 01/31/2005 | $3,739.00 |

Alderson Reporting  (03-001-00-C-LX-001-05)

| 8/6/2004 | 600.00 |
| | 1,100.00 |
| | 975.00 |
| 8/8/2004 | 375.00 |
| 8/24/2004 | 475.00 |
| 9/7/2004 | 850.00 |
| | 475.00 |
| | 412.50 |
| | 350.00 |
| 9/9/2004 | 475.00 |
| 10/25/2004 | 3,525.00 |
| | 2,562.50 |
| 11/2/2004 | 825.00 |
| 12/8/2004 | 2,625.00 |
| 1/5/2005 | 1,900.00 |

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

## Steely, Ann Bridges

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Tuesday, March 01, 2005 5:26 PM |
| **To:** | Bass, Mary E. |
| **Cc:** | Harris, Thomas D. |
| **Subject:** | FW: Alderson Reporting and Professional Interpreters Exchange Invoices |



RE: Alderson
Reporting Contrac...

         Mary, can you please tell me when you plan to respond to this client?
Thanks.

abs

Ann Bridges Steely
Associate Director
Acquisition Services
(202)942-3010


-----Original Message-----
From: Steely, Ann Bridges
Sent: Tuesday, February 22, 2005 7:05 PM
To: Bass, Mary E.; Gustafson, Joan L.
Cc: Harris, Thomas D.
Subject: Fw: Alderson Reporting and Professional Interpreters Exchange Invoices

Mary and Joan - Please copy me on your reply to Greg.
Thanks.
abs

Ann Bridges Steely
Associate Director
Acquisition Services


-----Original Message-----
From: Cofer, Greg <JCofer@FDIC.gov>
To: Gustafson, Joan L. <JGustafson@FDIC.gov>; Bass, Mary E. <MBass@FDIC.gov>
CC: Harris, Thomas D. <THarris@FDIC.gov>; Fludd, Velda <VFludd@FDIC.gov>; Hudgins, Joyce
L. <JHudgins@FDIC.gov>; Steely, Ann Bridges <ASteely@FDIC.gov>; Elcan, Robert P.
<RElcan@FDIC.gov>; Jones, Margaret A. <MarJones@FDIC.gov>
Sent: Tue Feb 22 14:54:35 2005
Subject: Alderson Reporting and Professional Interpreters Exchange Invoices

I have received calls from two vendors, Alderson Reporting and Professional Interpreters
Exchange, regarding unpaid invoices.  Alderson, our CART service provider, tells me they
are owed for invoices dating back to August 2004, for work that dates back to July 2004.
A list of those unpaid invoices is detailed below.  PIE is inquiring about their most
recent invoices, which would be for December and January.  These also are detailed below.

My PIE contact tells me that they have made several requests for a copy of the actual
PO/contract, but do not believe their office has received one.  Contract number 02-00534
_C_LX was originally awarded January 30, 2003.  The most recent modification was January
1, 2005.  They did receive a copy of the Modification dated January 1, 2005, via e-mail,
but it does not detail the invoicing procedures, which I suspect may have changed from the
original issue date.

Finally, in previous meetings in the Spring of 2004 with Mary Bass  and the other
contracting staff, Velda and I requested copies of both these PO/contracts.  Since I am

Bass v. Bair, No. 1:06-cv-01345-GK

Exhibit 10-1

00081

unable to locate copies, I can only conclude that they were never sent over. We really need copies of these active PO/contracts, as do the vendors.

In my discussions with both firms it appears there is ongoing confusion regarding where to send the invoices and how they are to be presented.  Here is what I think I need:

(1)    Copies of each Purchase Order or contract, including modifications  for our files, which should include accurate information on invoicing procedures and a POC for outstanding issues.
(2)    Copies of the PO/contracts need to be sent to the vendors with clear directions as to the proper invoicing procedures
            For PIE  Attn: Patti [patti@pieinc.com]
            For Alderson:  Attn: Rob  Deziel  [rob@aldersonreporting.com]
(3)    Verify if there are invoices received by the agency that have not been paid

Your attention to this ongoing difficulty would be sincerely appreciated.  If there is something ODEO is not doing, please let me know and I will take care of it. If there is an issue that the vendor is creating, please let me know and ODEO and DOA will attempt to resolve it.  I am attaching a series of e-mails regarding the Alderson Reporting Contract which might assist in resolving the matter.

As you can tell, our frustration over the process of administering these two contracts continues.  This is the third year that we have dealt with the same or similar issues. Each time we go through these trying experiences, we expect the issues to be resolved and for things to proceed without disruption.  However, this does not seem to be the case.

Any assistance you can provide to assure these issues are satisfactorily resolved would be appreciated.

Greg Cofer


  <<RE: Alderson Reporting Contract>>


Professional Interpreter Exchange Invoices (02-00534-C-LX):

12/31/2004  $3,395.00
01/31/2005  $3,739.00


Alderson Reporting  (03-001-00-C-LX-001-05)

| Date | Amount | |
|------|--------|--|
| 8/6/2004 | 600.00 | |
| | 1,100.00 | |
| | 975.00 | |
| 8/8/2004 | 375.00 | |
| 8/24/2004 | 475.00 | |
| 9/7/2004 | 850.00 | |
| | 475.00 | |
| | 412.50 | |
| | 350.00 | |
| 9/9/2004 | 475.00 | |
| 10/25/2004 | 3,525.00 | |
| | 2,562.50 | |
| 11/2/2004 | | 825.00 |
| 12/8/2004 | 2,625.00 | |
| 1/5/2005 | 1,900.00 | |

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00082

## Steely, Ann Bridges

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Monday, March 01, 2004 11:40 AM |
| **To:** | Weatherly, Deena J.; Baker, Harry D.; Bass, Mary E.; Benavides, Michael; Carr-Hawkes, E. Lynn; Cartwright, Rodney C.; Harris, Thomas D.; McDermott, Dave; Shuck, Beverly J. |
| **Subject:** | CSA Discussions |

We all knew that there would be a lot of discussion among the personnel once the CSAs were announced. That announcement has now been made. Please remember that the discussions we had concerning the CSA nominations were to be held in strict confidence. Also remember that the official process does not allow you to discuss individual nominations or discuss decisions not to nominate someone. I have already heard about one employee who asserts they were told things that were said in our management meetings. Each of us has a responsibility to maintain the trust of confidentiality that was established in those meetings.

I am very proud of the good conversations we had in those meetings and I am comfortable we made tough, but good decisions for the branch. Please be sensitive to the fact that ASB personnel will want to get as much information about this process as possible – that is only human. I hold each of you responsible for keeping the confidentiality of those meetings in tact.

If you have had any situations come up that have made you uncomfortable or that we should discuss, please let me know. Thanks.

abs

**Ann Bridges Steely**
Associate Director
Acquisition Services
202-942-3010

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**00083**

1

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Monday, February 23, 2004 3:05 PM |
| **To:** | 'Warihay Fil'; Weatherly, Deena J.; Baker, Harry D.; Bass, Mary E.; Benavides, Michael; Carr-Hawkes, E. Lynn; Cartwright, Rodney C.; Harris, Thomas D.; McDermott, Dave; Shuck, Beverly J. |
| **Subject:** | Conflict Management Training |

I want to thank all of you for the very positive session on Fri. The message from the ASB staff has been loud and clear – management must do a better job of managing all types of conflict in the branch. The first step in addressing the problem was for us to acknowledge that the problem exists – we did that with our group and individual 360 sessions. The second step was for us to take action in developing our conflict management skills. I feel very strongly that Fri got us through that important second step. Now the real challenge that faces each of us as individuals and as a team is focusing on dealing with conflict when we see it in the branch. It is good to know that we are all in this together and that we can count on each other for support. I hope you also know that you can count on me for support when you need it.

I want to give a special thanks to Fil. I did the best I could to pull Fil off track with some of our specific situations, but she just hung right in there! Great work, Fil!

As always, I know that you had a lot of work at your desks and I really appreciate you taking the time to participate in these important leadership activities. Thanks for your great work and wonderful support.

abs

**Ann Bridges Steely**
Associate Director
Acquisition Services
202-942-3010

## Steely, Ann Bridges

| | |
|---|---|
| **Subject:** | Leadership Discussion - CSA Process |
| **Location:** | 4092 |
| **Start:** | Wed 12/3/2003 1:30 PM |
| **End:** | Wed 12/3/2003 4:30 PM |
| **Show Time As:** | Tentative |
| **Recurrence:** | (none) |
| **Meeting Status:** | Not yet responded |
| **Required Attendees:** | Steely, Ann Bridges; McDermott, Dave (DMcDermott@FDIC.gov); Cartwright, Rodney C. (RCartwright@FDIC.gov); Harris, Thomas D. (THarris@FDIC.gov); Baker, Harry D. (HBaker@FDIC.gov); Bass, Mary E. (MBass@FDIC.gov); Shuck, Beverly J.; Carr-Hawkes, E. Lynn (ECarr-Hawkes@FDIC.gov) |

I think it is important that we meet to begin the discussion of how we will deal with CSA nominations within ASB. This is a very important topic for us and for all the employees of ASB, so we want to make sure we implement the process fairly and smartly. If you have a conflict on this date, please adjust your schedule so we can all be together.

Before the meeting, please review the procedures for the CSAs. Also, start thinking about who you think you will nominate. You can consider anyone you have supervised during this year. Please come prepared to discuss who you might nominate and to discuss the rationale for that person's contributions. You must relate your input to the CSA criteria. If you think you will nominate more than one person, please also be prepared to discuss who is your top candidate, who is next, etc. We will not be able to nominate everyone, so it will be very important to have enough information for us to fairly decide who the ASB nominees should be.

We'll also talk about how the nominations should be formatted so we will have a common understanding of how the actual process of writing the nominations will work.

The evaluation period for this recognition runs through the end of Dec, and nothing that we discuss in this meeting will represent a final decision on nominations. All ASB employees will be given an opportunity to provide input for consideration and there is certainly a lot of work that will b accomplished in this branch before the end of the year. I just think it is very important that this leadership team has a common frame of reference for the issues as we work through this process. Because this is preliminary work for this process, you are not to discuss what you prepare for the meeting or anything that will be discussed that day with anyone in the bargaining unit.

If you have any questions before the meeting, please let know so I can do any research that might be required.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00085

## Steely, Ann Bridges

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Wednesday, August 06, 2003 5:46 PM |
| **To:** | Shuck, Beverly J.; Baker, Harry D.; Bass, Mary E.; Carr-Hawkes, E. Lynn; Cartwright, Rodney C.; Harris, Thomas D.; McDermott, Dave |
| **Subject:** | Thanks! |

I want to thank each of you for participating in the Leadership Lunch today. I know it may seem like a small step, but I think the meeting was an important first step for us as a team. Your feedback as to how we can make this type of meeting more productive and meaningful for you would be very much appreciated. How frequently should we do this type of thing? What should the setting be? Etc? Etc?

We will schedule the 360 feedback for you very soon. That will be an important step in identifying areas in which you individually may need more training or focus. It will also help you identify the strengths you bring to the table so that you can continue to build on those. I'll also take the task to bring in a short seminar on Conflict Resolution that we can take as a team.

Thanks again for a good meeting. The discussion was very helpful for me.
abs

**Ann Bridges Steely**
Associate Director
Acquisition Services
202-942-3010

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**00086**

1

**Steely, Ann Bridges**

| | |
|---|---|
| From: | Steely, Ann Bridges |
| Sent: | Sunday, April 25, 2004 12:50 PM |
| To: | DOA Contracts DC |
| Cc: | 'rtaraschi@takechargeinc.com'; 'Warihay Fil (fwarihay@takechargeinc.com)' |
| Subject: | Thank You |

I want to take one more opportunity to thank all of you for the great participation and honest discussion during our off site last week. The night our session concluded, I was reflecting on everything that happened during those two days and I was struck by a sense of real progress. We have really worked hard during the past year, and it shows!

After my arrival at FDIC, we had our first ASB All Hands Lunch on May 20, 2003 – not even one year ago. As a result of that session, I received lots of candid feedback about was good about ASB (there was lots!) and about what needed work (there was lots!). During June, we completed the Team Readiness Survey, and on July 9, we spent half a day at VASQ where Bruce McCormick facilitated our review of the results. This process confirmed we had significant challenges, particularly in the areas of trust (which received the lowest overall score), communications, dealing with conflict, and with individuals not making the goals of the group a priority. Those results showed we really had our work cut out for us! On Aug 26, we held an introductory session on the Myers-Briggs inventory, and Becky Choi set the stage for how the Myers-Briggs could provide us good information about how to work together more effectively. We spent a full day at VASQ on Sep 10 studying the results of our individual Myers-Briggs and going through exercises aimed at helping us understand how our individual differences impact the team dynamics. Our next big investment was in the 360 feedback for the ASB management team. Fil and Ria kicked-off that activity on Sep 5 before you all completed the feedback surveys. When the survey results were completed, the managers spent most of the day on Oct 8 with Fil and Ria. They walked the management team through the importance of the feedback for the management team and helped us understand what messages were being conveyed in survey results. The next day, the team met with Becky Choi again to link in the 360 feedback with what we had previously learned from the Myers-Briggs results. On Nov 4, Fil presented the 360 results to the entire ASB group. I think it's fair to say the results were received with skepticism by most people in ASB. After much discussion with the OPM staff responsible for the 360 survey and FDIC facilitators, ASB's managers volunteered to reveal more of their own specific survey feedback. The entire branch invested a lot of time in that process on Jan 13 and 14. On Feb 20, the ASB management team spent half a day with Fil as she provided conflict management training for us. And then on April 14 and 15, the entire ASB team spent 2 full days at VASQ building our team, learning how to resolve conflict within our team, and setting important, big, hairy, audacious goals for the future of ASB. Wow!! We have really put a lot of time and energy into making ASB a better organization! This has been hard work!

In additional to all of that work, we have continued to have monthly All Hands meetings. Those meeting are intended to improve communication about what is going on in the corporation and across ASB. So far, we've had the Chairman, the COO, the CFO, Arleas and the Director of Insurance and Research speak with us and share their perspectives about what is going on in FDIC and how ASB fits into the overall success of the corporation. We've encouraged each section to share information about what is going in each section and encouraged everyone to participate in those discussions (not just the section chiefs). We've used those All Hands meetings to share the many compliments and awards that ASB personnel have received and we've discussed the on-going status of ASB personnel actions.

The ASB Recognition Council was launched on Jan 1. In addition to tackling the tough job of recognizing their peers for the good work they do, the Council has spearheaded some really fun activities that have provided the opportunity for us to enjoy some good food and lots of laughs together.

Case 1:06-cv-01345-GK
Exhibit 10-1

Oh, yeah.  And in the middle of all of this hard work, we completely reorganized ASB to more equitable align the workload and to give everyone a more balanced share of work.  Every manager got a new job and about half of the non-managers were assigned to new workloads. Lots of change – lots of stress!

In the meantime, the demands of our clients have continued, and even escalated in many cases. You have stepped up and continued to support FDIC even in the most challenges of circumstances.

The bottom line is this – During our off-site, we identified problems that still require a lot of work if we are going to make ASB the best possible contract operation it can be and we identified some rather daunting goals to help us get to where we want to be.  As we look down the road and see those challenges and feel the pressure of achieving our goals, I want each of you to take pride in what we have been able to achieve together during the past year.  Do we still have a long way to go?  Yes.  But we should never lose sight of just how far we have come.

Thank you all for your continued hard work and dedication to FDIC and ASB.

abs

**Ann Bridges Steely**
Associate Director
Acquisition Services
202-942-3010

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

May 17, 2005

I met briefly w/ Mary Bass to discuss Chuck Besson's proposed delayed departure. Tom Harris sat in. Mtg lasted only about 10 minutes. Gave Mary the attached copy of relevant guidance. She said she didn't have that information – I pointed out it came via Globals, FMCNet, etc. Emphasized that mgt must assess workload needs to support delayed departure. Chuck did not have a right to request it or w/draw the proposal. Pointed out that responsibilities as mgrs frequently require us to make decisions contrary to employee desires. Used the example of all employees wanting leave on one day – she couldn't support doing that. Said we try to be sensitive to employee "wants" but final decisions must be based on org needs. She thanked me for clarifying the issue, said she did not understand that to be the case. It was a very pleasant, brief mtg.

Bass v. Ball, No. 1:06-cv-01345-GK
Exhibit 10-1

**Federal Deposit Insurance Corporation**

Ann Bridges Steely
Associate Director
Acquisition Services

- part of mgt & want you to feel part of mgt team

- your msg came across that you might not fully understand your mgt role in this situation

- Chuck didn't have a right to request extension unless he needed 6 mos for retirement annuity —

- delayed departure based on workload requires a mgt assessment; Chuck did not have a right to participate in our mgt assessment

- many mgt issues require your assessment of the situation which may be different from employee desires/wishes/needs

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**From:**      Bovenzi, John F.
**Sent:**      Tuesday, October 26, 2004 3:08 PM
**To:**        FDIC EMPLOYEES CORPORATE
**Subject:**   Workforce Planning

MEMORANDUM TO:      All FDIC Employees

FROM:               John F. Bovenzi
                    Deputy to the Chairman and Chief Operating Officer

SUBJECT:            Buyout Program and Reductions-in-Force

This is the third in a series of communications about workforce planning for the future. In my August 6th message, I set forth several factors that will influence the Corporation's future business model and workforce profile. These factors, which include continued industry consolidation and improved efficiencies within the FDIC primarily through the use of technology, support the conclusion that the FDIC will need to become a smaller agency.

To assess the implications of this conclusion, each division and office was asked to determine if their organizational focus and workforce composition is properly aligned with the current workload and the evolving corporate vision. These analyses have been largely completed, reviewed, discussed with, and accepted by senior management. They fall into two groups.

The first group includes divisions where staffing levels are not justified by current or projected workloads. These divisions are planning for substantial reductions in their workforces. DRR, DIRM, DOA, Legal, and DOF are included in this group. Buyouts are going to be offered to most employees in these divisions. Nevertheless, it appears likely that the necessary staffing reductions in these divisions cannot be accomplished entirely through voluntary departures. Accordingly, we have begun active planning for RIFs in DRR and DIRM in the third quarter of 2005, and in DOA, Legal, and DOF in 2006.

The second group includes the remaining divisions and all of the offices. Staffing levels in these organizations are for the most part justified by current workload. As a result, in DSC, DIR, and the offices, there will be a more limited buyout program. There will not be a RIF in these organizations.

Corporate-wide we estimate a reduction of between 500 to 600 positions from our current on-board workforce of nearly 5,300. These reductions will occur by year-end 2006, with most of the reductions occurring by year-end 2005.

The approved buyout program has the following general parameters:

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

- A buyout period that will be open from early November 2004 to mid-May 2005 (Eligible DSC employees must submit their buyout applications by December 13, 2004, and leave the Corporation by December 31, 2004);
- A cash payment equal to 50% of total salary;
- Supplemental incentives including, but not limited to, exemption from obligations to repay certain relocation costs and an option to take the buyout as a lump sum or in installments;
- The ability to combine the buyout with either regular or early retirement;
- Employees who accept buyouts would be required to repay the gross amount of the buyout payment if they are re-employed or contract directly with the FDIC within five years following separation (except in exigent circumstances); and
- Management discretion to delay the departures of selected employees for workload reasons.

Eligible employees will start receiving detailed information related to buyouts on or about November 1, 2004, after we have satisfied all bargaining obligations.

Your division or office director will be sending you a more specific message this week detailing the scope of your organization's plans.

I recognize the anxiety and discomfort many of you may be experiencing while reading this message. The notion of undergoing another round of downsizing is troubling to everyone. These actions are necessary to ensure the FDIC is best able to fulfill its mission of maintaining public trust and confidence in the banking system. This public trust comes not only from ensuring the safety and soundness of the industry, but also from maintaining and managing the deposit insurance funds in a responsible manner. As FDIC employees, it is our responsibility to operate as effectively and efficiently as possible, thereby maximizing preservation of the funds and their availability to absorb losses resulting from institution failures. While difficult to accept, pursuing the restructuring activities outlined in this message is both necessary and consistent with our role as fiduciary of the deposit insurance funds.

As it has in the past under similar circumstances, the FDIC will take a variety of steps, including providing outplacement services and career counseling, to help provide a smooth transition for affected employees.

of your intention to accept the buyout in advance of the Coordinator's receipt of your signed Statement, but **be aware that you will not be considered as having applied for the buyout until your signed Statement of Intent has been received by the DOA/HRB Buyout Coordinator.** Do not give your buyout application to staff in the Benefits Center.

2) You should simultaneously give a copy of the Statement of Intent to your organization's point of contact for clearance listed on your organizational Buyout web site to begin the process of approving the date that you have selected.

If your organization needs you to continue in your job until a later date, management has the option of withholding approval of your buyout offer until that date.   If you do not concur with the buyout date approved by your management, you may rescind your application, up until the final date employees are permitted to apply for the buyout in your organization.

3) As soon as possible after receiving confirmation of your separation date, send the completed Buyout Program Payment Election Form, 2800/35, indicating your payment date and method of payment preference, and submit it to your DOA/HRB Buyout Coordinator.  Copies of this form do not need to be shared with management.

No applications will be accepted via **FDIC-paid** Federal Express or franked envelopes.

**Rescinding Your Buyout Application**

**No one can withdraw his or her buyout to remain employed with the FDIC after the final day on which applications will be accepted within the applicant's organization.   The final acceptance date is posted on the web page specific to your organization.**

The only exception to this requirement is when an employee applies to separate through early retirement and, as of the employee's approved separation date, the FDIC does not have the authority to permit early retirement for that employee.  Eligibility for the FERS reduced annuity shall not compel the separation of an employee who applied for early retirement, for whom the FDIC cannot offer early retirement.

**Employees who continue employment with the FDIC after this final date for rescinding applications -- even those delayed by management -- are not eligible to apply under Merit Promotion or any other internal placement program for jobs with the FDIC.**

**Departure Extensions**

- **Employees who want to retire and are just short of eligibility for an immediate annuity by the final departure date required for their organization will be allowed to continue past their approved separation date on <u>annual leave and/or leave without pay</u> to cover the period between their approved separation date and the first entitlement to an annuity.**

**Example:**  Employee A is early retirement eligible on June 15th, but works in an organization with a separation date requirement of May 14th.  Employee A can apply for the buyout by May 2nd, with a May 14th date. This employee works through May 13th, and starts a combination of annual leave and

Exhibit 10-1

9

leave without pay on May 16th until the effective date for retirement on June 15th, at which time the employee is separated from the FDIC with entitlement to a buyout.

- **In exceptional circumstances, management may delay an employee's departure to meet continuing workload needs, but not later than the day before a reduction in force may be scheduled for the competitive area in which a delayed employee is assigned. These delays must be concurred in by the Chairman, or his designee.**

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

10

## Steely, Ann Bridges

**From:** Global Messenger
**Sent:** Monday, January 31, 2005 2:26 PM
**To:** FDIC EMPLOYEES CORPORATE

For information on this announcement contact Joy Crosser, DOA/HRB, at 202-942-3497.

To:    Notice to all FDIC Buyout-Eligible Employees:

The Statement of Intent forms for applying to the FDIC Buyout Program have been revised in order to clarify the last date to rescind an application and the delayed departure feature of the buyout program.

The different dates of program application and separation for the participating Divisions and Offices created confusion, and these new forms should take care of several questions that have been frequently asked:

- If you submit a Statement of Intent to accept the buyout offer, the last day to cancel your application is May 2, 2005. If your separation date is delayed by management to continue working for an extended period beyond the program's final separation date of May 14, 2005, you will not be able to rescind your buyout application after May 2, 2005. If you separate from the FDIC earlier than May 2, 2005, you cannot elect to rescind your participation in the buyout after the date that you separate and seek reinstatement to the FDIC roles.

- The delayed departure feature of the buyout program allows employees to participate in the buyout and remain in non-duty status for up to six months following the required separation date of the program in order to reach the first day on which they are entitled to an annuity. DRR and DIRM employees, while being permitted to stay on duty up to May 14th, cannot stay on the rolls past August 30, 2005, which is the day before the projected RIF date of August 31, 2005. However, DRR and DIRM employees can use the full 6-month window for delayed departure feature to reach first entitlement to an annuity if they go on annual leave and/or leave without pay no later than February 28, 2005 – which coordinates with the timing of the upcoming FDIC job fair on February 9th.

Clarifying these forms in no way changes the terms, dates, or conditions of the buyout program as originally announced to employees in November 2004. There is no need to replace your Statement of Intent form if you have you have already submitted one.  You may view and print off copies of the Statement of Intent forms directly from the Buyout 2004 website.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**00095**

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Bass, Mary E. |
| **Sent:** | Thursday, May 05, 2005 7:52 AM |
| **To:** | Steely, Ann Bridges |
| **Cc:** | Harris, Thomas D. |
| **Subject:** | FW: Withdrawal of the Request for the Buy-out Extension for Mr. Charles Benson |

Good Morning Ms. Steely,

I do apologize for the delay in responding to your below email,
but I am confused, because nothing was ever finalized. Everything
was in "Draft', and Mr. Benson decided, which was his right, not
to pursue an extension.

I hope that the above response is acceptable. Thanks. MB

"HAVE A GREAT ONE!"

-----Original Message-----
**From:** Steely, Ann Bridges
**Sent:** Monday, May 02, 2005 12:33 PM
**To:** Bass, Mary E.
**Cc:** Harris, Thomas D.
**Subject:** RE: Withdrawal of the Request for the Buy-out Extension for Mr. Charles Benson

Mary, I haven't heard from you regarding this issue.  Today is the final day for these actions and I
need to have your input ASAP.
Thank you.

abs

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(202)942-3010**


-----Original Message-----
**From:** Steely, Ann Bridges
**Sent:** Friday, April 22, 2005 11:25 AM
**To:** Bass, Mary E.
**Cc:** Harris, Thomas D.
**Subject:** RE: Withdrawal of the Request for the Buy-out Extension for Mr. Charles Benson

Thank you, Mary.  I want to remind you that requests for delayed departure under FDIC buyout
procedures are a management prerogative, not an employee right.  With that in mind, I would
appreciate clarification of your managerial recommendation on a delayed departure for Chuck.
Thanks.

abs

**Ann Bridges Steely**
**Associate Director**

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00096

**Acquisition Services**
**(202)942-3010**

-----Original Message-----
**From:** Bass, Mary E.
**Sent:** Friday, April 22, 2005 10:59 AM
**To:** Harris, Thomas D.
**Cc:** Steely, Ann Bridges; Benson, Chuck
**Subject:** Withdrawal of the Request for the Buy-out Extension for Mr. Charles Benson
**Importance:** High

Good Morning Mr. Harris,

This email is to kindly inform you that Mr. Benson, has
withdrawn his request for a "Buy-out Extension", and will
be leaving the FDIC as originally planned on May 14, 2005.

Therefore, please let me know when you would like to
meet to discuss the transition of the "HRB Contracts"
to Mr. Morrison. Thanks. MB (#23243)

"HAVE A GREAT ONE!"

-----Original Message-----
**From:** Bass, Mary E.
**Sent:** Tuesday, April 19, 2005 2:38 PM
**To:** Harris, Thomas D.
**Cc:** Benson, Chuck
**Subject:** FW: Buy-out Extension
**Importance:** High

Good Afternoon Mr. Harris,

As requested, please find attached the "Draft" letter requesting a
"Buy-out Extension." Thanks. MB (#23243)

<< File: Request for Mr. Benson's Extension thru June 30, 2006.doc >>

-----Original Message-----
**From:** Bass, Mary E.
**Sent:** Thursday, April 14, 2005 2:29 PM
**To:** Baker, Harry D.
**Cc:** Benson, Chuck
**Subject:** Buy-out Extension
**Importance:** High

Good Afternoon Dr. Baker,

Would you be kind enough to provide Mr. Benson (Chuck) and I a copy
of what you submitted for your extension to get the "Buy Out" in August
2006.

We would like to see the format, and use it as guidance in submitting the

request for an extension for Mr. Benson to upper management (Ms. Steely and Mr. Harris).  I would definitely "Thank You" and "Appreciate" what you provide to us.  MB (#23243)

"HAVE A GREAT AND WONDERFUL AFTERNOON!"

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Bass, Mary E. |
| **Sent:** | Monday, May 16, 2005 7:31 AM |
| **To:** | Steely, Ann Bridges |
| **Cc:** | Harris, Thomas D. |
| **Subject:** | FW: Meeting |

Good Morning Ms. Steely,

After review of your below email, I am still very confused at exactly what you wish to discuss, concerning my understanding of my role in Mr. Benson's departure/withdrawal request. I clearly understood the directions that my "First Line Supervisor", Mr. Harris, directed me to do on Thursday, April 14, 2005, in the presence of "Former FDIC Employee", Mr. Dwight Benson. If there was some other "Managerial Policy and Procedures" covering the "Buyout Extension" process, Mr. Harris did not make me aware of these rules and regulations on Thursday, April 14, 2005, or afterwards. Therefore, I am not sure what you are asking for, and once again, I am at this point very confused.

I would like to have a meeting with you and Mr. Harris, in "Good Faith", but my perception of why this meeting is being called is not favorable. I accept the meeting with great reluctance.


Respectfully,

Mary E. Bass, Chief,
Divisional Contracting Unit (DCU)



-----Original Message-----
**From:** Steely, Ann Bridges
**Sent:** Thursday, May 12, 2005 12:26 PM
**To:** Bass, Mary E.
**Cc:** Harris, Thomas D.
**Subject:** Meeting

Mary, I believe my request for a meeting was fairly clear – I simply want to chat to make sure you understand the reason I asked for your input on the issue of Chuck's departure date. I want to ensure you understand your role as a manager in this process.


abs



FW: Request for
Extension Emai...


**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(202)942-3010**


Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Monday, May 16, 2005 9:24 AM |
| **To:** | Bass, Mary E. |
| **Cc:** | Harris, Thomas D. |
| **Subject:** | RE: Meeting |

Mary, our meeting tomorrow is to clear up any confusion. I will see you at 1:00 on Tues in my office. Thanks.
abs

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(202)942-3010**


-----Original Message-----
**From:** Bass, Mary E.
**Sent:** Monday, May 16, 2005 7:31 AM
**To:** Steely, Ann Bridges
**Cc:** Harris, Thomas D.
**Subject:** FW: Meeting

Good Morning Ms. Steely,

After review of your below email, I am still very confused at exactly what you wish to discuss, concerning my understanding of my role in Mr. Benson's departure/withdrawal request. I clearly understood the directions that my "First Line Supervisor", Mr. Harris, directed me to do on Thursday, April 14, 2005, in the presence of "Former FDIC Employee", Mr. Dwight Benson. If there was some other "Managerial Policy and Procedures" covering the "Buyout Extension" process, Mr. Harris did not make me aware of these rules and regulations on Thursday, April 14, 2005, or afterwards. Therefore, I am not sure what you are asking for, and once again, I am at this point very confused.

I would like to have a meeting with you and Mr. Harris, in "Good Faith", but my perception of why this meeting is being called is not favorable. I accept the meeting with great reluctance.


Respectfully,

Mary E. Bass, Chief,
Divisional Contracting Unit (DCU)



-----Original Message-----
**From:** Steely, Ann Bridges
**Sent:** Thursday, May 12, 2005 12:26 PM
**To:** Bass, Mary E.
**Cc:** Harris, Thomas D.
**Subject:** Meeting

Mary, I believe my request for a meeting was fairly clear – I simply want to chat to make sure you understand the reason I asked for your input on the issue of Chuck's departure date. I want to ensure you understand your role as a manager in this process.

00100

abs
 << Message: FW: Request for Extension Email >>

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(202)942-3010**


**Tracking:**          Recipient                          Delivery
                       Bass, Mary E.                      Delivered: 5/16/2005 9:24 AM
                       Harris, Thomas D.                  Delivered: 5/16/2005 9:24 AM

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | System Administrator |
| **To:** | Bass, Mary E.; Harris, Thomas D. |
| **Sent:** | Monday, May 16, 2005 9:24 AM |
| **Subject:** | Delivered:RE: Meeting |

Your message

| | |
|---|---|
| To: | Bass, Mary E. |
| Cc: | Harris, Thomas D. |
| Subject: | RE: Meeting |
| Sent: | 5/16/2005 9:24 AM |

was delivered to the following recipient(s):

Bass, Mary E. on 5/16/2005 9:24 AM
Harris, Thomas D. on 5/16/2005 9:24 AM

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | System Administrator |
| **To:** | Harris, Thomas D.; Bass, Mary E. |
| **Sent:** | Thursday, May 12, 2005 12:26 PM |
| **Subject:** | Delivered:Meeting |

Your message

| | |
|---|---|
| To: | Bass, Mary E. |
| Cc: | Harris, Thomas D. |
| Subject: | Meeting |
| Sent: | 5/12/2005 12:26 PM |

was delivered to the following recipient(s):

Harris, Thomas D. on 5/12/2005 12:26 PM
Bass, Mary E. on 5/12/2005 12:26 PM

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Thursday, May 12, 2005 12:26 PM |
| **To:** | Bass, Mary E. |
| **Cc:** | Harris, Thomas D. |
| **Subject:** | Meeting |

Mary, I believe my request for a meeting was fairly clear – I simply want to chat to make sure you understand the reason I asked for your input on the issue of Chuck's departure date. I want to ensure you understand your role as a manager in this process.

abs



FW: Request for
Extension Emai...

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(202)942-3010**

| **Tracking:** | **Recipient** | **Delivery** |
|---|---|---|
| | Bass, Mary E. | Delivered: 5/12/2005 12:26 PM |
| | Harris, Thomas D. | Delivered: 5/12/2005 12:26 PM |

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**00104**

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Monday, May 02, 2005 12:33 PM |
| **To:** | Bass, Mary E. |
| **Cc:** | Harris, Thomas D. |
| **Subject:** | RE: Withdrawal of the Request for the Buy-out Extension for Mr. Charles Benson |

Mary, I haven't heard from you regarding this issue. Today is the final day for these actions and I need to have your input ASAP.
Thank you.

abs

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(202)942-3010**


-----Original Message-----
**From:** Steely, Ann Bridges
**Sent:** Friday, April 22, 2005 11:25 AM
**To:** Bass, Mary E.
**Cc:** Harris, Thomas D.
**Subject:** RE: Withdrawal of the Request for the Buy-out Extension for Mr. Charles Benson

Thank you, Mary. I want to remind you that requests for delayed departure under FDIC buyout procedures are a management prerogative, not an employee right. With that in mind, I would appreciate clarification of your managerial recommendation on a delayed departure for Chuck. Thanks.

abs

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(202)942-3010**


-----Original Message-----
**From:** Bass, Mary E.
**Sent:** Friday, April 22, 2005 10:59 AM
**To:** Harris, Thomas D.
**Cc:** Steely, Ann Bridges; Benson, Chuck
**Subject:** Withdrawal of the Request for the Buy-out Extension for Mr. Charles Benson
**Importance:** High

Good Morning Mr. Harris,

This email is to kindly inform you that Mr. Benson, has withdrawn his request for a "Buy-out Extension", and will be leaving the FDIC as originally planned on May 14, 2005.

Therefore, please let me know when you would like to meet to discuss the transition of the "HRB Contracts" to Mr. Morrison. Thanks. MB (#23243)

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**00105**

"HAVE A GREAT ONE!"

-----Original Message-----
**From:** Bass, Mary E.
**Sent:** Tuesday, April 19, 2005 2:38 PM
**To:** Harris, Thomas D.
**Cc:** Benson, Chuck
**Subject:** FW: Buy-out Extension
**Importance:** High

Good Afternoon Mr. Harris,

As requested, please find attached the "Draft" letter requesting a
"Buy-out Extension." Thanks. MB (#23243)

  << File: Request for Mr. Benson's Extension thru June 30, 2006.doc >>

-----Original Message-----
**From:** Bass, Mary E.
**Sent:** Thursday, April 14, 2005 2:29 PM
**To:** Baker, Harry D.
**Cc:** Benson, Chuck
**Subject:** Buy-out Extension
**Importance:** High

Good Afternoon Dr. Baker,

Would you be kind enough to provide Mr. Benson (Chuck) and I a copy
of what you submitted for your extension to get the "Buy Out" in August
2006.

We would like to see the format, and use it as guidance in submitting the
request for an extension for Mr. Benson to upper management (Ms. Steely
and Mr. Harris). I would definitely "Thank You" and "Appreciate" what you
provide to us. MB (#23243)

"HAVE A GREAT AND WONDERFUL AFTERNOON!"

| Tracking: | Recipient | Delivery |
|---|---|---|
| | Harris, Thomas D. | Delivered: 5/2/2005 12:33 PM |
| | Bass, Mary E. | Delivered: 5/2/2005 12:33 PM |

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**00106**

# CAS Solution Acquisition Schedule

8/4/05

Met w/ Mary to review
this proposed schedule
for CAS
- very pleasant, productive
session
- I emphasized her role
as advisor to this team
-- the need leadership
in business/IT issues
- told her to tell me if she
wanted my support in
attending mtgs, etc.

| | | |
|---|---|---|
| 1 | Finalize Acquisition Plan | 7/15 |
| 2 | Prepare for ITAS Vendor Day | 7/1 – 8/12 |
| 2.5 | Finalize Vendor Day PP Presentation | 8/2 |
| 3 | Conduct ITAS Vendor Day | 8/15 |
| 4 | Update Statement of Objectives and RFTOP Docs | 8/9 |
| 5 | Obtain Internal Approval of SOO and RFTOP Docs | 8/10-12 |
| 6 | Distribute Draft SOO and RFTOP docs to ITAS Vendors | 8/15 |
| 7 | Receive Vendor Feedback on SOO | Week of 8/29 |
| 8 | Finalize SOO RFTOP based on Vendor Feedback | 9/16 |
| 9 | Complete Source Selection Plan | 9/30 |
| 10 | Complete Requirements Package (i.e., procurement requ | 9/16 |
| 11 | Finalize All Procurement Documents (incl. Source Select | 9/30 |
| 12 | Obtain Internal Approval of Procurement Documents | 10/11 |
| 13 | Select TEP Members and Chairperson     move | 10/14 |
| 14 | Release RFTOP to ITAS Vendors | 10/14 |
| 15 | Respond to ITAS Vendors' Questions | 10/26 |
| 16 | Receive Proposals from Vendors | 11/4 |
| 17 | Evaluate Proposals, conduct BAFO if needed, and write | 11/4 – 12/9 |
| 18 | Conduct Oral Presentations | 11/15 – 11/18 |
| 19 | Approve TO Award, including Selection Recommendation Report and Vendor Negotiation | 12/14 |
| 20 | Award CAS TO | 12/21 |

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00100

# CAS Solution Acquisition Schedule

| | | |
|---|---|---|
| 1 | Finalize Acquisition Plan | 7/15 |
| 2 | Prepare for ITAS Vendor Day | 7/1 – 8/12 |
| 2.5 | Finalize Vendor Day PP Presentation | 8/2 |
| 3 | Conduct ITAS Vendor Day | 8/15 |
| 4 | Update Statement of Objectives and RFTOP Docs | 8/9 |
| 5 | Obtain Internal Approval of SOO and RFTOP Docs | 8/10-12 |
| 6 | Distribute Draft SOO and RFTOP docs to ITAS Vendors | 8/15 |
| 7 | Receive Vendor Feedback on SOO | Week of 8/29 |
| 8 | Finalize SOO-RFTOP based on Vendor Feedback | 9/16 ✱ |
| 9 | Complete Source Selection Plan | 9/30 |
| 10 | Complete Requirements Package (i.e., procurement requisition) | 9/16 |
| 11 | Finalize All Procurement Documents (incl. Source Selection Plan and Performance Measures) *try to compress* | 9/30 |
| 12 | Obtain Internal Approval of Procurement Documents | 10/11 |
| 13 | Select TEP Members and Chairperson *move up* | 10/14 |
| 14 | Release RFTOP to ITAS Vendors *try to release by Sept 21* | 10/14 |
| 15 | Respond to ITAS Vendors' Questions | 10/26 |
| 16 | Receive Proposals from Vendors *try to hit 10/15* | 11/4 |
| 17 | Evaluate Proposals, conduct BAFO if needed, and write TEP Memorandum (assumes Thanksgiving no shows) | 11/4 – 12/9 |
| 18 | Conduct Oral Presentations | 11/15 – 11/18 |
| 19 | Approve TO Award, including Selection Recommendation Report and Vendor Negotiation | 12/21 |
| 20 | Award CAS TO | 12/21 |

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-4

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Wednesday, February 25, 2004 9:52 PM |
| **To:** | Bass, Mary E. |
| **Subject:** | Feedback |

Mary, I wanted to tell you that several people have commented to me they noticed how hard
you have been working lately. Someone used the phrase that you are "really stepping up to
the challenge of the new job".  I just thouht you would like to know that.
abs

Ann Bridges Steely
Associate Director
Acquisition Services

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00109

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Johnie McCoy [johniem@erols.com] |
| **Sent:** | Thursday, June 16, 2005 11:00 AM |
| **To:** | Steely, Ann Bridges |
| **Subject:** | Steely Affidavit |
| **Follow Up Flag:** | Follow up |
| **Due By:** | Monday, June 27, 2005 10:00 AM |
| **Flag Status:** | Flagged |

Ms. Steely,

I have prepared an affidavit of your testimony given to me on June 9 and June 13, 2005, and it is attached for your review. Please review your statements for clarity and to insure that they are stated the way you intended, and make the changes necessary for accuracy. Please include additional information as indicated in the draft affidavit. If there is other additional information relative and material to Ms. Bass's complaint that you wish to add to your affidavit, please do so.

After you have completed your review, please print your affidavit, number and initial each page, sign it, and mail it to me no later than June 24, 2005, using either FedEx (preferred) or US Postal Service Priority Mail. Please mail the signed affidavit and the documents to me at the following address:

10805 Henley Court
Columbia, MD 21044

If you have any questions or concerns, I can be reached at 410-997-1158, Fax 410-997-6424, or via e-mail at johniem@erols.com.

I look forward to receiving your signed affidavit.

Johnie J. McCoy
EEO Investigator
US Investigations Services, Inc.

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Selby, Fred |
| **Sent:** | Wednesday, January 04, 2006 4:34 PM |
| **To:** | Steely, Ann Bridges |
| **Subject:** | RE: CM Performance Input |

Ann,

My personal input is pretty limited, but here goes:

Tom--mostly in my capacity with oversight of the CAS, I have been quite impressed with Tom's strategic view of the process, his creativity and ingenuity, and how he actively keeps everyone in the loop regarding project status and patiently explaining the process
Mary--I know she has been assisting Tom, but I don't have any direct personal observation
Dave--Early in the year Dave was excellent in working with us on the issue of excessive Prompt Payment Interest penalties
Bev--a bit tangential, but I think the work she did representing your functions on the NFE effort were suburb
Connie Young and Nancy Matzke--again stalwart performers in support of NFE, both preparing for implementation and post-implementation
Trisha--I haven't actually met her, but I have sensed since her arrival much improved support of the P card and also convenience checks

Give me a call if I can further elaborate.

Happy New Year!!!!


Fred

---

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Wednesday, January 04, 2006 4:13 PM |
| **To:** | Selby, Fred; Hughes, Karen; Roberson, Janet W.; Peddicord, Thomas E. |
| **Subject:** | FW: CM Performance Input |

I am in the process of developing performance assessments for the ASB Corporate Managers. Support for our clients is a key aspect of what our managers do so I would like to include any feedback you may have. During the past year, Tom Harris and Mary Bass have provided primary support to DOF, but Dave McDermott and Bev Shuck also provided support on NFE. Since she arrived in July, Trisha Bursey has supported our policy functions and has managed the PCard program, so you may have also had some interactions with her. If you have any feedback on the support provided by these individuals (or any other ASB managers), please let me know.

Thanks very much for any inputs you may have.

abs

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(202)942-3010**

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**00111**

Steely, Ann Bridges

**From:** Steely, Ann Bridges
**Sent:** Wednesday, January 11, 2006 8:42 AM
**To:** Bass, Mary E.
**Subject:** RE: Ranking Categories I II III

Mary, can you confirm my interpretation or give me your numeric rankings so that I can compete my analysis this morning?

Also, you are the only individual who gave Group I recommendations for everyone in their own section and your Group III recommendations are the most divergent from with the rest of the group. You should be prepared to support your recommendations when we reconvene the managers tomorrow.

Let me know if we need to talk. Thanks.

abs

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(202)942-3010**

*The management met on 1/12. I explained where greatest variance was (which people), and indicated Mary had ranked her unit section people highest (all group 1) and rated others generally acknowledge high performers as Group 2. Asked her to discuss her thoughts of the group. She stated "I do because, I believe charity begins at home". ... During this meeting, she also read from Ed Hall's exit evaluation from Wayne Evans PASC. I told her before, I thought this was inappropriate.*

---

**From:** Steely, Ann Bridges
**Sent:** Tuesday, January 10, 2006 5:15 PM
**To:** Bass, Mary E.
**Subject:** RE: Ranking Categories I II III

Mary – I'm sorry – I need one piece of clarification. You didn't reflect a numeric rank for each person as I had asked. Is this order in which you listed the people consistent with the ranking you would give them? Example: is Lisa #3, Vonda #9, Ed #15, Karen #23?
Thanks.

---

**From:** Bass, Mary E.
**Sent:** Tuesday, January 10, 2006 3:49 PM
**To:** Steely, Ann Bridges
**Subject:** Ranking Categories I II III

Good Afternoon Ms. Steely,

As requested, listed below are my rankings:

Group I:

- Ms. Nicole Peters
- Ms. Serena Woolrich
- Ms. Lisa Brown-Jones
- Mr. Campbell DeMallie
- Ms. Joanne Boston
- Ms. Joan Gustafson

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00112

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Bass, Mary E. |
| **Sent:** | Thursday, January 12, 2006 5:14 PM |
| **To:** | Steely, Ann Bridges |
| **Cc:** | Harris, Thomas D.; DeMallie, Campbell |
| **Subject:** | Status of Call to Booz Allen Hamilton (BAH) |

Good Evening Ms, Steely,

As promised, I call BAH and left a message, but I haven't heard back from
Ms. Judith Ann Martin (703) 377-0012. Thanks. MB (#23243)

"HAVE A GREAT EVENING AND HOLIDAY WEEKEND!"

- Mary participated in mtg w/ Gail P, Ron Pfirdg, Nina, Dan deleo on plan to discuss travel cost issue on CAB.
- Prior to her call to BAH, she and I discussed the strategy for the call – tell BAH we're strategizing how FDIC will support the effort, ask what they plan for Dallas travel. Instead she called and asked if they had priced out travel

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

1/11/06

 **FDIC** Federal Deposit Insurance Corporation

Ann Bridges Steely
Associate Director
Acquisition Services

Mary —
Gail P has asked us to
participate in a mtg
in her office at 3:00.
Nisa and Ron Phemy will be
there. The topic is the travel
problem that has popped up
on CAS. Can you please
attend w/me?

Thanks.

Ann

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

(DRAFT 12/27/05)

## Selection Recommendation Report (SRR)

## Information Technology Application Services (ITAS)
## Task Order for Claims Administration System (CAS) Solution

This SRR documents the integrated best value analysis and award recommendation for the CAS Solution Task Order, to be awarded under the ordering provisions of the ITAS Multiple Award Contracts.

Based on the evaluation results of the initial proposals and Best and Final Offer (BAFO) proposals, it is recommended by the Contracting Officer that the Federal Deposit Insurance Corporation (FDIC) award the task order as follows:

*is space available?*

| Task Order | Contractor/ITAS Contract No. | Total Price (On-Site)* | Period of Performance |
|---|---|---|---|
| CAS Solution | Booz Allen Hamilton, Inc. /CORHQ-038 | $19,260,509 | Base Period – 6 Months (Firm Fixed Price) |
| | | | Option Period(s) – 24 Months (Negotiated Ceiling) |

**\* The price stated above is cumulative for the Base and Option Period(s) based on the labor hours that will be completed on-site at the FDIC Virginia Square Facility. Price also includes hardware\software costs. In addition, the program office has assured the Contracting Officer that the procurement requisition (PR) covering the total amount of this task order (Base and Option Period(s)) will be submitted so that the task order can be awarded. The Contracting Officer shall not award the CAS Solution Task Order with out the PR.**

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1
**00115**

"Confidential Procurement Information -
Not for Public Disclosure"                                                    1

# I. PRE-SOLICITATION:

## A. Background/Objectives

### 1. Statement of Requirement

The purpose of CAS is to develop a deposit insurance claims and payment process to ensure the FDIC can perform deposit insurance functions for any size financial institution, in a way that minimizes FDIC losses; minimizes spill over effects that could lead to systemic risks; preserves franchise value; and produces insurance results in a timely manner to quickly provide funds to claimants. For purposes of designing and building the CAS, the system should have the ability to administer the deposit and non-deposit claims for a financial institution of any size. With regards to hardware, the system should be built to handle up to 5 million deposit accounts (baseline). However, the solution must have the capacity to handle more than 5 million deposit accounts, if needed, in a timely and cost-effective manner.

This requirement will include two periods in the task order structure. The first period is referred to as the Base Period, and includes the tasks and activities necessary to complete the "Inception Phase." The Inception focuses on, but is not limited to confirming the scope and objectives of the project and bringing the business risks under control. The next period, the option period(s) includes all tasks and activities necessary to complete the Elaboration, Construction, and Transition Phases of the CAS Solution, using an iterative approach. Elaboration focuses on stabilizing the product plans and bringing the architectural and technical risks under control. Construction focuses on building the product and bringing the logistical and project execution risks under control. Transition focuses on delivering the product and bringing the roll-out under control.

### 2. History

The FDIC claims process as it exists today is a labor intensive, computer supported manual process that was uniquely designed to meet the FDIC's highly specific deposit insurance needs, both for small and large institutions. Recognizing that the claims process could be further automated and improved, it was recommended that a detailed review of the process be under taken. Despite recent enhancements to the system, the complex custom coding needed to maintain the Receivership Liability System (RLS), coupled with its inability to handle the insurance determinations for a large financial institution, led to the initiation of the CAS Project. The CAS Project Team was tasked with evaluating and proposing a new claim deposit insurance solution that will decrease duplication of effort and data by automating the insurance determination process and move the FDIC toward a more industry standard technology solution set using commercial off the shelf systems (COTS) products, with web-enabled interfaces configured for FDIC Claims processing.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 1
00116

"Confidential Procurement Information -
Not for Public Disclosure"

2

### B. Cost Estimate/Conditions

The CAS Project Team plans on funding the Base Period with operating funds. For 2006, the budget estimate for this period is approximately $1.7 million. The project team anticipates that the Optional Period (s), the elaboration, construction, and transition phases will be funded through the Capital Investment Review Committee (CIRC) process. Future funding requirement will crystallize as the solution moves from the inception stage into development phases, including elaboration, construction, and transition. Previously, a rough order of magnitude cost estimate was prepared on an earlier version of the CAS Solution. This estimate was based on labor, software, and hardware costs and totaled approximately $15 million to build and implement the new system. It was determined that the ITAS Vendors would provide an initial cost estimate in their proposals, for the CAS Solution, but a more detailed cost-to-complete estimate would be required from the winning ITAS Vendor prior to the decision to begin the Construction phase *(prior to exercise of the Option period)*.

### C. Sources

FDIC has awarded contracts to four ITAS Vendors. It was *determined* decided that these vendors were appropriate for the combination of software, technical infrastructure, development, and professional services required of the CAS Solution. The following four vendors would receive the Request for Task Order Proposal (RFTOP) for the CAS Solution: Pragmatics, IBM, Lockheed Martin and Booz Allen Hamilton, Inc.

#### 1. Competition

The CAS Solution RFTOP *was* would be let to the four ITAS Vendors. Prior to the release of the RFTOP, the CAS Project Team would conduct an "ITAS CAS DAY" conference. This ITAS CAS DAY would provide the ITAS Vendors with an understanding of the CAS objectives, the acquisition schedule, and allow them to begin to explore opportunities to meet the solution's objectives. Prior to the meeting, the CAS Project Team would release a draft Statement of Objective (SOO) and RFTOP to solicit input from the ITAS Vendors at the meeting. Additional individual meetings with each ITAS Vendor to discuss feedback *were* would be conducted to discuss their comments on the documentation. Based on the feedback, the documentation *were* would be finalized and issued to the four ITAS Vendors for proposals. Furthermore, the ITAS Vendors *were* would not be allowed to team with each other when submitting their proposals.

#### 2. Source Selection

A Source Selection Plan (SSP) was to be developed to explain how the proposals from the ITAS Vendors would be evaluated in order to make the selection decision. The SSP would identify the Technical Evaluation Panel (TEP), the evaluation factors that would be used to distinguish proposals, and the selection procedures and governance structure. Proposals would be evaluated on the basis of four factors. In descending order of importance, these factors were Mission Capability (technical and management capability)

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1
00117

and Performance Work Statement (PWS), past and related experience, and price. The Mission Capability and PWS were considered the most important, and then past relevant experience, with the combination significantly more important than price. Proposals would be evaluated on a color-coded basis and award would be made to the offeror whose proposal was considered most advantageous (best value) to the FDIC. The assessment of each proposal would be made with respect to the evaluation factors and sub-factors in the solicitation using the rating system. Price proposals would not be rated. Prices would be evaluated to determine if the proposed price was reasonable and to asses the offerors' understanding of the solicitation.

The SSP identified sub factors for the non-cost factors, and the project team identified the following possible sub-factors for further consideration:

- Related experience with the following:

  - Data Quality and Management
  - Business Process Re-engineering through Solution Development
  - Integration of COTS Products
  - Service Oriented Architecture Implementation
  - Rational Unified Process
  - Banking and Financial Services Operations and data processing industry experience

The project team would evaluate the proposals based on the written information provided in the proposals (PWS to be submitted by offerors) as well as oral presentations for the purpose of further evaluating an offeror's understanding and capability to perform requirements. In making a best value determination, the FDIC would consider the written information, oral demonstration, and pricing proposal. The selection process would consist of the following groups:

- An interdivisional Technical Evaluation Panel (voting members) that would evaluate and recommend the best value proposal.
- Advisors (i.e. senior FDIC management, Contracts, Legal, ODEO) to the TEP (non-voting).
- Source Selection Authority (SSA) that approves the final decision.

## D. Contract Type

The FDIC intends to award one Task Order with a Base Period and Option Period(s). The Task Order will follow a performance-base structure, using an incentive pool to reward performance. Following the FDIC's Rational Unified Process (RUP) software development methodology, the Base Period will encompass the tasks and activities necessary to complete the Inception Phase of CAS. The FDIC will determine the vendor's success during the Base Period by assessing the vendor's compliance with negotiated performance measures. Upon this determination, the FDIC may choose to award an initial Option of Task Order. In order to be consistent with the chosen ITAS

"Confidential Procurement Information -
Not for Public Disclosure"                                    4

Vendor's technical approach, the FDIC may choose to award more than one option to complete the Elaboration, Construction, and Transition Phases necessary to successfully implement a fully operational "Version 1.0" of the CAS Solution. The Firm Fixed Price Base Period and any Option Period(s) should each incorporate the Incentive Pool structures proposed by the ITAS Vendor. Awarded Option Period(s) will be structured based on the ITAS Vendor's proposed solution architecture and approach, with a compensation ceiling(s) to be negotiated between the ITAS Vendor and the FDIC. The sum total of all Option Period(s) shall not exceed the total ceiling price proposed to complete the Elaboration, Construction and Transition Phases in compliance with the FDIC's RUP methodology. The periods of performance will be as follows:

| | **Performance Period:** |
|---|---|
| Task Order Base Period | Not to exceed nine months from contract award |
| Task Order Option(s) | Not to exceed two years from end of Base Period |

### E. Other

1. Management Information Requirements – The Task Order will be monitored by the Task Order Oversight Manager(s) (TOOM), and the Technical Monitors(TM). The roles, duties and responsibilities of each clearly delineated in the OM Letter, TOOM Letter and TM Letter issued by the Contracting Officer.

2. Test and Evaluation – Testing will need to incorporate the concepts of timeliness, performance quality levels, capacity and stress testing, all in an objective environment that provides checks and balances regarding the solution vendor. Testing will occur throughout the RUP phases. Testing will involve solution testing and Certification and Accreditation(C&A) Testing.

3. Logistics Considerations – The CAS Solution Plan contemplates the use of services providers, either in an Application Service Provider (ASP) or a Managed Service Provider (MSP) environment.

4. Requirement for Contractor Data – CAS Project Team will require contractor to comply with Privacy Act Regulations for any data collected from FDIC or financial institutions.

5. FDIC-Furnished Property – On-site office space at FDIC's Virginia Square Facility will be available for contractor personnel for Task Order performance. However, the number of offices that will become available and dates of their availability are unknown at this time.

6. FDIC-Furnished Information – FDIC planned to provide as much information as appropriate to the ITAS Vendors prior to ITAS Vendor's

Bair, No. 1:06-cv-01345-GK
Exhibit 00119



7. Security Considerations – Contractor's plan must be complaint with Federal laws that include, but are not limited to, OMB Circular A-130, Transmittal 4, Management of Federal Information Resources, Appendix III and Federal Information Security Management Act of 2002 (Title 3 of P.L.107-347). In addition, the plan must implement IT Security requirements stated in FDIC's Policies and Procedures (These documents were made available through accessing the FDIC DOA Website; and National Institute of Standards and Technology (NIST) document could be accessed on the NIST Website (This website was made available)).

8. Contract Administration – The CAS Project Team consists of a Contracting Officer, a Division of Information Technology (DIT) Oversight Manager, and DRR Technical Monitors. These resources will be responsible, in part, for implementing the Quality Assurance Plan (QASP), which is the process by which the performance of the vendor and its solution will be monitored.

## II. SOLICITATION PREPARATION AND DISTRIBUTION:

### A. Request for Task Order Proposal (RFTOP) CORHQ-CAS Preparation

The RFTOP was prepared by Mary E. Bass, Contracting Officer, with input from DRR represented by Mike Spaid, DIT represented by Nina Aggarwal, the Legal Division, represented by Peter Somerville, the Office of Diversity and Economic Opportunity(ODEO) represented by Robert Elcan and Linda Washington. ~~The Program Office Representative and the ASB Contracting Officer~~ worked together to finalize the ~~RFTOP~~ Package.

### B. Sources

The RFTOP was distributed to the following four ITAS Vendors: Pragmatics, IBM, Lockheed Martin and Booz Allen Hamilton, Inc.

### C. Key Dates Associated with Release of RFTOP CORHQ-CAS and Receipt of Proposals

On October 12, 2005, the RFTOP was issued; questions were due by October 17, 2005; and proposals were due by October 26, 2005. On October 19, 2005, Amendment No. One to the RFTOP was issued, and included answers to questions submitted in regard to the RFTOP, from the ITAS Vendors.

"Confidential Procurement Information -
Not for Public Disclosure"

6

# III. PROPOSAL EVALUATION:

## A. Proposal Receipt

The FDIC received proposals from all four of the ITAS Vendors solicited: Pragmatics, IBM, Lockheed Martin and Booz Allen Hamilton, Inc. The proposals were received on time and were responsive.

## B. Technical Evaluation

### 1. Evaluation Methodology

The proposal evaluation methodology utilized in this acquisition process was in accordance with the FDIC Interim Acquisition Policy #2004-1, under the Best Value Methodology "Color Coded" approach of an integrated assessment (RFTOP CORHQ-CAS, dated October 12, 2005, Section 6.0 "Evaluation of Proposals, pages 18-22).

### PROPOSAL EVALUATION RATING SCALE

| COLOR | RATING | DEFINITION |
|-------|--------|------------|
| Blue | Exceptional | Exceeds performance or capability requirements in away beneficial to the FDIC. |
| Green | Acceptable | Meets performance or capability requirements necessary for acceptable contract performance. |
| Yellow | Marginal | Does not meet some performance or capability requirements necessary for acceptable contract performance, but any proposal inadequacies are correctable. |
| Red | Unacceptable | Fails to meet performance or capability requirements. Proposals with an unacceptable rating are not available. |

*If all of this is in the SSP, I don't think it needs to be re-stated here, does it?*

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10
00121

## 2. Organization and Members of the Source Selection Team

**a. Source Selection Official:**

- John Bovenzi, FDIC, Chief Operating Officer (COO)

**b. Source Selection Executive Committee:**

- Mitchell Glassman, Director, DRR
- Michael Bartell, Director, DIT
- Fred Selby, Director, Division of Finance(DOF)

**c. Source Selection Executive Committee Advisors:**

- Gail Patelunas – Deputy Director, DRR
- Jerry Russomano – Deputy Director, DIT
- Ron Pferchy – Assistant Director, DIT

**d. TEP Members:**

- TEP Chairperson/DIT – Nina Aggarwal, Voting Member
- TEP Evaluator/DIT – Marcia Boardley, Voting Member
- TEP Evaluator/DSC –Nathan Johns, Voting Member
- TEP Evaluator/DRR – Jan deLeo, Voting Member
- TEP Evaluator/DRR – Mike Spaid, Voting Member

**e. TEP Advisors:**

- TEP Advisor/DIT Infrastructure – Tom Kennedy, Non-Voting Member
- TEP Advisor/DIT Security – Mark Flanders, Non-Voting Member
- TEP Advisor/DIT Enterprise Architecture – Rich Campbell, Non-Voting Member
- TEP Advisor/DRR – Belinda Davis, Non-Voting Member
- TEP Advisor/DRR – BIS, Al Fierro, Non-Voting Member
- TEP Advisor/DRR – Penelope Moreland-Gunn, Non-Voting Member
- TEP Advisor/Division of Insurance and Research (DIR) – Lynn Shibut, Non-Voting Member
- TEP Advisor – Bearing Point Contracting Staff

**f. Other:**

- Legal – Peter Somerville , Non-Voting Member
- ODEO – Linda Washington, Non-Voting Member
- ASB – Mary E. Bass, Contracting Officer, Non-Voting Member
- ASB – Tom Harris, Contracting Manager, Non-Voting Member



Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1
**00122**

"Confidential Procurement Information -
Not for Public Disclosure"

8

### 3. Technical Evaluation Report/Including Mission Capability and Past Performance (TEP Memorandum, received 12/16/05)

The Technical Management proposal evaluation team considered and assessed the offeror's written and oral proposal against the following factors in accordance with RFTOP 3.1:

Factor A – Technical/Management Approach

    Sub-Factor A.1 – Technical/Management Approach to Inception, Elaboration, Construction and Transition Phases of CAS.

    Sub-Factor A.2 – Key Personnel Experience and Accreditations

Factor B – Performance Work Statement (PWS)
Factor C – Related Experience, Present and Past Performance
Factor D – Price

The summary evaluation of the four bidders follows, with color-coding of the four factors and sub-factors. The offerors are listed in alphabetical order:

| Vendor | | Booz Allen | IBM | Lockheed | Pragmatics |
|---|---|---|---|---|---|
| A. Technical Management Approach | A1. Technical Mgmt Approach | Blue | Green | Yellow | Yellow |
| | A2. Key Personnel | Blue | Green | Yellow | Green |
| | Overall TMA Rating | Blue | Green | Yellow | Yellow |
| B. Performance Work Statement | | Blue | Green | Green | Yellow |
| C. Past Performance | Confidence Rating | Exceptional High Conf. | Satisfactory | Satisfactory | Very Good |
| D. Price | | Realistic | Unrealistic | Base Unrealistic | Unrealistic |

(Note: TEP Memorandum will be made available upon request. The memorandum is approximately 105 pages in length and was too voluminous to attach to this SRR. On are about November 16, 2005, FDIC's Legal Division was given information for review by DRR concerning a possible conflict in the Proposal (written and oral) submitted by Pragmatics in response to RFTOP CORHQ-CAS. Currently, no decision has been rendered concerning this issue.)

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1
**00123**

"Confidential Procurement Information - Not for Public Disclosure"

9

### a. Initial Summary Ratings
### (Proposals Received 10/26/05)

| Vendor | | Booz Allen | IBM | Lockheed | Pragmatics |
|---|---|---|---|---|---|
| A. Technical and Management Approach | Color Rating | Blue | Green | Yellow | Yellow |
| B. Performance Work Statement | Color Rating | Blue | Green | Green | Yellow |
| C. Past Experience | Confidence Rating | Exceptional High Confidence | Satisfactory | Satisfactory | Very Good |
| D. Total Price | $ of total Base and Option Period | $20.8 Million | $13.2 Million | $18.3 Million | $10.2 Million |

### b. Best and Final Offer (BAFO) Summary Ratings
### (Received 12/15/05)

| Vendor | | Booz Allen | IBM |
|---|---|---|---|
| A. Technical and Management Approach | Color Rating | Blue | Green |
| B. Performance Work Statement | Color Rating | Blue | Green |
| C. Past Experience | Confidence Rating | Exceptional High Confidence | Satisfactory |
| D. Total Price | $ of total of Base and Option Period | $19.3 Million On-Site | $13.3 Million On-Site |
| | | $21.9 Million Offsite | $14.1 Million Offsite |

*need to discuss how we got from 4 offerents BAFOs down to from only 2* [handwritten]

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 19-4
00124

"Confidential Procurement Information - Not for Public Disclosure"

10



## IV. SELECTION AND PRE-AWARD ACTIONS

### A. Integrated Best Value Determination

In accordance with, RFTOP Section 7.3 "Best Value Determination", the best value to the FDIC is determined to be Booz Allen Hamilton, Inc. The justification for this determination is described below. Booz Allen offered the following:

1. Strongest technical solution and approach, which included:

   - Integrated solution that already supports major banks:

     - 12 Federal Reserve Bank
     - Mellon, M&I and Fleet

   - Proven scalability to handle large volumes of transactions and users:

     - Met all the CAS objectives by their software/hardware solution
     - Predictive modeling expertise combined with extensive bank deposit system experience showed in automating solution for handling deposit insurance determination.

2. Committed senior and highly qualified management team (5 Key Personnel) with:

   - Significant bank operations and data processing/IT experience
   - Certified Project Management team with significant RUP experience

3. Offer much higher level of effort during the base period:

   - Executable prototype in the Base Period that will lower the risk by proving the solution during the Base Period and will be used to build the system.
   - Clearly defined deliverable that meet RUP requirements

4. Price offered for completing the CAS Solution is more complete, realistic and reasonable as compared to other prices offered for the requirement.

Therefore, based on the foregoing, it is the Contracting Officer's recommendation that FDIC award the CAS Solution Task Order to Booz Allen Hamilton, Inc., based on the integrated best value determination stated here in.

### B. Small Business/SDB Status

Booz Allen Hamilton, Inc., is not classified as a small business or small disadvantage business. However, Booz Allen Hamilton, Inc., proposed small subcontracting that

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**00125**

"Confidential Procurement Information - Not for Public Disclosure"                                        11

exceeded the 15% target established for ITAS.  This will be reviewed and monitored during task order administration.

## C. Background Investigation Status/Request to Security Management Section

The background investigation form(s) for Booz Allen Hamilton, Inc., including credit check form(s) will be forwarded to the Security Management Section for processing the week of December 27, 2005.  If necessary, the task will awarded contingent on the final clearance and approval including any requests for substitutions of key personnel.

## D. Central Contractor Registration (CCR)

Booz Allen Hamilton, Inc., is registered in CCR as required by Acquisition Policy Manual (APM).

## E. MWOB/SDB Certification Verification

Booz Allen Hamilton, Inc., is not a Small Disadvantaged Business as defined by the Small Business Administration or Minority/Woman Owned Business.

## F. Financial Capability Review

Financial Capability reviews were performed prior to award of the ITAS Multiple Award Contracts and all four contractors were determined acceptable.  No additional financial capability reviews is required for award of Task Orders.

## G. Representations and Certifications Confirmation

Prior to award of the ITAS Contracts, the Contract Specialist reviewed the applicable FDIC Contractor Representations and Certifications and the FDIC Integrity and Fitness Representations and Certifications and found no impediments to award.  No additional reviews are required for award.

## H. IT Security Evaluation and Pre-award Site Visit, If Applicable

During the source selection of the ITAS Contractors, all offerors were required to submit their outline of an IT Security Plan for ITAS.  These outlines have been determined to be acceptable.  Full IT Security Plan is required within ten days after Task Order award and will be evaluated by DIT prior to acceptance.  Site visits may be conducted as appropriate on this Task Order.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 001026

**Steely, Ann Bridges**

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Wednesday, January 11, 2006 8:42 AM |
| **To:** | Bass, Mary E. |
| **Subject:** | RE: Ranking Categories I II III |

Mary, can you confirm my interpretation or give me your numeric rankings so that I can compete my analysis this morning?

Also, you are the only individual who gave Group I recommendations for everyone in their own section and your Group III recommendations are the most divergent from with the rest of the group. You should be prepared to support your recommendations when we reconvene the managers tomorrow.

Let me know if we need to talk.  Thanks.

abs

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(202)942-3010**

*The management met on 1/12. I explained where greatest variance was (which people), and indicated Mary had ranked her unit/section people highest (all group 1) and rated others generally acknowledged high performers as Group 2. Asked her to discuss her thoughts w/ the group. She stated w/ "To begin, I believe charity begins at home"....*
*During this meeting, she also read from Ed Hall's exit evaluation from Wayne Evans/BSC. I told her before, I thought this was inappropriate.*

---

**From:** Steely, Ann Bridges
**Sent:** Tuesday, January 10, 2006 5:15 PM
**To:** Bass, Mary E.
**Subject:** RE: Ranking Categories I II III

Mary – I'm sorry – I need one piece of clarification.  You didn't reflect a numeric rank for each person as I had asked.  Is this order in which you listed the people consistent with the ranking you would give them?  Example: is Lisa #3, Vonda #9, Ed #15, Karen #23?
Thanks.

---

**From:** Bass, Mary E.
**Sent:** Tuesday, January 10, 2006 3:49 PM
**To:** Steely, Ann Bridges
**Subject:** Ranking Categories I II III

Good Afternoon Ms. Steely,

As requested, listed below are my rankings:

Group I:

- Ms. Nicole Peters
- Ms. Serena Woolrich
- Ms. Lisa Brown-Jones
- Mr. Campbell DeMallie
- Ms. Joanne Boston
- Ms. Joan Gustafson

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

Group II:

- Mr. David Manion
- Ms. DeAna S. Washington
- Ms. Vonda Bailey
- Ms. Genelle Edna Betsey
- Ms. Marisha Price
- Mr. Troy-Lee Winter
- Ms. Cheryl Johnson
- Ms. Darlene Maxine Pope
- Mr. Edwin Reed Hall
- Ms. Andrea Michelle Landry
- Ms. Angela McConkey
- Ms. Kelly Budd

Group III:

- Ms. Jill Annette Ballina
- Mr. John E. Morrison
- Ms. Julie Ann Rothermel
- Mr. Bernard Piper
- Ms. Karen Ross

## PHONE CALL

FOR _Ann_    DATE _1·13·06_  TIME _10:20_ A.M. / P.M.

M _Mary Bass_

OF _____  29/23_

PHONE/ MOBILE _____  FAX _____

MESSAGE _Carabell is taking care of Gail's 3rd and Karen Huges on the ODEO contract. Call me if you need to_
_703·313·7691 home until 3pm_

SIGNED _amf_

- [X] TELEPHONED
- [ ] RETURNED YOUR CALL
- [ ] PLEASE CALL
- [ ] WILL CALL AGAIN
- [ ] CAME TO SEE YOU
- [ ] WANTS TO SEE YOU

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1



**Federal Deposit Insurance Corporation**

Ann Bridges Steely
Associate Director
Acquisition Services

5/22/06

Tom/Mary —

I am very concerned about this response. The replies to each recommendation sound as though we have done little or nothing to review the OIG's position and conduct our own review. This is unacceptable. Can't we say what we have accomplished so? Some of these issues don't seem that complex.

**Federal Deposit Insurance Corporation**
3501 Fairfax Drive, Arlington, VA 22226-3500

Division of Administration

May 17, 2006

MEMORANDUM TO:        Stephen M. Beard,
                      Deputy Assistant Inspec...

FROM:                 Ann Bridges Steely, As...
                      Acquisition Services Br...
                      Division of Administrat...

*[handwritten note: This is extremely weak — looks like we have done nothing to review this issue. Can't we give some information about what we have done?]*

SUBJECT:              Management Response ...
                      No. 05-030: Metavante ...
                      FDIC under Contract 00...

The Division of Administration (DOA) has completed its review of the subject Office of
Inspector General (OIG) report.  We appreciate the review performed by the OIG and its
recommendations for each finding.  We have evaluated the findings and recommendations,
and have provided a detailed response to include planned corrective actions (if applicable) and
expected completion dates as appropriate.

**OIG Recommendation:** *Qualification Requirements:*

The OIG questioned $645,592 in labor charges billed to the FDIC, and recommends that the
FDIC Contracting Officer (CO) ~~should~~ determine whether these employees were qualified for
the labor category Metavante used in billing the FDIC.

**Management Response:**

DOA is currently working with the Oversight Manager (OM) to ~~provide~~ *obtain* back-up documentation
concerning the above recommendation so that the questioned costs can be ~~verified~~ *assessed*.  If it is
determined that some or all of the questioned cost of $645,592 dollars is justified, ASB will seek
to recover amounts due by ~~October 31, 2006~~. *July 31, 2006.*

**OIG Recommendation:** *Key Personnel:*

The OIG questioned $14,940 in hourly labor charges for Metavante employees who were billed
to the FDIC as key personnel, but had not been designated or approved in advance by the FDIC
as key personnel. The OIG recommends that the FDIC CO ~~should~~ determine if the advisory
board had been authorized in advance by the FDIC and whether the individuals working on the

board had the minimum qualifications necessary for the enterprise system professional billing rate.

**Management Response:**

DOA is currently working with the Oversight Manager (OM) to ~~provide~~ *obtain* back-up documentation concerning the above recommendation so that the questioned costs can be verified. If it is determined that some or all of the questioned cost of $14,940 dollars is justified, ASB will seek to recover amounts due by ~~October 31, 2006~~ *July 31, 2006*.

**OIG Recommendation:** *Unsupported Expenses:*

The OIG questioned $20,000 in storage charges billed by Metavante to the FDIC. The OIG recommends that the FDIC CO ~~should~~ work with Metavante to determine costs for storing the equipment and allow only Metavante's actual costs.

**Management Response:**

DOA is currently working with the Oversight Manager (OM) to ~~provide~~ *obtain* back-up documentation concerning the above recommendation so that the questioned costs can be verified. If it is determined that some or all of the questioned cost of $20,000 dollars is justified, ASB will seek to recover amounts due by ~~October 31~~ *July 31,* 2006.

**OIG Recommendation:** ~~Excess Labor Hour Charges:~~

The OIG questioned $11,360 for excess labor hour charges by Metavante, and the OIG recommends that the FDIC CO ~~should~~ determine which "Professional Services Time Reports (PSTRs)" are correct and allow only those charges.

**Management Response:**

DOA is currently working with the Oversight Manager (OM) to ~~provide~~ *obtain* back-up documentation concerning the above recommendation so that the questioned costs can be verified. If it is determined that some or all of the questioned cost of $11,360 dollars is justified, ASB will seek to recover amounts due by ~~October 31~~ *July 31,* 2006.

Questions regarding this response may be directed to Mr. ~~Tom Harris, Assistant Director~~, *Andrew Nickle* Division of Administration, ~~Acquisition Services Branch~~ at (703) 562-~~2203.~~

cc:  Thomas Harris
     Trisha Bursey
     Andrew Nickle
     *Mary Bass*

# FDIC

**Federal Deposit Insurance Corporation**
3501 Fairfax Drive, Arlington, VA 22226-3500

*[handwritten: Bearing Point — no space]*

Division of Administration

*[handwritten: (5270) May 22, 2006]*

MEMORANDUM TO:      Stephen M. Beard,
                    Deputy Assistant Inspector G[...]

*[handwritten: Confirm that my edits don't change the meaning incorrectly]*

FROM:               Ann Bridges Steely, Associat[...]
                    Acquisition Services Branch
                    Division of Administration

SUBJECT:            Management Response to the
                    No. 06-002: Bearing Point, In
                    FDIC under Contract 04-0021

The Division of Administration (DOA) has completed its review of the subject office of Inspector General (OIG) report. We appreciate the review performed by the OIG and its recommendations for each finding. We have evaluated the findings and recommendations, and have provided a detail response to include planned corrective actions (if applicable) and expected completion dates as appropriate.

**OIG Recommendation:** *[handwritten: Billed Amounts: adjustments to the Contractor's labor and travel charges and]*

The OIG recommends that ~~the entire~~ DOA ~~should~~ provide Bearing Point with details on the $84,628 in adjustments made to ~~Bearing Point~~ *[handwritten: the]* invoices.

**Management Response:**

Based on ~~the~~ *[handwritten: our]* discussions and review of documentation with the Oversight Manager (OM), the invoice adjustments made were communicated to the contractor ~~and that the contractor was fully aware of the amounts adjusted. There is email documentation that verifies communications to Bearing Point that suggested certain adjustments were made to invoices (see Attachment).~~ Bearing Point *[handwritten: has not]* ~~had never~~ disputed the invoice adjustments made ~~until the issuance of the OIG Report. However, DOA will confirm that Bearing Point received the e-mail and if not, provide Bearing Point with the reasons for the adjustments.~~

**OIG Recommendation:** *[handwritten: Employee Rate Variance:]*

The OIG questioned $45,830 in hourly labor charges that *[handwritten: were not]* ~~are not~~ consistent with the rates proposed in the contract for certain employees. ~~The OIG was pleased that Bearing Point had~~ *[handwritten: Case 1:05-cv-01345-GK]* ~~taken the initiative to resolve the identified rate differences with the FDIC. However, the OIG~~ *[handwritten: as was]* *[Exhibit 10.1]*

*[handwritten: Softer]*

00133

*The OIG was*

concerned ~~that, based on Bearing Point's response, it appears~~ that Bearing Point misunderstands its responsibility to bill the FDIC in accordance with the agreed upon rates within each labor category.

**Management Response:**

DOA agrees with the OIG finding on the overpayment of hourly labor charges and will ~~attempt~~ *iniate efforts* to recover the money by ~~8/17/06.~~ ~~August 19, 2006~~. *July 31*

**OIG Recommendation:** *— Employee Qualifications*.

The OIG questioned $463,125, billed for "Key Personnel" because there was no documentation consistent with the contract terms to support the labor categories billed. The OIG recommends that a determination should be made by the OM and the CO to validate the quality of experience as it relates to the labor categories.

**Management Response:**

DOA does not agree with the OIG decision to question the entire amount ($463,125) billed to the FDIC for services provided by the 10 Bearing Point Employees. ~~DOA deems it inappropriate for the OIG to question costs as it relates to the quality of the experience for these employees, particularly, in light of the fact that the~~ OIG was able to validate the requisite years of experience for the employees.* The amount questioned by the OIG is allowable under the contract given the fact that Bearing Point Employees met the minimum qualifications for the labor categories under the contract. ~~However,~~ *Additionally,* for the Employee No. 8 (Tonic Tep), the OM had already recognized the incorrect billing rate for this employee and made the appropriate adjustment of $15,800 to the submitted invoices.  Therefore, the questioned $463,125 should be allowed.

If you have any questions regarding the response, our point of contact for this matter is Mr. Andrew Nickle, Audit Liaison, for the Division of Administration.   Mr. Nickle can be reached at (703) 562-2126.

cc: Thomas Harris
    Mary Bass
    Paul Sherman
    William Gately
    Dan Bendler

*\* There is no contract standard relating to the quality of a contractor employee's experience.*

4/6/06

Mtg: My Office w/ M. Bass & Tom Harris
RE: Attached 3/23 email from Mary to Andrea
    Koxeford

Stated I wanted to discuss the issues behind
    Mary's response as well as response itself
Told Mary I needed better understanding of
    her need for "HELP" as stated in her msg
    — also said I felt it not appropriate
    to vent to clients, particularly not
    answering client's question
Mary said said she had spoken to OWED and
    filed a complaint against Mr Harris
I said she had a right to do that, but we
    had to continue to get the work done for
    clients
She said she felt this mtg was hostile and she
    would make a memo to that effect
I said I was sorry she felt that way — I was
    merely trying to understand her issues
    & ensure adequate spt to client
She mentioned not having a 13, Tom addressed
    having reassigned work as people left — only holding her acct for
    work assigned to her a her staff

Bass, Barb No. 1:06-cv-01345-GK
Exhibit 10-1

00135

②
4/6/06 cont

She tried to divert discussion, I brought it
back to the MR email
I specifically told her that venting frustration
to client was unappropriate and that she
should address those issues 4 in ASB (reminded
her she had not raised her concerns to my
attention) and if she wasn't happy w/
ASB response, she should feel free to
approach D. Bjorklund a Area — In
the future I expected her to provide
appropriate answers to clients inquiries
I got no response, so I asked if she
understood. No response — facial
glaring, head back, arms crossed.
I told Mary that her body language &
facial expressions felt hostile toward
me. Asked again — She said she
understood.
There was lots of discussion of minor
details of work, she was only one
person, was handling a major project-CAS.

I told her we all have multiple projects &
priorities — the higher the grade, the
more that is true. I know can
cause stress — we all feel it. But I
hadn't heard anything that suggested

Bass v. Bair  No. 1:06-cv-01345-GK
Exhibit 00-1

00136

③
4/6/06 cont

we were expecting more of her than was
grade appropriate or more than
her peers. I asked her if there
was something about her workload
that she felt I wasn't aware of. No
response. I had to ask repeatedly
for an answer. She finally said
no.

Mary said she would call A Woolford w/ answers
to her questions.

Reiterated opening comments — org changes
happening daily — present challenges &
create stress — we must still work
together to support clients

Mary was very defensive even though
I tried very hard not to create
confrontation environment. I
really wanted to understand her
perspective. It was hard to keep
her focused on the topic of the mtg. I
felt she tried to intimidate me by
telling me this was a part of her EEO

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

00137

 Federal Deposit Insurance Corporation

Ann Bridges Steely
Associate Director
Acquisition Services

- work together to serve customers

- organizational changes creating

-

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

## Steely, Ann Bridges

**From:** Steely, Ann Bridges
**Sent:** Thursday, March 23, 2006 5:25 PM
**To:** Bass, Mary E.
**Cc:** Harris, Thomas D.
**Subject:** FW: Requisition Report by Division

**Attachments:** ASB Requisition All by division 03232006.ZIP

Mary – I am concerned about this email and the issues that you have raised. I would like to discuss the situation with you and Tom. I will be out of the office next week, so I will schedule time to meet with both of you the following week.

abs

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(703)562-2192**


**From:** Bass, Mary E.
**Sent:** Thursday, March 23, 2006 11:27 AM
**To:** Woolford, Andrea L.
**Cc:** Harris, Thomas D.; Steely, Ann Bridges
**Subject:** FW: Requisition Report by Division
**Importance:** High

Good Morning Ms. Woolford,

Thanks so much for your below email. It is also "Unacceptable" that I am a CM-1 with the "Corporation" with only a "CG-8" reporting to me. I have no additional "HELP." I have a workload going out the window, and I have requested help too no avail., from Mr. Harris.

You have copied Ms. Steely and Mr. Harris so they are on record.

Respectfully,

Mary E. Bass


**From:** Woolford, Andrea L.
**Sent:** Thursday, March 23, 2006 11:17 AM
**To:** Bass, Mary E.
**Cc:** Harris, Thomas D.; Steely, Ann Bridges
**Subject:** FW: Requisition Report by Division
**Importance:** High

Mary,

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

I've been very patient, but I am very concerned about all of the contract modifications and requisitions that have not been completed. This report shows that there has been no movement on any of these items including the CDR modifications.    This is unacceptable.    When will they be complete?

Andrea Woolford
Assistant Director, Planning and Resource Management

| From: | LeVault, Matthew |
|---|---|
| Sent: | Thursday, March 23, 2006 9:32 AM |
| To: | Liang, Richard C.; Mento, Philip D.; Bendler, Daniel H.; Mettee, Erin; Mattus, Holly; Downey, James A.; Woolford, Andrea L.; Johnson, Elena; Mahoney, Daniel J.; Sarsfield, Gary B.; Savopoulos, James A.; Hatch, Cheryl D.; Brooks, Gail; Moreland-Gunn, Penelope; Evans, Wayne M.; Duffy, Kathleen M.; Davis, Paulette E.; Strickler, William C.; Warren, Annette M.; Smith, Jeannette P.; Parker, Denise L.; Watts, Corinne; Mertic, Edward M.; Frank, Nancy J.; Lee, Angela Y.; Jones, Debra; Hearn, Janice S.; Wright, Nann E. |
| Cc: | Eason, Joy; Nagel, Rochelle A.; Young, Constance; Matzke, Nancy L.; Hunter, Jodi R.; Waldron, Robert C.; Reeves, Brett A.; Cooley, David; Hobbs, Tim; Hughes, Karen; LeVault, Matthew; Hudgins, Joyce L.; Lucio, Lucretia G.; Shuck, Beverly J. |
| Subject: | Requisition Report by Division |



ASB Requisition All
by divisio...

Attached is an MS Excel files containing information regarding requisitions in NFE.  All requisition data on the report will lag one day from the date on the report.

There are some slight format changes on this report.  The changes are at the request of some of the program offices.  You will see that the division column is now the first column and the 'Auto Filter' option is turned ON.  To use this auto filter, click on the drop down arrow in the column heading and pick the value of the data you want to see on the report (i.e. If you only want to see DOA requisitions, click the drop down arrow in the Division column and select DOA.  This will display the DOA REQs only.)

In the lower left corner of the PRINTED version of this report, you will now find a key to decipher the status.

If you have questions or concerns about the report or it's formatting, please contact me.

Thanks,
Matt LeVault
DOA/Management Services Branch/Information Support Section
703-562-2119

4/7/06    Mtg w/ Tom Harris; Joan Gustafson
RE: leg CORHG 189, attc email

- Joan was a little disjointed in giving
  background for this reg
- couldn't remember if problem was
  incomplete leg pkg or failure of MR
  to budget check
- said reg was assigned to her in Mar
  she knew of client's requirement - had
   originally talked to MR (Andrea Woolfal)
  in Aug 05
- clearly laid responsibility at feet of
  Mary Bass ("Mary told us not to work...";
  "Mary was working a high priority...")
- told Joan we were not to ask the client
  to give us a new reg since it was an
  ASB error that closed it in NFE

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

## Steely, Ann Bridges

| | |
|---|---|
| **From:** | Steely, Ann Bridges |
| **Sent:** | Friday, April 07, 2006 9:42 AM |
| **To:** | Gustafson, Joan L.; Bass, Mary E. |
| **Cc:** | Harris, Thomas D. |
| **Subject:** | RE: Req Status |

**Tracking:**

| Recipient | Delivery |
|---|---|
| Gustafson, Joan L. | Delivered: 4/7/2006 9:42 AM |
| Bass, Mary E. | Delivered: 4/7/2006 9:42 AM |
| Harris, Thomas D. | Delivered: 4/7/2006 9:42 AM |

Joan  - Thank you for this additional information.  Since the requisition was approved on Nov 30 and had been assigned to you, can you give me the history regarding the efforts you took to obtain the missing information from DIR?  This requisition was in our area for 4 months, so I would like to know what actions ASB had been taking. Even though the requisition is now closed in NFE, we have not yet satisfied the client's requirement.  Please continue to work this requirement and stay in close communication with DIR so they know when they can expect a contract to be awarded.  I would like you to tell me your forecast for a contract award by COB Monday, April 10.

Mary – if this requisition was inadvertently closed within ASB, it is our responsibility to take whatever action is necessary to "re-activate" it.  We should not burden the client for a new requisition when this is an ASB-caused problem.  Please get with Nancy Matzke or Connie Young and see what we can do to take the requisition out of closed status.  Please let me know what you find out by COB Tues.

abs

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(703)562-2192**

---

**From:** Gustafson, Joan L.
**Sent:** Friday, April 07, 2006 9:21 AM
**To:** Steely, Ann Bridges
**Cc:** Harris, Thomas D.; Bass, Mary E.
**Subject:** RE: Req Status

Hi Ann,

Tom asked me this morning to respond to your email in Mary's absence.  Peterson's requisition was part of a group of reqs that needed to be resubmitted by DIR.  The only attachments submitted with Peterson's original req were a Statement of Objectives and a JNCP letter.  Because he was a new client, this was not sufficient information to process the requirement.  At a minimum, we needed a phone number, address or even an email address.  Mary may have inadvertently closed the requisition believing that it was resubmitted with the others, but you may want to ask her to know for sure.  Let me know if you need anything else.  Thanks.

---

**From:** Steely, Ann Bridges
**Sent:** Wednesday, April 05, 2006 4:44 PM
**To:** Bass, Mary E.

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

**Cc:** Gustafson, Joan L.; Harris, Thomas D.
**Subject:** RE: Req Status

Mary – from the last list I printed (Mar 13), requisition CORHQ 00189 was approved on 11/30/2005 for $50,000 for Mitchell Peterson. What happened to that requisition? Did the client cancel it? Did we reject it for some reason?
Thanks.

abs

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(703)562-2192**

---

**From:** Bass, Mary E.
**Sent:** Wednesday, April 05, 2006 12:15 PM
**To:** Steely, Ann Bridges
**Cc:** Gustafson, Joan L.; Harris, Thomas D.
**Subject:** FW: Req Status

Good Afternoon Ms. Steely,

The requisition for Mr. Petersen has never been resubmitted by DIR for processing.
Thanks. MB (#22198)

---

**From:** Steely, Ann Bridges
**Sent:** Wednesday, April 05, 2006 11:11 AM
**To:** Gustafson, Joan L.
**Cc:** Harris, Thomas D.; Bass, Mary E.
**Subject:** RE: Req Status

Thank you, Joan.

The Peterson req was approved last Nov. Have we had it all this time without the necessary information as to how to contact the contractor? Is this a new person we are adding to the CFR effort or have we contracted with him in the past?
Thanks,

abs

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(703)562-2192**

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1

---

**From:** Gustafson, Joan L.

**Sent:** Wednesday, April 05, 2006 11:06 AM
**To:** Steely, Ann Bridges
**Cc:** Harris, Thomas D.; Bass, Mary E.
**Subject:** RE: Req Status

Hi Ann,

Hanweck should be finished today. Katie Ahrens faxed Peterson's contact information to me last week. As soon as he registers in CCR, his requisition can be processed. Let me know if you need anything else. Thanks.

---

**From:** Steely, Ann Bridges
**Sent:** Monday, April 03, 2006 5:57 PM
**To:** Gustafson, Joan L.
**Cc:** Harris, Thomas D.; Bass, Mary E.
**Subject:** Req Status

Joan, Tom mentioned that several of the DIR reqs are close to completion and are out to the contractors for signature. Could you please let me know the status of CORHQ 00401 (Hanwick) and CORHQ 00189 (Peterson)? Thanks.


abs

**Ann Bridges Steely**
**Associate Director**
**Acquisition Services**
**(703)562-2192**

Bass v. Bair, No. 1:06-cv-01345-GK
Exhibit 10-1