Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x
                                  :
MARY E. BASS,                     :
                                  :
        Plaintiff,                :
                                  :
        v.                        : Case Number:
                                  :
SHEILA C. BAIR,                   : 1:06CV01345
Chairman, Federal Deposit         :
Insurance Corporation,            :
                                  :
        Defendant.                :
                                  :
- - - - - - - - - - - - - - - - - x

                        Arlington, Virginia

                        Tuesday, July 24, 2007

Deposition of

                ANDREA L. WOOLFORD

a witness of lawful age, taken on behalf of the

Plaintiff in the above-entitled action, before Leanne

M. Krivonak, Notary Public in and for the Commonwealth

of Virginia, Registration Number  180129, in the

offices of Federal Deposit Insurance Corporation, 3501

Fairfax Drive, Arlington, Virginia, commencing at 1:10

p.m.

                Diversified Reporting Services, Inc.
                        (202) 467-9200

APPEARANCES:


On Behalf of the Plaintiff:
        DAVID H. SHAPIRO, ESQ.
        SWAIK & SHAPIRO
        1225 Eye Street, N.W.
        Suite 1290
        Washington, D.C.  20005


On Behalf of the Federal Deposit
Insurance Company:


        BARBARA SARSHIK, ESQ.
        WILLIAM S. JONES, ESQ.
        3501 Fairfax Drive
        Arlington, Virginia  22226

C O N T E N T S

EXAMINATION BY:                                    PAGE

     Counsel for Plaintiff                         4

DEPOSITION EXHIBIT:

1 - Chain of e-mails                             31

Page 4

1                     P R O C E D I N G S

2    Whereupon,

3                      ANDREA L. WOOLFORD

4    was called as a witness and, having been first duly

5    sworn, was examined and testified as follows:

6               EXAMINATION BY COUNSEL FOR THE PLAINTIFF

7               BY MR. SHAPIRO:

8         Q    **Will you state your full name, please, ma'am.**

9         A    Andrea Lynn Woolford.

10        Q    **Andrea?**

11        A    Lynn, L-Y-N-N.  The last name is Woolford,

12   W-O-O-L-F-O-R-D.

13        Q    **And, Ms. Woolford, can you tell us where you**

14   **live?**

15             MS. SARSHIK:  I'm going to object to that and

16   agree that we will accept the subpoena for her if you

17   choose to subpoena her.

18             MR. SHAPIRO:  Is that acceptable to you?

19             THE WITNESS:  Yes.

20             MR. SHAPIRO:  But I've got to tell you, she's

21   just a witness, she's not a management person for the

22   same part of this case.

Page 5

1          MS. SARSHIK:  She is a manager here at the

2     FDIC.

3          MR. SHAPIRO:  That may be, but for the

4     purposes of this case, she's not an actor, she's not

5     somebody who did anything in terms of the complaint.

6     So she's just a witness and I'm entitled to contact her

7     without your presence and call her and talk to her.

8          MS. SARSHIK:  You can contact her or you know

9     how --

10          MR. SHAPIRO:  I can contact her where I want

11     to and I want her personal phone number, I'm entitled

12     to get it.  There is no objection about that.  That is

13     not a legitimate objection.  It's just not.  I mean, I

14     don't know where you thought you would get an objection

15     to that, but it's not a legitimate objection.

16          So I'm going to ask you for your address,

17     ma'am, and your phone number.

18          MS. SARSHIK:  You may answer.

19          THE WITNESS:  12205 Quintette Lane and it's in

20     Bowie, Maryland  20720.

21          BY MR. SHAPIRO:

22     Q     A long haul?

1          A      Yes.

2          Q      **And your telephone there?**

3          A      (301) 804-8508.

4          Q      **Any plans to move?**

5          A      None.

6          Q      **And you're currently a FDIC employee?**

7          A      Yes.

8          Q      **For how long have you been at the FDIC?**

9          A      A little over 15 years.

10         Q      **Since?  What's the date again?**

11         A      October 1991, I think, yeah.  October 1991.

12         Q      **And what is your current job?**

13         A      I am the Assistant Director of Planning and

14    Resource Management for the Division of Insurance and

15    Research.

16         Q      **Division of Insurance?**

17         A      Yes, Insurance and Research.

18         Q      **How long have you had that job?**

19         A      For about -- it's the year 2007.  I started

20    that job in August of 2001.

21         Q      **So six years?**

22         A      Yes.

1      **Q    What did you do prior?**

2      A    Prior to that I was a senior financial

3   analyst.

4      **Q    I'm sorry.  I didn't hear.**

5      A    A senior financial analyst.

6      **Q    Senior financial analyst.**

7      A    Uh-huh, and in the Division of Insurance

8   and -- oh, at that time it was just the Division of

9   Insurance.

10     **Q    And how long were you a senior financial**

11  **analyst in the Division of Insurance?**

12     A    Probably -- I'm trying to think about time.  I

13  started at the Division in '96, but I didn't become a

14  senior analyst until about -- I would say probably

15  about -- '98 or '99, somewhere around there.

16     **Q    So you were originally a financial analyst?**

17     A    Right, a banking analyst.

18     **Q    And prior to your service there?**

19     A    I was a commission examiner in the Division of

20  Supervision.

21     **Q    And where did you work?**

22     A    In the Baltimore Field Office.

1    **Q    Always?**

2    A    Uh-huh, yes.

3    **Q    So you started there in 2001 to --**

4    A    I started --

5    **Q    '91 to '96 you were a commission examiner.**

6    A    Ninety -- okay, hold on.  I missed a job in

7    between there, '91 to '95 I was in Baltimore.  '95 to

8    '96 I moved to Washington as financial analyst in

9    supervision and that was one year before I moved to the

10    other position.

11        So you took the training as a commission

12    examiner and got your commission --

13    A    Yes.

14    **Q    So you came to the FDIC in '91.**

15    A    Yes.

16    **Q    And where did you come before -- where were**

17    **you before?**

18    A    Prior to that I worked for Household Finance

19    Corporation.

20    **Q    And how long did you work for HFC?**

21    A    Two years.

22        (Phone interruption.  Brief recess.)

```
 1              BY MR. SHAPIRO:

 2        Q    We were talking about HFC.

 3        A    Yes.

 4        Q    You said you were there for two years.

 5        A    Yes, two years.

 6        Q    What did you do there?

 7        A    I was a loan officer.

 8        Q    And that would have been some time from '89 to

 9    '91?

10        A    '89 and I left sometime in the beginning of

11    '91.

12        Q    Okay.  And what did you do before that?

13        A    I was in college.

14        Q    College?

15        A    Yes.

16        Q    And where did you go to college?

17        A    Bowie State University.  I should clarify.  It

18    was college then, Bowie State College.

19        Q    And you have a bachelor's degree --

20        A    Yes.

21        Q    From Bowie State?

22        A    Yes.
```

Page 10

1    Q    And what's the -- B.A, B.S. --

2    A    Yes.

3    Q    B.S. in?

4    A    Finance.

5    Q    And when did you graduate?

6    A    In 1988.

7    Q    And were you a full-time student at Bowie

8    State?

9    A    Yes.

10   Q    Okay.  And so you went for four years?

11   A    No, I transferred in.

12   Q    Where did you go first?

13   A    I went to Delaware State -- Delaware State

14   College.

15   Q    And when did you go there?

16   A    From '83 until '85.

17   Q    So you did two years at Delaware State and two

18   years at Bowie State?

19   A    Uh-huh, two and a half years at Bowie State.

20   Q    And where were you raised?

21   A    Dover, Delaware.

22   Q    Dover, Delaware.

Page 11

1    A    Yes.

2    Q    **Nice town, Dover -- pretty.**

3         **And you went to high school in Dover?**

4    A    Yes.

5    Q    **When did you graduate from high school?**

6    A    In 1983.

7    Q    **And what is your current grade?**

8    A    I am a CM-2.

9    Q    **And that's higher than CM-1?**

10   A    Yes.

11   Q    **Okay.  And so you had a -- let's see,**

12   assistant director.

13   A    Yes.

14   Q    **So your boss is the --**

15   A    My boss is the director of the division.

16   Q    **And what does the division do?**

17   A    The division is -- there is a few things.  We

18   manage the bank data for the FDIC.  We also

19   manage -- insurance, that the insurance funds are

20   viable, meaning we price deposit insurance.

21   Q    **What do you mean -- price deposit?  What does**

22   **that mean?**

Page 12

1      A    Price deposit insurance?  In other words, we

2  determine whether or not that it should pay premiums

3  and if so, how much is based on the risk that are in

4  the portfolio.  And I should say we make those

5  recommendations because ultimately the FDIC has to

6  approve anything that we recommend.  And we also have a

7  research function which we research financial and

8  banking issues that are pertinent to insured

9  institutions, and then we also identify and monitor the

10  trends and risks in the banking industry.

11      **Q    Now you know Mary Bass?**

12      A    Yes.

13      **Q    She was -- you used contractors to do the**

14  **work?**

15      A    Yes.

16      **Q    So she would be your -- her people would be**

17  **your contracting --**

18      A    Yes.

19      **Q    I don't know.  What do you call it?  They help**

20  **you do your contracts?**

21      A    Yes.

22      **Q    They provide the technical support?**

Page 13

1      A    Yes.

2      Q    **So you do corporate contracting, not IT**

3  **contracting?**

4      A    IT corporate contracting --

5      Q    **So you also contract for IT Services?**

6      A    We don't do it in our division; it's done in

7  the Division of Technology for our division.

8      Q    **Okay, okay.  Are you still dealing with Mary**

9  **Bass?**

10     A    No.

11     Q    **When did you deal with her?**

12     A    I'm not quite sure of the dates.  I kind of

13  give you roughly -- I stopped dealing with her probably

14  about almost a year ago.  She stopped being our

15  contracting person.

16     Q    **Okay.  So before that how long did you deal**

17  **with Mary?**

18     A    Probably for about maybe two years, round

19  about, I would say.

20     Q    **So if you stopped a year ago --**

21     A    Right.

22     Q    **-- mid-2006 --**

Page 14

1      A    Uh-huh.

2      **Q    And you dealt with her for two years, it would**

3   **be mid-2004?  So mid-2004 to mid-2006 roughly.**

4      A    Well, roughly about that.  It may have been a

5   little bit before that or after.  I'm not sure.

6      **Q    And who was the person who was actually**

7   **servicing your unit for contracts?**

8      A    Mary -- both Mary Bass and Joan Gustafson.

9      **Q    And Joan worked for Mary?**

10     A    Yes.

11     **Q    Joan Gustafson, G-U-S --**

12     A    Oh, I don't know.  There's an F in there

13  somewhere.  I don't know how to spell it.

14     **Q    Okay.  So Gustafson was the contracting**

15  **specialist and Mary was the supervisor?**

16     A    Yes, I believe so.  I don't really know their

17  titles.

18     **Q    Okay.**

19     A    I just know Mary was her supervisor and Tom

20  Harris was Mary's supervisor.

21     **Q    And you say you dealt with all of them?**

22     A    Uh-huh.

Page 15

1    Q    Tom, Mary and Joan?

2    A    Yes, yes.

3    Q    Successfully?

4    A    No.

5    Q    No.

6    A    Now when you say successfully --

7    Q    Well, you worked well with Mary?

8    A    I think we worked well together, but was the

9    work satisfactory, I wouldn't necessarily say that.

10    Q    Well, what was not satisfactory?

11    A    There were performance issues in terms of the

12    contracts, letting them in a timely fashion.  It was

13    all the issues in a timely fashion.

14    Q    They weren't -- the contracts were not let in

15    a timely fashion?

16    A    No.

17    Q    And you said there was something else that was

18    not in a timely fashion?

19    A    If there were contract issues, they were not

20    resolved in a timely manner.

21    Q    Okay.  And whom do you work for?  Who is your

22    boss?

Page 16

1        A    Art Merton.

2        **Q    Art Merton.**

3        A    Yes.

4        **Q    Okay.  You say that you worked together, but**

5    **there were performance issues, it was not satisfactory.**

6    **Who was not satisfactory?  Mary Bass' work was not**

7    **satisfactory?  Joan Gustafson's work, Tom Harris', who**

8    **was not satisfactory?**

9        A    In my opinion, Joan Gustafson's work was not

10    satisfactory and if her work is not satisfactory, then

11    it falls on Mary to correct it and to make sure we're

12    taken care of and her work was not satisfactory either.

13        **Q    So Gustafson was the problem and Mary didn't**

14    **correct it?**

15        A    Mary was a problem, too, because she didn't

16    correct it.

17        **Q    That's what I mean.  Gustafson's work**

18    **was -- she was the line person whose work was not**

19    **satisfactory.  Mary was not satisfactory because she**

20    **didn't correct Gustafson's problems?**

21        A    Right.

22        **Q    Okay.**

Page 17

1    A    Nor did she resolve the issue herself?

2    **Q    Okay.  And what about Tom Harris?**

3    A    Tom Harris did resolve the issue.

4    **Q    Well, what was the issue to be resolved?**

5    A    It was many issues.

6    **Q    Okay.  So tell me the issues that were to be**

7    **resolved.**

8    A    Are you asking for examples or --

9    **Q    Well, tell me all the issues that you can**

10   **recall that were not resolved by Mary.**

11   A    I can just kind of give you kind of my summary

12   of it, if that helps out.

13   **Q    Yes, I want everything you can recall.**

14   A    We -- or during the time back then we were

15   beginning to let contracts for economic consultants

16   which is a very sensitive area and whenever the

17   corporation needed those resources --

18   **Q    I don't understand.  When it says -- you were**

19   **beginning to let contracts during the time of 2004 to**

20   **2006?**

21   A    I can't say specifically, I might -- around

22   about that time, during that two-year period I would

Page 18

1    say we worked with Mary.

2        Q    Okay.  So you were beginning to let contracts

3    for economic consultants --

4        A    Exactly.

5        Q    -- and you said that was sensitive because?

6        A    They're sensitive contracts.

7        Q    Why?

8        A    Well, because economists are eccentric to deal

9    with and they're very busy and it's very tough to get

10   their services.

11       Q    They're difficult to deal with?

12       A    No, I didn't say difficult to deal with.

13   They're eccentric, I said.

14       Q    Eccentric?

15       A    Yes.  So we were working with Mary and with

16   Joan and on this, primarily Mary, because she was the

17   senior person to get those correct.  We had issues and

18   these are just the ones that I can recall off the top

19   of my head some time ago.  We have issues with the

20   contract actually being executed timely.  We had issues

21   with the economists not being contacted in an

22   appropriate manner.

Page 19

1       Q     What do you mean -- not contacted in an

2    appropriate manner?

3       A     In other words, they had the contract

4    methodology that they followed when they let contracts

5    and when they're supposed to contact the contractor and

6    give them information and have them sign the contract,

7    etcetera, etcetera, and we had the lapses in those

8    times when the contractors would then call us, which

9    was not a good reflection on the FDIC and which I had a

10   very big problem with -- that was not good.

11      Q     What was the problem?  Did you ever get to the

12   root of the problem?

13      A     Yes, they weren't calling them.  They

14   didn't -- they weren't doing the work that was required

15   to get the contract out in a timely manner?

16      Q     Gustafson and Mary?

17      A     Yes.

18      Q     Okay.  And how many contracts did this

19   involve?

20      A     I can't recall, but roughly --

21      Q     Well, give me a sense; 10, 20, 50, 3, 100?

22   What ballpark are we talking about?

Page 20

1       A    Somewhere around between, I would say, 10 to

2    15.

3       Q    **Ten to 15?**

4       A    Yes.

5       Q    **Different economists.**

6       A    Yes, different economists, but the contracts

7    themselves are very similar.

8       Q    **I understand.**

9       A    They shouldn't have been that difficult.

10      Q    **Do you -- are you a contracting officer**

11   **yourself?**

12      A    No.

13      Q    **Have you ever been a contracting officer --**

14      A    No.

15      Q    **So you don't really know how difficult the job**

16   **of contracting officer is; is that correct?**

17      A    You're absolutely right.

18      Q    **Okay.  So you said -- was it all they were not**

19   **being contacted timely?**

20      A    No.

21      Q    **Or just some?**

22      A    No.

Page 21

1    Q    Just a couple, some?

2    A    I can't recall.  It was significant enough for

3    it to be considered a problem.

4    Q    Okay.  So some were being done right -- and by

5    right I mean timely and some were not?

6    A    I don't recall.

7    Q    But they weren't all not being done timely,

8    right?

9    A    I really don't recall --

10    Q    Okay.  A few minutes ago you said that some of

11    them were being done, some were not, but it was

12    significant enough that it made it a problem.

13    A    I was saying that yes, they were enough that

14    it was significant enough that it was a problem.

15    Q    Okay.  But implies to me that some were being

16    done timely and some were not and it was a significant

17    number, significant enough number that they were not,

18    but it was noticeable.

19    A    I say significant because I can't say 100

20    percent that all of them were not being done timely,

21    nor can I say that all of them were being -- or some of

22    them were being done timely.  I just can't remember.

Page 22

1      Q    Okay, good.

2           All right.  And you were involved in all 15 of

3    these or some 10 to 15, you said?

4      A    Yes.  Uh-huh, yes.

5      Q    And you said that the economists were -- are

6    eccentric, they're difficult to deal with?

7      A    No, they're not difficult to deal with -- I

8    just -- they're eccentric in terms of -- they're

9    just -- it's very hard to explain.  I come from a

10   culture of being examiners, economists respond

11   differently and handle administrative matters,

12   etcetera, differently, that's all.

13     Q    Different than they handle the work --

14     A    Than examiners, exactly.

15     Q    Than they handle the work.

16     A    Exactly.

17     Q    So they might handle the work in a perfectly

18   professional manner, but in administrative matters they

19   might be not quite as organized as examiners?

20     A    Yes, they may need a little more help.

21     Q    Okay.

22     A    And that was explained to the contract folks.

Page 23

1     Q    To the contractors --

2     A    Yes.

3     Q    Meaning Gustafson, Mary and Tom.

4     A    Yes.

5     Q    Okay. Anybody else that you deal with on

6  Mary's staff in this, or is it just Joan Gustafson?

7     A    I don't recall and maybe I don't recall

8  because that's where I had a lot of the problems with

9  though.  I think there were a couple of other

10  contracting people, but I don't know if they were on

11  Mary's staff or if they just worked for Tom.  I'm not

12  sure.

13     Q    All right.  Did you have problems dealing with

14  anybody else besides Gustafson and Mary?

15     A    No.

16     Q    Okay.  And was it just these contracts -- the

17  economists or were they --

18     A    No, it was all of our contracts.

19     Q    So all of your contracts were not being done

20  timely or some of your contracts were not being done

21  timely in all categories?

22     A    Can you repeat that?

Page 24

1    Q    Yes.

2    A    I didn't --

3    Q    **Were all your contracts not being done timely?**

4    A    I'm not sure.  I can't say with certainty.

5    I'm just saying to you that the majority of them -- I

6    can give you that, the majority of our contracts had

7    issues with them -- significant issues --

8    Q    **Okay.**

9    A    -- that required me to follow up to contact

10   and to go above Mary to get it resolved.

11   Q    **Okay.  And how many contracts did you have**

12   **during this two-year period?**

13   A    Other than the economists' contracts?

14   Q    **Yes.**

15   A    In addition to the economists' contracts there

16   may be -- not a lot, maybe -- I would say anywhere from

17   two to six additional contracts.

18   Q    **And what were they for?**

19   A    Various consulting services in the division.

20   Q    **Not economists?**

21   A    Some of them may have been economists by

22   trade, but they weren't the economic consulting

Page 25

1    contracts.  They may have been consulting for business,

2    like the deposit insurance formula, something like

3    that.

4         Q    And there was trouble with every contract?

5         A    I won't say that for certain.

6         Q    Do you recall trouble with any contracts as in

7    the economists contracts?

8         A    I really don't recall.

9         Q    Okay.

10        A    I need to sit down and look at the list of

11   contracts.

12        Q    Okay.  Let me make sure we understand each

13   other.  Okay?

14        A    Uh-huh.

15        Q    I'm not asking you to guess.

16        A    Yes.

17        Q    I'm not asking you to suppose.  I'm not asking

18   you to -- what must have been or what could have been

19   or what might have been.  I'm asking you what you

20   actually have a recollection of?

21        A    All right.  I got you.

22        Q    Okay.  So it's important that you keep that in

Page 26

1    mind when I ask you.  If I want you to guess or

2    suppose, I'll ask you that, too.  But now I -- you

3    know, sometimes you say recall and people don't take it

4    to mean what they -- so I'm trying to get --

5         A    I understand.

6         Q    -- what you recall.

7              So you said there was a significant number of

8    problems in the economists contracts that you took

9    notice of it.

10        A    Uh-huh, yes.

11        Q    You don't know if it was hundred percent of

12   the contracts were involved, but many -- enough so that

13   you took notice.

14        A    Yes.

15        Q    There was a problem.

16             With respect to the non-ecomonists consulting

17   contracts with those -- they're not the economists, but

18   they're not --

19        A    Right.

20        Q    -- and you said not consulting as part of the

21   economists' contracts.  Do you recall any of those

22   contracts having a problem?  Recall.

Page 27

1    A    And that's what I said --

2    **Q    You can't recall?**

3    A    I cannot recall.

4    **Q    Now did you look at any documents in**

5    **preparation for this deposition like a list of the**

6    **contracts or a review of your -- I don't know -- your**

7    **complaints or memos or e-mails?**

8    A    Yes.

9    **Q    Okay.  And what did you look at?**

10   A    I look at some of the former complaints, the

11   e-mails that I --

12   **Q    How many?**

13   A    Maybe one or two.

14   **Q    Do you have them here?**

15   A    No.

16   **Q    Which e-mails were they?**

17   A    I can't --

18   **Q    From you to somebody else or are they --**

19   A    They're e-mails that were sent to Mary Bass

20   and then there is an e-mail that was sent to Ann

21   Bridges Steely -- Steely Bridges, one or the other, --

22   **Q    Okay.  And what are the dates of these**

Page 28

1    e-mails?

2        A    I don't recall.

3        **Q    What is the year of these e-mails?**

4        A    You can call it age.  I can't recall.

5        **Q    Okay.  Where are those e-mails now?  On your**

6    **desk?**

7        A    No.  After reviewing it, destroyed.  I have

8    copies -- I have e-mails like electronic copy, but

9    paper I don't leave sitting around.

10       **Q    So you looked at two e-mails, one to Mary Bass**

11   **and one to Ann Bridges Steely both to you.  Were these**

12   **e-mail runs like several e-mails, a chain of e-mails or**

13   **was it just one e-mail to each?**

14       A    I believe they were chains of e-mails.

15       **Q    So two chains of e-mails?**

16       A    Yes.

17       **Q    Were they in the same chain -- these two**

18   **e-mails?**

19       A    I don't recall.

20       **Q    Who told you to look at those -- anyone?**

21       A    I was discussing the case with the FDIC

22   lawyer.

Page 29

1          Q      And you were looking at those e-mails as a

2    consequence of that?

3          A      Yes.

4          MS. SARSHIK:  I'm going to object and instruct

5    you not to answer that question or any other question

6    about conversations that you had with lawyers.

7          MR. SHAPIRO:  I want the things that she

8    looked at.  I want to have a look at the things that

9    she looked at.

10         MS. SARSHIK:  We'll talk about that after the

11   deposition.

12         MR. SHAPIRO:  Well, I can't very well close

13   the deposition without seeing those, can I?

14         MS. SARSHIK:  I don't know.  You have never --

15         MR. SHAPIRO:  Well, you didn't mention

16   anything about them in your initial disclosure of your

17   supplements.

18         MS. SARSHIK:  There was no requirement that we

19   do that.  There was no request for them.  The discovery

20   cutoff is in a few days.  You've had a lot of time when

21   you could have requested any documents.

22         MR. SHAPIRO:  Well, there is no way of knowing

Page 30

1    what documents are around, but this witness now tells

2    me that she looked at a couple of chains of e-mails.

3              MS. SARSHIK:  There is a way of making a

4    document request --

5              MR. SHAPIRO:  Yes, I had to make --

6              MS. SARSHIK:  And it didn't happen in this

7    case.

8              MR. SHAPIRO:  Excuse me.  When I want an

9    instruction on how to make a document request, you're

10   not the person I'll come to.

11             All right.  Now I want those documents, she

12   looked at those documents.  Am I going to get those

13   documents or not?

14             MS. SARSHIK:  I'll be glad to talk with you --

15             MR. SHAPIRO:  Are you going to produce -- I

16   want to know if you're going to produce those documents

17   or not.

18             MS. SARSHIK:  We don't plan to.

19             MR. JONES:  Let's take five minutes.

20             MR. SHAPIRO:  Sure.

21             (Brief recess.)

22             MS. SARSHIK:  Mr. Shapiro, we are going to

Page 31

1    give you two pages of an e-mail chain that Ms. Woolford

2    reviewed before this deposition.  These two pages

3    happen to be in the tickler file that we gave you for

4    Ann Bridges Steely, but they were printed off, at any

5    earlier date, from Ms. Woolford's computer.

6            MR. SHAPIRO:  A date earlier than?

7            MS. SARSHIK:  Well, I don't know when the

8    tickler file was -- earlier than today.  They

9    previously were given to us independently by Ms.

10   Woolford.  So we have them from her computer, not just

11   from Ms. Bridges Steely's tickler file.

12           MR. SHAPIRO:  Then why don't we mark this

13   document then as Exhibit 1 to this deposition.

14           MS. SARSHIK:  That's fine.

15                           (Whereupon, Deposition Exhibit

16                           Number 1 was marked for

17                           identification.)

18           MR. SHAPIRO:  And we'll find out about it.

19           MS. SARSHIK:  And for the record we do agree

20   that Ms. Woolford will review what is in her computer

21   to establish with certainty what she reviewed before

22   today's deposition for the deposition, and we will

Page 32

1    produce those documents to you.

2          BY MR. SHAPIRO:

3      Q    I would like to show you what has been marked

4    for identification as Exhibit Number 1 to this

5    deposition.  This is the document that was just handed

6    to me.  Ms. Woolford, this indicates it's an e-mail

7    chain, correct?

8      A    Yes.

9      Q    And it indicates that it is printed off of

10   your computer.  That's why your name is at the top

11   above the dark black line, correct?

12     A    Yes.

13     Q    That's what that means.  It came from your

14   station.

15     A    Uh-huh, yes.

16     Q    Okay.  It is a -- the last e-mail in this

17   chain, that is the most recent of these e-mails is from

18   Mary Bass.  The date is Thursday, March 23, 2006, at

19   12:27 p.m. and it's to you with a cc to Tom Harris and

20   Anne Bridges Steely, and the subject is requisition

21   report by division.

22     A    Yes.

Page 33

1      Q    Okay.  And it says -- and there's attachments,

2  an ASB requisition all by division with a number.  It

3  says, Good Morning, Ms. Woolford.  Thanks so much for

4  your below e-mail.  It is also "unacceptable" that I am

5  a CM-1 with the "Corporation" with only a "CG-8"

6  reporting to me.  I have no additional "HELP."  I have

7  a workload going out the window, and I have requested

8  help to no avail., from Mr. Harris.

9           You have copied Ms. Steely and Mr. Harris and

10  so they are on record, respectfully, Mary Bass.

11           The e-mail to which this seems to have

12  responded is one of the same day from you to Mary Bass

13  with a cc to the same people, correct?

14      A    Yes.

15      Q    About a little bit more than an hour before on

16  March 23 at 11:17 a.m., and that e-mail says, Mary, I

17  have been very patient, but I am very concerned about

18  all of the contract modifications and requisitions that

19  have not been completed.  This report shows that there

20  has been no movement on any of these items including

21  the CDR modifications.  This is unacceptable.  When

22  will they be complete?

Page 34

1          And it's from you, Andrea Woolford, Assistant

2    Director, Planning and Resource Management.  Correct?

3        A    Yes.

4        Q    And there is an e-mail that's even earlier

5    from the same day from a Matthew LeVault?

6        A    Yes.

7        Q    To a host of people, including you.  You're a

8    recipient of that e-mail, correct?

9        A    Yes.

10        Q    But it looks like Mary Bass is neither a

11    recipient or a cc person, correct?

12        A    It does not appear that way.

13        Q    Am I correct?

14        A    Yes, her name is not on here.

15        Q    Neither is Tom Harris apparently, true?

16        A    His name is not on here.

17        Q    On either recipient or cc, right?

18        A    Yes.

19        Q    And it says and it's the ASB requisition all

20    by division.  That was the attachment, correct?

21        A    Yes.

22        Q    Who is Mr. LeVault?

Page 35

1    A    He is an employee of the corporation.

2    **Q    Well, is he in Mary Bass' unit?  Is he in your**

3  **unit?**

4    A    He's not in my unit.  I'm not sure exactly

5  where -- I believe he works in the Division of Finance.

6    **Q    Of Finance -- so that means he wouldn't be**

7  **under Bridges Steely, right?**

8    A    I wouldn't know.

9    **Q    I'm correct?**

10   A    I don't believe he is.

11   **Q    So I am correct?**

12   A    Yes.

13   **Q    As far as you know?**

14   A    As far as I know.

15   **Q    Okay.  And his e-mail says -- it says attached**

16 **an MS Excel files containing information regarding**

17 **reacquisitions in NFE.**

18       **What is NFE?**

19   A    New Financial Environment.

20   **Q    Ah, all requisition data on the report will**

21 **lag one day from the date of the report.  There are**

22 **some slight format changes on this report.  The changes**

Page 36

1   are at the request of some of the program offices.  You

2   will see the division column is now the first column

3   and the "Auto Filter" option is turned on.  To use this

4   auto filter, click on the drop-down arrow in the column

5   heading, and pick the value of the data you want to see

6   on the report. i.e., if you only want to see DOA

7   requisitions, click the drop-down arrow in the Division

8   column and select DOA.  This will display the DOA REQS

9   only.)  In the lower left-hand corner of the printed

10  version of this report, you will now find a key to

11  decipher the status.  If you have questions or concerns

12  about the report, or its formatting, please contact me.

13  Thanks, and it says, Matt LeVault, DOA.

14          So he is in the Division of Administration,

15  right?

16      A    I stand corrected, he is, yes.

17      Q    Management services branch, information

18  support section.  Management services branch is one of

19  the branches in DOA, correct?

20      A    Yes.

21      Q    Is it under Ms. Bridges Steely?

22      A    I don't know.

Page 37

1     Q     I see.  Now, this document is one of the ones

2   you looked at in preparation for today?

3     A     Yes.

4     Q     One of the two chains that you looked at?

5     A     Yes.

6     Q     Now, this date -- is this -- the -- from the

7   discussion when it was handed to me, there was

8   something about a change in date.  It's not the March

9   23rd date that changes -- that's the date of these

10  actual e-mails in real time, right?

11    A     Yes.

12    Q     Okay, so this was in 2006?

13    A     Yes.

14    Q     All right.  And it was in 2006 that you're

15  writing to Mary saying, you've been very patient, but

16  you still don't have the contract modifications?

17    A     Yes.

18    Q     And you want to know why, and she tells you

19  look -- and I have one CG8 working for me, that's all,

20  I'm doing the best I can?  I'm summarizing what her

21  e-mail says.

22    A     That's what she says.

Page 38

1      Q    And she says, I've asked for more help and I'm

2   not getting it, from my bosses, right?

3      A    Yes.

4      Q    Okay.  Do you know who this CG8 was, is this

5   Joan?

6      A    I believe that's who she's referring to.

7      Q    Joan Gustafson?

8      A    Joan Gustafson.

9      Q    Okay.  Okay.  Do you know if Mary Bass had

10   more help than that?

11      A    I don't know.

12      Q    Do you know for how long she only had one CG8

13   working for her?

14      A    I don't know.

15      Q    Did you ever deal with anybody other than Ms.

16   Gustafson on Mary Bass' staff?

17      A    As I stated before, I've dealt with other

18   contracts specialists, but that I don't know if they're

19   under Mary or not.

20      Q    Right.

21      A    I just know they work for Tom Harris.

22      Q    Okay, so they may not have been under Mary?

Page 39

1      A     They may not.

2      **Q     But they were under Tom Harris?**

3      A     Yes.

4      **Q     Okay.  Now, was this the first time you've**

5    **wrote to Mary about a problem?  Wrote.  Not called,**

6    **not -- I'm talking about wrote an e-mail?**

7      A     I am pretty certain that no, this is not the

8    first time.

9      **Q     Okay, how close --**

10     A     2006 --

11     **Q     How close to the first -- this is not -- this**

12   **is March, so it's the end --**

13     A     Of 2006.

14     **Q     Near the end of the first quarter of 2006?**

15     A     Right.  I can't say how far back, but --

16     **Q     Six months back?**

17     A     If you want me to be precise, that's --

18     **Q     I'm asking you to be -- Obviously I**

19   **can't -- can't be precise because you can't remember**

20   **the date -- how about ballpark?**

21     A     Mary was our contracting specialist for a

22   couple of years --

Page 40

1       Q    Well let's just take this document as we see.

2   You said that sometime about a year ago, Mary stopped

3   being your contract person?

4       A    Right.

5       Q    So this is a quarter or so from the end of

6   that --

7       A    Right.

8       Q    From the end of her time.  You did look at

9   this document?

10      A    Yes.

11      Q    You chose it from -- because you don't keep

12  documents around, you said -- so you chose it from the

13  documents that you had on your computer?

14      A    Yes, from e-mails that I retained.

15      Q    Okay, and you chose two chains to look at?

16      A    I actually just chose whatever I had left.

17      Q    So the other ones don't exist anymore?

18      A    If there's -- there were a couple on there

19  that I actually had.  If there was anything else, no.

20  It doesn't.

21      Q    Okay, so the couple -- this one and another

22  one were the only ones you had left?

Page 41

1    A    Yes.

2    Q    Okay.  This one is March -- is a chain from,

3    as it happens, all March 23rd, 2006?

4    A    Right.

5    Q    When was the other one from?  The other chain?

6    A    I'd have to look at it to recall, I don't

7    recall --

8    Q    Was it after this one?

9    A    I don't recall.

10   Q    What did -- what did it talk about?  This one

11   deals with something like requisition reports by

12   division?

13   A    If --

14   Q    The ASB requisition, all by division, that's

15   what the -- the thing seems to be asking about.  What

16   did the other one ask about?  What was the subject of

17   the other one?

18   A    I really don't recall, other than it was about

19   contract matters.

20   Q    Well, it wouldn't have been about anything

21   besides that with Mary Bass, she was --

22   A    Exactly.

Page 42

1          Q     What I'm asking is, you've told us about some

2     contracts, this is not about a particular contract,

3     it's about something called --

4          A     This is --

5          Q     Where you're asking about the modifications

6     for a CDR -- the CDR modifications?

7          A     These are about contracts.

8          Q     Yes, I understand everything would be about

9     contracts, but it's not about contracts in general,

10    it's about --

11         A     Specific contracts that were in the pipeline

12    that they were supposed to be working on.

13         Q     In March, they being Mary and her --

14         A     And her group.

15         Q     Well, she tells you that there's one person in

16    her group -- her group is Mary and a CG8?

17         A     And Joan.

18         Q     Right.  That's the group.

19         A     Okay, well, whoever that is -- Mary and Joan,

20    these are the contracts that they were supposed to be

21    working on.

22         Q     Yeah, there's something about modifications?

Page 43

1      A    Those are contract modifications, yes.

2      **Q    Right, I understand --**

3      A    And requisitions, which are new contracts

4    requesting new, the letting of new contracts.

5      **Q    Okay, so, I'm asking you again.  You**

6    **looked -- when did you look at these two things, today,**

7    **before you came over?**

8      A    No, it's been -- I don't know, maybe a month

9    or two ago.  It's been a while ago.

10     **Q    Okay, so these two things -- there are two**

11   **things, two chains of e-mails that are on your computer**

12   **now, this one and another one?**

13     A    Yes, I believe they're still on there.  That's

14   why I'm going to go back, I will look on my computer,

15   and if I will have it, I will produce it.

16     **Q    Well there wouldn't be any more than that,**

17   **because you only saw two --**

18     A    No, there's no more than that, exactly --

19     **Q    A couple of months ago you pulled it -- and**

20   **you don't recall the other one's dates?**

21     A    No.

22     **Q    Okay.  Did Miss -- did you get any written**

Page 44

1    response from Ms. Bridges Steely or from Mr. Harris to

2    your e-mail?

3        A    To this e-mail?

4        Q    Yes.  You cc'd them when you sent the e-mail.

5    The middle e-mail is from you, and you cc'd -- it's to

6    Mary Bass, with cc to Thomas Harris and Ann Bridges

7    Steely.  Did you get anything written back?

8        A    I don't recall.  This is what I had on my

9    computer and this is what I reviewed, so if there was

10   something additional, I obviously didn't keep it.

11       Q    Okay.  Okay, I'm going to wait to see what

12   that is.  Is there any chance of you going to another

13   computer and getting what you have on yours?

14       A    The only problem -- we discussed that.  If I

15   go and log in here, I can't get back to my personal

16   folders, which is where this is.

17       Q    Gotcha.  So it's not possible to do it from

18   here?

19       A    No.

20       Q    Okay, just a thought.

21       A    We thought that, too.

22       Q    Okay.  Great minds think alike.

Page 45

1          MS. SARSHIK:  And fools seldom differ.

2          BY MR. SHAPIRO:

3      **Q    So do you recall any other complaints that you**

4  **had about Mary other than the ones that you've**

5  **recounted for me today?**

6      A    In terms of other issues other than the

7  timeliness?

8      **Q    Timeliness, of the -- particularly the**

9  **economist's contracts, the -- but also some other**

10  **things, and now we have some other things here --**

11      A    Yes.

12      **Q    In 2006.  Do you recall any other?**

13      A    Issues with her?  No.  Primarily for me, my

14  issues are if I've got contracts that aren't being

15  let --

16      **Q    No, I understand --**

17      A    -- or modifications not being done, that's --

18      **Q    I understand -- work not being done --**

19      A    Exactly.

20      **Q    But, have you now told us all the ones that**

21  **you can recall?  Remember I was going to ask you about**

22  **recollection?  Obviously there's an e-mail that you**

Page 46

1    don't have in front of you --

2        A    Right.

3        Q    But other than that e-mail, have you now told

4    us -- this e-mail or the other things that you told us

5    before we had this e-mail, have you now covered all the

6    things that you can recall about --

7        A    In terms of yes, the issues that I had with

8    the performance coming from this area.  It's all

9    centered around what I've told you.  Letting of the

10   contracts, timeliness, responsiveness, getting it done.

11       Q    Okay.  Okay.  Now, did you have a meeting with

12   Bridges Steely about these issues?

13       A    We talked on the phone.

14       Q    How many times?

15       A    At least three times I can recall.

16       Q    With regard to this e-mail?

17       A    With regard to issues with contracts.

18       Q    All right, so you don't recall when these

19   conversations on the phone were?

20       A    Right.

21       Q    But they were sometime before Mary Bass left,

22   or before Bridges Steely left?  Actually, more

Page 47

1    particularly?

2       A    No, they were before Mary left, because once

3    Mary left, I didn't have to contact her about Mary.

4       **Q    You didn't have to contact her about Mary.**

5    **Who took over Mary's function?  Tom did it directly, or**

6    **somebody else?**

7       A    Deena Weatherly.  I was -- Deena Weatherly is

8    the person who has taken over as our contract

9    specialist.  I was trying to recall if it was anyone on

10   the interim before they assigned her to us.  I'm not

11   sure.  I think there may have been like a month or two

12   where they had assigned while they were --

13      **Q    Well, Diane Weatherly didn't work for Mary,**

14   **right?**

15      A    No.  Deena Weatherly?  No.

16      **Q    She didn't work for Mary, she was in some**

17   **other unit?**

18      A    Yes.

19      **Q    Also under Tom?**

20      A    I don't know.

21      **Q    You don't know.  And whoever had it in**

22   **interim, it wasn't Joan, was it?**

Page 48

1      A    No.

2      Q    So that person didn't work for Mary, whoever

3  it was interim?

4      A    No.

5      Q    Worked for somebody else?

6      A    Right.

7      Q    Okay.  Did you have any meetings with Tom

8  Harris about the problems with getting contracts let?

9      A    Yes.

10      Q    Actual in person meetings?

11      A    Face to face.

12      Q    Yes?

13      A    Yes.

14      Q    And you had meetings with Mary Bass about it,

15  too?

16      A    Yes.

17      Q    Face to face?

18      A    Yes.

19      Q    The two of them together?  Bass and Harris

20  together?  That is, you, Bass, and Harris?

21      A    I know, I'm trying to recall meetings.  I'll

22  tell you what I recall -- for probably the first year

Page 49

1    of working with Mary, my meetings were primarily with

2    Mary, trying to work through the issues.  After that

3    point, in which they weren't being worked through, and

4    it was continuous, then I went to Tom.

5        **Q    And when that didn't work, you went to Ann**

6    **Bridges Steely?**

7        A    Yeah.  I went -- well, yeah.  Tom, and when

8    problems continued -- it wasn't -- for me, I will say

9    this is for me -- Tom could get the things done, but it

10   was always at the last minute or because it was urgent,

11   because it was messed up, etcetera, etcetera, and so I

12   took it to Ann Bridges Steely because I thought she

13   should be made aware of this.

14       **Q    And when did you do that?  After this?**

15       A    I think it was way before that.

16       **Q    Way before?  What does way mean?  Half a year?**

17       A    At least.

18       QQ   Okay, so at least six months before this?

19       A    At least, yeah.

20       **Q    More like nine months?  Mid 2005?**

21       A    I guess the best recollection I can have on

22   this is that it was roughly after a year, in which I

Page 50

1    then started going above to get assistance to get these

2    problems resolved --

3         **Q    With Tom?**

4         A    With Tom, and then with Ann.

5         **Q    And then with Ann later?**

6         A    Yes.

7         **Q    So -- so I'm saying, if this -- we have a date**

8    **on this?**

9         A    Right -- but if you want specifics, or

10   even -- I hate to say that, because it could have been

11   a year before this, it could have been nine months

12   before this --

13        **Q    It could have been six months before?**

14        A    Exactly.

15        **Q    All right, okay.  Good.  Best you can do is**

16   **six months, maybe a year?**

17        A    Roughly.

18        **Q    That's fair?**

19        A    That's -- yeah.

20        **Q    Okay.  And again, we're talking about when we**

21   **went to Bridges Steely?**

22        A    Yes.

Page 51

1    Q    Okay.  Any other documentation in your records

2    besides these two e-mail chains?  Of this problem?

3    A    No, because at this point I wouldn't -- I

4    wouldn't keep it.  Once my contracting issues were

5    straightened out.

6    Q    Okay.  What happened to Ms. Gustafson when

7    Mary left?  Ms. Gustafson stayed?  Or was she gone

8    already?

9    A    She went with her.

10    Q    She went with Mary?

11    A    I mean, they left around the same time.

12    Q    Ah, so you don't know if they went together,

13    but they left around the same time --

14    A    No, I don't think they went together, but

15    yeah, they left around the same time.

16    Q    They left around the same time?

17    A    Yes.

18    Q    Okay.  And who -- do you know who took Mary's

19    slot?

20    A    I don't know if -- I don't know how they --

21    Q    Right, you just know that your work was

22    assigned to somebody else and then to Ms. Weatherly --

Page 52

1      A    Weatherly.  Uh-huh.

2      Q    And that would have been sometime in two

3    thousand --

4      A    Six.

5      Q    And it would have been later than this --

6      A    Right.

7      Q    -- so it would have been some time second half

8    of 2006?

9      A    Yeah, I think some time in -- gosh, probably

10   like summertime or -

11     Q    Maybe even later?

12     A    Going into fall.

13     Q    Okay.  And how many -- how many people did

14   your contract work after that?  After Mary left?

15   Weatherly was in charge, but were there other people?

16     A    One.

17     Q    One other person?

18     A    It's her.

19     Q    Just her?

20     A    Yeah.

21     Q    And who was her boss?

22     A    Dave McDermott is her boss.

Page 53

1    **Q    Dave McDermott is her boss?**

2    A    Right.

3    **Q    And --**

4    A    He's akin to Tom Harris.  They're in the same

5    type of position.

6    **Q    So they took your work out of Tom Harris' unit**

7    **and gave it to Dave McDermott's unit?**

8    A    I think what they did is they had some type of

9    reorganization over there.

10    **Q    All right.  But you're -- Tom Harris is still**

11    **there?**

12    A    Yeah, but he doesn't work on our contracts, I

13    think he works on IT contracts now.

14    **Q    I see, so they took McDermott --**

15    A    They kind of --

16    **Q    They switched?**

17    A    Yeah.

18    **Q    And your contracts are not IT contracts?**

19    A    No.  No.

20    **Q    And do you still have the economist's**

21    **contracts?**

22    A    Yes.

Page 54

1     **Q    Right, and they -- how long a period are the**

2    **contracts for?**

3     A    The contracts -- most of the contracts are

4    written on an annual basis with the potential one-year

5    renewal.

6     **Q    All right.  So when did they start these**

7    **economist's contracts?**

8     A    You mean, like the first -- well --

9     **Q    Yeah, the first burst of economist's contracts**

10    **that you started letting?**

11     A    2004.

12     **Q    2004 was the first burst of them?**

13     A    Yes.  2004.

14     **Q    And there were just a couple of them in 2004,**

15    **and then they added more?**

16     A    No.  We were setting up the center for

17    financial research, which is a -- it's how we do our

18    research and get it out there to the academics and then

19    the rest of the economist's community.  And that was in

20    2004, and at that point, when we first started that,

21    there were roughly about five program coordinators and

22    five senior fellows, and a couple of what we call

Page 55

1    visiting scholars.  And that was -- that was 2004.

2        Q    That was the initial contracts?

3        A    Right.

4        Q    And these were let in 2004?  Or they were

5    planned for in 2004?

6        A    No.  I will be honest with you -- they were

7    supposed to be let in 2004; I think some of them were

8    let in like January of '05 --

9        Q    Okay.

10       A    Because we were having issues with getting

11   them done.

12       Q    Okay.  But were all the issues from the

13   contract people, or were some of the issues just issues

14   with the people with potential contracts, your own

15   units, people you were servicing?

16       A    No, I think the issues were -- this is when

17   like the issue started of timely response to the

18   potential contractors getting the information to them

19   to sign up and get things handled.

20       Q    Okay, so 2004 were the beginnings of these

21   contracts, this was a new contract --

22       A    The economic consultant.

Page 56

1    Q    A new kind of consultant contract that you

2    had?

3    A    Ah --

4    Q    Dealing with economists?  Economists?

5    A    New venue, but we had been dealing with

6    economist's contracts for some time.

7    Q    Sure.

8    A    Yeah.

9    Q    Like you said, some of the people are

10   economists but they're not hired in the economist's

11   vein?

12   A    Exactly.  Right.

13   Q    But these economists contracts were let and

14   were they all let by January 2005?  This first wave of

15   them?

16   A    I believe so, but I can't recall.  It would

17   have been roughly -- I'd have to go back and look at

18   the report of when they were all finally let.  I don't

19   think any went beyond like February.

20   Q    Right, and the complaints were the next wave

21   of them --

22   A    No, there were complaints in this --

Page 57

1      Q    I understand there were complaints, but that's

2   where you were dealing with Mary?

3      A    I was dealing with Mary with this wave.

4      Q    Yes --

5      A    In the second wave.

6      Q    In the second wave, and then the third wave

7   was when you finally elevated it to Tom?

8      A    No.

9      Q    When did you elevate it to Tom?

10     A    I think --

11     Q    You said for the first year, you dealt with --

12     A    The first -- the second wave -- because the

13  second wave would have come around like in 2005.

14     Q    Five, right -- after the contracts were going

15  for a year when you were renewing and that sort of

16  thing --

17     A    Right.  Exactly.

18     Q    So it would have been the mid to the end of

19  2005?

20     A    Yes.

21     Q    Right.

22     A    '04 also.  Let me clarify -- I hate to put

Page 58

1   timeliness on it, because, you know, I'm sorry, I just

2   don't have the full -

3       **Q    That's all right, I'm not trying to force you**

4   **to.  You said that they were supposed to be all let in**

5   **2004, but they were -- some of them weren't until**

6   **2000 -- January, 2005 --**

7       A   Or February of 2005.

8       **Q    Then that was the first wave --**

9       A   That was the first wave for the Center for

10  Financial --

11          MR. JONES:  Can she finish her answer before

12  you interject --

13          MR. SHAPIRO:  I'm not interjecting over, we're

14  communicating, here.

15          BY MR. SHAPIRO:

16      **Q    So it was the first wave and the second wave**

17  **you said you dealt with Mary?**

18      A   I'm trying to recall for the second wave if by

19  that time I had contacted Tom on any issues, and that I

20  can't recall.

21          MS. SARSHIK:  I'm going to object and ask you

22  that you allow her to finish her answer before you

Page 59

1    start another one.

2         MR. SHAPIRO:  Your objection is on the record.

3         Don't interrupt again.

4         MR. JONES:  Don't interrupt the witness, Mr.

5    Shapiro.

6         MR. SHAPIRO:  Excuse me, I'm perfectly

7    prepared to deal with both of you legal giants, but I

8    think I should only have to deal with one at a time,

9    all right?

10        MR. JONES:  Ask her if she's finished her

11   answer?

12        MS. SARSHIK:  Yes.  Are you finished with your

13   answer, Ms. Woolford?

14        THE WITNESS:  No, I'm trying to kind of

15   explain here and clarify.

16        The first wave of contracts when we first

17   started this process, it was for the summer of '04.  We

18   wanted the contracts to be let, originally, by

19   September of '04, and the reason was, is because we had

20   a very large conference in which we wanted to make the

21   announcement about the center and all of the people who

22   would participate.  That did not happen.  They were not

Page 60

1    let at that time, so we continued and Mary and her

2    staff -- that's Joan -- continued to work on them and I

3    think that the final ones in that first wave were done

4    no later than February.

5             BY MR. SHAPIRO:

6        Q    **2005?**

7        A    Of 2005.

8        Q    **Okay.**

9        A    So during that period, I was working with Mary

10   and Joan trying to get them to get on the stick and get

11   this accomplished, get this done, let's get

12   this -- because, again, you know, for me these are

13   these folks' first interaction with FDIC, and it was

14   not good.

15       Q    **Okay.**

16       A    So then, following that, as we continue on, in

17   between there and the second wave there are other

18   contracts that were let for like the scholars and any

19   other contracts for business we had.

20            Now, I continued to try to work with Mary and

21   try to work with them to get them up to speed, get them

22   to do the work, etcetera, and it was thereafter.  I

Page 61

1    can't specifically state whether it was prior to the

2    second wave of Center for Financial Research contracts,

3    or whether it was after that in terms of when I went to

4    Tom and said, this is not working, I need some help.

5        **Q    Okay, so it was either the second wave, which**

6    **was 2005 --**

7        A    Yes.  It was in 2005, I can tell you that.

8        **Q    Sometime after February 2005?**

9        A    Yes.

10       **Q    Okay.  And that's when you would have gone to**

11   **Tom, and then finally to --**

12       A    To Mary after that --

13       **Q    Not Mary, you mean --**

14       A    Oh, excuse me.

15       **Q    Steely.**

16       A    Ann Steely Bridges.

17       **Q    Right.  Or Ann Bridges Steely, as the case may**

18   **be?**

19       A    Yes.

20       **Q    All right.  And I take it the problem wasn't**

21   **resolved, fully, until this reorganization of some sort**

22   **in DOA, where the whole material moved from Tom's unit**

Page 62

1    to Dave McDermott's unit, and you got reassigned a

2    whole bunch of different people?

3        A    Well, I think before that reassign, before Tom

4    and Dave switched, in the interim, the person that was

5    assigned to us -- I'm having problems recalling his

6    name -- in that interim period for a couple of months

7    or so, that we worked with on contracts.  He was -- I

8    believe he was still under Tom.

9        Q    Okay.

10       A    It wasn't until after that that they did the

11   re-org and then --

12       Q    Right, but it wasn't -- right.  But it wasn't

13   somebody in --

14            MS. SARSHIK:  Had you finished your answer,

15   Ms. Woolford?

16            THE WITNESS:  Yes.

17            BY MR. SHAPIRO:

18       Q    But it wasn't somebody under Mary?

19       A    No, it was no one under Mary.

20       Q    Right.  The only person you knew of who was

21   under Mary was Joan Gustafson?

22       A    That's the only person I worked with under

Page 63

1    Mary.  That I know definitively was under her.

2         Q    **Right, and this would have all been after Mary**

3    **had left?  This guy --**

4         A    Yes.

5         Q    **Whoever his name was --**

6         A    Yes.  I just can't recall.

7         Q    **Okay.  Now, we were talking before we got into**

8    **all of this, we were talking about documents you may**

9    **have looked at in preparation for this deposition.**

10        A    Uh-huh.

11        Q    **Is there anything other than these**

12   **two -- these two e-mail chains that you've talked**

13   **about, one of which we've now seen?**

14        A    No.

15        Q    **Did you meet with anybody in preparation for**

16   **this deposition?  That is to say, to refresh your**

17   **recollection about the problems, or discuss -- anybody**

18   **from your staff?**

19        A    No.

20        Q    **Anybody above your level?**

21        A    No.

22        Q    **Okay.  Did you meet with Tom, for example, Tom**

Page 64

1    Harris, to talk about this?

2        A    No.

3        Q    Did you contact Bridges Steely to talk to her

4    about this?

5        A    No.

6        Q    Did you meet with anybody else to sort of

7    refresh your recollection, other than reviewing these

8    two chains, one of which we've now seen?

9        A    No.

10        Q    Okay.  And when was it that you reviewed these

11    two chains of e-mails?

12        A    Maybe a month or two ago.

13        Q    Okay.  And did you ever meet face to face with

14    Ann Bridges Steely?

15        A    Specifically to talk about --

16        Q    Any time.  Let's take any time first.  Do you

17    recall ever meeting --

18        A    Oh, yeah.

19        Q    When did you do that?

20        A    Yes, periodically we would meet when she would

21    come to discuss our contracts in ways -- like annually

22    they would come and sit down with us to talk about ways

Page 65

1    that they could improve service, talk about the amounts

2    of our contracts, the numbers, all of that kind of

3    information, and we would sit down and do planning for

4    the year.

5             I would also see Ann at meetings.  For the

6    corporation, different for new financial environment

7    meetings, or the acquisition service branch meetings

8    that we were discussing contractual issues in terms of

9    new procedures, polices, that kind of thing.

10        **Q    Okay.  And Mr. Harris, you dealt with him,**

11   **too, you saw him in meetings and regularly?**

12        A    Yes.

13        **Q    Okay.  And when would these annual meetings to**

14   **discuss contracting problems come, when would those be**

15   **held when you and others would meet with Ann Bridges**

16   **Steely and --**

17        A    They would schedule them on an annual basis

18   with our division, so --

19        **Q    At what time of year, is my question.  I**

20   **understand it was annual.  Was it in the summer, the**

21   **fall, winter, spring?**

22        A    I honestly do not recall.

Page 66

1    Q    When was the last one that they held?  Think

2    back if you can to the very last one, and tell me if

3    you recall -- was Ann Bridges Steely there at the last

4    one, or was it somebody else, because Ms. Bridges

5    Steely had left?

6    A    No, we've had planning meetings since Ann

7    Bridges Steely has left --

8    Q    So the annual meeting is what I'm talking

9    about, the one that you said it was an annual meeting?

10   A    Right.  I --

11   Q    Have you had that meeting since Ann Bridges

12   Steely left?

13   A    No, that was something that Ann started

14   to -- when she came to kind of meet the division, she

15   was new to the agency, to meet the divisions, and then

16   also she wanted to do it so she could improve service.

17   Q    Okay.  So she came to the agency when, in

18   2003?

19   A    I'm not sure.  I just --

20   Q    Okay.  Do you recall having a meeting -- how

21   many times do you recall having an annual meeting with

22   Ann Bridges Steely to improve the performance?  How

Page 67

1    many meetings of those type do you recall?

2        A    I recall us having two.  I can't recall if

3    there was a third one, but those are the ones that I

4    know definitively, I know we had at least two.

5        Q    And you would talk about Mary Bass' problems

6    that you had with Gustafson and Bass at any of those

7    meetings?  Let me say in either of those meetings that

8    you just recall.

9        A    We could not speak about anybody specifically

10   in those meetings.  Those meetings were more planning

11   and than to talk about improving service in terms of

12   ways that they could better help us with contracts and

13   consult with us and that kind of thing.  We would not

14   talk about individuals specifically.  That wouldn't be

15   the venue.

16       Q    Well, I don't mean about individuals.  I mean,

17   about the problems you were having with the economists'

18   contracts.  With economists you said they are

19   eccentric.

20       A    Would there be -- no, I can't even recall us

21   discussing and Ann apologizing for, you know, some of

22   the slowness of the contracts and ways that we can make

Page 68

1    this better, but --

2         Q    **We can make this --**

3         A    Yes.

4         Q    **I mean, you and the contract people?**

5         A    Yeah, we all work together.

6         Q    **Right.  Because there are things that maybe**

7    **you could have done to get your group -- I don't mean**

8    **you personally -- but your group, could have done to**

9    **help the contract people.**

10        A    I won't say no to that because I think anybody

11   can improve performance, but the issues were not on our

12   side of the house.

13        Q    **Okay.  As far as you saw them?**

14        A    As far as I know.

15        Q    **Yes, as far as you saw them.**

16        A    And I never received any complaints from the

17   contract staff on my folks.

18        Q    **Yes, okay.**

19        A    Or me because at that time I was heavily

20   involved.

21        Q    **The telephone conversation you had with Ann**

22   **Bridges Steely, there was just one about this?**

Page 69

1    A    No.

2    **Q    How many?**

3    A    I talked to Ann a few times on the phone.

4    **Q    Okay.  I want you to -- but you didn't have**

5    **any meetings with her about this, just telephone**

6    **conversations?**

7    A    I don't recall us having a face-to-face sit

8    down meeting about this.

9    **Q    Okay.  Well, let's go to the telephone**

10    **conversations.**

11    A    Uh-huh, yes.

12    **Q    Tell me about the first one, think back to the**

13    **very first one.  I want to know everything that**

14    **transpired to the best of your recollection.  Well, if**

15    **you can't remember anything, say I can't remember what**

16    **transpired.  I just know there was a conversation.  If**

17    **you can't remember, whatever you can remember, that's**

18    **what I want.**

19    A    I can remember making a call to Ann because I

20    was extremely frustrated over the slowness on the

21    letting of our contracts and not being a matter

22    resolved.  And that's pretty much the crux of the

Page 70

1    conversation, how do we get this through.

2            In talking to her I remember giving her

3    specifics in terms of the particular contact at that

4    particular time that I was calling about that was

5    problematic and that we had to get straightened out.

6        **Q    Did you mention any people on the contract**

7    **side, or did you just keep it to the issues?  Did you**

8    **mention Joan Gustafson?**

9        A    No, I mentioned Mary and Joan.

10       **Q    You did?**

11       A    Yes.

12       **Q    You're sure?**

13       A    I'm positive.

14       **Q    Quite sure?  All right.  Did you mention Tom?**

15       A    Mmm --

16       **Q    You'd been dealing with him, you said?**

17       A    Yeah, but I don't think I -- I don't recall

18   mentioning Tom.

19       **Q    Could it be that you didn't mention Mary, you**

20   **just mentioned Joan?**

21       A    No.

22       **Q    That could not be?**

Page 71

1     A     No.

2     **Q     Okay.**

3     A     Because in the line of work -- and that's how

4     I work, too -- my staff may start it, but I am

5     responsible for getting that work completed.

6     **Q     Which means that Tom was also responsible for**

7     **getting that work completed?**

8     A     Exactly, but Tom --

9     **Q     But you didn't mention him?**

10    A     Well, that's because Tom's a second-line

11    supervisor, he's not actually doing the work.  Mary is

12    actually involved in doing the work.

13    **Q     I see.  So you're quite sure you mentioned**

14    **Mary?**

15    A     I am positive.

16    **Q     Now remember --**

17          MS. SARSHIK:  Did you get to finish your

18    answer, Ms. Woolford?

19          BY MR. SHAPIRO:

20    **Q     Now, remember -- what I want is a**

21    **recollection, not, I must have, I certainly did -- not**

22    **context.  I want a memory?**

Page 72

1    A    You want memory --

2    **Q    Memory?**

3    A    I am giving you memory.

4    **Q    Okay.**

5    A    I recall specifically mentioning Mary Bass --

6    **Q    Good.  Okay.  And this was in the very first**

7    **conversation with Ms. Bridges Steely?**

8    A    Not my first conversation with her, but my

9    first conversation about contracting.

10   **Q    Yes, the first telephone conversation, that's**

11   **right, that's what I'm talking about.  And did you ever**

12   **mention Tom to her as not being able to get the whole**

13   **thing done or done quickly or done in an organized**

14   **manner or anything like that?**

15   A    I do not recall during the first -- whether it

16   was the first conversation or subsequent conversations

17   I had with her.  I did have conversations where we

18   specifically spoke about him resolving issues, but that

19   is not the way business should be done.  It should not

20   take me, you know, to go through two people to get

21   contracts worked out.

22   **Q    Okay.  And how many conversations do you have**

Page 73

1    on the telephone with Bridges Steely?

2        A    I don't recall.  I know at least three, but I

3    don't recall.  When we're talking about conversations,

4    excuse me, we are talking about --

5        Q    About these.

6        A    These conversations?

7        Q    These conversations, yes, absolutely.

8        A    I just wanted to be clear.

9        Q    And would you say that it was after the last

10   one that things started to improve?  Or after the first

11   one?

12       A    With Mary?

13       Q    That things started to -- that you were

14   getting better service?

15       A    I don't think service improved.

16       Q    Even with three conversations --

17       A    I --

18       Q    Let me finish -- even with the third

19   conversation with Bridges Steely?

20       A    Let me say this -- if you're referring to, did

21   we get our problems resolved, yes.  Ann made sure the

22   problems were resolved, Tom handled them, or Mary

Page 74

1    handled them -- they were handled, that was it.

2        Q    Okay --

3        A    But in terms of service improving after that,

4    that we didn't have to have conversations -- that never

5    occurred.

6        Q    Okay, until after -- until after it was

7    removed from Tom and --

8        A    Exactly, and the gentleman's name was Jim

9    Thompson.  That was the interim.

10       Q    Right, interim guy, and then when things came

11   to McDermott's group, that's when things --

12       A    It improved with Jim Thompson.

13       Q    It improved with Jim Thompson?

14       A    Yes.

15       Q    Okay.  And the issue -- so did the problems

16   get worked out, as you say -- service didn't improve,

17   but did the problems get worked out after the first

18   call you did with Bridges Steely, or after the last

19   call?

20       A    Whenever I would make a call, and deal with

21   specific issues, they would get worked out, they would

22   be handled and they would be handled appropriately --

Page 75

1      Q    By Tom or Mary?

2      A    By Tom or Mary.

3      Q    Okay.  It was -- it was doing that on a

4   regular basis, never improved until Mary left?

5      A    No.

6      Q    Right?  I'm correct?

7      A    You're not --

8      Q    The service didn't improve, the service as a

9   general matter didn't improve, until after Mary left?

10     A    Yes.

11     Q    And the matter went to whatever his name --

12     A    Jim Thompson.

13     Q    Somebody else under Tom as an interim, and

14   then it went to somebody under Dave McDermott?  And

15   then it's been fine since?

16     A    It's been great.

17     Q    Since then?

18     A    -- the service is --

19     Q    Perfect?

20     A    No one's perfect, but it's very good.

21     Q    Good.

22     A    We've had no problem with our contracts.

Page 76

1    Q    And that's been since a year ago?

2    A    I guess so.  I can't -- I'm thinking Deena may

3    have been -- I'm trying to think of my first

4    interactions with her on contracts with this matter.

5    Definitely goes back to 2000 -- well, I can't even say

6    that.  I don't know if it was the end of 2006 or the

7    beginning of 2007.

8    Q    So it might have only been half a year ago?

9    A    Yeah.  Whenever -- Jim Thompson was our

10   contract specialist only for a couple of months --

11   Q    Two months?

12   A    And then after that, when they did their reorg

13   or whatever they did, then Deena Weatherly has been

14   with us since then.

15   Q    And you can't remember when that was?

16   A    I can't remember specifically the date, no.

17   Q    Okay.  Good.

18        MR. SHAPIRO:  I don't have any other

19   questions.  Do you have any questions?

20        MR. JONES:  Let's take five.

21        (Brief recess.)

22        MS. SARSHIK:  We have no questions.

Page 77

1          MR. SHAPIRO:  The only problem I have is I

2     have to keep the deposition open because I don't have

3     this document now.  I might -- you notice I didn't have

4     very many questions about this document and I would

5     expect not to have very many questions about the other

6     document, but just in case I do --

7          MS. SARSHIK:  No, Mr. Shapiro, we will agree

8     to provide you any other document there is before Ms.

9     Steely's deposition.  You can ask Ms. Steely about

10    that, we're not agreeing to keep this deposition open.

11         MR. SHAPIRO:  I don't care whether you agree

12    or not.  We're keeping the deposition open and we're

13    adjourning it because I don't have the last document.

14         As I understand it there's only one other

15    document that this person looked at, and only one other

16    document on her computer.  When I say one document, I

17    mean a chain of e-mails, and one other chain, and I

18    doubt I'll have any questions about it, because I

19    didn't have hardly any questions about this chain, the

20    one we do have, but I'm going to keep the record open

21    just in case.  But I'll appreciate -- but obviously if

22    I get the document in the next day or two I'll be able

Page 78

1    to make a quick determination that there may not be any

2    more.  In which case I'll just simply say that there's

3    no need to keep the deposition open.

4            MS. SARSHIK:  Okay.  For the record, we are

5    not agreeing to produce Ms. Woolford again.

6            MR. SHAPIRO:  Okay, I'm not asking you to

7    agree to a damn thing, I'm telling you that this

8    deposition, because a document has not been provided,

9    is remaining open.  So I don't care whether you agree

10   or you don't agree.

11           MR. JONES:  We understand that's your

12   position.

13           MR. SHAPIRO:  That's our position.  Good.

14           (Whereupon, at 2:38, p.m., signature having

15   not been waived, the deposition of Andrea Woolford was

16   concluded.)

17           I have read the foregoing pages, which are a

18   correct transcript of the answers given by me to the

19   questions therein recorded.

20

21       Deponent_____

22       Date_____

Page 79

1                    CERTIFICATE OF NOTARY PUBLIC

2

3          I, Leanne M. Krivonak, the officer before whom

4    the foregoing deposition was taken, do hereby certify

5    that the witness whose testimony appears in the

6    foregoing deposition was duly sworn by me; that the

7    testimony of said witness was taken by me

8    stenographically and that I thereafter reduced it to

9    typewriting; that said deposition is a true record of

10   the testimony given by said witness; that I am neither

11   counsel for, related to, nor employed by any of the

12   parties to the action in which this deposition was

13   taken; and further, that I am not a relative or

14   employee of any attorney or counsel employed by the

15   parties thereto; nor financially or otherwise

16   interested in the outcome of the action.

17

18          _____

19          LEANNE M. KRIVONAK, CVR, CCR

20          Notary Registration Number  180129

21   MY COMMISSION EXPIRES:  11/30/2009

22